# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DISH NETWORK L.L.C.

      Plaintiff,

    v.

GABY FRAIFER, TELE-CENTER, INC.,
and PLANET TELECOM, INC.,
individually and together d/b/a
UlaiTV, PlanetiTV, and AhlaiTV,

      Defendant(s).

Case No. 8:16-cv-02549-EAK-TBM

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW Defendants, TELE-CENTER, INC. and PLANET TELECOM, INC. and GABY FRAIFER (hereinafter "TCI", "PTI", and "Fraifer" respectively), by and through undersigned counsel, hereby file Defendants' Motion for Final Summary Judgment on the Plaintiff's Amended Complaint[1], against Plaintiff, DISH NETWORK L.L.C., pursuant to Local Rule 3.01(b), Middle District of Florida, and hereby respectfully moves this Honorable Court to grant Defendants' Motion, and, in support thereof, states as follows:

## Statement of Case & Facts

TCI is a Florida corporation primarily conducting business in the wholesale and distribution of telecommunication products and devices, including but not limited to prepaid long distance, and prepaid wireless telecommunication products and devices. See Exhibits 1[2] and 2[3]. PTI is also a Florida corporation, structurally independent but operationally related to TCI by

---

[1] Doc 58-1; Plaintiff's Amended Complaint is defined later herein.
[2] See corporate formation documentation.
[3] See TCI Annual P&Ls for years, 2013, 2014, 2015 and 2016, along with sales breakdown.

providing technical support for all of TCI's distribution of products and devices. See Exhibit 1. Such products and devices certainly include all telecommunication products and devices and any relatively small revenue line items such as internet television products and smart electronic devices (as elaborated on below). See Exhibit 2[4]. Fraifer is the President of both TCI and PTI, acting always in his official officer capacity (for over 20 years, since corporate inception) and never acting in his individual capacity at any point whatsoever[5]. TCI is a very small company (with few employees) generating a substantial majority of its revenue primarily from telecommunications, which is wholly unrelated to the sale of the electronic devices such as set-top boxes or operating devices (as herein, defined).[6]

TCI expanded its distribution business in 2010-11, approximately, to include the wholesale, resale, and distribution of select electronic products from various vendors or manufacturers located outside of the United States, such as Cressida Telecom AB to distribute to end-consumers worldwide, namely to the United States[7], Canada, Australia and European countries etc. See Exhibit 3[8]. However, it was not until 2015 when TCI and PTI began wholesaling and distributing its privately labeled line of "UlaiTV" Android set-top box[9] and "AhlaiTV" Android set-top box[10] (hereinafter "STBs"). See Exhibit 2. TCI and PTI purchased these STBs from various vendors located outside of the United States, namely Lenkeng[11] and

---

[4] The sales associated with the IPTV products is less than 20% of the total sales of the company.
[5] On February 27th and 28th, 2018, the Fraifer, as President of TCI and PTI, explained that he acted within his officer capacity as President, always; see also Fraifer responses to discovery requests.
[6] See id; see supra, n. 3, and n. 4.
[7] Defendants' deposition on February 27 and 28, 2018, Gaby Fraifer, as President of TCI and PTI.
[8] Cressida Telecom AB is responsible for providing the channels from FTA source. See Exhibit 3, pp. 2-4. This process continued under the successor Vendors, collectively Lenkeng, Geniatech, and Netup; see also id.
[9] TCI's distribution of UlaiTV STB began in the middle of 2015, approximately. See Exhibit 2, sales breakdown.
[10] TCI's distribution of AhlaiTV STB began in late 2015, approximately. See Exhibit 2, sales breakdown.
[11] See supra, n. 8.

Geniatech (the "Vendors") using software applications (ex. Netup applications) for the STBs to access the internet. See Exhibit 3[12].

The STBs contain hardware and software, only, which consist of a smart electronic device receiver (and other various accessories) and an Android operating system equivalent to a regular computer, laptop, tablet or smart phone device. See Exhibit 3[13]. Each STB operating system application is received already pre-programmed for accessing the internet, pointing specifically to a set of uniform resource locators ("URLs") corresponding to hundreds of channels and programs already made available by the Vendors from the internet free-to-air (the "FTA")[14]. At all times, the Vendors provided the initial URLs pointing to various channels for customers or end-users, already made available on the internet by the Vendor (Lenkeng) and the applications Vendor (Netup) from an FTA source (accessible worldwide, including from the U.S.), and TCI and PTI were not involved in any way whatsoever with respect to this initial set of URLs (corresponding to FTA channels). TCI and PTI merely purchased from the Vendors and sold the STBs to TCI's customers[15] (after STB activation). After noticing that the output quality was unsatisfactory, TCI and PTI contracted with various content delivery networks ("CDNs") such as Verizon and Tulix to improve data output quality (which resulted in a new set of URLs

---

[12] See Vendor's websites and services therein — Lenkeng, http://www.lenkeng.net/ ; Geniatech, https://www.geniatech.com/ ; Netup, http://www.netup.tv/en/

[13] See invoices including line items showing various products; see also *supra*, n. 8. See Exhibit 8, pp. 8-21.

[14] See relevant channels available on the FTA sites worldwide, including the United States of America — www.mbc.net ; www.alarabiya.net ; www.mtv.com.lb ; www.aljadeed.tv ; www.nbn.com.lb ; www.lbcgroup.tv ; www.al-nahar.tv ; www.wwitv.com (including also IOS and Android application(s) list). It should be noted that the Android operating systems and mobile devices provide access to the internet, pointing to URLs which correspond to the Protected Channels (see *infra*, defined term pp. 4-5).

