# Exhibit 11

Execution

# INTERNATIONAL AFFILIATION AGREEMENT

*Al Nahar*
*Al Nahar Drama*

This International Affiliation Agreement, including, without limitation, the Standard Terms and Conditions attached hereto (the "Agreement"), is made and effective as of August 26, 2014 (the "Effective Date") by and between DISH Network L.L.C., a limited liability company organized and existing under the laws of the State of Colorado, having a place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112 USA ("DISH") and World Span Media Consulting, Inc., a corporation organized and existing under the laws of California, having a place of business at 4919 Hidden Dune Court, San Diego, CA 92130 USA ("Network"). Each of DISH and Network may be referred to in this Agreement as a "Party" and, together, as the "Parties."

## RECITALS

WHEREAS, DISH has established multi-channel video distribution platforms for the distribution of programming services; and

WHEREAS, Network desires to grant, and DISH desires to obtain, the rights to distribute the Services and the VOD Content (each, as defined below);

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties mutually agree as follows:

## PART A
## TRANSACTION INFORMATION

**Launch Date:** Subject to Network's compliance with Section 5(a)(i) of the Standard Terms and Conditions, DISH shall launch, no later than ■■■■ following the Effective Date: (1) the *Al Nahar* Service on DISH's DBS portion of the Distribution System and (2) the *Al Nahar Drama* Service on DISH OTT.

**Expiration Date:** ■■■■

**Required Package:** For the *Al Nahar* Service only: the "Arabic Super Elite Pack" on the DBS portion of the Distribution System

**Network Notice Information:**

World Span Media Consulting, Inc.
4919 Hidden Dune Court
San Diego, CA 92130 USA
Facsimile: (858) 793-1739

Confidential             Page 1 of 41                DISH *CW*   Network *HE*

PL 002725

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

## PART B
## SERVICES INFORMATION

**Services Names:** Al Nahar, Al Nahar Drama

**Service Language:** Arabic

**Commercial Advertising:**

**Avails:**

**Cue Tone Delivery Date:**

**Direct On-Air Sales Programming:**

None permitted

**Repetition Limitation:** Network shall ensure that, at all times during the Term, at least: (i) ▌▌▌▌▌▌▌▌▌ of the hours of the programming on the *Al Nahar* Service and (ii) ▌▌▌▌▌▌▌▌▌ of the hours of the programming on the *Al Nahar Drama* Service are original programming (i.e., programming that has not previously been distributed in the Territory by Network or any other person or entity) and are distributed exclusively on each Service. Network shall ensure that, at no time during the Term, will any episode or other show appear on each Service in the same time slot more than ▌▌▌ any seven (7)-day period or appear on each Service more than ▌▌ times in any seven (7)-day period, regardless of the time slot.

## PART C
## MARKETING INFORMATION



## PART D
## FEES INFORMATION



Confidential          Page 2 of 41          DISH _CW_ Network _HG_

PL 002726

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution



Confidential           Page 3 of 41           DISH CbJ Network 4̂

PL 002727

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution



Network Payment Address:   World Span Media Consulting, Inc.
                           4919 Hidden Dune Court
                           San Diego, CA 92130 USA

DISH Payment Address:      DISH Network L.L.C.
                           Attn: Accounts Receivable
                           9601 South Meridian Boulevard
                           Englewood, Colorado 80112

*[The rest of this page left intentionally blank. Signature page follows.]*

Confidential                Page 4 of 41                 DISH _CW_ Network HE

PL 002728

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the Effective Date.

DISH NETWORK L.L.C.

By: _____

Name: ROGER LYNCH

Title: EXECUTIVE VICE President

WOLRD SPAN MEDIA CONSULTING, INC.

By: Haytha_____

Name: Haytham ElMokadem

Title: President

PL 002729

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

## STANDARD TERMS AND CONDITIONS

1. <u>Definitions</u>. The following terms have the following meanings:

    (a) "<u>3D</u>" means three-dimensional.

    (b) "<u>Additional Rights</u>" has the meaning set forth in Section 3(f).

    (c) "<u>Additional Rights Offer</u>" has the meaning set forth in Section 3(f).

    (d) "<u>Affiliate</u>," with respect to each Party, means any person or entity that directly or indirectly, or through one or more intermediaries, controls, is controlled by, or is under common control with such Party. For the purposes of this definition, the term "<u>control</u>" (and the correlative forms "<u>controlling</u>" and "<u>controlled by</u>") means the power to direct or cause the direction of the management, policies and/or affairs of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

    (e) "<u>Arbitration Rules</u>" means the ICC's Rules of Arbitration.

