UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA (TAMPA DIVISION)

DISH NETWORK, LLC,
a Colorado limited liability company,

*Plaintiff, Counterclaim-Defendant*,

v.

GABY FRAIFER, an individual Florida resident,
PLANET TELECOM, INC., a Florida corporation,
and, TELE-CENTER, INC., a Florida corporation,

*Defendants, Counterclaim-Plaintiffs*.

_____/

Case No. 8:16-cv-2549-EAK-CPT
Honorable Elizabeth A. Kovachevich
Magistrate Judge Christopher P. Tuite

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' AMENDED MOTION FOR FINAL SUMMARY JUDGMENT**

COMES NOW Defendants, TELE-CENTER, INC, and PLANET TELECOM, INC, and GABY FRAIFER, by and through undersigned counsel, hereby file Defendants' Statement of Undisputed Facts (hereinafter "SOUF(s)") in Support of Defendants' Amended Motion for Final Summary Judgment against Plaintiff, DISH NETWORK L.L.C. (hereinafter "Dish").

**Dish's Alleged Rights**

1. Dish filed its amended complaint against the Defendants for Direct Copyright Infringement pursuant to 17 U.S.C. §501 based on its alleged status as an exclusive licensee. (hereinafter referred to as "Amended Complaint"). (Dkt. 62.)

2. Dish does not allege any specific unregistered works in its Amended Complaint, nor did it identify specific unregistered works during the discovery period. (*Id*.; Dkt. 146-6; Fraifer Decl. ¶9, Ex. 3 ["Slowikowska. Dep."] at 17:6, 168: 17-23. (Dish could not identify specific works.).)

1

3.      Dish identifies only four (4) works registered with the U.S. Copyright Office which allegedly aired on foreign networks: Sabah Al Khair Ya Arab, Tasali Ahla Alam, Saherat Al Janoub, and Chef Hassan (the "Registered Works"). (Dkt. 62, at pp. 3-4 ¶13)

4.      Dish alleges that it purchases rights to international "channels" from networks or their affiliates and agents, including MBC FZ LLC ("MBC"), International Media Distribution (Luxembourg) S.A.R.L. ("IMD"), World Span Media Consulting, Inc. ("WSM"), Peninsula Production Company ("PPC"), Gulf DTH LDC ("Gulf"), and Dream Media ("Dream"), (collectively, the "Networks") (Dkt. 62, at p. 3 ¶12.)

5.      Dish alleges that the "Networks acquire copyrights in the works that air on their respective channels, including by producing the works and by assignment." (*Id*.)

6.      Dish alleges that it acquires its purported rights to exclusively distribute and publicly perform all of the works that air on the channels by entering into signed, written agreements with the Networks. (Dkt. 62, at p. 3 ¶13.)

7.      Dish alleges that the programs that make up the channels are copyrightable works. *(Id.)*

8.      Dish alleges that its copyrights in the programs arise under laws of nations other than the United States that are parties to copyright treaties with the United States, including the United Arab Emirates, Qatar, Egypt, and Lebanon, where the programs were authored and first published. (Dkt. 62, at p. 6 ¶27.)

### Dish's Contracts

9.      Dish admits that it produced heavily redacted contracts and related amendments between Dish and the Networks[1]: (1) MBC (the "MBC Contracts") (Dkts. 146-14, and 15 at pp. 1-75.); (2) IMD (the "IMD Contracts") (Dkts. 146-16, and 17.); (3) WSM (the "WSM Contracts") (Dkt. 146-

---

[1] (Slowikowska Decl. ¶5; Dkt. 146-13, at p. 2 ¶5.)

18.); (4) Dream (the "Dream Contracts") (Dkt. 146-19, at pp. 2-70.); (5) PPC (the "Al Jazeera Contracts") (Dkt 146-15, at pp. 77-115.); (6) Gulf DTH LDC ("Al Yawn Contracts") (Dkt. 146-19, at pp. 72-105.) (collectively, the "Dish Contracts".)

10.  On April 6, 2018, Dish attached declarations to its Motion for Summary Judgment allegedly identifying unregistered works for the very first time in this litigation: (1) John Whitehead on behalf of MBC, dated April 6, 2018 (Dkt. 146-8.); (2) Haytham Elmokadem on behalf of WSM, dated April 4, 2018 (Dkt. 146-20.); (3) Eithar Ali Mohamed Abutaha on behalf of Al Jazeera, dated March 29, 2018 (Dkt. 146-3.); and (4) Pierre Ayoub on behalf of IMD, dated April 5, 2018 (Dkt. 146-5.) (collectively, the "Declarations").

