# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA (TAMPA DIVISION)

DISH NETWORK, LLC,
a Colorado limited liability company,

     *Plaintiff, Counterclaim-Defendant,*

v.

GABY FRAIFER, an individual Florida resident,
PLANET TELECOM, INC., a Florida corporation,
and, TELE-CENTER, INC., a Florida corporation,

    *Defendants, Counterclaim-Plaintiffs,*

Case No. 8:16-cv-2549-EAK-CPT
Honorable Elizabeth A. Kovachevich
Magistrate Judge Christopher P. Tuite

_____/

## DECLARATION OF BASSEL EL TURK

I, Bassel El Turk, of Dubai, United Arab Emirates declare as follows:

    1.    My name is Bassel El Turk, I make this declaration based on personal knowledge and, if called upon to testify, would testify competently as stated herein.

    2.    I am a Principal and the Country Manager of the Rouse & Company International Limited's United Arab Emirates Office in Dubai, U.A.E. I am licensed as a Legal Consultant by the Rulers Court of Dubai and Admitted to the Lebanese Bar. I am an intellectual property attorney and my practice focuses on a broad range of IP matters including IP Consultancy, Copyrights, Trademarks, Patents & Technology, Brands and Creative and Industrial Rights, with a particular focus on enforcement and complex IP litigation in the Middle East and North Africa ("MENA"). Additionally, I manage the IP portfolios of a number of multinational entities across MENA as well as regional entities worldwide. I also advise on potential legal and cultural risks associated with Arabic language marketing and advertising across the MENA region. I have attached hereto as Exhibit 1, my curriculum vitae.

1



3.   I have been retained by Defendants Tele-Center, Inc., Planet Telecom, Inc., and Gaby Fraifer (collectively, "Defendants") to provide analyses of the copyright law of the United Arab Emirates, and to prepare this declaration in support of Defendants' Amended Motion for Summary Judgment providing my findings, to assist the Court in its analysis and application of the aforementioned law in relation to the above-styled litigation as a matter of law.  I understand that this declaration will be filed with this Court pursuant to United States Federal Rule of Civil Procedure 44.1.

4.   Attached hereto as Exhibit 2 are true and correct copies of English language translations of the UAE copyright law of the following which have been sourced from the website of the United Nations World Intellectual Property Organization ("WIPO") and another revised copy as included in Peter W. Hansen's book on Intellectual Property Law and Practice of the United Arab Emirates, Oxford University Press 2009 :

United Arab Emirates Federal Law No. 7 of the Year 2002 available at

https://wipolex.wipo.int/en/text/124612 ("UAE Copyright Laws").

None of these translations is an official translation of the law. The official

language of the law is in Arabic. When a legal issue is in question, a legal review

of the Arabic text will need to be made to ensure proper application of the legal

principles. English versions are for guidance purposes only for non-Arabic

speakers. *See* https://wipolex.wipo.int/en/text/224730 (Original Arabic Language

Version)

5.   I am familiar with and have personally reviewed and analyzed the UAE Copyright Laws in Exhibit 2 which I reference on a regular basis as part of my law practice in the UAE.  I hereby provide the following analyses of the same based upon my personal and

2



professional knowledge relating to the application of the same in the UAE.

6.     I have also attached as <u>Exhibit 3</u>, an article entitled, <u>Copyright law – How Does The UAE Compare With Common Law Jurisdictions,</u> Gowling WLG, Parker, Jon and Delnaud, Vanessa (Published February 16, 2017; Dubai, UAE), available at <u>https://gowlingwlg.com/en/insights-resources/articles/2017/copyright-law-how-does-the-uae-compare-with-comm/</u> . I have been asked to review this article and to provide my opinion as to the accuracy of the statements and legal analyses made therein.

7.     Following my analysis of the UAE Copyright Laws ns noted in Paragraph 4 of this Declaration, of which I have personal knowledge, it is my belief that the aforementioned article accurately reflects, and is consistent with, the substantive laws, requirements and application of the UAE Copyright Laws.[1]

8.     I have been informed of the above-styled litigation between Dish Networks, LLC and Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc., currently pending before the U.S. District Court for the Middle District of Florida, Tampa Division, whereby the plaintiff in this action is seeking injunctive relief and damages for alleged direct copyright infringement in certain unregistered and registered foreign works as an alleged exclusive licensee of such works pursuant to 17 U.S.C. § 501.

9.     I also understand that certain redacted contracts have been publicly filed with this Court in the above-styled litigation as attachments to Docket Entry 146. I understand these contracts contain clauses purporting to transfer certain rights prospectively and I have been asked to provide my understanding of their validity pursuant to the UAE Copyright Laws. I have

---

[1] I note one correction to the referenced article. With regard to the article's discussion of Article 15 of the UAE Copyright Laws, the UAE Copyright Laws provide that "[a]ny assignment of the author in his all prospective intellectual works or in more than five such works is absolutely invalid." The article incorrectly states "five or more" rather than the correct measure of "more than five" works.

3



not reviewed the full contracts. More specifically, I have been asked to determine whether the following clauses are invalid or null and void under the UAE Copyright Laws for violating a prohibition on the prospective transfer of intellectual property rights, including copyright rights, as contained in each of the UAE Copyright Laws:

> (a) Transferor/Licensor "…hereby grants DISH and its Affiliates the exclusive right and license (including, without limitation, the exclusive license to all copyright, trademark and other intellectual property rights to each Service and all programming content contained within or which relates to, each Service)…".
> (Dkt. 146-4: 13, ¶3(a)).

> (b) Transferor/Licensor "….hereby grants to Dish and its Affiliates the exclusive right and license (including without limitation, the license to all copyright, trademark, and other intellectual property rights appurtenant to the programming content that makes up or relates to the Services)… (Dkt. 146-21, ¶3(a)).

> (c) Transferor/Licensor "….Network hereby grants to Dish in the Territory and during the Term, (i) the exclusive right and license to distribute, exhibit, perform and broadcast each and every one of the Services using any and all forms of satellite technology along with any  and all other means or methods of transmission, via any or all platforms……(together with all other intellectual property rights appurtenant thereto (including, without limitation, all other copyright, trademark, and performing rights which are necessary or desirable to exhibit and broadcast the content, in whole and in part, that airs on each Service")) (Dkt. 146-7: 67, ¶2.1).

> (d)  "Network hereby grants to Dish and its Affiliates the exclusive license and



right along with all intellectual property rights appurtenant thereto (including without limitation all copyright, trademark, and performing rights to the extent necessary to broadcast, perform and distribute the Service in the Territory) to (i) receive and decrypt the Service; (ii) broadcast, exhibit, perform and distribute the Service to Service Subscribers in the Territory using any and all forms of satellite technology…"). (Dkt. 146)(multiple contracts contain this language).

10.     Considering the UAE Copyright Laws, it is my opinion that, to the extent the above clauses serve as an assignment of copyright rights in future works, such assignments in the aforementioned paragraph (a)-(d) would be invalid and null and void, as a matter of law, for violating the prohibition against the prospective assignment of "all" copyright rights as contained in UAE Copyright Laws, Art. 15.

11.     Additionally, I have been asked to provide an analysis of the UAE Copyright Laws to determine whether the UAE Copyright Law, recognizes the United States work-for-hire doctrine as between an employee/employer and / or independent contractor/commissioner.  I have based my understanding of the United States work-for-hire doctrine on the definition of a "work made for hire" as defined in the United States Copyright Act of 1976, 17 U.S.C. § 101 available at https://wipolex.wipo.int/en/text/338108.

12.     It is my opinion that the UAE Copyright Law does not recognize the work-for-hire doctrine, which would not result in a valid transfer or assignment of an author's rights under the UAE Copyright Laws.  Instead, any such transfer would necessarily require a formal writing subject to the requirements of the UAE Copyright Laws.

13.     The UAE copyright law however allows in Article 26 for any person who directed the creation of a collective work to solely exercise the moral and financial rights in the



work unless agreed otherwise.

14.   "Collective Work" is define in Article 1 as the work achieved by a group of authors under the guidance of a natural or legal person assuming the duty of its publication in his name and under his own direction. The contribution of such authors should be incorporated in such work within the common aim targeted by such person so it becomes impossible to separate the contribution of each person distinctively.

15.   If the work of each person may be distinctively separated or attributed, then such work in my opinion shall not fall within the definition of Collective Works and therefore shall not apply to Article 26.

16.   I have also been asked to provide an analysis of the UAE Copyright Laws to determine whether it allows for a "Joint Work" and, if so, whether a written agreement would be required to convey or transfer the rights of an author in any such Joint Work.