[15] Approximately, forty percent (40%) of the total number of TCI's sales of STBs were to customers located outside of the United States during the time period at issue; Defendants' deposition on February 27 and 28, 2018. Gary Fraifer, as President of TCI and PTI.

relating to the initial URLs, already provided and made available on the internet by the Vendors). See Exhibits 3 and 4[16].

Since early 2015, DISH Network LLC (the "Plaintiff"), as part of its joint-venture with NagraStar LLC and Nagravision SA, and by and through its affiliated entities, associations (i.e. "IBCAP"[17]), employees and agents, began purchasing the STBs and directing the "hacking[18]" into TCI's and PTI's network to unlawfully retrieve its network data and information violation of the end user license agreement (the "EULA"). See Exhibits 5[19] and 6[20]. Each of the Plaintiff's agents, employees and/or affiliated entities who purchased the STBs were required to agree to the EULA, wherein the EULA prohibits such "hacking" activity. (Docs 77-79); see Exhibit 6. Plaintiff's wrongful efforts to hack TCI's and PTI's network, by and through its joint venture agents or partners, resulted in an expert report issued by NagraStar LLC and Nagravision SA (Kudelski Security, division of Nagravision SA); Pascal Metral authored the Plaintiff's expert report as an employee of Nagravision SA. See Exhibit 7[21]. The Plaintiff's expert report asserts that the Defendants aired various audiovisual foreign works on the Protected Channels beginning in 2015[22]. (Doc 58-1).

The Plaintiff, by and through its affiliated entities, employees and agents, allegedly sent numerous notifications to TCI, PTI and the CDNs alleging copyright infringement and demanding that such activity cease. (Doc 58-1, pp. 5-6, §§ 23-24). Many of these notices went to

[16] See *supra*, n. 8.
[17] IBCAP – International Broadcast Coalition Against Piracy; see https://ibcap.us/
[18] Merriam-Webster Dictionary Definition of "Hack" is to gain illegal access to (a computer network, system etc.); see https://www.merriam-webster.com/dictionary/hack
[19] Kevin McMonnies is an employee of Nagrastar LLC; Sarah Weller, was a paralegal at Hagan, Noll & Boyle, which represents the Plaintiff; Mason Moreos purchased on behalf of an investigative agency, Ethos Risk Services. See also *infra*, n. 24.
[20] See screenshots showing the purchasing steps for each STB; each purchaser is required to check the box agreeing to the EULA or terms of use on the website.
[21] See Expert Report, authored by Pascal Metral of Nagravision SA (Kudelski Security is a business unit of Nagravision SA).
[22] See *Id.*, at 3.

various junk e-mail inboxes and were not received by the Defendants. (See Docs 125-27)[23]. The Plaintiff claims that these notifications continued for an extended period, but TCI and PTI only received a few notices and did not fully become aware of these notices until the CDNs brought the matter to TCI's and PTI's attention. See Exhibit 8 (containing correspondence sample). TCI and PTI fully cooperated with each of the CDN's requests in response to the Plaintiff's notices. See id. Nevertheless, the Plaintiff imposed its will by applying relentless pressure on the CDNs to cease service to TCI and PTI, employing bullying techniques and ultimately resulting in Verizon (CDN) deciding to terminate all services to TCI and PTI including those services completely unrelated to any channels, programs and/or any issues in this case. See id.

On or about September 1, 2016, the Plaintiff filed the "Plaintiff's Complaint For Damages and Injunctive Relief" (Doc 1) against TCI and Fraifer, and together d/b/a UlaiTV[24] and PlanetiTV for Direct Copyright Infringement under 17 U.S.C. §501. On or about February 16, 2017, the Plaintiff timely amended its complaint to include as party-defendant, Planet Telecom Inc. and d/b/a name AhlaiTV (hereinafter referred to as "Amended Complaint"). (Docs 58, and 58-1).

The Plaintiff's Amended Complaint alleges that the Plaintiff purchased from international channel networks, namely MBC FZ LLC ("MBC"), International Media Distribution (Luxembourg) S.A.R.L, ("IMD"), World Span Media Consulting, Inc. ("WSM"), Peninsula Production Company ("PPC"), Gulf DTH LDC ("Gulf"), and Dream Media ("Dream"), (collectively, the "Networks") "...the exclusive right to distribute and publicly perform the

---

[23] See Defendants' Amended Responses to the Plaintiff's Requests for Admissions; at Defendants' deposition on February 27 and 28, 2018, Gaby Fraifer, as President of TCI and PTI explained that many of the notices likely went to junk inboxes and were not received.
[24] On March 1, 2018, Izabela Slewikowska on behalf of Dish Network LLC (at deposition) explained that Dish Network LLC and/or its affiliates and Nagravision SA and Nagrastar LLC were part of a joint venture in its anti-piracy efforts.

works that air on..." the international channels identified in its Amended Complaint in the United States including "Al Arabiya., Al Hayah 1, Al Jazeera Arabic News, Al Nahar, Al Nahar Drama, Al Nahar Sport, Al Yawn, Dream 2, Future TV, Iqraa, LBC, LDC, MBC1, MBC Drama, MBC Kids (aka MBC3), MBC Masr, Murr TV (aka MTV Lebanon), New TV (aka Al Jadeed), Noursat, ONTV, and OTV (the "Protected Channels")[25] by means including satellite, over-the-top media distribution, internet, and internet protocol television. (Doc 58-1, p. 3, §13). While the Plaintiff provides a list of Protected Channels in its Amended Complaint, an exhaustive list of the foreign works allegedly infringed upon is not identified anywhere therein. See id.

The Plaintiff has produced various contracts purporting to be executed by each respective Network or its authorized agents/affiliates (the "Contracts") in support of its claim to the exclusive right to distribute and publicly perform the foreign works that air on the Protected Channels. See Exhibits 9, 10, 11, 12, 13 and 14. However, the Contracts contain many redactions, do not provide for the specific contract term or expiration date, and appear to be missing material information necessary to evaluate the content of each of the Contracts. See id. This is despite the Defendants' multiple requests for production and information. See Exhibit 15.