    (f) "<u>Avails</u>" has the meaning set forth in Section 4(e).

    (g) "<u>Bulk-Bill Arrangement</u>" has the meaning set forth in Section 8(b)(ii).

    (h) "<u>Children's Television Requirements</u>" means the Children's Television Act of 1990 and the regulations of the FCC promulgated thereunder, each as may be amended from time to time.

    (i) "<u>Closed Captioning/Video Description Requirements</u>" means all Laws pertaining to closed captioning and/or video description requirements (including, without limitation, 47 CFR 79.1 of the regulations of the FCC), each as may be amended from time to time.

    (j) "<u>Commercial Loudness Requirements</u>" means the CALM Act of 2010 and the regulations of the FCC promulgated thereunder, each as may be amended from time to time.

    (k) "<u>Confidential Information</u>" means the existence of this Agreement, the terms of this Agreement (including, without limitation, the expiration date), and all non-public information disclosed by one Party to the other Party in connection with this Agreement, the Services, the VOD Content and/or delivery of the Services and/or the VOD Content, including, without limitation, technical information, technical or marketing tests, product plans, and Subscriber Information (all of which Subscriber Information the Parties agree, regardless of which Party collected, compiled or created such Subscriber Information, is DISH's Confidential Information (and, for clarity, not Network's Confidential Information)). For clarity, the existence of this Agreement and the terms of this Agreement are both Parties' Confidential Information.

    (l) "<u>Content Deviation</u>" has the meaning set forth in Section 4(n).

    (m) "<u>Cue Tone Delivery Date</u>" has the meaning set forth in the Cue Tone Delivery Date section of Part B.

    (n) "<u>Current Affiliation Agreement</u>" has the meaning set forth in Section 17(b).

    (o) "<u>DBS</u>" means direct broadcast satellite.

PL 002730

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(p) "Delivery Change" has the meaning set forth in Section 5(a)(ii).

(q) "Direct On-Air Sales Programming" means any programming that includes direct on-air marketing, offering for sale and/or sales of products and/or services, including, without limitation, home-shopping, infomercials and direct response advertising, regardless of the length of such programming; provided that "Direct On-Air Sales Programming" does not include Network's regularly scheduled commercial announcement time on the Services (i.e., the commercial announcements distributed throughout the Service during other programming, which commercial announcements are generally thirty (30) seconds or less in length and used primarily for promotional announcements or third party advertising of products and services that are not directly sold to the viewer during such commercial announcements).

(r) "DISH Marks" means, collectively, each of DISH's and its Affiliates' trade names, service marks, trademarks, and logos.

(s) "DISH OTT" means the distribution system employed by DISH to distribute encrypted and DRM (i.e., Digital Rights Management) protected audio, video, data and other programming services to end users in the Territory, whereby the programming signal or feed is: (i) received by DISH (or any DISH Affiliate or subcontractor), and if applicable, digitized, compressed, encrypted, encoded, transcoded, and otherwise processed; and (ii) transmitted, or requested, over the Internet for reception by Subscriber's devices (e.g., game consoles, Blu-Ray players, set-top boxes, smart TVs, smart phones, handheld devices, mobile devices) using computer programs, application software and/or streaming platforms (e.g., DISH World application, Roku) that are owned, operated, leased, controlled, managed or otherwise accessed by DISH. For clarity, DISH OTT does not include any electronic delivery for receipt and viewing via (i.e. directly accessible via) the world wide web using a uniform resource locator ("URL") within an unauthenticated or unauthorized browser; rather, a Subscriber must be authenticated and authorized to access the content that is distributed on the DISH OTT platform from any device where the DISH application software and/or streaming platform is in use. For further clarity, DISH OTT is part of DISH's Distribution System.

(t) "DISH Package" means any package of programming services offered by DISH via all or any portion of the Distribution System.