11.  On April 6, 2018[2], Dish produced redacted copies of additional contracts, related amendments and other documents for the very first time: (1) additional MBC documents and contracts (the "MBC SUPP Contracts") (Dkts. 146-9 at pp. 3-9; 146-10, at pp. 2-12.); (2) additional IMD contracts (the "IMD SUPP Contracts") (Dkts. 146-6, 7 at pp. 2-51.); and additional WSM contracts (the "WSM SUPP Contracts") (Dkt. 146-21, at pp. 3-8.), (the "Supplemental Contracts".)

12.  The Dish Contracts and Supplemental Contracts[3] fail to identify any of the unregistered works identified in the declarations to Dkt. 146, effective terms or payment schedules. (*Id*.; Fraifer Decl. 12-13 (statements regarding screenshots and works).)

MBC

13.  The MBC Contracts for channels, MBC, Al Arabiya, MBC 3 (kids), MBC Drama, and MBC Masr., state in part that the network or distributor prospectively "… grants to Dish and its

---

[2] Defendants' first and second requests for production ("RFP") requested all documents, writings and/or contracts related to Dish's purported rights in its Amended Complaint. (Fraifer Decl. ¶10, Ex. 4, see Defendants' RFP No. 1). Dish responded ("Resp.") with objections and produced only the first page of the copyright registrations at issue in this litigation. It did not identify any of the unregistered works. (*Id*. at Dish's Resp. No. 1).

[3] The Dish Contracts and Supplemental Contracts are signed without any witnesses nor notarization. (Dkts. 146-6, 7, and 9, at pp. 3-9; 146-10, at pp. 2-12; 146-14, 15, 16, 17, 18, 19, and 21, at pp. 3-8.)

3

Affiliates the exclusive license and right along with **all intellectual property rights** appurtenant thereto (including without limitation **all copyright**, trademark, and performing rights to the extent necessary to broadcast, perform and distribute the Service in the Territory) to (i) receive and decrypt the Service; (ii) broadcast, exhibit, perform and distribute the Service to Service Subscribers in the Territory…"). (Dkts. 146-9, at pp. 17-18 ¶2.1, 56-57, ¶2.1; 146-10, at pp. 20-21 ¶2.1; 146-11, at pp. 10 ¶2.1, 46 ¶2.1.)

14.     The MBC Contracts for channels, MBC, Al Arabiya, MBC 3 (kids), MBC Drama, and MBC Masr., describe the service as 24-hour-per-day, 7-day-per-week channels containing programming content of the same quality as broadcast by the Network in the Middle East. (Dkts. 146-9, at pp. 13, 52-53; 146-10, at pp. 15-16; 146-11, at pp. 3, 40.)

15.     The MBC Contracts for channels, MBC and Al Arabiya, state, in part, that "Network may maintain its current distribution agreement with **Jump TV for distribution via internet streaming**…" making Dish's license nonexclusive. (Dkt. 146-9, at pp. 12, 52 "Exclusivity Limitation".)

16.     The MBC Contracts for the channel, MBC Masr, broadly states that Internet "…means the series of global, interconnected, packet-switched networks, that utilize transmission controls ("TCP") and internet protocols ("IP") to communicate and otherwise transmit information to and from connected users' computers and operating systems." (Dkt. 146-11, at p. 7.)

17.     The MBC Contracts for the channel, MBC, state that "The Signal *shall be time delayed by Network so that the content as broadcast in its country of origin corresponds to the prevailing time on the east coast of the United States.*" (Dkt 146-9, at p. 19 ¶4.1.1.)

18. The MBC Contracts for the channel, Al Arabiya, state that "The Signal shall be time delayed by Network *so that the content as broadcast in its country of origin corresponds to the prevailing time on the east coast of the United States*." (Dkt. 146-9, at p. 58 ¶4.1.1.)

19. The MBC Contracts for channels, MBC 3 and MBC Drama, state that "Distributor shall time delay each Signal *so that the content as broadcast in its country of origin corresponds to the prevailing time on the east coast of the United States*." (Dkt. 146-10, at p. 23 ¶4.1.1.)

20. The MBC Contracts for channel, MBC Masr, state that "Distributor shall time delay the Signal *so that the content as broadcast in its country of origin corresponds to the prevailing time on the east coast of the United States.*" (Dkt. 146-11, at p. 14 ¶4.1.1.)