17.   Having reviewed of the UAE Copyright Laws, it is apparent that it recognizes the author, a natural person, as the creator of the work, and whom copyright initially subsists. Additionally, where a work is the creation of two or more co-authors, the UAE Copyright Laws recognizes a "Joint Work" as the product of co-authors, who each hold equal rights as an author and that does not fall within the definition of Collective Work as set out in Paragraph 14 above.

18.   It is my opinion that the definition of Joint Work under the UAE Copyrights Law, makes any product of multiple authors a "Joint Work" as a general rule unless the exception under Collective Work applies. Proving the existent of the elements of Collective Work to apply such exception under Article 26 is a complex question of fact.

19.   Although the question whether the work may be distinctively separated or

6



attributed to a contributor is a question of fact, the UAE Copyrights Law has specifically identified the contributors to some types of works, applying, in my opinion, the legal principles of "Joint Work" as a matter of law. Such works are works related to audio-visual, audio or visual works.

20.    Article 27 states:

A joint author in the audio-visual, audio or visual work can be:

1.  The scenarist;

2.  The one who modifies a literary existing work to an appropriate audio-visual method;

3.  The dialogist;

4.  Music composer if he composes it specifically for the work;

5.  The director if he practices actual supervision to accomplish the work."

21.    It is my opinion that the UAE Copyrights Law gives the above description as distinctive separation of each joint author's work which makes the legal nature of audio-visual, audio or visual works as Joint Works and not Collective Works.

22.    Pursuant to the UAE Copyright Laws, a valid transfer of an author's or co-author's rights in a "Joint Work" requires a formal written instrument which comports with the requirements for the UAE Copyright Laws.

23.    The UAE Copyright Laws provide generally that copyright rights initially subsist to the work's author(s).  Article 1 of the UAE Copyright Laws define an author as "[t]he person who creates the work, and the person who has his name mentioned on the work, or has the work attributed to him as its author at the time of publication, unless proved otherwise."

24.    Article 5 of the UAE Copyright Laws provides that "The author and his successors in title enjoy literary rights not subject to prescription or assignment of the work."  The

7



rights enumerated in Article 5 of the UAE Copyright Laws, also known as "moral rights" include:

> 1.  The right to determine first publication of the work.;
>
> 2. The right of writing the work in his name.;
>
> 4. The right to withdraw his work from circulation in case of serious reasons justifying such an act.;
>
> 7. Only the author and his successors or the holder of the right of the author can grant license for exploitation of the work by any means, particularly for copying including electronic loading or storing, acting a play by any means, broadcasting, re-broadcasting transmission, performance, publication, translation, modification, alteration, rental, lending or publication by any means including provision or publication through computers or information nets or communication nets or other means."

25.    Under the UAE Copyright Laws, in order for a transfer of copyright rights to be a valid transfer, the parties must adhere to certain strict formalities identified in Article 9 which states:

> "The author or his successors, can transfer to a natural or legal third party, all or part of his economic rights stipulated in this law provided that such action be in writing specifying the object of the right to be exploited along with the purpose, the duration and place of exploitation.  The author is the owner of all the rights except what he disposes openly.  Without violation of the literary rights of the author stipulated in this law, the author cannot perform any act that can impair the exploitation of the disposed right."

26.    Not all transfers, even those in writing, are valid under the UAE Copyright



Laws.  For example, the UAE Copyright Laws prohibit any prospective assignment which seeks to grant "all" or "more than five works" and automatically deems any such transfer "absolutely invalid" as a matter of law.  *See* UAE Copyright Laws, Article 15, which states: "Any assignment by the author of all the author's future intellectual production or more than five of his future works is null and void."

27.    Pursuant to the UAE Copyright Laws, Article 9 and 15, require that, for a assignment of financial rights to be a valid transfer, the transfer of such rights must be contained in a writing which:

(1) specifically identifies the work(s) subject to the transfer;

(2) the purpose of the transfer;

(3) the term of the transfer;

(4) the territorial rights granted in such transfer, and;

(5) the transfer must not purport to transfer "all" or "more than five works" prospectively.

An agreement which fails to adhere to these requirements is invalid under UAE Copyright Laws.

28.    The UAE Copyright Laws also proscribe certain authorship rights to "performers" of a work.  Performers have the exclusive right to authorize or prohibit the broadcasting and communication to the public of their live performance; the fixation of their unfixed performance in sound recordings; the reproduction of their performance fixed in sound recordings; the exploitation of their performances in any manner without their prior written consent, in particular the fixation of their live performance on a medium, the rental of their performance for direct or indirect commercial profit, the broadcast or making available to the

9



public of their performance through any means. Performers or their successors also enjoy perpetual and inalienable moral rights which include the right to claim authorship of their performances and to object to any alteration or modification that would be prejudicial to their reputation to their performances. *See* UAE Copyright Laws, Articles 16 and 17. Accordingly, in order to grant an exclusive right in a work involving performer(s), a licensor or transferor of that work would first need to secure the transfer of the performer(s) rights in writing and subject to the formalities of Articles 9 and 15.

29.     Article 25 of the UAE Copyright Laws sets forth the rights of individual contributors or co-authors to a work. It provides that:

> "In case that a number of people participate in making a work in a way that the share of each one cannot be separated from the other shares, all the parties shall be considered equally authors, unless they have agreed in writing otherwise. In this case none of them is allowed to practise the rights of the author alone unless there was a written agreement among them. In case the contribution of all the authors is listed under a different type of art in the same work each one of them has the right to exploit the part of his own contribution provided that this would not damage the exploitation of the work by the others unless they agree in writing otherwise. Each one of them has the right to file a claim when a violation of any of the author's right protected by this law occurs."

30.     Accordingly, pursuant to Article 25, a valid assignment of a co-authored work requires that each co-author agree in a writing to such an assignment and that any such assignment comport with the formalities of a transfer as defined in Article 9.

31.     Finally, I have been asked to provide an analysis of the UAE Copyright Laws

10



to determine the extent of protection of broadcast rights as a neighboring right separate from the author's right.

32.    Having reviewed of the UAE Copyright Laws, it is apparent that it recognizes the broadcast rights as a neighboring right under Article 19:

The broadcasting organizations shall only enjoy the following economic rights.

1. The right to grant licenses for exploitation of their recordings and broadcasted programmes.

2. The right to prohibit any communication of their programmes or recordings to the public without their authorization. Recording of such programmes, copying or re-copying their recordings, rental, re-broadcasting, and communication to the public by any means are prohibited to the third parties in particular"

33.    The UAE is also a party to the Rome Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organizations 1961 that came into force in the UAE in 2005.

34.    The broadcasting rights are therefore protected under UAE Copyright Laws. It is my opinion that these rights are granted to resolve issues when broadcasting organizations broadcast content that lack underlying copyrights by nature of the content itself where it will be difficult to be classified as "works". This could be a live broadcast of an event or a sport game or tournament for example.

35.    In the event that the broadcasted content is a protected "work", the broadcasting organization may have two separate rights such as the broadcasting right and the author's right in the content. If the broadcasting organization has no rights in the content, it is my opinion that the broadcasting right itself shall give no rights in the underlying copyright in the content.

36.    Article 19 of the UAE Copyrights Law, clearly states the rights only extend to the broadcasting organisation's own programmes as stated in multiple instaces ("***their*** *recordings and broadcasting programmes"* and *"**their** programmes"* which in my opinion

11



confirms that Article 19 only applies when the broadcasting organization already had underlying rights in the content or the content lacks the nature in which rights can subsist.

37.    This is in line with Article 1 of Rome Convention:

Protection granted under this Convention shall leave intact and shall in no way affect the protection of copyright in literary and artistic works. Consequently, no provision of this Convention may be interpreted as prejudicing such protection

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on May 2, 2019 in Dubai, United Arab Emirates.