The Plaintiff has also produced a total of four (4) registered foreign works (with the United States Copyright Office) airing on the Protected Channels (the "Registered" foreign works)[26], along with "[A] vast number of additional, unregistered copyrighted works..." (Doc 58-1, pp. 3-4, §13); see also Exhibit 16. The Certificate of Registration for each of the four Registered foreign works reflect an effective date of June 21, 2016 ("Effective Date"), with the

---

[25] The Protected Channels consist of a total of 21 channels as listed herein. This is approximately 10% of the total channels accessible by the STBs (over 250 channels, approximately); Defendants' deposition on February 27 and 28, 2018, Gaby Fraifer, as President of TCI and PTI.
[26] The Registered works are episode specific - Sabah Al Khair Ya Arab, Number: Ep. #85 (Fed. Reg. #PA0001992320), Tasali Ahla Alam, Number: Ep. #51 (Fed. Reg. # PA0001992317), Saherat Al Janoub, Number: Ep. #15 (Fed. Reg. # PA0001992319), and Chef Hassan, Number: Ep. #289: (Fed. Reg. # PA0001992315).

date of first publication prior to this date as identified in each respective foreign country. See *id*; see also *supra*, n. 17.

The Plaintiff seeks injunctive relief under 17 U.S.C. §502, maximum statutory damages under 17 U.S.C. §504(c) for the alleged infringement for each of the identified Registered foreign works (among other things), but its actual damages and the discouragement of profits associated with the alleged infringement of the unregistered foreign works under 17 U.S.C. §504(b). (Doc 58-1, pp. 7-8). The discovery period has closed,[27] and this case is now ripe for dispositive motions[28].

## Standard of Review

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998). The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. *Id.*; see also *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); see also *Teevee Toons, Inc. v. Overture Records*, 501 F. Supp. 2d 964, 968 (E.D. Mich., 2007). The moving party may support its motion for summary judgment with affirmative evidence demonstrating that there is an absence of evidence to support non-moving party's case. See *Dream Dealers Music v. Parker*, 924 F. Supp. 1146, 1150 (N.D. Ga. 1996); see also *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

## Argument

---

[27] See this Court's Order, (Doc 131); see also this Court's Case Management Order, (Doc 50).
[28] Dispositive motion deadline extended by this Court to April 6, 2018, (Doc 131).

The Defendants contend that there does not exist a genuine issue of material fact with respect to any of the dispositive issues and allegations in the Plaintiff's Amended Complaint. See *id.*; see also (Doc 58-1). Specifically, the Defendants will explain to this Court why there does not exist a genuine issue of material fact with respect to the Plaintiff's claims for Direct Copyright Infringement under §501. However, should this Court rule against the Defendants with respect to the Plaintiff's claim for Direct Copyright Infringement under §501, in the alternative, the Defendants request that this Court rule as a matter of law in its favor with respect to: whether the Defendant acted "willfully" under §504(c) or whether any statutory relief is available; and whether Defendant Fralfer, individually, is liable for TCI's and PTI's alleged infringement activity.

## I.   Defendants Are Not Liable for Direct Copyright Infringement Under § 501.

"To make out a prima facie case of copyright infringement, a *plaintiff must show* that (1) it owns a valid copyright in the [work] and (2) defendants copied protected elements from the [work]." See *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1301 (11th Cir. 2008) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). *Emphasis added.* The United States Copyright Act (the "Copyright Act") grants authors the exclusive rights to: copying, preparation of derivative works, distribution, public performance, and public display. 17 U.S.C. § 106. The Plaintiff's enforcement of its alleged exclusive rights in the foreign works must satisfy a significant burden of proof, and, consequently, for the Plaintiff "To prevail on a copyright infringement claim, a plaintiff must show (1) that it owns a valid copyright in a work and (2) that the defendant violated one of its exclusive rights in the work. See §501(a). This Court, however, must first undertake a choice of

law analysis with respect to the *foreign works* in relation to the direct copyright infringement elements.

Where the copyright work was created abroad, the '[i]nitial ownership of a copyrighted work is determined by the laws in the work's country of origin.'" See *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290-92 (11th Cir. 2011); see also *Lahiri v. Universal Music & Video Distribution, Inc.*, 513 F. Supp. 2d 1172, 1176 (C.D. Cal. 2007)). However, there is no controlling authority regarding which country's law governs the issue of copyright transfer and infringement activity. See *Saregama India Ltd*, 635 F.3d at 1290-92; see also *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 88-92 (2d. Cir. 1998) (declining "to consider the choice of law issues concerning assignments of rights."). While the Copyright Act provides no guidance with respect to the choice of law principles, federal courts have looked to the "most significant relationship" based on the several factors in Section 6 of the Restatement (Second) of Conflict of Laws. See *Itar-Tass*, 153 F.3d 82, 91-92 (2d Cir. 1998); see also *Chau Kieu Nguyen v. JP Morgan Chase Bank, NA*, 709 F.3d 1342, 1345 (11th Cir. 2013) (stating that "federal common law follows the approach of the Restatement (Second) of Conflict of Laws"); see also *Dish Network, L.L.C. v. TV Net Solutions, LLC et al*, 2014 U.S. Dist. LEXIS 165120 at **8-11, Case No: 6:12-cv-1629-Orl-41TBS (M.D. Fla., November 25, 2014)[29] (applying the factors in Section 6 of the Restatement (Second) of Conflict of Laws in deciding that the United States is the country with "the most significant relationship" with the alleged copyright ownership and infringement activity with respect to each foreign work). Accordingly, United States law should govern the issues of ownership transfer and infringement activity. See *id*.