(u) "Distribution System" means the distribution system employed by DISH to distribute audio, video, data and other programming services to Subscribers in the Territory whereby the programming signal or feed is: (i) received by DISH (or any DISH Affiliate or subcontractor) and, if applicable, digitized, compressed, encrypted, encoded, transcoded, and otherwise processed; and (ii) transmitted for reception by Subscribers using transmission systems that are owned, operated, leased, controlled, managed or otherwise accessed by DISH (or any DISH Affiliate or subcontractor). For clarity, "Distribution System" includes all transmission systems used by DISH (or any DISH Affiliate or subcontractor) to transmit audio, video, data and other programming services, including, without limitation, C-band receive facilities, such as SMATV systems; all forms of wireless and wire-line data distribution technology (including, without limitation, BSS and FSS satellite regardless of frequency or band; copper wire; fiber optic, twisted pairs or coaxial cable; all forms of terrestrial wireless; and all Internet Technologies); and all other technologies, whether now existing or later developed.

(v) "Embedded Information" has the meaning set forth in Section 5(e).

(w) "EPG Failure Fee" means the amount set forth in the EPG Failure Fee section of Part D.

PL 002731
CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(x)  "Expiration Date" means the date set forth in the Expiration Date section of Part A.

(y)  "Facility" or "Facilities" means the downlink facility or facilities, as determined by DISH at any time and from time to time and in its sole discretion, at which the video programming services are received by DISH (or any DISH Affiliate or subcontractor). "Facility" and "Facilities" include, without limitation, the reception, compression, processing and uplink/data aggregation facilities operated by or on behalf of DISH (or any DISH Affiliate or subcontractor) in Cheyenne, Wyoming, Gilbert, Arizona.

(z)  "FCC" means the Federal Communications Commission.

(aa)  "FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations and Department of Justice interpretations thereunder.

(bb)  "Fees" has the meaning set forth in Section 8(a).

(cc)  "Free Preview Period" means the period(s) set forth in the Free Preview Period section of Part C.

(dd)  "Free/Discount Promotions" has the meaning set forth in Section 8(b)(v).

(ee)  "Force Majeure Event" has the meaning set forth in Section 17(e).

(ff)  "HD" means high-definition.

(gg)  "ICC" means the International Court of Arbitration of the International Chamber of Commerce.

(hh)  "Indemnification Claim" means, collectively, any and all losses, damages, judgments, penalties, liabilities, costs and expenses (including, without limitation, court costs and reasonable attorneys' fees) incurred in connection with, arising out of or relating to any claim, lawsuit or action brought by a third party.

(ii)  "Internet" means the series of global, interconnected, packet-switched networks that utilize transmission control protocols ("TCP") and internet protocols ("IP") to communicate and otherwise transmit information to and from connected users' computers and operating systems.

(jj)  "Internet Technology" or "Internet Technologies" means any and all technologies using one or more computer networks that utilize TCP/IP, IP or other architecture or that utilize computer terminals, terminal servers, routers, multicasting technology or other data processing or transmission devices (regardless of transmission speed experienced by the end user), whether via cable, wire, wireless, or other technology, regardless of the end user's reception and/or viewing device (e.g., television, computer (including, without limitation, tablets), cellular telephone or other mobile device, Blu-ray player, gaming console, IRD). Without limiting the generality of the immediately foregoing sentence, "Internet Technology" and "Internet Technologies" include, without limitation, the Internet as presently configured and all modifications and additions thereto and substitutions thereof (including, without limitation, the Internet II), whether using means, methods, processes media or technology now known or later developed. Notwithstanding anything to the contrary contained in this Agreement, "Internet Technology" and "Internet Technologies" include temporary and progressive downloading, streaming and pre-caching (as such terms are used in the Internet industry).

(kk)  "IP" has the meaning set forth in Section 1(ii).

PL 002732

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(ll) "**IRD**" means integrated receiver-decoder.

(mm) "**Launch Contribution**" means the amount set forth in the Launch Contribution section of Part D.

(nn) "**Launch Date**" means, regardless of the requirements of the Launch Date section of Part A, the actual date(s), respectively, on which DISH launches one or more Services.

(oo) "**Law**" means any and all applicable current or future federal, state, local or international laws, rules, regulations or government or quasi-government action or order.

(pp) "**Look Back Functionality**" means a distributor's recording a program on a linear video service so that a subscriber may, without having recorded the program him-, her- or itself, watch such content up to a certain period of time following such content's airing on the television service (including, without limitation, the functionality to restart a program already in progress).

(qq) "**Merger**" has the meaning set forth in Section 17(b).

(rr) "**MVPD**" means a multi-channel video programming distributor that uses a cable, DBS or fiber system to deliver content to subscribers (e.g., Comcast, DirecTV, Verizon Fios).