21. The MBC Contracts for channel, MBC Masr, state "Network shall time delay the Signal *so that the content as broadcast in its country of origin corresponds to the prevailing time on the east coast of the United States*." (Dkt. 146-11, at p. 52 ¶4.1.1.)

22. The MBC Contracts reflect that in certain instances either MBC FZ LLC, MBC Group Holding Hungary Limited Liability Company (Luxembourg Branch), Mabmedia LLC, and/or the Multicultural Network Corporation joined as signatory parties. (Dkts. 146-14, 15, at pp. 1-75.)

23. Dish produced copies of documents purporting to be a signed MBC resolution and Dish declaration recognizing MBC Group Holding Hungary Limited Liability Company (Luxembourg Branch). (Dkt. 146-9, at pp. 3-9.)

24. The MBC SUPP Contracts include a copy of a redacted contract between MBC FZ-LLC and Mab Media FZC ("Mabmedia"), (the "Mabmedia Contract") (Dkt. 146-10, at pp. 2-12.)[4]

25. The Mabmedia Contract does not identify any specific works. (See *id*.)

---

[4] Mabmedia Contract requires certain conditions precedent before the contract can take legal effect, subject to the termination of agreements and the making of a deposit. (Dkt. 146-10, at 4 ¶2.1.)

26. The Mabmedia Contract states, in part, that "**Service** means the audio and/or video programming **channel or channels** as more particularly described in Annexure 1…" (Dkt. 146-10, at p. 3.)

27. The Mabmedia Contract affords MBC prior approval authority of any "International Affiliation Agreement" before Mabmedia enters such agreement. (Dkt. 146-10, at p. 4 ¶3.)

28. The MBC Contracts identifying Mabmedia as signatory party do not include the signature on behalf of the guarantor (MBC). (Dkts. 146-14, at pp. 89, 113, and 119; 146-15, at pp. 6, 37.)

29. The MBC Contracts identifying MNC as a signatory party also contain the signature on behalf of the guarantor (MBC). (Dkts. 146-14, at p. 124; 146-15, at p. 41.)

30. Dish produced copies of the MBC Certificates of Registration from the U.S. Copyright Office for each of the 4 Registered Works: (1) Sabah Al Khair Ya Arab, Ep. #85, date and nation of first publication - May 3, 2016, United Arab Emirates (the "Sabah Registration"); (2) Tasali Ahla Alam, Ep. #51, date and nation of first publication – April 18, 2016, United Arab Emirates (the "Tasali Registration"); (3) Saherat Al Janoub, Ep. #15, date and nation of first publication – April 14, 2016, United Arab Emirates (the "Janoub Registration"); and (4) Chef Hassan, Ep. #289, date and nation of first publication – April 16, 2016, United Arab Emirates (the "Chef Registration"); (collectively the "Registrations") (Dkt. 146-12, at pp. 53-56[5].)

31. The Sabah, Tasali, and Hassan Registrations list **MBC FZ LLC as the author** of each respective registered work. MBC is not a natural person. (Dkt. 146-12, at pp. 53-54, 56.)

32. The Janoub Registration lists both **MBC FZ LLC and O3 Production as co-authors** to the respective registered work. MBC and O3 are not natural persons. (Dkt. 146-12, at p. 55.)

---

[5] (Courtesy Copies of the Registrations are attached to Defendants' Amended Motion for Summary Judgment, as "Exhibit 1 to Defendants' Amended Motion for Summary Judgment".)

6

33.     The Registrations each reflect that MBC FZ LLC indicated "**Yes**" in response to the section entitled "**Work made for hire**". (Dkt. 146-12, at pp. 53-56.)

34.     The Registrations claim that MBC FZ LLC is the <u>author of the entire production</u>. (See *id*.)

35.     The Registrations reflect that MBC FZ LLC is the copyright claimant located at Dubai Media City Building 3, P.O. Box 72627, Dubai, United Arab Emirates. (See *id*.)

36.     The laws of United Arab Emirates do not recognize the work-for-hire doctrine because the doctrine would affect an invalid and void transfer. (El Turk Decl. ¶¶4, 6-7, 11-12., Ex. 2)

37.     The laws of United Arab Emirates prohibit as "absolutely invalid" any prospective transfer or assignment of "all" or "more than five" works. (*Id.* at ¶¶9-10., Ex. 2[6].)