Bassel El Turk
Principal & UAE Country Manager
Rouse & Co. International
11th Floor, The Maze Tower
Sheikh Zayed Road
Dubai P.O. Box 31778
United Arab Emirates
belturk@rouse.com
+971 4 3098000

## Appendix to the Declaration of Bassel EL Turk

**Document**                                                                 **Pages**

**Exhibit 1**……………………………………………………………………**1-4**

**Exhibit 2**……………….……………………………………………….......**5-18**

**Exhibit 3**…………………………………………………………………**19-26**

# EXHIBIT 1

**[to Bassel El Turk Declaration]**

SHEIKH ZAYED RD, CAPRICORN TOWER ., 31ST FL., DUBAI UNITED ARAB EMIRATES
PHONE +971-55-2210883 • EMAIL BELTURK@ROUSE.COM

# BASSEL EL TURK

July 7th, 1981. Male, Married, Lebanese

## EDUCATION

- Sept. 2004 – Sept. 2005:  University of Glasgow *United Kingdom*
  *LL.M in Commercial Law*

- 2000- JUNE2004  La  Sagesse University
  *Maitrise in Law/LLB. in Law*  *Lebanon*

- June 2000  International College
  *Lebanese Baccalaureate in Literature and Philosophy*  *Lebanon*

## LANGUAGES

Arabic: Native, English: Fluent, French: Satisfactory

## WORK EXPERIENCE

May 2006- Present  Rouse & Co. International
*Partner  and Country Manager (since April 2018)*
*Dubai*

- Enforcement and Litigation

  Primarily focussed on enforcement and litigation Strategies.
  - Advising on enforcement strategy
  - Advising on litigation strategy and managing cross border litigation with local advocates before the Civil and Criminal Courts.
  - Drafting court applications, conservatory measures applications, and memorandums in

Arabic and English for Courts of First Instance, Courts of Appeal and Courts of Cassation across the MENA.

- o Drafting reports and memoranda to IP experts and attending court appointed expert meeting
- o Drafting settlement agreements and undertakings. Managing settlement negotiations.

- Trade Marks Prosecution

  - o Advising on filing strategies
  - o managing international and regional trade mark prosecution portfolios

- Commercial IP

  - o Advising on commercial agencies laws and practices
  - o managing cancellation actions of agency agreements

- Media and Advertisement

  - o Advising on and reviewing terms and conditions for wholly or partially internet based competitions and offline marketing campaigns and promotions
  - o Advising on legal risk and cultural sensitivity of media and advertising material
.
- Training authorities on Intellectual Property Rights related laws regulations and case studies.


September 2005 –May 2006            Global Consulting Group sarl
      *Legal Consultant*                              *(GCG) Lebanon*

- GCG is a legal/financial consultancy firm in Beirut.
- Responsible for giving legal advice to commercial companies (clients of GCG) regarding commercial law, labour law, company law, and contract law.
- Also involved in the formation of contracts in Lebanon and the formation of companies in Cyprus, UK, Lebanon and Jordan, and legally represent GCG on behalf of its clients before UK law firms in London and Edinburgh for matters of litigation and formation of companies and Limited Liability Partnerships.
- Managing the clients' litigation with local law firms.

ACCOLADES

- Ranked Silver in WTR 1000 2015, 2016, 2017and 2018

- Recommended legal 500 in 2017 and 2018

- Recommended in MIP IP Stars in 2015 and 2016

- MIP IP star 2017

# EXHIBIT 2

**[to Bassel El Turk Declaration]**

# APPENDIX
# A14

## Federal Law No. 7 of 2002 in Relation to the Rights of the Author and Neighboring Rights

### Contents

Article 1 [Definitions]

Chapter 1: The Scope of Protection
    Article 2 [Works and Rights Protected from Infringement]
    Article 3 [Limits of Protection]
    Article 4 [Registration of Rights in Works]

Chapter 2: Rights of the Author
    Article 5 [Moral Rights of the Author]
    Article 6 [Amendments in Translating]
    Article 7 [Who May License a Work]
    Article 8 [Renting Works]
    Article 9 [Transfers of Rights]
    Article 10 [Consideration for Transfers of Rights]
    Article 11 [Judicial Review of Consideration]
    Article 12 [Transfers of Rights in Computer Programs]
    Article 13 [Disposal of Original Copies]
    Article 14 [Attachment of Financial Rights]
    Article 15 [Future Copyright Works]

Chapter 3: The Scope of Protection for Holders of Neighboring Rights
    Article 16 [Moral Rights of Performers]
    Article 17 [Financial Rights of Performers]
    Article 18 [Rights of Producers of Sound Recordings]
    Article 19 [Rights of Broadcasting Organizations]

Chapter 4: Term of Protection and Licensing the Use of Works
    Article 20 [Terms of Protection]
    Article 21 [Compulsory Licenses]

Article 22 [Permitted Acts]

Article 23 [Rights of the Press]

Article 24 [Same Rules for Holders of
Neighboring Rights]

Chapter 5:   Provisions Relating to Some Works

Article 25 [Joint Authors]

Article 26 [Authors of Collective Works]

Article 27 [Audio and Visual Works]

Article 28 [Anonymous and Pseudonymous Works]

Article 29 [Attachment of Infringing Buildings]

Chapter 6:   Collecting Society Management of the Author's Rights
and Neighboring Rights

Article 30 [Assignment to Collecting Societies]

Article 31 [Discrimination by Collecting Societies]

Article 32 [Collecting Society Licenses]

Article 33 [Register of Collecting Society Members]

Chapter 7:   Precautionary Procedures and Penalties

Article 34 [Interim Court Orders]

Article 35 [Right to Challenge Interim Court Orders]

Article 36 [Customs Seizure]

Article 37 [Infringement and Its Penalties]

Article 38 [Manufacturing and Importing for Sale, etc.]

Article 39 [Computer Program Infringements]

Article 40 [Orders the Court May Make]

Article 41 [Violations of Other Provisions]

Chapter 8:   General and Final Provisions

Article 42 [Intestate Authors]

Article 43 [Images of People]

Article 44 [Works of Foreigners—Reciprocal
Treatment]

Article 45 [Law Officers]

Article 46 [Fees]

Article 47 [Regulations]

Article 48 [Repeal of the 1992 Law]

Article 49 [Regulations Previously in Force]

Article 50 [Publication of this Law]

We, Zayed Bin Sultan Al Nahyan, President of the United Arab Emirates, after considering:

The constitution, and

Federal law no. 1 of 1972 in relation to the jurisdictions of the Ministries and the powers of the Ministers and the laws amending it, and

Federal law no. 15 of 1980 in relation to printed matter and publishing, and

Federal law no. 40 of 1992 in relation to the protection of intellectual works and the rights of the author, and

Based on what was presented by the Minister of Information and Culture, and the approval of the Cabinet, and the ratification of the Supreme Federal Council,

Issued the following law:

## Article 1 [Definitions]

In the application of the provisions of this law, the words and expressions below are intended to have the following meanings unless the context of the text requires otherwise:

| | |
|---|---|
| The State: | The United Arab Emirates. |
| The Ministry: | The Ministry of Economy.[82] |
| The Minister: | The Minister of Economy.[83] |
| Work: | Any creative[84] work in the field of literature, or the arts, or the sciences, of whatever kind or manner of expression, or whatever its importance or its purpose.[85] |

---

82. Federal law no. 32 of 2006 amending federal law no. 7 of 2002 in relation to the rights of the author and neighboring rights, directed the replacement of "Ministry of Information and Culture" with "Ministry of Economy."

83. Federal law no. 32 of 2006 amending federal law no. 7 of 2002 in relation to the rights of the author and neighboring rights, directed the replacement of "Minister of Information and Culture" with "Minister of Economy."

84. The Arabic word here is "mubtakar," which comes from the verb "ibtakara," to invent, create or to originate, but also to be the first person to do something. In other contexts, it might be more appropriate to translate it as "inventive" or "innovative."

85. This definition appears to be an adaptation of article 1 of the Berne Convention: "The expression 'literary and artistic works' shall include every production in the literary, scientific and

| | |
|---|---|
| Author: | A person who creates a work. The author of a work is considered to be the one who puts his name on the work, or to whom the work is attributed upon its publication, unless proven otherwise.[86] |
| | The author of a work is also considered to be the one who publishes a work without a name or under a pseudonym or in any other way, on the condition that there is no doubt in knowing the true identity of the author. If there is such a doubt, the publisher or producer of the work, whether or not a natural or legal person, is deemed to be the representative of the author in exercising his rights until the real identity of the author is known. |
| Creativity:[87] | The creative[88] characteristic that gives to the work originality and distinctiveness. |
| Holders of neighboring rights: | Performance artists, producers of sound recordings, broadcasting organizations, as defined by this law. |
| Performers: | Actors, singers, musicians, dancers or other persons who recite or sing or play or perform in any way, literary or artistic or other works, protected pursuant to the provisions of this law or that are in the public domain. |
| Producer of sound recordings: | A natural or legal person who records for the first time the sounds of a performer or other sounds.[89] |
| Broadcasting organization: | Any entity making wireless audio or visual or audio-visual broadcast transmissions. |
| Broadcasting: | Making an audio or visual or audio-visual transmission to the public by wireless means, of a work or a performance or a sound recording or a program and its recording. Transmitting by means of satellites is also considered to be broadcasting. |