A.   The Plaintiff Has Not Established Ownership of An Exclusive Right.

---

[29] This case was decided according to the dispositive issues in the plaintiff's complaint on dismissal; not summary judgment.

United States law recognizes contracts as a proper means to acquire ownership of an exclusive right in copyright, audiovisual works. As to the validity of the transfers, which is determined pursuant to United States law, "ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law." See §201(d)(1). "Any of the exclusive rights comprised in a copyright . . . may be transferred . . . and owned separately, The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." See *id.*; see also §201(d)(2). To be valid, a transfer of copyright ownership must be "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Id.* § 204(a). Additionally, the Copyright Act's statutory standing provision requires that the plaintiff own an "exclusive right." *Id.*; see §501(b).

Plaintiff's Amended Complaint alleges Direct Copyright Infringement under §501 (Doc 58-1). The Plaintiff asserts that it entered into signed, written agreements with Networks "…granting DISH the exclusive right to distribute and publicly perform the works that air on the Protected Channels in the United States by means including satellite, OTT, Internet protocol television ("IPTV"), and Internet." (Doc 58-1, p. 3, §13). In furtherance thereof, the Plaintiff has provided redacted versions of the Contracts purporting to be executed by the Networks and/or its authorized agents or signatories. See Exhibits 9, 10, 11, 12, 13 and 14. However, these contracts are insufficient alone for the Plaintiff to establish that it has acquired an "exclusive right" for primarily the following reasons: (1) there is no conclusive contractual term covering the entire time period relevant to the alleged infringement activity; (2) the Contracts are not self-authenticating, and require additional evidentiary support to conclusively establish that the

Contracts were signed by each Network and/or its authorized agent[30]; and (3) the Contracts do not contain documentation or riders evidencing that the Networks actually owned the exclusive rights to air the foreign works on the Protected Channels, or that those Protected Channels possessed such rights in the foreign works allegedly being conveyed in the Contracts.[31] See Exhibits 9, 10, 11, 12, 13 and 14.[32] Defendants will address each of the above in turn with respect to the Contracts, but will first address a global issue regarding ownership in each of the alleged foreign works.

While the Plaintiff did identify the Protected Channels in its Amended Complaint, it did not provide a list of the foreign works airing on the Protected Channels. (Doc 58-1). The Plaintiff's alleged rights in each foreign work must begin with an ownership determination for each work giving rise to the Plaintiff's claims herein, and that such ownership remained exclusive and continuous throughout the relevant period. Not only has the Plaintiff failed to provide any documentation conclusively demonstrating its ownership in an exclusive right, the Plaintiff has also not provided conclusive documentation establishing that each of the alleged foreign works are copyright protected for purposes of its enforcement. If there is/was any break in ownership or exclusivity (or copyright protection) with respect to any of the foreign works during the relevant time-period, then it is uncertain as to whether the owners of the Protected Channels possessed the alleged rights conveyed to the Networks, and then subsequently from the Networks to the Plaintiff. For the Plaintiff to demonstrate an exclusive right under §106, the ownership chain for each of the foreign works must be direct, exclusive and continuous throughout the relevant period giving rise to its Amended Complaint. A party cannot convey a

---

[30] It must be emphasized each of the Contracts and amendments do not contain witness signatories, nor do they contain a notary acknowledgment or sworn verification.
[31] See language in 17 U.S.C. § 501(a)-(b). The contractual terms are also relevant to the alleged infringement activity analysis.
[32] See Plaintiff's production with bates stamps, PL002648-003072, PL 003562-003569).

right to another party it does not have. See §106; see also *Davis v. Blige*, 505 F.3d 90, 99-100 (2d Cir. 2007 (stating that "An owner may give a license to someone to exploit the work in some way, provided he owns that particular copyright interest.").

The Defendants certainly requested from the Plaintiff documentation supporting its alleged rights in the underlying foreign works giving rise to its Amended Complaint, which would include supporting documentation regarding the direct ownership chain, beginning from determining the exclusive ownership of the foreign works to the owners of the Protected Channels, and subsequently to the Contracts executed by the Networks and Plaintiff. See Exhibit 15. Unfortunately, each time, the Plaintiff refused to provide anything material other than the Contracts (with redactions), See *id.*

With respect to the Plaintiff's contracts and amendments with network International Media Distribution (Luxembourg) S.A.R.L. (the "IMD Contract")[33], the contract term is redacted and is not provided despite the Defendants' numerous requests to the Plaintiff. See Exhibit 9[34]; see also *supra*, n. 16. Furthermore, the IMD Contract limits the exclusivity of the alleged right being conveyed by setting forth numerous restrictions in paragraph 7, so it is very clear from the beginning that there exist exclusivity restrictions, and there are no absolutes with respect to the alleged rights during the contractual term (yet, to be defined). See *id.* Of importance is the non-exclusive language used for distribution on the World Wide Web (this definition appears to accurately capture TCI's and PTI's operations as the STBs point to URLs on the internet)[35] See *id.*, at PLs 002899-90. Moreover, under subsection (iii) it appears that the IMD network can offer the distribution rights to a third party during the term of the Contract but there are certain

---

[33] See Exhibit 9 – See PLs 002869-002896, 002897-002957 - the Protected Channels include: Al Hayah 1, Murr TV, New TV, Noursat, ONTV, OTV, Iqraa, LBC, LDC, and Future TV.
[34] See Paragraph 3 in PLs 002958-2959, and all subsequent amendments – PLs 002958 – 2957.
[35] The STBs contain hardware and software, which point to a URL on the World Wide Web as more fully described in the IMD Contract definitions.