(ss) "**Net Revenues**" means the aggregate amount of subscription fees received by DISH from Subscribers for their receipt of the Services (or, if applicable, the VOD Content), as applicable, as part of a DISH Package or on an a-la-carte basis, in each case less any amounts credited to the account of any Subscriber by DISH that are related to each Service (or, if applicable the VOD Content) and any amounts collected by DISH with respect to any taxes, assessments, or other fees imposed by governmental or quasi-governmental taxing authorities or other entities that are related to each Service (or, if applicable, the VOD Content) or DISH's distribution thereof. For clarity, "**Net Revenues**" does not include: (i) equipment fees, access fees or other ancillary fees (e.g., telephone transaction fees); or (ii) any fees that DISH elects to charge a customer for other programming services (including, without limitation, in the case of the VOD Content, any fees that DISH elects to charge a customer for a Service).

(tt) "**Network Marks**" means, collectively, the Services Names and any other of Network's trade names, service marks, trademarks and/or logos that are protectable under the United States trademark Laws, including, without limitation, the names, titles and logos of certain programs that appear in the Services and/or the VOD Content and any subsequently selected names or marks for the Services.

(uu) "**Network Player**" means Network's online video player(s).

(vv) "**Net Sales**" means all amounts that Network receives on account of time on the Services and/or the VOD Content that is used for Direct On-Air Sales Programming, less taxes and reasonable freight charges actually incurred by Network.

(ww) "**Non-compliance**" has the meaning set forth in Section 3(h).

(xx) "**Outage Fee**" means the amount set forth in the Outage Fee section of Part D.

(yy) "**Patriot Act**" means the USA PATRIOT Act of 2001.

Confidential                Page 9 of 41                DISH _CW_ Network  H.G

PL 002733

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(zz) "Primary Signal" means the principal video and accompanying audio portions of a Signal.

(aaa) "Related Party" means each of Network and each of its subsidiaries, Affiliates, directors, officers, employees, agents, contractors, sub-contractors and representatives (whether domestic or foreign).

(bbb) "Reporting Period" means the period of time beginning the twenty-second (22nd) day of one calendar month and ending the twenty-first (21st) day of the immediately following calendar month, as DISH may change such period at any time and from time to time and in DISH's sole discretion.

(ccc) "Required Materials" means all data or information: (i) for each Service, that Network includes in or around a Primary Signal when delivering such Primary Signal to DISH; and also (ii) for each Service and the VOD Content, that the FCC or any applicable Law requires that DISH transmit.

(ddd) "Required Package" means those package(s) and/or a-la-carte carriage as set forth in the Required Package section of Part A; provided that, if DISH elects, in its sole discretion, to discontinue one or more such packages during the Term, then such package will no longer be a "Required Package" as of the effective date of such discontinuance.

(eee) "SD" means standard-definition.

(fff) "Second Service" has the meaning set forth in Section 4(i).

(ggg) "Service" means: (i) each twenty-four (24) hour per day, seven (7) day per week, linear television programming service commonly known by a name set forth in the Services Names section of Exhibit A (and as more fully described in Part B and Section 4); and (ii) any component and/or constituent part of each such service, including, without limitation, all feeds, formats, interactive components, graphics (including, without limitation, scrolls or other visual graphics), all portions of the VBI (or its digital equivalent), and any commercial advertising that may be included on such service.

(hhh) "Service Language" means the language set forth in the Service Language section of Part B.

(iii) "Service Name" means, with respect to each Service, the name set forth in the Services Names section of Part B.

(jjj) "Service Subscriber" means, with respect to each Service, any Subscriber that DISH (or a DISH Affiliate or Subdistributor) has intentionally authorized to receive, and who actually receives, such Service.

(kkk) "Signal" means, with respect to each Service, the programming signal or feed containing such Service, including, without limitation, all video, audio, data and other components delivered by Network to one or more Facilities.

(lll) "Subdistributor" means any person or entity that DISH or a DISH Affiliate has authorized to distribute one or more Service(s) and/or the VOD Content to customers, including, without limitation, franchised and non-franchised cable operators.