38.     The copyright laws of each of the relevant foreign countries relevant to the transfers in this case have corollaries to the laws of the United Arab Emirates, including strict prohibitions on the prospective transfer of "all" works. (El Turk, Decl., Ex.3; see also Dkt. 146-28, at pp. 1-198)[7]

39.     Dish relies on the declaration of John Whitehead on behalf of MBC, dated April 5, 2018 (hereinafter "MBC Declaration") (Whitehead Decl.; Dkt. 146-8.)

40.     The MBC Declaration states, in part, that it <u>*"[e]mploys production companies in the Middle East to author works that air on the MBC Channels*</u>." (See *id*.)

41.     The MBC Declaration states, in part, that "The registered works were first aired on the MBC Channels, as identified in the table above, ***on or about*** the publication dates listed in the Certificates of Registration." (Dkt. 146-8, at p. 5 ¶10.)

42.     The MBC Declaration states, in part, that "The works aired on the MBC Channels, including those identified in the foregoing paragraphs, are ***first published in the UAE when***

---

[6] UAE Copyright Laws, Article 9 and 15.
[7] (See Dkts. 146-28 at p. 45 ¶18 (Ex 3, Lebanon); at p. 106 Article 153 (Ex. 4, Qatar).)

*inserted into the respective channel feed (MBC1, MBC Drama, MBC3, MBC Masr., and Al Arabiya) that originates from the UAE.*" (Dkt. 146-8, at pp. 5-6 ¶13.)

43. MBC Declaration states that the channel feeds <u>*are delivered*</u> "to uplink facilities <u>*around the world*</u> for subsequent distribution to viewers." ((Dkt. 146-8, at p. 6 ¶14.)

IMD

44. IMD Contracts state, in part, that "Each of Network and Dish acknowledges and agrees that "…the rights that Network grants DISH in Section 2.1 hereby exclude the distribution rights for such Services via World Wide Web (but, for clarity, include the distribution rights for such Services via OTT)…" (Dkt. 146-7, at p. 55 ¶7(ii)(2).)

45. IMD Contracts state that *"World Wide Web means electronic delivery of a video comprised of packetized data by means of TCP/IP technology <u>over the public Internet or "World Wide Web" to a browser via a URL</u>.*" (Dkt. 146-7, at p. 67 ¶1).

46. IMD Contracts state, in part, that the network prospectively "….grants to Dish in the Territory and during the Term, (i) the exclusive right and license to distribute, exhibit, perform and broadcast each and every one of the Services using any and all forms of satellite technology along with any and all other means or methods of transmission, via any or all platforms…(together with all other intellectual property rights appurtenant thereto (including, without limitation, **all other copyright**, trademark, and performing rights which are necessary or desirable to exhibit and broadcast the content, in whole and in part, that airs on each Service")) (Dkt. 146-7, at p. 67 ¶2.1.)

47. IMD Contracts state, in part, that "Each Service is (for clarity as of the Effective Date) and shall: (i) remain, a 24-hour-per-day, 7-day-per-week channel; (ii) be the same service as broadcast in the Middle East under the same service brand name;…(Dkt. 146-7, at p. 86 Ex. A ¶2.)

48.     The IMD Contracts define the Middle East to include: "Algeria, Comoros Islands, Chad, Djibouti, Egypt, Mauritania, Morocco, Somalia, Sudan, Tunisia, Bahrain, **Iran, Iraq**, Jordan, Kuwait, Lebanon, Oman, Qatar, Saudi Arabia, and the United Arab Emirates." (*Id.* at Ex. A ¶3).

49.     IMD Contracts for channels, Al Hayah 1, Future TV, Iqraa, LBC, LDC, Murr TV (MTV Lebanon), New TV (al Jadeed), Noursat, ONTV, and OTV, state in part that "…at all times during the Term, each Service shall be comprised of the same feed and programming content as broadcast in the Middle East under the same brand name…" (Dkt. 146-7, at p. 57 Part B ¶3.)

50.     IMD Contracts, states, in part, that the "Network shall, at its own cost and expense, deliver the Signal for the LBC Sat Service in NTSC formation and *time delayed so that the content as broadcast in its country of origin corresponds to the prevailing time on the East Coast of the United States*." (Dkt. 146-7, at p. 103 "Amendment No. 2" ¶7(ii).)

51.     IMD Contracts that, "…[i]n the case of the New Services only, Network is hereby granting such rights to Dish: (i) *on a non-exclusive basis* and (ii) solely for distribution in the Territory via IP streaming (including, without limitation, via DISH OTT). (Dkt. 146-7, at p. 92 Exhibit B ¶3(c).)