| | |
|---|---|
| Publishing: | Making available to the public a work or a sound recording or a broadcast program or any performance, in any way. |
| Public performance: | An action that leads to the direct communication of a work to the public such as acting a theatrical work or offering or performing artistic works, or showing audio-visual works, and playing musical works, and reciting literary works, it making no difference whether the performance is live or recorded. |
| Public communication: | Transmission, by wire or wirelessly, of a work, or a performance of a sound recording, or broadcast program, the receiving of which is possible by means of the transmission alone, other than a transmission to family members and close friends, in any place other than the place from which the transmission starts, regardless of the time or place or manner of receiving. |
| Reproduction: | Making one or more copies of a work, or a sound recording, or a broadcast program, or any performance, in any manner or form, including permanent or temporary electronic downloading or storage, regardless of the method or device used in the reproduction. |
| Sound recording: | Any aural fixation of a group of sounds resulting in a specific performance whatever the manner of fixation or medium used. Sound recordings include the process of fixing sounds with pictures to produce audio-visual works, unless agreed otherwise.[90] |
| Producer of audio-visual works: | The natural or legal person who provides the necessary conditions to produce an audio-visual work, and who takes on the responsibility of its production. |
| Collective work: | A work created by a group of authors under the direction of a natural or legal person who is responsible for the work's publication in his name and under his supervision. The contributions of the authors to the work are incorporated into the work for the general purpose intended by the person who directed the work and are not able to be separated or distinguished.[91] |
| Joint work: | A work in whose creation a number of persons participated, whether or not it is possible to separate |

---

artistic domain, whatever may be the mode or form of its expression." The Arabic text is substantially the same as article 138.1 of the IPEG.

86. The Arabic text for this definition is identical to article 138.3 of the IPEG.

87. The Arabic word here is "Ibtikaar" and comes from the same root as the word for "creative" in the definition of a "work." The Arabic text for this definition follows article 138.2 of the IPEG but adds the concept of "distinctiveness."

88. The Arabic word here is "ibdaa'e, a possible synonym for the word "mubtakar" that is used in the definition of a "work".

89. The Arabic word here is "asswaat" and is generally used to mean both "sounds" and "voices" depending on the context. I have translated both uses of the word in this sentence as "sounds" to capture the broader meaning in English.

---

90. The expression "unless otherwise agreed" seems out of place here. Statutory definitions are not usually open to the agreement of those to whom the law applies.

91. The Arabic text here is almost identical to IPEG article 138.4.

each person's share, and which is not classified as a collective work.[92]

Derivative work: A work whose existence relies on the existence of a prior work such as translations. Collections of literary and artistic works and collections of folkloric expressions are to be considered as derivative works as long as they are creative as to their arrangement or choice of contents.[93]

National folklore: Any expression of oral, musical, dynamic, or tangible popular folklore containing distinctive elements reflecting traditional artistic heritage originating in the State, and not attributable to a known author.[94]

Public domain: All those works that are from the beginning excluded from protection or those for which the period of protection for the financial rights has expired.[95]

## Chapter 1: The Scope of Protection

### Article 2 [Works and Rights Protected from Infringement]

The protection established by this law is to be enjoyed by the authors of works and the holders of neighboring rights, if their rights are infringed within the State,[96] especially in relation to the following works:

1. Books, pamphlets, articles and other written works
2. Computer programs and their applications, databases and such similar works as are determined by a decision of the Minister
3. Lectures, speeches, addresses, and other works that have a similar nature
4. Dramatic works, including those with music and those without sound
5. Musical works with and without words
6. Audio, visual, and audio-visual works

7. Architectural works and engineering drawings and plans.
8. Works of drawing by means of lines or colors, sculpture, engraving, printing on stone, on fabric, on wood and on metals, and any similar works in the field of the fine arts.
9. Photographic and similar works
10. Works of applied art and plastic art
11. Illustrative pictures, geographical maps, diagrams, three-dimensional works relating to geography, topography and architectural designs, etc.
12. Derivative works, without prejudice to the protection of the works from which they are derived[97]

The protection of the law extends to the title of a work if it is creative[98] and to the written creative idea for a broadcast program.

### Article 3 [Limits of Protection]

The protection [of the law] does not extend to thoughts, procedures, methods of operation, mathematical concepts, principles and mere facts unless a creative form of expression is given to them. Specifically, protection does not extend to:

1. Official documents, whatever language they were originally in or were transferred to, such as texts of laws, regulations, decisions, international agreements, judicial rulings, rulings of arbitrators and decisions published by administrative committees with judicial jurisdiction
2. Reports and information about events and current affairs that are purely informational
3. Works that have fallen into the public domain

However, collections of what is referred to in paragraphs 1, 2, and 3 of this article enjoy the protection of the law if the collecting or arrangement of them or any efforts that have gone into them are distinguished by creativity.[99]

### Article 4 [Registration of Rights in Works]

The Ministry is to establish a system with the competent authority for the depositing or registration of rights in works and for dealings that may occur pursuant to what is set down in the implementing regulations to this law.

The records of the deposit or registration of rights with the Ministry are a reference for the particulars of the work.

---

92. The Arabic text here is almost identical to IPEG article 138.5 but the word order has been changed.
93. Compare EGIP, article 138.6.
94. Article 138.7 of the EGIP contains explanations of the meanings of some of the terms used here. The term "dynamic folklore," for example, includes dance and theatre.
95. The definition here is almost identical to IPEG article 138.8.
96. It is unclear why the enjoyment of rights under the law has been made contingent upon infringement occurring. This expression is not in the corresponding provision of the EGIP—article 140.

---

97. The Arabic text of this list is substantially the same as the list in article 140 of the EGIP.
98. The Arabic text here is identical to the last phrase of article 140.13 of the EGIP.
99. Compare EGIP, article 141.

The non-deposit of a work or non-registration of rights or of dealings that may occur does not in any way prejudice to the rights established by this law.

## Chapter 2: Rights of the Author

### Article 5 [Moral Rights of the Author]

The author and his successors are to enjoy moral rights in the work, and such rights may not be limited by time or alienated, including the following:

1. The right to decide to publish the work for the first time.
2. The right to have the work attributed to him.
3. The right to object to any amendment of the work if the amendment would be denigrating to or a distortion of the work or would be damaging to the reputation of the author.
4. The right to withdraw his work from circulation, if serious reasons arise justifying it. This right is to be exercised through the competent court, with an obligation to pay fair compensation to the one to whom the financial rights of exploitation have been transferred and in the time specified for it by the court and before the execution of the order to withdraw, otherwise any effect of the order is terminated.

### Article 6 [Amendments in Translating]

Amendment in the domain of translation is not to be considered infringement unless the translator omitted a reference to the places of deletion or change or his work harms the reputation of the author.[100]

### Article 7 [Who May License a Work]

The author alone and his successors after him, or the holder of the right of the author, may license, in any way, the exploitation of the work, especially by means of reproduction including electronic downloading and storing, or acting by any method, or broadcasting, or re-broadcasting, or public performance or transmission, or translation, or alteration, or amendment, or rental, or lending, or publishing in any way, including giving access to the work by means of a computer or information and communication networks, or by other means.

### Article 8 [Renting Works]

There is no right to rent computer programs unless the program itself is the subject of the rental. Similarly, there is no right to rent audio-visual works unless the rental is for the ordinary exploitation of the work.

### Article 9 [Transfers of Rights]

The author or his successors may transfer to others, whether natural or legal persons, all or some of his financial rights set out in this law. It is a condition of making any disposal of rights that it be in writing and the right subject of the disposal be specified, with a statement of the purpose of the disposal, the period and place of exploitation. The author continues to be the owner of all rights that he does not expressly assign.

Without prejudice to the moral rights of the author stated in this law, the author may not do anything that would frustrate the exploitation of the work the subject of the disposal.

### Article 10 [Consideration for Transfers of Rights]

The author or his successors may be paid in cash or its equivalent for his transfer of one or more of his financial rights to another to exploit the work that is based on a shared percentage of the income resulting from the exploitation. He may also contract to receive a lump sum payment, or to receive both a lump sum and a percentage of income.[101]

### Article 11 [Judicial Review of Consideration]

If it is apparent that the agreement referred in article 10 of this law is detrimental to the right of the author or to any holders of neighboring rights, or becomes detrimental because of circumstances that arise after contracting, the author or his successors may resort to the competent court to request a review of the value of the payment that was agreed upon.[102]

### Article 12 [Transfers of Rights in Computer Programs]

Without prejudice to the provisions of article 9 of this law, the transfer of financial rights in relation to computer programs and applications or databases is subject to the license contract that is stated on or affixed to the program

---

100. The Arabic text of this article is identical to part of paragraph 143.3 of the EGIP.

101. The Arabic text of this article is almost identical to article 150 of the EGIP.
102. The Arabic text of this article is almost identical to most of article 151 of the EGIP.

whether appearing on the disc[103] or on the screen when downloading or storing the program. The purchaser or user of the program is obliged to comply with the conditions stated in the license.