provisions for the Plaintiff. See *id.* Based on a plain reading of these provisions, it is very much unclear as to whether the Plaintiff possessed the alleged rights during the relevant period, or, if the Plaintiff did possess such rights, it is inconclusive as to the applicable time period or whether such ownership was exclusive and continuous throughout the contractual term (which has yet to be disclosed and/or defined). Documentation regarding the Plaintiff's payments made under the IMD Contract would be helpful, but, despite the Defendants' multiple requests for said documentation the Plaintiff has failed to provide anything material leaving only the Contracts with redactions. See also Exhibit 15. The Plaintiff has failed to provide the Defendants with a single document establishing that its alleged rights under the IMD Contract to the foreign works airing on the Protected Channels were never discontinued and remained fully intact during the contractual term (yet to be defined). Also, it must be emphasized that the Defendants did not intercept or interfere in any way whatsoever with the encrypted service (the "IMD Service") referenced in the IMD Contract. The IMD Service allegedly being conveyed in the IMD Contract is the spirit and purpose of the IMD Contract, and even though the Plaintiff's alleged exclusive right is in said IMD Service (per IMD Contract), the Defendants did not violate, intercept or interfere with the encryption associated with said IMD Service and/or its public performance and/or display median.[36]

The Plaintiff's contract and amendments with MBC FZ LLC present much of the same issues. See Exhibit 10, at PL 002958-003072 (the "MBC Contract")[37]. The MBC Contract fails to provide the specific contract term governing the alleged rights being conveyed and corresponding payment schedules. See *id.* Despite the alleged grant of rights in the MBC Contract, the provisions in section 3 provide for the Plaintiff's discretion to elect a remedy (this

---

[36] See *supra*, n. 8.
[37] See Exhibit 10 – the Protected Channels include: Al Arabiya, MBC 1, MBC Drama, MBC Kids and MBC Masr.

13

is redacted, and somewhat difficult to interpret) should a third party acquire the rights allegedly being conveyed in the MBC Contract. See Exhibit 10, PL 002965-002967. The MBC Contract also provides for the MBC network to provide documentation to the Plaintiff confirming it has controlling rights throughout the contractual term, and, yet, despite the Defendants' multiple requests, the Plaintiff has failed to provide any such documentation apparently within its grasp. See id.; see also Exhibit 15. Moreover, the Plaintiff has refused to disclose the material information redacted in the MBC Contract (such as the contract term), nor any documentation disclosing or confirming any payments made thereunder or that the contract was signed by the Network or its authorized agent or signatory. Also, again, it must be emphasized that the Defendants did not intercept or interfere in any way whatsoever with the encrypted service (the "MBC Service") referenced in the MBC Contract. The MBC Service allegedly being conveyed in the MBC Contract is the spirit and purpose of the MBC Contract, and even though the Plaintiff's alleged exclusive right is in the MBC Service (per MBC Contract), the Defendants did not violate, intercept or interfere with the encryption associated with said MBC Service and/or its public performance and/or display median.[38]

Similarly, the Plaintiff's contracts and amendments with World Span Media Consulting, Inc. ("WSM Contract")[39], Peninsula Production Company ("PPC Contract")[40], Gulf DTH LDC ("Gulf Contract")[41], and Dream Media ("Dream Contract"); (collectively, "these Contracts")[42] all reflect the same irregularities. Similar to the IMD Contract and MBC Contract, these Contracts fail to identify the entire contractual term, with the termination date always redacted along with

---

[38] See supra, n. 8.
[39] See Exhibit 11 – See PLs 002726-002771 – the Protected Channels include: Al Nahar, Al Nahar Drama, and Al Nahar Sport.
[40] See Exhibit 12 – See PLs 002686-002724 – the Protected Channels include: Al Jazeera Arabic News.
[41] See Exhibit 13 – See PLs 002772-002799; the Protected Channels include: Al Yawn.
[42] See Exhibit 14 – See PLs 002800-002868; the Protected Channels include: Dream 2.

other material sections such as payment schedules etc. See Exhibits 9, 10, 11, 12, 13, and 14. Moreover, these Contracts outline provisions addressing the occurrence of the third parties acquiring the rights allegedly conveyed therein and limit the exclusivity of the alleged rights in the foreign works airing on the Protected Channels. See Exhibit 11, PLs 002738-40; See Exhibit 12, PLs 002697-99; See Exhibit 13, PLs 002773-00281; See Exhibit 14, PLs 002806-07[43]. And, despite the Defendants' requests during discovery (see Exhibit 15), the Plaintiff has failed to provide a single document confirming that the alleged rights in the foreign works airing on the Protected Channels purportedly being conveyed in the WSM Contract, PPC Contract, Gulf Contract, and Dream Contract were never subsequently conveyed to third parties (by the Networks). Also, again, it must be emphasized that the Defendants are not intercepting or interfering in any way whatsoever with the encrypted service as defined in these Contracts. The service described therein is the spirit and purpose of these Contracts, even though the Plaintiff's alleged exclusive right is in said service (per these contracts), the Defendants did not violate, intercept or interfere with said service and/or its public performance and/or display median.[44]

Based on the foregoing, a plain reading of the Contracts and amendments alone do not establish that the Plaintiff owned an exclusive right in the foreign works airing on the Protected Channels during the relevant period, nor do they establish on its face that the Plaintiff's alleged rights were infringed upon during the alleged time-period without any identified contract term (redacted). Also, despite the Defendants' numerous requests for production, the Plaintiff has failed to provide a single document substantiating the payments made under the Contracts and has also failed to provide confirmation that the Network signatory for each respective contract is signed by an authorized agent on behalf of the Network; no witness signatories, notary

---

[43] See Section 2.1 regarding internet, non-exclusivity or exclusivity limitation.
[44] See *supra*, n. 8.

acknowledgments nor sworn verifications. See Exhibits 9, 10, 11, 12, 13 and 14. The Plaintiff has also failed to provide any documentation conclusively establishing that each Network legally owned and/or acquired from the Protected Channels the exclusive rights to distribute and publicly display each of the foreign works during the entire duration of the contractual term (yet to be defined) for each respective contract. Such documents would include, but certainly not be limited to those contracts, agreements and/or assignments between the Networks and Protected Channels, and, subsequently the applicable agreements between the Protected Channels and the owners of the foreign works.