(mmm) "Subscriber" means any person, entity, or location, whether residential or commercial, in the Territory that DISH (or a DISH Affiliate or Subdistributor) has intentionally authorized to receive any

Confidential          Page 10 of 41          DISH _CW_ Network H-Z

PL 002734

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

video programming service(s). For clarity, "Subscriber" includes individuals; owners and managers of multi-family dwelling complexes (e.g., apartments, condominiums, homeowners' associations, gated communities, student housing complexes); owners and managers of hotels, motels, timeshares, hospitals, rehabilitation facilities, assisted-living facilities, RV parks, truck stops, and prisons; owners and managers of firehouses, oil rigs, and other commercial locations where individuals reside while working; owners and managers of bars, restaurants, offices, retail locations, and schools and universities; and owners and managers of airlines, commercial hauling vehicles and other vehicles.

(nnn) "Subscriber Information" means any and all information relating to one or more Subscribers (including, without limitation, Service Subscribers), including, without limitation, names, addresses, account numbers, account history, and usage data (regardless of whether such usage data is anonymized and/or aggregated). Network acknowledges and agrees that any and all Subscribers (including, without limitation, Service Subscribers) are, and at all times will be, deemed customers of DISH (and, for clarity, not Network).

(ooo) "TCP" has the meaning set forth in Section 1(ii).

(ppp) "Team Summit Amount" means the amount(s) set forth in the Team Summit Amount section of Part C.

(qqq) "Term" has the meaning set forth in Section 2.

(rrr) "Territory" means the United States of America and its territories, commonwealths and possessions, including, without limitation, the District of Columbia, Puerto Rico and the United States Virgin Islands.

(sss) "VBI" means vertical blanking interval.

(ttt) "VOD Content" means all video-on-demand (for clarity, whether related or not related to the Service): (i) to which Network has video-on-demand rights or is otherwise able to provide video-on-demand distribution rights to DISH for distribution in the Territory and (ii) that Network elects to start distributing in the Territory.

2. **Term.**

(a) Term. This Agreement commences on the Effective Date and, unless terminated earlier in accordance with the provisions of this Agreement, expires at 5:00 p.m. Mountain Time on the Expiration Date (the "Term").



3. **Grant of Rights.**

(a) Services. Network hereby grants DISH and its Affiliates the exclusive right and license (including, without limitation, the license to all copyright, trademark and other intellectual property rights appurtenant to the programming content that makes up or relates to the Services) throughout the Term to:

PL 002735

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(i) distribute each Service in the Territory via any and all methods of distribution now existing or in the future developed, including, without limitation, the Distribution System, for reception, viewing, exhibition and display by Service Subscribers using any form of device used for the reception and/or display of visual images, audio and/or data; (ii) record, store, copy, digitize, compress, encode, transcode, and otherwise process (including, without limitation, for adaptive bit-rate streaming) each Service; and (iii) record, store, copy, duplicate, process, encode, transcode, and/or delay all or any portion of the content of each Service, in DISH's sole discretion, for up to eight (8) calendar days following such content's airing on such Service in order to enable Look Back Functionality for each program in each Service. For clarity, but without limiting the generality of the immediately foregoing sentence, the rights granted to DISH in this Agreement include the right to distribute each Service to: (A) residential locations; (B) commercial locations; (C) vehicles (e.g., cars, airplanes, recreational vehicles and commercial hauling vehicles); (D) cellular telephones and other mobile devices; (E) personal computers (including, without limitation, tablets); and (F) consumer electronics devices (e.g., Internet-capable televisions, gaming consoles).

(b) _VOD Content_. Network hereby grants DISH and its Affiliates the exclusive right and the license (including, without limitation, the license to all copyright, trademark and other intellectual property rights appurtenant to the programming content that makes up the VOD Content) throughout the Term to: (i) make available the VOD Content to Service Subscribers via, in DISH's sole discretion, the Distribution System (including, without limitation, via push video-on-demand technology, pull video-on-demand technology, streaming, temporary download, and/or progressive download) for reception, viewing, exhibition and display using any form of device used for the reception and/or display of visual images, audio and/or data; (ii) record (including, without limitation, real-time record from each Service), store, copy, encode, transcode, encrypt and otherwise process (including, without limitation, for adaptive bit-rate streaming) such VOD Content; and (iii) use the Network Player in making available the VOD Content.