52.     IMD SUPP Contracts consist of redacted IMD contracts and amendments with the Hayat Television Network (the "Hyatt Contract"), Future TV SAL (the "Future Contract"), IQRAA Satellite Channels (the "IQRAA Contract"), LDCW Limited (the "LDCW Contract"), MTV SAL (the "MTV SAL Contract"), New TV/Al Jadeed (the "New TV Contract"), Telelumiere SAL (the "Noursat Contract"), ONTV Channel/HAW Limited (the "ONTV Contract"), and Al Lubnaniah Lil I'lam (the "OTV Contract"). (Dkts. 146-6, at pp. 2-41; 146-7, at pp. 2-51.)

53.     Hayat Contract states that the Hyatt Television Network is "…organized and existing under the laws of Cairo, Egypt…" (Dkt. 146-6, at p. 3.)

54. Hayat Contract states, in part, that "Licensor hereby grants Licensee the sole and exclusive right to receive, decrypt, compress, telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, and license and sublicense with or without counterpart the Channel in the Territories…". (Dkt. 146-6, at pp. 3-4 ¶4.1.)

55. Hayat Contract does not identify specific works. (Dkt. 146-6, at pp. 3-9.)

56. Hayat Contract confirmation states, in part, that "Hayat licensed to IMD,….(i) the exclusive right and license to distribute, exhibit and broadcast Hayat TVs using any and all forms of satellite technology,….(together with all intellectual property rights appurtenant thereto, including without limitation, **all copyright**, trademark, and performing rights that are necessary to exhibit, broadcast, distribute…." (Dkt. 146-6, at p. 9.)

57. Future TV SAL is organized and existing under the laws of Lebanon. (Dkt. 146-6, at p.11.)

58. Future Contract states, in part, that "Future hereby grants IMD the sole and exclusive right to receive, decrypt, compress, telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, and license and sublicense the Future TV Channel in the Territory…" (Dkt. 146-6, at p. 12 ¶4.1.)

59. Future Contract states, in part, "Future agrees to provide periodic public announcements of the exclusive rights of IMD to the Future TV Channel in the Territory, including by inserting screen scrolls indicating IMD's exclusive rights on the Future TV Channel's customized feed to the Territory, as well as the original Future TV free-to-air channel." (Dkt 146-6, at p. 14 ¶8.2.)

60. Future Contract does not identify specific works. (Dkt. 146-6, at pp. 11-16.)

61. IQRAA Contract is not written in the English language. (Dkt. 146-6, at pp. 18-22.)

62. Dish did not provide an English translation for the IQRAA contract. (*Id.*).

63. LDCW Contract states, in part, that the "'LDC Channel" (the "Service") consists of a 24-hour general entertainment variety channel, constituted of live talk shows, political programs, entertainment shows, movies, and drama in the Arabic language comprised primarily of originally produced leading Lebanese programs…." (Dkt. 146-6, at pp. 24-25.)

64. LDCW Contract does not specifically identify any asserted works. (*Id*.)

65. MTV SAL is organized under the laws of Lebanon. (Dkt. 146-6, at p. 38.)

66. MTV SAL Contract states, in part, that "MTV grants IMD (i) the sole and exclusive right in the Territory….to receive, decrypt, encrypt, compress, telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, license and sub-license the Channel…" (Dkt. 146-6, at p. 38.)

67. MTV SAL Contract does not identify specific works. (Dkt. 146-6, at pp. 38-41).

68. New TV is incorporated in accordance with the laws of Lebanon. (Dkt. 146-7, at p. 2.)

69. New TV Contract states, in part, "In consideration for the rights granted by NTV to Licensee for the Territory including the exclusive distribution rights for North America (USA & Canada)…IMD shall pay…." (Dkt. 146-7, at p. 7 Article 3.)

70. New TV Contract does not identify specific works. (Dkt. 146-7, at pp. 2-8.)

71. Telelumiere SAL is organized under the laws of Lebanon. (Dkt. 146-7, at p. 10.)

72. Noursat Contract states that "TELELUMIERE grants IMD the sole and exclusive right to receive, decrypt, encrypt, compress, telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, and license the Channel in the Territories…." (Dkt 146-7, at p. 22 ¶2.1.)

73. Noursat Contract includes non-exclusive distribution rights to additional channels. (Dkt. 146-7, at p. 27 Article 3.)