## Article 13 [Disposal of Original Copies]

Any disposal by the author of the author's original copy of the work does not result in a transfer of the author's financial rights, unless otherwise agreed.

However, the transferee of the property in the original copy of the work is not obliged—without prior agreement—to permit the author to copy the work, transfer it or exhibit it.[104]

## Article 14 [Attachment of Financial Rights]

The financial rights of authors in their published works may be attached. However, the unpublished works of a dead author cannot be attached unless it is proven with certainty that he intended to publish the works before his death.[105]

## Article 15 [Future Copyright Works]

Any disposal by the author of all of the author's future intellectual production or more than five of his future works is null and void.[106]

## Chapter 3: The Scope of Protection for Holders of Neighboring Rights

## Article 16 [Moral Rights of Performers]

Performers and their successors enjoy a moral right that cannot be assigned or be subject to limitations, entitling them to:

1. The right to attribute the performance to themselves whether it was live or recorded
2. The right to prevent any alteration, distortion, or derogatory treatment or modification of their performance in any way that damages their reputation

The Ministry is to exercise this moral right after the end of the period of protection of the financial rights stated in this law in order to preserve the manner in which the performance was created.[107]

## Article 17 [Financial Rights of Performers]

Performers alone enjoy the following financial rights:

1. The right to transmit their unrecorded[108] performance and transfer it to the public
2. The right to fix their performance in a sound recording
3. The right to reproduce their recorded[109] performance in a sound recording

The recording of a live performance on any medium or renting it with the purpose of obtaining a direct or indirect commercial return or transmitting it or making it available to the public without the consent of the owner of the right is to be considered prohibited exploitation.

The provisions of this article apply to the fixing of the performers' performance in an audio-visual work unless otherwise agreed.[110]

## Article 18 [Rights of Producers of Sound Recordings]

Producers of sound recordings alone enjoy the following financial rights:

1. The right to prevent any exploitation of their recordings by any means without a license from them (reproducing or renting or broadcasting or re-broadcasting or making their recording available to the public by computer or other means is to be considered prohibited exploitation).
2. The right to publish their recordings by wire or wireless means or by computer or other means.[111]

## Article 19 [Rights of Broadcasting Organizations]

Broadcasting organizations alone enjoy the following financial rights:

1. The right to grant licenses to exploit its broadcast recordings and programs.

---

103. The meaning here could be broader than "disc" to include anything that carries the program.
104. This article corresponds to article 152 of the EGIP.
105. This article corresponds to article 154 of the EGIP.
106. The Arabic text here is identical to article 153 of the EGIP except that the concept of "more than five works" has been added in the UAE version of the article.

107. The Arabic text here is substantially similar to article 155 of the EGIP.
108. Or "unfixed."
109. Or "fixed."
110. This article corresponds to article 156 of the EGIP.
111. This article corresponds to article 157 of the EGIP.

2. The right to prevent any communication of its programs or recordings to the public without a license from it (recording these programs or making copies of them or reproducing their recordings or renting them or re-broadcasting or transmitting them to the public by any means is deemed to be prohibited).[112]

## Chapter 4: Term of Protection and Licensing the Use of Works

### Article 20 [Terms of Protection]

1. The financial rights of the author stated in this law are protected for the life of the author and fifty years from the first Gregorian year following his death.[113]

2. The financial rights of authors of joint works are protected for the lives of the authors and fifty years from the first Gregorian year following the death of the last author that remains alive.[114]

3. In relation to collective works, if the author is a legal person, the financial rights of the author—with the exception of authors of works of applied art—are protected for fifty years from the first Gregorian year following the year of first publication, but if the author is a natural person, the financial rights are protected for the periods referred to in paragraphs 1 and 2 of this article.

The financial rights in works published for the first time after the death of the author expire fifty years from the first Gregorian year following the year in which the work was first published. [115]

4. The financial rights in works published without the name of the author or under a pseudonym are protected for fifty years from the first Gregorian year following the year in which the work was first published. However, if the author is known and identifiable or he reveals his identity, then the period of protection is calculated according to the principle stated in paragraph 1 of this article.[116]

5. The financial rights of the authors of works of applied art expire 25 years from the first Gregorian year following the year of first publication.[117]

6. In the cases where the period of protection is calculated from the date of first publication, the date of first publication is taken as the basis for calculating the period of protection regardless of any subsequent re-publication, unless on re-publication the author made essential amendments such that the work can be considered as a new work.

If the work consists of several parts or volumes published separately and over a period, each part or volume is to be considered as an independent work for the purposes of calculating the period of protection.[118]

7. The financial rights of performers are protected for fifty years calculated from the first Gregorian year following the year of the performance. If the performance is fixed in a sound recording, the period of protection is calculated from the end of the year in which the performance was fixed.[119]

8. The financial rights of producers of recordings are protected for a period of fifty Gregorian years calculated from the first Gregorian year following the year in which the recording was published or, if the recording has not been published, from the first year in which the recording was fixed.[120]

9. The rights of broadcasting organizations are protected for a period of twenty years from the first Gregorian year following the year in which the programs were first broadcast.[121]

### Article 21 [Compulsory Licenses]

Any person may apply to the Ministry for the grant of a compulsory license to copy or translate or both any work protected pursuant to the provisions of this law, but in relation to licenses to translate, only after the passing of three years from the date of publication of the work. The license is to be issued by means of a reasoned decision specifying the time and place of exploitation and the fair payment to which the author is entitled. The purpose of the issue of the license must always be restricted to educational needs of any kind or level, or the needs of public libraries or archives. Such licenses are to be granted pursuant to the conditions, constraints, and terms specified in the implementing regulations of this law, and in a way that does not cause unjustifiable damage to the lawful interests of the author or his successors or prejudice the normal exploitation of the work. The fees to be charged for granting such licenses are to be specified in a decision of the Cabinet.[122]

---

112.  This article corresponds to article 158 of the EGIP.
113.  The Arabic text of this paragraph is substantially identical to article 160 of the EGIP.
114.  The Arabic text of this paragraph is substantially identical to article 161 of the EGIP.
115.  The Arabic text of these two paragraphs is substantially identical to article 162 of the EGIP.
116.  The Arabic text of this paragraph is substantially identical to article 163 of the EGIP.
117.  The Arabic text of this paragraph is substantially identical to article 164 of the EGIP.

118.  The Arabic text of these two paragraphs is substantially identical to article 165 of the EGIP.
119.  This paragraph corresponds to article 166 of the EGIP.
120.  This paragraph corresponds to article 167 of the EGIP.
121.  This paragraph corresponds to article 168 of the EGIP.
122.  Article 21 of the ARL 2002 corresponds to article 170 of the EGIP.

## Article 22 [Permitted Acts]

Without prejudice to the moral rights of the author set out in this law, the author, after the publication of his work, may not prevent others from doing any of the following acts:

1. Making a single copy of the work for the copier's personal use for purely non-profit and non-professional purposes, but excluded from this are
[a] works of fine art or applied art unless they are located in a public place and the owner of the rights or his successors has consented, and
[b] architectural works not covered by paragraph (7) of this article,
and [c] computer programs and applications and databases not mentioned in paragraph (2) of this article

2. Making a single copy of a computer program or its applications or a database with the knowledge of the lawful possessor, who has the right to adapt it, but only within the limits of the licensed purpose, for the purpose of back-up, or as a replacement for when the original copy is lost or destroyed or unusable, on the condition that the substitute or adapted copy is destroyed as soon as the copier no longer has the right to possess the original copy, even if the copy is carried or stored on a computer

3. Copying protected works for use in judicial or similar procedures within the limits of what is necessary for such procedures and with mention of the source and author's name

4. Photocopying a single copy of the work with the knowledge of the documentation office, archives, libraries or documentary centers, not being for any direct or indirect profit, in either of the following two circumstances:

   a. The copying is for the purpose of preserving the original, or to replace a lost or destroyed copy or one that has become unsuitable for use, and it is not possible to obtain a substitute in reasonable circumstances.
   b. The purpose of the copying is to answer a request from a natural person to use the copy in study or research but only once or at irregular intervals, but only if it has not been possible to obtain a license to copy pursuant to the provisions of this law.

5. Quoting short paragraphs or extracts or analyses within the limits of what is customary for such a work, with the intention of criticism or debate or news, mentioning the source and the name of the author.

6. Performing the work in family gatherings or, if performed by students, performing the work in educational institutes, provided that the performance is not for direct or indirect payment.