Without adequate and proper evidentiary support establishing the direct chain of ownership of the purported exclusive right in each of the foreign works, beginning from the initial owner of each of the relevant foreign works to the Plaintiff as required under §201(d)(1), the Plaintiff's claim to exclusivity is unsubstantiated for the relevant time-period and should be deemed unenforceable under the Copyright Act. The Plaintiff's contracts with the Networks alone cannot establish that the Plaintiff acquired the exclusive right to distribute and publicly perform the alleged foreign works aired on the Protected Channels. And, without establishing ownership of an exclusive right under the Copyright Act, the Plaintiff cannot have standing under §201 and prevail on the merits of its claim for direct copyright infringement under the Copyright Act.

B. The Defendant Did Not Infringe on the Plaintiff's Rights

"[T]he owner of [a] copyright...has the exclusive rights to . . . distribute copies . . . of the copyrighted work to the public," "to perform the copyrighted work publicly," and "to display the copyrighted work publicly." 17 U.S.C. § 106. "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright," and the owner of the copyright may

"institute an action for any infringement of that particular right committed while he or she is the owner of it." § 501.

Assuming, arguendo, that the Plaintiff establishes a valid ownership of an exclusive right under § 106, the Plaintiff still has not adequately established that the Defendants infringed on its exclusive right. The Plaintiff's Amended Complaint advances numerous allegations that the Defendants "...capture live broadcast signals of the Protected Channels, transcode these signals into a format useful for streaming over the Internet, transfer the transcoded content to one or more servers provided, controlled, and maintained by Defendants, and then transmit the Protected Channels to users of their Services through OTT delivery, including users in the United States." (Doc 58-1, p. 5, §21). However, while the Plaintiff has provided numerous documents in discovery, the Plaintiff has failed to provide a single document that conclusively establishes that the Defendant 'provided, controlled, and maintained any server for the alleged transcoded content'. Moreover, the Plaintiff's failure to provide the specific term for each contract in which the Plaintiff alleges grants it the exclusive right relevant to the time-period at issue certainly presents more questions than answers as to whether or when the Plaintiff's possessed the alleged rights and whether the Defendants infringed upon those rights during the relevant period. See Exhibits 9-14.

The Defendants merely purchased from the Vendors the STBs and sold to the consumers worldwide including those located in the U.S. and had no responsibility with respect to the setup of the initial URLs. See Exhibits 3 and 4[45]. And, while the Defendants TCI and PTI did engage the CDNs to improve the quality of the initial URLs, the Defendants were only go-between facilitators or points of contact between the CDNs and Vendors regarding this process. See Exhibit 3 and 4. The Defendants TCI and PTI sold the STBs provided by various Vendors along

---

[45] See *supra*, n. 8.

with the initial set of URLs (also provided by said Vendors). See *Cartoon Network LP, LLLP*, 536 F.3d at 131-33 (requiring more than ownership of a machine used by other to make illegal copies to establish direct liability under the Copyright Act). The Vendors manufacture the STBs and create the initial URLs making the alleged "works" available on the internet to potential consumers worldwide including to those consumers located the United States. See Exhibits 3 and 4[46]. TCI and PTI do facilitate communication with Vendors and CDNs to improve the data output quality of what is already made available by the Vendors on the internet; this is the by-product of this interaction. See Exhibit 4.

Additionally, all of the alleged servers are provided, controlled and maintained by entities located *outside* of the United States, and, at no point whatsoever were such attributable to the Plaintiff. See Exhibits 3 and 4. While the Plaintiff produced an export report authored by Pascal Metral, on behalf of the Plaintiff's joint-venture partners, Nagravision SA, and NagraStar LLC, the report content and findings are easily challenged, inconclusive, and clearly bias and therefore unreliable[47]. Moreover, the report was generated by the unlawful intrusion and "hacking"[48] of the Defendant's network and therefore taints the reliability of its content (among other things).

Regardless, the Plaintiff must show a direct ownership link between the Network's exclusive ownership in the foreign works airing on the Protected Channels allegedly conveyed in the Contracts, including the contractual term or applicable time period, along with a material showing that the Defendants infringed on those rights warranting protection under the Copyright Act. This would certainly include documentation conclusively establishing that the Network possessed the rights from the Protected Channels and owners of the foreign works during the entire term of the Contracts. Nothing has been provided to date. Without the existence of such

---

[46] See *id.*
[47] See Rule 702, of the Federal Rules of Evidence.
[48] See *supra*, n. 14.

evidentiary support, the Plaintiff cannot have standing under §201 and prevail on the merits of its claim for Direct Copyright Infringement under §501. For the foregoing reasons, this Court should find that there does not exist a genuine issue of material fact with respect to the dispositive issues underlying the Plaintiff's Amended Complaint, and rule in favor of the Defendants' as a matter of law. See *Dream Dealers Music*, 924 F. Supp. at 11450; see also *Fitzpatrick*, 2 F.3d at 1116-17.