(i) Network shall, at all times during the Term, provide the VOD Content to DISH for DISH's distribution on a video-on-demand basis;

(ii) DISH may real-time record all VOD Content that originates from any of the Services that DISH wishes to make available;

(iii) Network shall provide DISH with at least sixty (60) calendar days' prior written notice, on a rolling calendar-monthly basis, of all VOD Content for the next three (3) months;

(iv) Network shall deliver all VOD Content to DISH (or a DISH Affiliate or subcontractor, as determined by DISH) pursuant to this Agreement via mezzanine files, in accordance with DISH's standard technical specifications and with metadata in a form and substance reasonably acceptable to DISH;

(v) DISH shall protect such VOD Content using its standard security protocols;

(vi) DISH shall provide Network with its standard content-provider branding on its applicable user interface(s) for such VOD Content; and

(vii) Neither Network nor DISH may include any advertising in the VOD Content (including, without limitation, pre-roll and post-roll advertising) without the prior written consent of the other Party.

(c) _Additional Rights_. Network hereby grants DISH and its Affiliates the non-exclusive right and the license throughout the Term to: (i) receive and decrypt the Services and the VOD Content;

Confidential                    Page 12 of 41                    DISH _CW_ Network _HZ_

PL 002736

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

(ii) up-convert the Signal of each Service from SD to HD; (iii) down-convert the Signal of each Service and the VOD Content from HD to SD; (iv) test each Service and the VOD Content; and (v) advertise, promote, publicize, market and sell subscriptions to each Service (and/or any of the Service(s) that is packaged with other services) and the VOD Content in the Territory (which right, for the avoidance of doubt, extends to DISH's Affiliates, Subdistributors, and retail distribution network).

(d) <u>Transport and Subdistribution</u>. Network hereby grants DISH and its Affiliates the non-exclusive right and the license throughout the Term to: (i) transport and arrange for the transport of the Signal for each Service in the Territory to third parties who gain rights to one or more of the Services independent of DISH (e.g., through an agreement with Network), including, without limitation, to cable system operators (both franchised and non-franchised); and (ii) subdistribute, resell and/or otherwise sublicense each Service and the VOD Content to Subdistributors (including, without limitation, on a bulk-bill basis) for distribution to, *inter alia*, multi-family dwelling complexes (e.g., apartments, condominiums, homeowners' associations, gated communities, student housing complexes); hotels, motels, timeshares, hospitals, rehabilitation facilities, assisted-living facilities, RV parks, truck stops, and prisons; firehouses, oil rigs, and other commercial locations where individuals reside while working; retail locations; schools and universities; and airlines, commercial hauling vehicles and other vehicles.

(e) <u>Right to Record</u>. Network hereby grants DISH and its Affiliates the right to record, in DISH's sole discretion, all or any portion of each Service and the VOD Content for the purposes expressly set forth in this Agreement (e.g., DISH's right to preempt and replace content that airs on any of the Services pursuant to Section 4).

(f) <u>Additional Services/Additional Content/Additional Distribution Methods</u>. If Network or any of its Affiliates currently has (i.e., before the Effective Date) or later acquires (i.e., on or after the Effective Date, but during the Term) the rights, directly or indirectly, in the Territory: (A) to distribute any programming services or content <u>other than</u> the Services and the VOD Content; or (B) to distribute the Services and/or the VOD Content; but via means or methods <u>other than</u> the ones already granted by Network to DISH in this Agreement (all such rights under (A) and (B), the "<u>Additional Rights</u>"), then: (i) Network shall, no later than thirty (30) calendar days following Network's or its Affiliate's acquisition of such rights (in the case of an acquisition of rights) and within thirty (30) calendar days of Network's or its Affiliate's decision to exploit such rights in the Territory (in the case of rights already held by Network or its Affiliate before the Effective Date), send written notice to DISH first offering DISH (i.e., prior to any Other Distributor) the right for any such Additional Rights (an "<u>Additional Rights Offer</u>"); and (ii) DISH may, in its sole discretion, elect to accept such rights by sending written notice of such acceptance within sixty (60) calendar days following DISH's receipt of the applicable Additional Rights Offer. In the event that DISH rejects such Additional Rights Offer or fails to accept such Additional Rights Offer within such sixty (60) day period, then Network may offer the Additional Rights to any third party; provided that, if Network offers the Additional Rights to any third party on terms and conditions that are different from or more favorable than those set forth in the applicable Additional Rights Offer, then: (A) before entering into a definitive agreement with such third party, Network must send written notice to DISH re-offering DISH the Additional Rights on such different or more favorable terms and conditions; and (B) DISH may, in its sole discretion, elect to accept such rights by sending written notice of such acceptance within thirty (30) calendar days following DISH's receipt of the new Additional Rights Offer. In the event that DISH rejects such offer or fails to accept such offer within such thirty (30) day period, then Network may enter into an agreement with such third party.