74. Noursat Contract does not identify specific works. (Dkt. 146-7, at pp. 10-27.)

75. ONTV Channel is organized under the laws of Egypt. (Dkt. 146-7, at p. 29.)

76. ONTV Channel broadcasts out of Egypt. (Dkt. 146-7, at p. 29.)

77. ONTV Contract states, in part, that ONTV Channel "….grants IMD the sole and exclusive right to receive, decrypt, encrypt, compress, telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, and license and sublicense…." (Dkt. 146-7, at p. 29.)

78. ONTV Contract does not identify specific works. (146-7, at pp. 29-36.)

79. Al Lubnaniah Lil I'lam is organized under the laws of Lebanon. (Dkt. 146-7, at p. 38.)

80. OTV Contract states, in part, that "Al Lubnaniah Lil I'lam grants IMD the exclusive right granted to telecast, broadcast, transmit, retransmit, downlink, uplink, distribute, deliver, market, sell, and license the Channel in …." (Dkt. 146-7, at p. 38; see also 147-7, at p. 47 ¶2.2.)

81. OTV Contracts states, that "Al Lubnaniah Lil I'lam reserves the right to transmit the Channel on its own website…(*Id.*)

82. OTV Contract does not identify specific works. (Dkt. 146-7, at pp. 38-51.)

83. Dish relies on the declaration of Pierre Ayoub on behalf of IMD, dated April 5, 2018 (hereinafter "IMD Declaration") (Ayoub Decl.; Dkt. 146-5.)

84. IMD Declaration references channels: Al Hayah 1, Future TV, Iqraa, LBC, LDC, Mur TV (aka MTV Lebanon), New TV (aka Al Jadeed), Noursat, ONTV, and PTV (collectively, the "IMD Channels")…" (Dkt. 146-5, at p. 1 ¶2.)

85. IMD Declaration states, in part, that "According to the Nagra monitoring report dated December 19, 2017, which I have reviewed, the IMD Channels or the programs that make up the IMD Channels were transmitted on the UlaiTV and AhlaiTV services within the Unites States." (Dkt. 146-5, at pp. 3-4 ¶13.)

86. IMD Declaration, in reliance on the Nagra monitoring report, purports to identify works and producers. (Dkt. 146-5, at p. 4 ¶14.)

87. IMD Declaration states, in part, that "…IMD is aware that the Producers author and create many of the television series that air on their respective channels …" (Dkt. 146-5, at p. 5 ¶15.)

88. IMD Declaration states, in part, that "…IMD is also aware that the Producers authored or created works that aired on the IMD Channels…." (Dkt. 146-5, at p. 5 ¶16.)

89. IMD Declaration states, in part, that "…IMD is further aware that these works were first published in each Producer's home country, as identified in the table, when inserted into the Producer's channel feed that originated from that location." (*Id*.)

90. IMD Declaration states, in part, that "[t]he Producers' channel feeds were then delivered to uplink facilities around world…for subsequent distribution to viewers." (*Id*.)

## WSM & Dream

91. WSM Contracts for channels, Al Nahar, Al Nahar Drama, and Al Nahar Sports state, in part, that the "Network hereby grants DISH and its Affiliates the exclusive right and license (including, without limitation, the license to **all copyright**, trademark and other intellectual property rights appurtenant to the programming content that makes up or relates to the Services)…" (Dkts. 146-21, at p. 11 ¶3(a), 52-57.)

92. Dream Contracts for channels, Dream 1 and Dream 2, state, in part, that the "Network hereby grants DISH and its Affiliates the exclusive right and license (including, without limitation, the license to **all copyright**, trademark and other intellectual property rights appurtenant to the programming content that makes up or relates to the Services)…(Dkt. 146-22, at p. 39 ¶3(a).)

93. The WSM and Dream Contracts contain partially redacted provisions under section, Exclusivity. (Dkts. 146-21, at pp. 24-25, ¶3(j), 52-57; 146-22, at pp. 42-43 ¶3(j).)

94. The WSM and Dream Contracts, state, in part that the "Service – means: (i) each twenty-four (24) hour per day, seven (7) day per week, linear television programming service commonly known by a name set forth in the Services Name…" (Dkts. 146-21, at pp. 20 ¶1(ggg), 52-57.; 146-22, at p. 38 ¶1(ggg).)

95. WSM Contracts for channels, Al Nahar, Al Nahar Drama, and Al Nahar sports, state, in part, that "…the Signal for each Service:….in NTSC format and time delayed so that the content as broadcast in its country of origin corresponds to the prevailing time on the East Coast of the United States..." (Dkt. 146-21, at pp. 29 ¶5(a)(i)(D), 52-57.)