7. Showing works of fine art, applied art, plastic art or architecture in broadcast programs if the work is permanently located in a public place.

8. Copying short parts of a work in written form or in an audio or visual recording for educational, or cultural, or religious, or professional training purposes, provided that the copying is within reasonable limits, and does not exceed its purpose, and the name of the author and the title of the work are mentioned each time it is possible, and that the copier is not aiming to obtain a direct or indirect profit, and on condition that it was not possible to obtain a license to copy pursuant to the provisions of this law.[123]

## Article 23 [Rights of the Press]

Without prejudice to the moral rights of the author pursuant to this law, the author may not prevent reproduction by newspapers, periodicals, or broadcasting organizations for the purpose of publishing any of the following within the limits that are justified by that purpose:

1. Extracts of the author's works that have been lawfully made available to the public. This provision applies to also to works that have been seen or heard during current events or broadcasts of the work or any other transmission of the work to the public.

2. The author's published articles relating to debates on subjects that have engaged public opinion at particular times, as long as at the time of publication such articles have not been declared to be prohibited.
   In the cases mentioned in paragraphs 1 and 2, the source and the name of the author must be mentioned.

3. Speeches, lectures and discussions in public parliamentary or judicial sessions, or in public meetings, as long as they are addressed to the public and reproduced in the context of current news reporting.
   The author alone, or his successors, continues to have the right to collect any of these works in collections attributed to him.[124]

## Article 24 [Same Rules for Holders of Neighboring Rights]

The rules applying to the financial rights of the author set out in this law also apply to the holders of neighboring rights.[125]

---

123.  Article 22 of the ARL 2002 corresponds to article 171 of the EGIP.
124.  Article 23 of the ARL 2002 corresponds to article 172 of the EGIP.
125.  Article 24 of the ARL 2002 is almost identical to article 173 of the EGIP.

## Chapter 5: Provisions Relating to Some Works

### Article 25 [Joint Authors]

If a number of persons participated in the creation of a work and it is not possible to separate the contribution of each of them, all of the participants are considered to be authors of the work equally, unless otherwise agreed in writing. Only if the participants agree in writing prior to creating the work may one of them alone exercise the author's rights.

If each of the authors participated in the work contributing different kinds of art, each of them has the right to exploit the part that he alone contributed, on the condition that the exploitation does not damage the exploitation of the work for the others, unless otherwise agreed in writing. Each of them has the right to raise a case of infringement of any one of the author's rights protected by this law.

If one of the participating authors dies without a successor, his share in the work passes to the remaining participants or their successors after them, unless otherwise agreed in writing.[126]

### Article 26 [Authors of Collective Works]

The natural or legal person who directed the creation of a collective work may alone exercise the financial and moral rights in relation to it, unless there is an agreement to the contrary.[127]

### Article 27 [Audio and Visual Works]

1. The following are considered to be joint authors of an audio-visual, audio or visual work:

   a. The author of the scenario
   b. The person who adapted an existing literary work such that it is suitable for an audio-visual use
   c. The author of the dialogue
   d. The composer of music that is made especially for the work
   e. The director, if he exercised effective control over the production of the work

If the work is taken or derived from another prior work, the author of the prior work is deemed to be one of the authors participating in the new work.

2. The author of the literary or musical part has the right to publish what is his in any way other than the way in which the joint work is published, unless agreed in writing to the contrary.

3. If one of the participants in the creation of an audio-visual or audio or visual work refrains from completing his part of the work, the rest of the participants are not prevented from exploiting the part of the work created by them, but without prejudice to the rights in the creation resulting from the participation of the one who refrained.

4. The producer, during the agreed period for the exploitation of the audio-visual, audio or visual work, is to be the representative of the authors of the work and their successors, in agreeing to the exploitation of the work, without prejudice to the rights of the authors of the literary works, or extracted or adapted musical works, unless otherwise agreed in writing.

The producer is deemed to be the publisher of this work and has the rights of the publisher for it and for its reproductions, within the limits of the purposes of financial exploitation.[128]

### Article 28 [Anonymous and Pseudonymous Works]

The author of a work that does not carry the name of the author or carries a pseudonym is deemed to have appointed the publisher as his representative in exercising the rights set out in this law, unless he appoints another representative or declares his identity or confirms his role as author or there is no doubt as to the truth of his identity.[129]

### Article 29 [Attachment of Infringing Buildings]

Buildings may not be attached and an order may not be issued for the destruction, change of features or confiscation of a building, with the purpose of preserving the rights of the architectural author whose engineering designs and drawings or plans have been unlawfully used, but that does not prejudice his right to just compensation.

---

126. The Arabic text of article 25 of the ARL 2002 is substantially the same as article 174 of the EGIP.
127. Article 26 of the ARL 2002 corresponds to article 175 of the EGIP.

128. Article 27 of the ARL 2002 corresponds to 177 of the EGIP.
129. The Arabic text of article 28 of the ARL 2002 is substantially the same as article 176 of the EGIP.

## Chapter 6: Collecting Society Management of the Author's Rights and Neighboring Rights

### Article 30 [Assignment to Collecting Societies]

The holders of the rights of the author and of neighboring rights may assign their financial rights to a professional collecting society that specializes in their management, or may authorize other persons to exercise these rights.

Contracts executed by the collecting society or other persons in relation to this matter are considered to be civil contracts.

### Article 31 [Discrimination by Collecting Societies]

The collecting society or other persons mentioned in article 30 of this law may not discriminate between applicants seeking to contract with it for the exploitation of works entrusted to it.

The grant of licenses by the collecting society or other persons for reduced payment is not to be considered discrimination in the following two circumstances if based on a reasoned decision:

1. Exploitation of works for public celebrations by means of live performance
2. Exploitation of works in the context of educational or cultural activities that do not produce a direct or indirect financial return

### Article 32 [Collecting Society Licenses]

The collecting society or other persons who are responsible for the management of the rights of the author and neighboring rights may not practice their activities except with an annual license from the Ministry and the Ministry may put into the implementing regulations any rules organizing the work of the collecting society or persons and make the necessary amendments to the rules and the system of licensing and the carrying out of its work.

The Cabinet is to issue a decision specifying the fees for the grant of licenses.

### Article 33 [Register of Collecting Society Members]

The collecting societies and those responsible for the management of the rights of the author and neighboring rights must hold registers with the names of its members and their titles and the acts for which they have contracted, explaining the kind of act and duration and the payment agreed. They must inform the Ministry of any changes in the registers, and must abide by administrative decisions issued by the Ministry. The Ministry has the right to withdraw the license if the collecting society or other persons do not comply with the provisions of the law and regulations and administrative decisions implementing the law.

## Chapter 7: Precautionary Procedures and Penalties

### Article 34 [Interim Court Orders]

The President of the First Instance Court may, based on an application by the author or his successors and, consistent with the orders sought in the pleadings, order the following procedures in relation to any works published or exhibited without the written permission of the author or his successors:

1. To make a detailed description of the work
2. To stop publication, exhibition or production of the work
3. To attach the original work or its copies (whether books, pictures, drawings, performances, photographs, sound recordings or broadcast programs or other works) and also the materials used in re-publishing the work or extracting copies from it, on the condition that these materials are suitable only for re-publishing the work
4. To record the public performance of the playing, the acting or the recitation of the work to the public, and prevent the continuation of the present exhibition or prohibit it in the future
5. To calculate the financial return produced by the publication or exhibition, if necessary by means of an expert appointed for this purpose, and attach the financial return in any case
6. To obtain proof of the fact of infringement of any of the rights protected pursuant to the provisions of this law

The President of the First Instance Court may, in any case, order the appointment of an expert to assist the court bailiff who has been charged with execution of the order, and may order the applicant to deposit a suitable security. The applicant must file the main case in relation to the dispute within fifteen days after the issue of the order, and if the applicant does not file the case within this period, the order is to cease to have effect.[130]

---

130. Article 34 of the ARL 2002 corresponds to article 179 of the EGIP.

## Article 35 [Right to Challenge Interim Court Orders]

The person against whom the order has been issued may challenge the order before the President of the Court that issued the order within twenty days of the issue of the order, and in this case, the President of the Court may either confirm the order, or wholly or partially cancel it, or appoint a guardian whose role it is to re-publish the work subject of the dispute, or to exploit it, or to exhibit it, or to manufacture it or to extract copies of it, and deposit the financial return produced in the treasury of the court until the main case has been decided.[131]

## Article 36 [Customs Seizure]

The customs authorities may order, on their own account or upon application by the author or the right holder or their successors, based on a reasoned decision, the non-release from customs, for a period of not more than twenty days, of any copied material infringing the provisions of this law. The implementing regulations are to specify the circumstances, conditions and procedures for a non-release application, and what supporting documents should be attached to it, and the value of what is necessary for the applicant to deposit as suitable financial security to ensure the seriousness of the application. Three days from the date on which the application is filed satisfying all requirements, the applicant will be informed of the decision immediately upon its issue.