## II.   Plaintiff Does Not Have Any Right to Maximum Damages Under §504(c)

The Plaintiff seeks maximum statutory damages under §504(c) for each of the four Registered foreign works based on unsupported allegations that the Defendants were "willful" in infringing on the Plaintiff's allegedly acquired exclusive rights under §106. Assuming, that this Court finds that there does indeed exist a genuine issue of material fact with respect to the dispositive elements of the Plaintiff's claim against the Defendants for Direct Copyright Infringement under §501, this Court should find that no such issue exists with respect to whether the Plaintiff is entitled to statutory damages under §504(c) and/or whether the Defendants' acted "willfully" under this section. This is true for the following two reasons: (1) Defendants' alleged actions do not constitute as "willfulness" under §504(c)(2); and (2) Defendants' alleged activity with respect to the four Registered foreign works commenced *prior* to effective date of these Registrations and remained *continuous* thereafter.

### A.   The Defendants' Did Not Act Willfully Under 304(c)(2)

"[I]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed *willfully*, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." See §504(c)(2). *Emphasis added*. However, merely proving willfulness does not automatically entitle a copyright holder to

the statutory maximum under 504(c)(2) as this Court has emphasized that it retains *broad discretion* to determine an appropriate damages figure in each case. See *Quartet Music v. Kissimmee Broadcasting, Inc.*, 795 F. Supp. 1100, 1105-06 (M.D. Fla. 1992) (noting that the district court may exercise wide discretion in determining statutory damages). *Emphasis added.*

"To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005). This Court has stated that willfulness under the Copyright Act "means that the defendant 'knows his actions constitute an infringement; the actions need not have been malicious.'" See *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990) (quoting *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1988)). The Defendants did not have "actual knowledge", nor act with "reckless disregard" sufficient to constitute as willfulness under §504(c).

    i.    <u>Defendants Did Not Have Actual Knowledge of the Alleged Infringement Activity</u>

While the Defendants acknowledge receiving a few of the Plaintiff's notices containing allegations of copyright infringement, the Defendants simply did not understand the content of these notices, and, moreover even after reviewing the content is was very much unclear whether the Plaintiff possessed the rights alleged in said notices.[49] This is especially true when considering the Defendants, along with the entire worldwide community including those located

---

[49] Defendants' deposition on February 27 and 28, 2018, Fraifer as President of TCI and PTI explained that many of the notices likely went to junk inboxes and were not received; and, for those notices he did receive, the content was not readily understood. Fraifer did explain that English is not his native language.

in the United States were able to access the Protected Channels airing the foreign works[50] from FTA[51] sources on the internet.[52] The content of these notices were confusing and somewhat difficult to understand.[53] Additionally, English is not Fraifer's native language which places a significant and material impediment to his actual knowledge of any infringement activity or ability to understand the content of these notices. In short, the Defendants did not possess the requisite knowledge during the alleged infringement activity.

      ii.      Defendants Did Not Act With Reckless Disregard, But In Good Faith At All Times

Establishing a reckless state of mind in a copyright case requires a showing that the infringer possessed particular knowledge from which willfulness could be inferred from such conduct. See *Walt Disney Co. v. Video 47, Inc.*, 972 F. Supp. 595, 604-05 (S.D. Fla. 1996) (considering an important factor by stating "[A]n award of 'substantial damages,....is appropriate where the Defendant repeatedly violates copyright laws despite actual knowledge of their licensing requirements."). Courts have held that a finding of willfulness under the Copyright Act is also appropriate where a defendant recklessly disregarded the possibility that it was infringing a copyright. See *Olem Shoe Corp., v. Wash Shoe Corp.*, 591 Fed. Appx. 873, 877-78 (11th Cir. 2015) (acknowledging that "the District Court adopted a rule from the Second Circuit, that willfulness can be found where a party "recklessly disregarded the possibility" that it was infringing a copyright"); see also *RCA/Ariola Intern., Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 779 (8th Cir. 1988) (stating that "[O]ne who has been notified that his conduct

---

[50] See *supra*, n. 8.

[51] See *supra*, n. 14 – The Defendants were always under the impression that the Protected Channels were available in the United States from FTA sources on the internet.

[52] See *id.*

[53] See *supra* n. 12.

constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful',.."),

The Defendants simply did not have knowledge that its alleged conduct either amounted to infringement activity or that it was even possible that such activity could amount to copyright infringement rising to the level of 'reckless disregard'. While the Defendants' received a few notices, the Defendants did not understand the content of these notices until well *after* working with the CDNs in good faith to satisfactorily resolve the issues raised. See Exhibits 4 and 8. Once the Defendants retained legal counsel, the Defendants immediately began to take the necessary steps to cease the alleged activity with legal process then pending (as evidenced by the Plaintiff's legal action). The entire process ceased shortly thereafter.

It should be emphasized that the Defendants have never been associated with any allegations of copyright infringement prior to this matter, and, consequently, they had no prior point of reference when receiving the alleged notices. When determining that the infringement is willful, "deterrence of future violations is a legitimate consideration" because "'defendants must not be able to sneer in the face of copyright owners and copyright laws.'" *International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988). The Defendants acted in good faith, and, it should be noted that the Defendants are not repeat offenders in any way. They did not "...[s]neer in the face of copyright owners and copyright laws." See *id.*

Taking all factors into consideration, including the foregoing and the FTA availability of the Protected Channels airing the foreign works in the United States, the Defendants acted reasonably, and in good faith under the circumstances and their actions do not constitute 'reckless disregard" with respect to the Plaintiff's (alleged) rights. The Defendants' actions did not amount to "willful" conduct under §504(c).