(g) <u>Content Holdbacks</u>. Network may not, directly to end users or through a distributor (including, without limitation, Network's Affiliates), exhibit, distribute, air, stream or otherwise make available in the Territory, whether on a live, simulcast, time-delayed, or other basis, any of the Services and/or any portion of the Services (including, without limitation, any programming content included in

Confidential                              Page 13 of 41                        DISH CW  Network HZ

PL 002737

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)

Execution

any of the Services) or the VOD Content in any format (e.g., SD, HD, 3D, interactive, enhanced) using any type of pay TV distribution platform and/or any distribution or streaming technology whether now existing or later developed, whether for a fee or otherwise.

(h)  Piracy Prevention. If Network becomes aware (including, without limitation, by receipt of notice from DISH) of any piracy, infringement, and/or other unlawful use of all or any portion of the Services and/or the VOD Content, then Network shall promptly commence legal action diligently seeking to prevent such piracy, infringement, and/or other unlawful use and to protect the rights granted to DISH under this Agreement, utilizing legal counsel selected by Network and approved by DISH, at Network's sole cost and expense. If Network fails to promptly commence legal action in accordance with the immediately preceding sentence, Network shall join and cooperate, at Network's cost and expense, in any action brought by DISH and other networks (the "Participating Networks" and each individually a "Participating Network") to enforce the rights granted to DISH and any of its Affiliates under this Agreement (and, as applicable, the rights that each Participating Network granted to DISH and any of its Affiliates for distribution of such Participating Network's channel(s) in the Territory), including, without limitation, the exclusivity set forth in Section 3; provided that, with respect to the sharing of the costs and expenses of such legal action(s), the percentage of such costs and expenses attributable to Network will not be greater than the percentage attributable to any Participating Network. For example, if each Participating Network is responsible for ten percent (10%) of the costs and expenses of such litigation, Network's share of such costs and expenses may not be more than ten percent (10%). Upon request from DISH, Network shall provide DISH with proof, in a form reasonably satisfactory to DISH, of Network's ownership of, or other interest in, all rights necessary to grant to DISH the exclusive rights for which DISH contracted under this Agreement. In the event that DISH finds, as determined in DISH's sole discretion, that Network, for any reason or no reason, has failed and/or refused to promptly commence legal action and/or failed or refused to join and cooperate and/or provide proof in accordance with this Section 3(h) ("Non-compliance"), then, in addition to any other rights that DISH may have at law, in equity, under contract (including, without limitation, this Agreement) or otherwise, all of which are hereby expressly reserved: (I) for the duration of any period of such Non-compliance, Network hereby irrevocably waives any and all fees payable by DISH under this Agreement for the remainder of the Term beginning on, and including, the first date of Network's Non-compliance (as reasonably determined by DISH); (II) DISH may, for clarity, offset any amounts otherwise due under this Agreement against any costs or expenses incurred as a result of any Non-compliance; and/or (III) DISH may, in its sole discretion, terminate this Agreement by providing at least five (5) business days' prior written notice to Network.

(i)  Overspill. Notwithstanding anything to the contrary contained in this Agreement, Network acknowledges and agrees that the Signals for the Services, when transmitted by DISH, its Affiliates or its subcontractors, may extend beyond the geographic boundaries of the Territory and that such "overspill," in and of itself, may not be deemed a breach of this Agreement.

(j)  Exclusivity. If any right or license is described in this Agreement as "exclusive" (including, without limitation, in Section 3), then, for clarity, Network may not grant the same or similar right or license to any person or entity (for clarity, other than DISH) for exploitation within the Territory, or exploit such right or license itself. Network hereby acknowledges and agrees that each attempt by Network to grant the same or similar right or license to any person or entity (other than DISH) for exploitation within the Territory, or to exploit such right or license itself, will constitute a material breach of this Agreement, and that any such attempted or purported grant or exploitation will be null and void ab initio. If for any reason DISH, in good faith, determines that Network has violated any exclusivity obligation under this Agreement, then, in addition to any other rights and remedies that DISH may have at law, in equity, under contract (including, without limitation, this Agreement) or otherwise, all of which are hereby expressly reserved, DISH may: (i) retain

PL 002738

CONFIDENTIAL - DISH NETWORK L.L.C. v. FRAIFER ET AL., CASE NO. 8:16-CV-02549 (M.D. FLA.)