96. Dream Contracts for channels, Dream 1 and Dream 2, state, in part, that "…the Signal for each Service:….in NTSC format and *time delayed so that the content as broadcast in its country of origin corresponds to the prevailing time on the East Coast of the United States*..." (Dkt. 146-22, at p. 47 ¶5(a)(i)(D).)

97. WSM SUPP Contracts include a copy of a redacted broadcast license agreement between WSM and Trenta for Art Production and Distribution (hereinafter "Trenta"), (the "Trenta Contract") (Dkt. 146-21, at pp. 3-9.)

98. Trenta Contract does not identify any specific works. (*Id.*)

99. Trenta Contract states, in part, that "…[t]he licensor…grants the licensee a license to exclusive broadcast of the following channels: 1) Al Nahar, 2) Al Nahar Drama, and 3) Al Nahar sports (the "Channels")…" (Dkt. 146-21, at p. 3.)

100. Trenta Contract states, in part, that "The licensee is granted the exclusive right to broadcast the Channels In the territory by any available broadcasting media, **now existing or developed in the future**, including by way of free simultaneous free basic cable, OTT, paid IPTV platform(s) and satellite television." (Dkt. 146-21, at p. 5 ¶3-2.)

101.   Dish relies on the declaration of Haytham Elmokadem on behalf of WSM, dated April 4, 2018 (hereinafter "WSM Declaration") (Elmokadem Decl.; Dkt. 146-20.)

102.   WSM Declaration identifies channels, Al Nahar, Al Nahar Drama, Al Nahar Sports, and Dream 2. (Dkt. 146-20, at pp. 1 ¶3, 2 ¶5.)

103.   WSM Declaration states that Trenta is headquartered in Cairo, Egypt. (*Id*.)

104.   WSM Declaration states that Dream Media is headquartered in Giza, Egypt. (*Id*.)

105.   WSM Declaration states, in part, that "**I am informed** that the Al Nahar channels were detected on the defendants' UlaiTV service between October 6, 2015 and May 3, 2017, and on the AhlaiTV service on March 21, 2007." (Dkt. 146-20, at p. 2 ¶7.)

106.   WSM Declaration states, in part, that "**I am informed** that the Dream 2 channel was detected on the defendants' UlaiTV service June 25, 2015 and May 3, 2017, and on the AhlaiTV service on March 21, 2017." (*Id*.)

107.   WSM Declaration states, in part, that "…World Span is aware that Trenta and Dream Media authored or created works that aired on their respective channels in Egypt... (Dkt. 146-20, at p. 3 ¶9.)

108.   WSM Declaration states, in part, that "World Span is further aware that these works were first published in Egypt when inserted into Trenta and Dream Media's channel feeds that originate from Egypt." (*Id*.)

109.   WSM Declaration states, in part, that "The channel feeds were then delivered to uplink facilities around the world for subsequent distribution to viewers." (*Id*.)

Al Jazeera

110.   Al Jazeera Contracts state, in part, that the "Network hereby grants DISH and its Affiliates the exclusive right and license (including, without limitation, the exclusive license to all copyright,

trademark and other intellectual property rights to each Service and all programming content contained within, or which relates to, each Service)…"(Dkt. 146-4, at p. 13 ¶3(a).)

111. Al Jazeera Contracts contain exclusivity limitations. (Dkt. 146-4, at p. 15 ¶3(j).)

112. Al Jazeera Contracts contain a service description for continuous broadcast of channels 24-hours-per-day, 7-days-per-week. (Dkt. 146-4, at p. 11 ¶1(eee).)

113. Al Jazeera Contracts indicate that *the channel programming broadcast is the same in the United States as broadcast in the country of origin*. (Dkt. 146-4, at p. 16 ¶4(f).)

114. Dish relies on the declaration of Either Ali Mohamed Abutaha on behalf of Al Jazeera, dated March 29, 2018 (hereinafter "Al Jazeera Declaration") (Abutaha Decl.; Dkt. 146-3.)

115. Al Jazeera Declaration states, in part, that "The works aired on the AJAN channel, including those identified in the foregoing paragraphs, are first published in Qatar when inserted into the AJAN channel feed that originates from Qatar." (Dkt. 146-3, at p. 2 ¶7.)