In any case, the customs authorities may not prevent interested parties from examining the materials in respect of which the non-release order has been made, pursuant to the conditions that are specified in the implementing regulations.

## Article 37 [Infringement and Its Penalties]

Without prejudice to any harsher punishment stated in any other law, any person who, without the written permission of the author or the holder of neighboring rights, or their successors, does any of the following acts, is to be punished by imprisonment for a period of at least two months and a fine not less than 10,000 dirhams and not exceeding 50,000 dirhams or either one of these:

1. Infringes any of the moral or financial rights of the author or holder of a neighboring right as set out in this law, including putting any work or performance or sound recording or broadcast program that is protected by this law within the reach of the public whether by means of computer or the Internet or information networks or communication networks or any other means

2. Sells or rents or makes available for circulation in any way a work or sound recording or broadcast program protected pursuant to the provisions of this law

The punishment set out in this article is to be multiplied according to the number of works or performances or broadcasts or recordings the subject of the crime.

If the crime is committed again, imprisonment for not less than six months and a fine of not less than 50,000 dirhams are to be imposed.[132]

## Article 38 [Manufacturing and Importing for Sale, etc.]

Without prejudice to any harsher punishment stated in any other law, any person who commits the following acts is to be punished by imprisonment for a period of at least three months and a fine not less than 50,000 dirhams and not exceeding 500,000 dirhams:

1. Manufacturing or importing, without a right to do so, and with the purpose of selling or renting or circulating, any work or counterfeit copies or any apparatus or means or tools designed or prepared especially for manipulating protection or techniques used by the author or the holder of a neighboring right to transmit or offer for circulation or to regulate or to manage these rights or to preserve a specific clarity of quality of reproduction

2. Disabling or impairing, without a right to do so, any technical protection or electronic information intended to regulate and manage the rights set out in this law

3. Computer downloading or storing of any copy of computer programs or applications or databases without a license from the author or right holder or their successors

If the crime is committed again, imprisonment for not less than nine months and a fine of not less than 200,000 dirhams is to be imposed.

## Article 39 [Computer Program Infringements]

Aside from the provisions of article 37 of this law, any person who uses a computer program or applications or databases without a prior license from the author or his successors is to be punished by a fine of not less than

---

131. Article 35 of the ARL 2002 corresponds to article 180 of the EGIP.

132. Article 37 of the ARL 2002 corresponds to part of article 181 of the EGIP.

10,000 dirhams and not more than 30,000 dirhams for each program or application or database.

If the crime is committed again, a fine of not less than 30,000 dirhams is to be imposed.

If the crime is committed in the name of, or on account of, a legal person, or a commercial or professional business, the court may order its closure for a period of not less than three months.

## Article 40 [Orders the Court May Make]

Without prejudice to the punishments set out in articles 37, 38, and 39 of this law, the court may order the confiscation of the counterfeit copies the subject of the crime or obtained from it and the destruction of them. The court may also order the confiscation of the equipment and tools used in the commission of the crime that are not suitable for any other purpose, and the closure of the business that committed the crime of counterfeiting for not more than six months and publish a summary of the judgment issued in one or more daily newspaper at the expense of the defendant.

## Article 41 [Violations of Other Provisions]

Without prejudice to the penalties that are stated in this law, any person who violates any provision of this law or regulations or orders issued implementing it is to be punished by imprisonment not exceeding six months and a fine, or by either one of them.

## Chapter 8: General and Final Provisions

## Article 42 [Intestate Authors]

The Ministry is to exercise the moral and financial rights of the author in the event that there is no heir or testator. The Ministry is to continue to exercise the moral rights set out in this law with the purpose of preserving the work even after the expiry of the prescribed period of protection for the financial rights in the work.

## Article 43 [Images of People]

A person who makes a image of another, by any means, does not have the right to save or exhibit or publish or distribute the original or copies of it without the permission of the person who is depicted, unless otherwise agreed, or unless publication of the image was done on the occasion of

public events, or it relates to persons who are official or public personalities or are famous, or the publication was permitted by the public authorities as being in the public interest, but on the condition that the exhibiting of the image or its circulation does not affect the reputation of the person that is represented.

The person appearing in the image may authorize publication of it in newspapers or other media, even if the creator did not permit the publication, unless otherwise agreed.[133]

## Article 44 [Works of Foreigners—Reciprocal Treatment]

In the domain of conflicts of laws, the provisions of this law apply to the works and performances and sound recordings and broadcast programs of foreigners, on the condition that there is reciprocal treatment, and without prejudice to the provisions of international agreements in force in the State.

## Article 45 [Law Officers]

The Minister of Justice and Islamic Affairs and Endowments, in agreement with the Minister of Economy[134], is to issue a decision specifying the employees who have the role of judicial seizure officers in the implementation of the provisions of this law.

## Article 46 [Fees]

The specific fees for undertaking the procedures pursuant to this law are to be published by a decision of the Cabinet.

## Article 47 [Regulations]

The Minister is to issue the regulations and decisions necessary for the implementation of this law.

---

133. The Arabic text of article 43 is substantially the same as part of article 178 of the EGIP. The EGIP article also contains the paragraph: "These provisions apply to any images however they are made including by drawing or engraving or any other means." Seen in the context from which the article was probably adopted, it should be interpreted broadly and not as limited to, for example, photographs.

134. Federal law no. 32 of 2006 amending federal law no. 7 of 2002 in relation to the rights of the author and neighboring rights, directed the replacement of "Minister of Information and Culture" with "Minister of Economy."

### Article 48 [Repeal of the 1992 Law]

Federal law no. 40 of 1992, and all provisions inconsistent with the provisions of this law, are repealed.

### Article 49 [Regulations Previously in Force]

Applicable regulations and decisions remain in force, to the extent that they do not contradict the provisions of this law, until such time as implementing regulations and decisions are issued.

### Article 50 [Publication of this Law]

This law is to be published in the official gazette and will come into force on the date of its publication.

Zayed Bin Sultan Al Nahyan
President of the United Arab Emirates

Issued at the Presidential Palace in Abu Dhabi
Date: Rabi'a 20, 1423 H
Corresponding to: July 1, 2002 M.

# EXHIBIT 3

**[to Bassel El Turk Declaration]**



# COPYRIGHT LAW - HOW DOES THE UAE COMPARE WITH COMMON LAW JURISDICTIONS?

16 February 2017

Civil law and common law traditions exert divergent influences on certain features of national copyright laws, which results in major differences between copyright law in civil law jurisdictions and in common law jurisdictions:

**In civil law jurisdictions,** the protection of the author is the cornerstone of copyright law. As a result, copyright law is aimed at protecting both the author's economic interests and the author's reputation against the unauthorized use or alteration of his/her works. To this end, authors are granted some non-transferable rights and retain copyrights in their works absent any express assignment of rights, even in the context of an employment contract.

**In common law jurisdictions,** copyright law promotes progress and economic benefits arising out of a work. As a result, an author is seen as a transferor of rights that constitute a source of economic benefits for the community. As such, all of the authors' rights are transferable, and employers or commissioning parties may benefit from an automatic assignment of rights in a work to facilitate investment and exploitation of the rights.

The UAE is a civil law jurisdiction, highly influenced by French law and Islamic law. As such, the provisions of the UAE copyright law fundamentally diverge, in some respects, from copyright law in common law jurisdictions (such as the United Kingdom (UK), Ireland, the United States, Australia and New-Zealand).

However, it is common practice for many companies operating in the UAE to run their business on the assumption that the principles enshrined in the UAE Federal Copyright Law (the "UAE Copyright Law") are the same as those applied in common law jurisdictions. This is not the case. This false belief may have a significant impact on businesses since it may result in authors' rights arising out of the company's activities not being effectively passed through to the company, and remaining with the individuals who created those rights, the consequences of which are detailed hereafter.

Since the UAE is attracting more and more businesses in a wide variety of sectors, it is paramount for these companies employing people and/or commissioning works in the UAE to know the differences between the copyright law in the UAE and the copyright laws in common law jurisdictions.

This article highlights some of the typical main differences between UAE copyright law and the copyright laws in common law systems, which any business operating or looking to operate in the UAE should be aware of.

# No automatic transfer of copyrights

In both civil law and common law countries, the general rule is that copyright initially vests in the author of the work.