B. The Plaintiff is Not Entitled to Relief Under §504(c).

"A plaintiff is not entitled to recover statutory damages, which include costs and attorneys' fees, for any infringement of plaintiff's copyright that commenced prior to the effective date of copyright registration, regardless of whether the infringement continues after the effective date of copyright registration." *X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 227 F. Supp. 2d 494, 527-28 (E.D. Va. 2002) see also *Johnson v. University of Virginia*, 606 F. Supp. 321, 324 (W.D. Va. 1985) (holding that the recovery of statutory damages and attorney fees is barred for an infringement of photographs that occurred before the copyright was registered, and continuing use of photographs after registration does not reestablish); see also *Teevee Toons, Inc.*, 501 F. Supp. at 968 (ruling that the plaintiff was not entitled to statutory damages under §504 and attorney's fees under §505, after finding no genuine issue of material fact as to the defendant's activity commencing prior to the copyright registration date).

The Plaintiff provides copies of the Registered foreign works showing an Effective Date of June 21, 2016. See Exhibit 16; *supra*, n. 16. Each of these Registered foreign works are episode specific, reflecting a date of first publication well before the Effective Date in the country of origin – (1) Saherat Al Janoub, No., Ep. #15, reflecting a date of first publication of April 14, 2016 in the United Arab Emirates ("UAE"); (2) Tasali Ahla Alam, No, Ep. #51, reflecting a date of first publication of April 18, 2016 in the UAE; (3) Sabah Al Khair Ya Arab, No. Ep. #85, reflecting a date of fist publication of May 3, 2016; and (4) Chef Hassan, No. Ep. #289, reflecting a date of first publication of April 16, 2016. See *id.* Each of these Registered foreign works are each a separate "work". See *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993) (acknowledging that the Copyright Act does not define "work" but

instead applies an independent test for viability, and recognizing a "work" if it is independently copyrightable); see also *MCA TV, LTD v. Feltner*, 89 F.3d 766, 769-70 (11th Cir. 1996).

After carefully reviewing the Plaintiff's Amended Complaint and its corresponding documentary support for the alleged infringement activity, it is very clear that even after accepting the Plaintiff's claim that the Defendants distributed or publicly performed the foreign works airing on the Protected Channels beginning in 2015, such alleged infringement activity *commenced* at the time of first publication indicated in each of the Certificates of Registration which is *prior* to the Effective Date and continued thereafter. (Doc 58-1). The rationale applied in the Court's decision in *X-It Prods., L.L.C.* should also be applied in this case, and, consequently, the Plaintiff should be not afforded the opportunity to seek statutory relief for these works, or any relief for that matter under § 504(c) and related relief under §505.

For the foregoing reasons, there does not exist a genuine issue of material fact with respect whether any statutory relief is available to the Plaintiff under § 504(c) (and related relief under §505) as the Defendants' alleged conduct commenced prior to the Effective Date of the Certificates of Registration. See *X-It Prods., L.L.C.*, 227 F. Supp. 2d at 527-28; see also *Teevee Toons, Inc.*, 501 F. Supp. at 968. However, if this Court rule against the Defendants on this issue, it should find that there is no genuine issue of material fact as to whether Defendants' conduct amounts to "willful" under §504(c) for the reasons previously advanced herein. See *Dream Dealers Music*, 924 F. Supp. at 11450; see also *Fitzpatrick*, 2 F.3d at 1116-17.

III.    **Plaintiff Has Failed to Establish Any Liability on Behalf of Fraifer, Individually**

Officers of a corporation may be held individually liable for the corporation's copyright infringement. *See Southern Bell Tel. & Tel. Co. Associated Tel. Directory Publishers*, 756 F.2d 801-811-12 (11th Cir. 1985) (stating that "An individual, including a corporate officer,

24

who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement."); see also *Shady Records, Inc. v. Source Enters.*, 2004 U.S. Dist. LEXIS 26143 at 77-78** 03 Civ. 9944 (GEL) (S.D. NY, January 3, 2005) (acknowledging that "directors and officers may not be held liable based solely on a theory of control of the corporate entity,...).

While the Defendant Fraifer is the President and sole shareholder of TCI and PTI, it must be emphasized that Fraifer did not earn and or receive any salary, distribution and/or dividend in direct relation to the sale of the STBs nor directly related to the alleged infringement activity. See Exhibits 1 and 2[54]. TCI certainly did not heavily profit from the sales of the STBs, and such monetary value was a relatively small part of TCI's entire business during the relevant time-period[55]. And, it must be emphasized that Fraifer did not make each and every (day-to-day) decision with respect to the alleged infringement activity. When considering all factors and circumstances, Fraifer did not possess the requisite involvement nor direct financial interest with respect to TCI's and PTI's alleged infringement activity and should not be held individually liable as there does not exist a genuine issue of material fact as to whether such elements could be found.

## CONCLUSION

Wherefore, for the foregoing reasons the Defendants respectfully request that this Honorable Court grant the Defendants' Motion for Final Summary Judgment on the Plaintiffs' Amended Complaint for Direct Copyright Infringement under §501, as there does not exist a genuine issue of material fact with respect to all dispositive issues related thereto. However, in the event that this Court finds that a material fact does exists with respect to the Plaintiff's claims

[54] See Defendants' deposition on February 27 and 28, 2018, Gaby Fraifer, as President of TCI and PTI.
[55] See *id.*; See *supra*, n, 3, and n. 4.

25

under §501, then this Court should not find the same with respect to the whether the Defendants' conduct constitutes as "willful" under §504(c) and/or whether any statutory relief is available to the Plaintiff under §504(c) and related relief under §505; and whether Fraifer, individually, is personally liable for TCI's and PTI's alleged infringement activity.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of April, 2018, I electronically filed the foregoing document through the US District Court CM-ECF filing system which will electronically send copies to Plaintiff, by and through its counsel.

/s/ Frances R. Lakel Esq.
Frances R. Lakel, Esquire
P.O. Box 331120
Miami, Florida 33233
FBN: 351237
Attorney for the Defendants