116. Al Jazeera Declaration states, in part, that "This channel feed is then delivered to uplink facilities around the world for subsequent distribution to viewers." (*Id.*)

Al Yawn

117. Al Yawn Contracts state, in part, that "…Network hereby grants to DISH and/or its Affiliates the exclusive license and right (but not the obligation) along with all intellectual property rights appurtenant thereto (including without limitation **all copyright**, trademark, and performing rights…). (Dkt. 146-19, at p. 80 ¶2.1.)

118. Al Yawn Contracts contain exclusivity limitation provisions. (Dkt. 146-19, at 73.)

119. Al Yawn Contracts contain a service description for continuous broadcast of channels 24-hours-per-day, 7-days-per-week, and that the *channel broadcast is the same in the United States as broadcast in the Middle East.* (Dkt. 146-19, at 74 Part B.)

TCI & PTI

120. Tele-Center, Inc. ("TCI") and Planet-Telecom Inc. ("PTI") are Florida corporations, whose principal address is 4701 West Hillsborough Ave. Tampa, FL. (Fraifer Decl. ¶¶3, 4, Ex. 1.)

121. Gaby Fraifer ("Fraifer") is an individual residing at 4801 Longwater Way, Tampa, FL 33615. (Fraifer Decl. ¶2.)

122. Fraifer is the President of TCI and PTI. (Fraifer Decl. ¶3.)

123. Since inception, TCI and PTI has operated in the telecommunications business generating revenue primarily from telephone cards, and prepaid long-distance sales. (Fraifer Decl. ¶5.)

124. From 2013 to 2016, TCI sold and distributed telephone calling cards, prepaid long-distance, in addition to set-top boxes. (Fraifer Decl. ¶¶5, 6.)

125. The set-top boxes contain hardware and software, which consist of a smart electronic device receiver and accessories, and an Android operating system equivalent to a smart electronic device. (*Id*.)

More Than Monitoring

126. Dish is a Colorado limited liability company. (Dkt. 62, at 1 ¶1.)

127. EchoStar is a sister company of Dish. (Slowikowska. Dep. at 17:6).

128. Nagravision is a Swiss company. (Slowikowska. Dep. at 36: 8-9.)

129. Dish admits that Nagrastar LLC ("Nagrastar") is a joint venture between Nagravision and Dish, and Dish has an ownership interest in Nagrastar. (Slowikowska, Dep. at 17:6, 35:20-25.)

130. Dish admits that the original joint venture was with Nagravision and EchoStar. (Slowikowska, Dep. at 36:24-37:2-17.)

131. Dish produced a report ("Dish's Report") authored by a Nagravision employee, Pascal Metral ("Metral") . (Dkt 146-23, 23 at 1 ¶2; 146-24 at 5 1¶.)

132.  Dish admits that the STBs were stored at the facilities of Nagrastar and Nagravision (collectively, "Nagra"). (Dkt. 146-24:3, ¶3.)

133.  Dish admits that Wireshark technology was used in connection with the STBs. (Dkt. 146-24:6, ¶3.1.)

134.  Dish admits that the UlaiTV and AhlaiTV STBs were connected to the Internet using a virtual private network (hereinafter "VPN"), and "[c]onfigured so that Nagra, when monitoring for Protected Channels on the UlaiTV and AhlaiTV STBs, would appear to be located in the United States." (*Id*.)

135.  Dish admits that Nagra's setup configuration captured video and network traffic, and screenshots captured in the form of PCAP files. (Dkt. 146-24:6-7 ¶¶3.1, 3.2(e)(f).)

136.  The screenshots and network traffic were captured outside of the United States. (*Id*.; see also Fraifer, Decl. ¶12.)

137.  Metral relied on monitoring reports and screenshots generated by Wireshark technology to prepare the conclusions in Dish's Report. (Dkt. 145-6: 23:2-3 ¶5.)

138.  MBC, IMD, WSM and Al Jazeera rely on the Report and its screenshots to identify works, but did not conduct an independent analysis apart from the Report. (Dkts. 146-3: 2, ¶5; 146-8: 3-5, ¶¶9-12.; 146-20 at 2 ¶2 (IMD statements being "informed"), 3-4 ¶¶13-14, see Fraifer Decl. ¶12.)

139.  Dish claims to have sent numerous copyright infringement notifications to TCI, PTI and content delivery network service providers (the "Notices"). (Dkt 62, at pp. 5-6 ¶¶23-24.)

140.  None of the alleged DMCA notices identify any specific works whatsoever. (Dkt. 146-30.)