However, in common law countries, the copyright may initially vest in the employer or another person/entity for whom the work was prepared.

In the United-States, under the "work made for hire" doctrine, the copyright in a work created by an employee within the scope of his/her employment will automatically (without a written assignment) and initially vest in the employer. A commissioner may also own the copyrights in a work made by an independent contractor as a work made for hire under certain circumstances.

This doctrine is premised on the principle of facilitation of investment and exploitation.

A similar rule exists under the laws of the UK and the laws of Ireland with respect to works made by an employee in the course of his/her employment.

In civil law countries, however, ownership of copyrights in a work vests in the author of such work, until the copyright is assigned through a written assignment instrument.

As a result, unlike what it is often assumed, an employer or a commissioning party does not automatically own the copyrights in the work made by an employee in the course of his/her

employment or commissioned to an independent contractor. This rule applies in the UAE and is a public order rule.

Under the UAE Copyright Law, absent a written assignment of copyrights in employment contracts or commissioning agreements, the copyrights will not be passed through to the employer or commissioner of the work, and will remain with the employee or the independent contractor (unless the work may qualify as a collective work under Article 1 of the UAE Copyright Law, which may be difficult to prove in practice). Confirmatory assignments may also have to be put in place for the assignment of copyrights to the employer or commissioner to be valid under UAE law, as explained in section two below.

Companies must therefore ensure that adequate assignment agreements are put in place with their employees and independent contractors in the UAE to ensure the effective transfer of the rights to the company.

It is paramount for all companies in the UAE, but especially those with research and development (R&D) departments (laboratories, cosmetic companies, etc.), design offices in the UAE (fashion brands, etc.), or creating content in the UAE (advertising agencies, design/brand agencies, etc.) to include in their standard employment contracts an express assignment in their favour in respect of the copyrights in the works created by their employees in the course of their employment. We also strongly recommend that companies put in place with their employees a system of confirmatory assignments of the copyrights in the works created in the course of the employment contract (see section two below).

Likewise, any companies, regardless of their field of activity, should ensure that their agreements instructing third party contractors and governed by UAE law contain the relevant assignment clauses allowing the copyrights in the deliverables ordered to be transferred to the company (such as a logo, a web design, a retail design, a packaging, a software, the architecture of a building, etc.). A clause merely referring to the assignment of all the rights in the works as works 'made for hire' would be irrelevant and ineffective.

It is important to note that a copyright assignment is only valid under the UAE Copyright law if it satisfies a number of conditions, including that the assignment should: be in writing, expressly specify the rights assigned, and include statements of the purpose for which the rights are assigned and the geographical area in respect of which the rights are assigned. In addition, one must note that under UAE law, an assignment of copyrights in more than four future works is null and void, as further detailed in section two.

Without an assignment that complies with the provisions of the UAE Copyright Law, companies

are at risk of having to defend a copyright infringement claim from the owner of the rights that were not transferred (either an employee or a contractor), on the basis of the unauthorized use of its work(s), which could notably result in damages to be paid to the claimant and an injunction to withdraw the related work(s) (or product comprising such work(s)) from the market (hence entailing withdrawal and replacement costs).

If the company attempted to assign the rights to a third party, such third party may also face a copyright infringement claim from the owner of the rights. In such a situation, we would expect the third party assignee to file a contractual liability claim against the company that assigned to it copyrights it did not own.

In addition, in the event the company were to seek to enforce its intellectual property rights against an alleged infringer, there is a significant risk that the alleged infringer could be successful in challenging the ownership of such intellectual property rights, which would result in the dismissal of the infringement claim.

Also, if a company cannot prove its ownership of copyrights, it may have a significant impact on its ability to find investors or on the price of its business when trying to sell it.

# No general assignment of future copyrights

Another major difference between copyright law systems in civil law jurisdictions and common law jurisdictions resides in the assignment of future copyrights.

In common law countries, there is no prohibition on the contractual assignment of a future copyright in a work that has yet to be created. As a result, it is possible to assign future copyrights, i.e. copyrights in works that are still to be created.

In civil law countries, as a general rule, an agreement that concerns all the works or all the works of a specific type that will be created by an author in the future is void.

In particular, the UAE Copyright law contains a provision that deems any disposal of the author's future intellectual rights in five or more future works to be null and void. But if, for example, an employee is employed in a creative role, this could mean that his/her five works are completed within a few hours of signing any agreement.

As a result, in order to overcome such restrictions from assigning five or more future works, we would recommend that companies put in place with their employees in the UAE a system of confirmatory assignments that should be completed and signed by the employee once it has created and delivered any work in the context of his/her employment agreement. This means

that the employee does not assign rights in all future works created in the course of his/her employment contract but assigns the rights as and when a particular work is completed.

The same applies to service providers once they have created any deliverables in the context of a service agreement (involving the delivery of more than four works during the term of the agreement), and have been paid for such deliverables in accordance with the service agreement. That would, for instance, apply in the case of a design and build agreement between an employer and a contractor, which generally involves the delivery of multiple design documents.

A system of confirmatory assignments executed upon delivery would ensure the effective assignment of rights in the deliverables where more than four deliverables are involved. More generally, we recommend putting in place a system of confirmatory assignments of copyrights with any service providers as a matter of good practice since it allows a clear identification of the deliverables, the copyrights of which are assigned to the commissioner, and hence limits any possibility of a successful challenge from the contractor as to the copyrights assigned to the company.

As a result, we would recommend adding in all employment agreements or service agreements governed by UAE law a clause pursuant to which the employee or the contractor undertakes to execute any required documents, during the term of the agreement or any time after its termination, in order to ensure the effective assignment of rights in the works/deliverables.

## Strict limitations in the waiver of moral rights

As a general rule, moral rights granted to authors consist of the right of disclosure of the works, the right of attribution (i.e. right to claim or disclaim authorship in the work) and the right of integrity (i.e. right to prevent distortion and modification of a work).

In the United States, however, authors benefit from limited moral rights of attribution and integrity because such rights only exist for a narrowly defined group of works of visual arts.

Moral rights are personal and cannot be assigned. However, in most common law jurisdictions, moral rights can be waived. It is therefore usual practice to see in assignments or licensing agreements governed by US, UK or Irish laws, provisions under which authors waive their moral rights. As a general rule, a waiver of moral rights is only valid if it is in writing and it identifies the relevant copyrighted work(s). Such an approach is consistent with the functional view of authors' rights in these countries.

On the contrary, in civil law countries, including the UAE, general waivers of moral rights would ordinarily be unenforceable as it would be equivalent to an assignment of moral rights, which is prohibited in accordance with the traditional approach of copyrights in civil law jurisdictions (pursuant to which authors' works are protected as the products of the authors' personality, so that authors should be protected against any modification of their works).

An author may only undertake in writing not to exercise his/her moral rights in relation to a specific person or entity, provided that the agreement specifies the work(s) and specific uses to which the undertaking applies. The more detailed these provisions are, the greater the likelihood that they will, if challenged, prove valid and enforceable in court.

Copyright laws in the other GCC countries contain provisions similar to the ones described above and in force in the UAE.

**Gowling WLG has extensive experience in advising clients on the full spectrum of copyright issues, in a wide range of sectors such as media and entertainment, retail and leisure, fashion, FMCG, luxury goods and hospitality.**

**For more information regarding copyright law in the UAE or in the other GCC countries, please contact Jon Parker or Vanessa Delnaud.**

NOT LEGAL ADVICE. Information made available on this website in any form is for information purposes only. It is not, and should not be taken as, legal advice. You should not rely on, or take or fail to take any action based upon this information. Never disregard professional legal advice or delay in seeking legal advice because of something you have read on this website. Gowling WLG professionals will be pleased to discuss resolutions to specific legal concerns you may have.

**Related**   Intellectual Property



**Jon Parker**
Partner - Dubai

✉ Email

**Vanessa Delnaud**
Principal Associate - Dubai

✉ Email

| jon.parker@gowlingwlg.com | | vanessa.delnaud@gowlingwlg.com | |
|---|---|---|---|
| 📞 Phone | | 📞 Phone | |
| +971 (0)4 437 5126 | | +971 4 437 5100 | |
| ⬇ vCard | | ⬇ vCard | |
| Jon Parker | | Vanessa Delnaud | |

Gowling WLG is an international law firm comprising the members of Gowling WLG International Limited, an English Company Limited by Guarantee, and their respective affiliates. Each member and affiliate is an autonomous and independent entity. Gowling WLG International Limited promotes, facilitates and co-ordinates the activities of its members but does not itself provide services to clients. Our structure is explained in more detail on our Legal Information page.

© 2019 Gowling WLG International Limited. All rights reserved.