UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DISH NETWORK L.L.C.,

     Plaintiff/Counter-Defendant,

v.                                   Case No. 8:16-cv-2549-T-60CPT

GABY FRAIFER, TELE-CENTER,
INC., and PLANET TELECOM, INC.,
individually and together d/b/a
UlaiTV, PlanetiTV, and AhlaiTV,

     Defendants/Counter-Plaintiffs.
_____/

## REPORT AND RECOMMENDATION

This cause is before me on referral for consideration of the *Plaintiff's Dispositive Motion for Summary Judgment* (Doc. 146) and the *Defendants' Amended Motion for Summary Judgment on Count I of Plaintiff's Amended Complaint* (Doc. 217). For the reasons set forth below, I respectfully recommend the Court grant in part the Plaintiff's motion for summary judgment and deny the Defendants' amended motion for summary judgment.

I.

*A. Procedural Background*

Plaintiff DISH Network L.L.C. (DISH) initiated this action in August 2016 against Defendants Gaby Fraifer (Fraifer) and Tele-Center, Inc. (TCI), asserting one

count of direct copyright infringement under Section 501 of the Copyright Act, 17 U.S.C. § 101, *et seq.* (Copyright Act or the Act).   (Doc. 1).   In March 2017, DISH amended its complaint to add Planet Telecom, Inc. (PTI) as a defendant.   (Doc. 62). In short, DISH claims in its revised complaint that the Defendants "captur[ed] broadcasts of television channels exclusively licensed to DISH and unlawfully retransmitted these channels over the Internet to customers of the[ Defendants'] UlaiTV and AhlaiTV services throughout the United States."   *Id.*   DISH further avers that the Defendants "profit from [this] scheme by selling UlaiTV and AhlaiTV set-top boxes and corresponding service plans," and that they have engaged in this conduct without compensating DISH.   *Id.*   For relief, DISH seeks, *inter alia*, statutory and actual damages as well as a permanent injunction precluding the Defendants from committing further infringing activity.   *Id.*

All three Defendants—Fraifer, TCI, and PTI—timely answered DISH's amended complaint and asserted counterclaims against DISH for conversion, trespass, and breach of contract.   (Docs. 77-79).   After two rounds of motion practice, the Court dismissed the Defendants' counterclaims for conversion and trespass.   (Doc. 115).   The counterclaim for breach of contract, however, remains pending.   *Id.* That claim is founded upon the Defendants' assertions that DISH purchased a set-top box from the Defendants, agreed to certain terms in connection with that purchase,

and thereafter breached those terms by "hacking" into the set-top box and utilizing the Defendants' "URLs[1] . . . for its own purposes."   (Doc. 104).

Following the close of discovery, the parties filed cross motions for summary judgment as to DISH's copyright infringement claim.   (Docs. 146, 217).   DISH also seeks summary judgment on the Defendants' breach of contract counterclaim.   (Doc. 146).   Each party filed a memorandum in opposition to the other's summary judgment motion.   (Docs. 151, 224).   In addition, the Defendants submitted a reply to DISH's response to their summary judgment motion, and DISH filed a sur-reply. (Docs. 228, 237).   These matters are now ripe for consideration.

B.   Factual Background[2]

While the parties hotly contest the claims and defenses at issue, many of the basic facts underlying this litigation are not genuinely in dispute.   A brief overview of these facts is useful before delving into the parties' respective arguments.

DISH is a pay-television provider that airs, *inter alia*, twenty-one Arabic language channels (the Protected Channels) in the United States.   (Doc. 146-1 at 1-2).   DISH serves its subscribers by means of satellite delivery and over-the-top (OTT) services, whereby programming is delivered using a public internet infrastructure.   *Id.*; (Doc. 62 at 3).   These satellite and OTT services allow DISH's clients to access the

---

[1]  URL is an acronym for "uniform resource locator" and is "more commonly known as a web address."   *United States v. Auernheimer*, 748 F.3d 525, 530 n.1 (3d Cir. 2014) (citation omitted).
[2]  The factual background set forth herein is derived primarily from the pleadings, the parties' statements of undisputed facts, and the documentary evidence of record.

3

Protected Channels, as well as other international or foreign language channels. (Doc. 62 at 3).

DISH claims the exclusive right to distribute and publicly perform in the United States all programs broadcast on the Protected Channels. *Id*. at 2-5. According to DISH, it derives this right from license agreements with various networks (the Networks) that are responsible for such programming or that work with the entities that produced the programming. *Id*. The Networks consist of: (1) MBC FZ LLC (MBC), a United Arab Emirates (UAE) media and broadcasting organization that provides five of the Protected Channels (MBC Channels); (2) Al Jazeera Media Network (Al Jazeera), a Qatari media and broadcasting organization that offers one of the Protected Channels, Al Jazeera Arabic News (AJAN); (3) International Media Distribution (IMD), a content redistributor that allegedly obtained the exclusive right to air domestically all programming on ten of the Protected Channels (IMD Channels) from the programming's producers located in Lebanon, Egypt, Cyprus, and Saudi Arabia; and (4) World Span Media Consulting, Inc. (World Span), a content redistributor that allegedly obtained the exclusive right to air domestically programming on four of the Protected Channels (World Span Channels) from an Egyptian entity, Trenta for Art and Production and Distribution (Trenta). *Id*. According to DISH, World Span also serves as the licensing agent for Dream Media (Dream), another Egyptian entity that produced works airing on one of the Protected Channels. *Id.*

4

The programming on the Protected Channels consists of audiovisual works that DISH contends were authored and first published in one or more of the following foreign countries: the UAE, Qatar, Lebanon, Egypt, Cyprus, and Saudi Arabia. *Id.* at 6. While MBC allegedly registered four of these works with the United States Copyright Office (the Registered Works), the remaining works that aired on the Protected Channels are not registered (the Unregistered Works). *Id.* at 3-4; (Doc. 146 at 2).[3]

Fraifer is the founder, sole shareholder, and president of TCI and PTI. (Docs. 146-1 at 5; 150 at 6). TCI and PTI are effectively the same company, although TCI generally handles sales and distribution, while PTI deals with technology. (Docs. 150 at 6, 151-5 at 8-9). All of TCI and PTI's employees and consultants reported to Fraifer during the relevant time period. (Doc. 150 at 6).

Fraifer, TCI, and PTI own and operate the UlaiTV and AhlaiTV services, as well as TCI-Direct.com and Planet-itv.com (collectively, the Defendants' Services). *Id.* at 4. UlaiTV and AhlaiTV offer customers access to hundreds of Arabic-language channels, while TCI-Direct.com and Planet-itv.com allow customers to order UlaiTV and AhlaiTV products. *Id.* These products include UlaiTV and AhlaiTV set-top boxes, which give customers access to the Arabic-language channels provided by UlaiTV and AhlaiTV. *Id.* at 5.

---

[3] In its amended complaint, DISH identifies the four Registered Works by name. (Doc. 62 at 3-4). DISH does not, however, specifically identify the Unregistered Works, alleging instead that they consist of "[a] vast number of additional, unregistered copyrighted works[, which] also aired on the Protected Channels." *Id.* at 4.

DISH contends the Defendants unlawfully transmitted the Protected Channels through the Defendants' Services.   *Id.* at 5.   Specifically, DISH posits that, during the relevant time period, the Defendants captured live broadcast signals on the Protected Channels; transcoded those signals into a format useful for streaming over the internet; transferred the transcoded content to servers the Defendants provide, control, and maintain; and then retransmitted the Protected Channels to their customers—some of whom are located in the United States—through OTT internet delivery.   *Id.* According to DISH, this method allows the Defendants to provide the Protected Channels to their UlaiTV and AhlaiTV users in real time, nearly simultaneously with the original transmission.   *Id.*

The Defendants dispute DISH's allegations.   They deny intercepting DISH's transmission of the Protected Channels and interfering with or violating the exclusive copyrights DISH claims it has.   (Doc. 151 at 9-11).   Instead, the Defendants maintain that the Protected Channels are accessible through their UlaiTV and AhlaiTV set-top boxes due to the actions of the third parties that sell the boxes, and that the Defendants merely contract with content delivery networks (CDNs)[4] to improve the quality of the Protected Channels for the Defendants' customers.   *Id.* According to the Defendants, these third-party set-top box suppliers—or "Channel Providers"—create the hardware and software that makes the Protected Channels

---

[4] Websites and other content providers pay "CDNs to accelerate delivery of their content over the internet to end users."   *Limelight Networks, Inc. v. XO Commcn's, LLC*, 241 F. Supp. 3d 599, 604 (E.D. Va. 2017).

available on the internet through the set-top boxes the Defendants purchase and sell. *Id.* at 10.   The Defendants argue that their conduct—the purchase and sale of the set-top boxes, along with their enhancement of the content through the CDNs—does not rise to the level of direct copyright infringement.   *Id.* at 11.

In their cross motions for summary judgment on DISH's copyright infringement claim, each side contends that the uncontroverted material facts warrant judgment as a matter of law in their favor as to: (1) DISH's ownership of valid copyrights in the Registered and Unregistered Works, and (2) the Defendants' alleged infringement of those copyrights.

On the issue of ownership, DISH submits that the undisputed evidence proves the Networks owned valid copyrights in the Registered and Unregistered Works and then transferred those rights to DISH by way of written agreements, thereby affording DISH the exclusive rights to distribute and publicly perform the works in the United States.   The Defendants counter that DISH fails to carry its burden of proving the validity of both the Networks' initial ownership of the copyrights and their subsequent transfer of those rights to DISH.    Within this area of argument, the parties also quarrel over whether United States or foreign law governs the issues of ownership and transfer.

On the matter of infringement, DISH asserts that, under United States law, the uncontested facts show the Defendants trenched upon their copyrights by causing the Protected Channels to be transmitted to United States users of the Defendants' Services.   While the Defendants agree with DISH that United States law governs DISH's copyright claim, they disagree as to what the evidence reveals.   As explained

above, the Defendants deny causing the alleged copyright infringement and also attack the admissibility of the evidence DISH has marshaled in support of its claims.

The Defendants tender two additional arguments in support of their request for summary judgment on DISH's copyright claim, both of which pertain to the Unregistered Works.   The first argument concerns the adequacy of DISH's amended complaint.   In particular, the Defendants assert that DISH's allegations with respect to the Unregistered Works fail to afford them proper notice of DISH's infringement claim and the grounds upon which that claim rests.   Their second argument concerns the initial publication of the Unregistered Works.   Specifically, the Defendants maintain the undisputed material facts establish that the Unregistered Works were first published in United States and thus had to be registered with the United States Copyright Office in order for DISH to maintain an infringement action under the Copyright Act.

With respect to the Defendants' counterclaim for breach of contract, DISH submits the uncontroverted evidence does not support that cause of action.   The Defendants, however, contend that judgment as a matter of law is improper on this claim because genuine issues of material fact remain regarding whether: (1) a valid contract existed between the parties, (2) DISH breached that contract, and (3) that breach resulted in damages to the Defendants.

## II.

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

*Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007)).   A moving party discharges its burden by showing that there is an absence of evidence to support the non-moving party's case.   *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has satisfied its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.   *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).   To do so, the non-moving party must rely on more than conclusory statements or allegations unsupported by facts.   *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").   "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."   FED. R. CIV. P. 56(e).

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.   *Fennell*, 559 F.3d at 1216 (citing *Welding Servs.*, 509 F.3d at 1356).   That is, it must credit the evidence tendered by the non-movant and draw all justifiable inferences in its favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

III.

As alluded to above, the parties' summary judgment filings present four primary issues.   The first three pertain to DISH's copyright infringement claim:

(1) the adequacy of DISH's identification of the works at issue in its amended complaint; (2) DISH's ownership of the challenged copyrights; and (3) the Defendants' alleged infringement of those copyrights.   The fourth issue, whether DISH breached a contract with the Defendants, pertains to the Defendants' counterclaim.   Each topic is addressed in turn below.

### A.   DISH's Claim for Copyright Infringement
#### 1.   Pleading Issues

"To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [works at issue] and (2) defendants copied protected elements from [those works]."   *Peter Letterese & Assoc., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1301 (11th Cir. 2008) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001)).   Notwithstanding these rather straightforward elements, the gist of the Defendants' first argument is that DISH's amended complaint is fatally infirm because it does not specifically identify all of the copyrighted works allegedly infringed and instead only asserts "the mere existence of four registered works and a 'vast number of unregistered works.'"   (Doc. 217 at 5-7).[5]   In the Defendants' view, such averments fall short of providing them with fair notice of the allegations against them and prevented them from "test[ing] the evidence or

---

[5] Another matter the Defendants raise is that DISH "improperly shoehorn[ed into its summary judgment motion] entirely new evidence unquestionably requested of [it] during discovery."   (Doc. 217 at 3).   This allegation has already been addressed and rejected by way of the Court's denial of the Defendants' prior motion to strike.   (Doc. 187).   I therefore need not address this argument here.

develop[ing their] defenses throughout the entirety of this ligation." *Id.* at 4-5.   As a result, the Defendants seek dismissal of DISH's copyright infringement count on the grounds that it fails to state a claim.   *Id.* at 7.   This argument fails.

Rule 8 of the Federal Rules of Civil Procedure establishes "[t]he bare minimum a plaintiff must set forth in the complaint." *Hunter v. Woods*, 2017 WL 6610889, at *1 (M.D. Fla. Nov. 3, 2017).   It requires, in relevant part, that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).   This mandate ensures that a defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Ward v. Select Portfolio Servicing, Inc.*, 690 F. App'x 649 (11th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   While this requirement does not necessitate that a complaint contain detailed factual allegations, it does impose an obligation on a plaintiff to offer "more than labels and conclusions." *Twombly*, 550 U.S. at 555.   In other words, "a formulaic recitation of the elements of a cause of action will not do." *Id.*   Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570.   This facial plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Twombly*, 550 U.S. at 556).

The allegations in DISH's amended complaint satisfy Rule 8.   DISH avers, among other things, that the works at issue consist of four that are registered with a

U.S. Copyright Office as well as "additional, unregistered copyright works."  (Doc. 62 at 3-4).  It further alleges that these works aired on the twenty-one Protected Channels and identifies each of those channels by name.  (Doc. 62 at 3).  It also identifies by name the Networks that purportedly owned the initial copyrighted works broadcast on those channels.  *Id*.  In addition, it asserts DISH entered into signed, written agreements with the Networks to distribute and publicly perform these works and provides specific examples of the works the Defendants allegedly infringed.  *Id*. These allegations are sufficient to provide the Defendants with fair notice of the materials that are the subject of DISH's copyright claim.  *Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming*, 2013 WL 4011052, at *3 (N.D. Ill. Aug. 6, 2013) ("[G]iven the breadth of [the] programming at issue . . . [i]t is enough for [plaintiff] to allege that [defendant] infringed on all of the programming on the above-referenced television stations; there is no need to list each of the programs carried by those stations."); *Intercom Ventures, LLC v. FasTV, Inc.*, 2013 WL 2357621, at *4 (N. D. Ill. May 28, 2013) (noting that plaintiff's allegation in copyright action "that it owns rights to 'all' programming produced and distributed by the seven channels is broad, but it is not ambiguous").

The decision in *Sater Group., Inc. v. Jack Bartlett Cust. Homes Creations, Inc.*, 2007 WL 121218 (M.D. Fla. Jan. 11, 2007), upon which the Defendants rely, does not alter my conclusion as to the sufficiency of DISH's averments.  In *Sater Group*, the court advised that "[t]o state a claim for copyright infringement a complaint must allege: (1) the specific original work that is the subject of the copyright claim; (2) that the

12

plaintiff owns the copyright in the work; (3) that the work in question has been registered in compliance with the statute; and (4) by what acts and during what time the defendant has infringed the copyright." *Id.* at *1 (citing *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1481 (S.D. Fla. 1990)). Latching on to the first of these requirements, the Defendants posit that to satisfy Rule 8, a complaint for copyright infringement must at least allege "'the specific original work that is the subject of the copyright claim.'" (Doc. 217 at 4) (quoting *Sater Group*, 2007 WL 121218, at *1). There are several problems with the Defendants' argument.

To begin, *Sater Group* was decided before the Supreme Court's pronouncements in *Twombly* and *Iqbal*. Additionally, the language in *Sater Group* to which the Defendants cite can be traced back to a forty-year-old, out-of-district case, *Gee v. CBS, Inc.*, 471 F. Supp. 600, 643 (E.D. Pa.), *aff'd,* 612 F.2d 572 (3d Cir. 1979). While a number of courts have since employed *Gee*'s heightened pleading standard in copyright infringement actions, many have not, particularly in light of *Twombly* and *Iqbal*. *See*, *e.g.*, *Beom Su Lee v. Karaoke*, 2019 WL 2537932, at *3 (D.N.J. June 19, 2019) (declining to impose *Gee*'s heightened pleading standard on grounds that "the *Gee* holding . . . has been subsumed by the subsequent Supreme Court authority of *Twombly* and *Iqbal*"); *Krist v. Scholastic, Inc.*, 253 F. Supp. 3d 804, 807 n.12 (E.D. Pa. 2017) ("The Court declines to adopt Defendant's suggestion that a heightened pleading standard applies based on *Gee* which predates *Twombly* and *Iqbal* by decades."); *see also FasTV*, 2013 WL 2357621, at *4 ("[C]laims for copyright infringement must satisfy the pleading requirements under Rule 8 and need not be pleaded with heightened

13

specificity.") (citing cases); *Light for Life, Inc. v. Our Firm Found. for Koreans, Inc.*, 2012 WL 4397421, at *6 (M.D. Ga. Sept. 24, 2012) ("[T]he Court is cognizant that a heightened pleading standard, as suggested by Defendants, is not required in copyright and trademark infringement cases."); *Crispin v. Christian Audigier, Inc.*, 2010 WL 11508342, at *4 n.4 (C.D. Cal. June 21, 2010) (finding defendants' argument for imposing "heightened pleading standard" with respect to copyright infringement claims "fail[s] to acknowledge that courts within the Ninth Circuit have routinely refused to apply such a standard") (citing cases); *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 675 n.8 (D. Md. 2009) (rejecting defendants' argument for imposing heightened pleading requirement in copyright infringement actions).

Of particular note here, the Defendants have not cited any Eleventh Circuit decision, nor am I aware of one, in which the Court has adopted *Gee*'s more rigorous pleading requirements.   Indeed, although *Gee* was affirmed without an opinion by the Third Circuit, its stringent pleading criteria apparently "'ha[ve] not been embraced by any Third Circuit panel" since then.   *John Wiley & Sons, Inc. v. Golden*, 2015 WL 716880, at *9 (D.N.J. Feb. 19, 2015) (quoting *Bradshaw v. Am. Inst. for History Educ.*, 2013 WL 1007219, at *4 n.4 (D.N.J. Mar. 13, 2013)).

It is also noteworthy that the district judge who issued *Sater Group* subsequently declined to apply the type of "heightened pleading standard" utilized in *Gee*.[6]   *Klein & Heuchan, Inc. v. Costar Realty Info., Inc.*, 2009 WL 963130, at *2 (M.D. Fla. Apr. 8,

---

[6] The district judge in *Klein* did not refer to *Gee* but to another case, *Paragon Servs., Inc. v. Hicks*, 843 F. Supp. 1077 (E.D. Va. 1994), which cited *Gee*.

14

2009) ("Copyright infringement does not require a heightened standard of pleading."). In doing so, the district judge engaged in a robust analysis of the merits of the *Gee*-type pleading requirements and found they were supported "[n]either by the Federal Rules nor case law."   *Id*.   To buttress this finding, the judge cited the plain language of Rule 8 as well as the Supreme Court's decision in *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1992), in which the Court rejected a heightened pleading standard in section 1983 cases.   The Court in *Leatherman* reasoned:

> We think that it is impossible to square the "heightened pleading standard" applied by the Fifth Circuit in this [section 1983] case with the liberal system of 'notice pleading' set up by the Federal Rules.   Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

507 U.S. at 168.

The Supreme Court in *Leatherman* also found the Fifth Circuit's elevated pleading requirements inconsistent with other aspects of the Federal Rules of Civil Procedure.   In particular, citing Rule 9(b),[7] the Court observed that the Federal Rules already address "the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints

---

[7] Rule 9(b) states, in pertinent part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   FED. R. CIV. P. 9(b).

alleging municipal liability under [section] 1983.   *Expressio unius est exclusio alterius*."[8]
507 U.S. at 168.

Other courts have also found the *Leatherman* decision fatal to the argument that a heightened pleading standard applies in copyright infringement cases.   *See, e.g., Jetform Corp. v. Unisys Corp.*, 11 F. Supp. 2d 788, 790 (E.D. Va. 1998) (noting that, in light of *Leatherman*, the heightened pleading standard advanced in some cases "appears to be in clear violation of Rule 8").   Legal commentators have reached a similar conclusion.   *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE CIVIL § 1237 (3d ed. 2011) ("A few district courts have imposed a heightened pleading requirement in cases involving copyright infringement . . . [I]n light of the Supreme Court's decisions in [*Leatherman*] and [one other case,] however, this requirement appears to be in clear violation of the 'short and plain' mandate of Rule 8.").

Even if *Gee*'s heightened pleading standard had any vitality, there is persuasive case authority that its requirements are "relaxed somewhat" where, as here, the basis of a copyright claim is "the alleged wholesale infringement of a large number of copyrighted works."   *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 696126, at *14 (S.D.N.Y. Feb. 15, 2017), *report and recommendation adopted*, 2017 WL 2988249 (S.D.N.Y. Mar. 27, 2017).   The court in *Infomir* noted, however, that

---

[8] "*Expressio unius est exclusio alterius*" is a canon of statutory construction, which stands for the proposition "that when construing a statute . . . 'expressing one item of [an] associated group or series excludes another left unmentioned.'"   *Circuitronix, LLC v. Kapoor*, 785 F. App'x 678, 681 (11th Cir. 2019) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)).

parties who avail themselves of the relaxed rule typically identify a representative example of the works allegedly infringed.   *Id.* (noting that, in the Southern District of New York, "as elsewhere, copyright plaintiffs alleging that defendants unlawfully copied or retransmitted all or substantially all of their television programming typically provide representative, albeit 'non-exhaustive' examples of the individual works broadcast").[9]

DISH's amended complaint satisfies this "relaxed standard."   As DISH correctly points out (Doc. 224 at 3), it asserts the "wholesale infringement of a large number of copyrighted works" and provides a representative sample of those works aired on the Protected Channels.   While the Defendants maintain that this sample is deficient because it is limited to the Registered Works, they fail to meaningfully argue why this distinction—registered versus unregistered—is material.[10]   Indeed, it is difficult to discern why it would be necessary for DISH to specifically identify both the Unregistered and Registered Works in order to provide the Defendants with fair notice of the grounds upon which its infringement claim rests.   The Defendants have not alleged, much less shown, for example, that the "relatively simple" act of registering a copyrighted work somehow fundamentally alters the character of that work. *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299 (M.D.

---

[9] I recognize that the case authority the *Infomir* court cites is from outside the Eleventh Circuit.
[10] I note in this regard that registration is a "relatively simple and inexpensive" process by which a copyright owner submits an application, along with "a copy of the work" at issue and a "modest fee," and "the Register of Copyrights [then] determines whether the deposited material is copyrightable."   *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012).

Fla. 2015) (finding copyright infringement sufficiently alleged where works were generally identified by "form and nature").

Nor do the Defendants explain with any particularity how the alleged want of additional information in DISH's pleading has hampered their ability to defend this action.   Absent such an explanation, this case is distinguishable from the cases they cite in which the lack of specificity regarding the asserted copyrighted works impeded the defendants from responding to the complaint or otherwise litigating the matter. *See, e.g., Sater Group*, 2007 WL 121218, at *1 (granting motion to dismiss where there was admitted inconsistency between the amended complaint and exhibit attached thereto with respect to the identity of the allegedly copyrighted material); *Wolo Mfg. Corp. v. ABC Corp.*, 349 F. Supp. 3d 176, 201-02 (E.D.N.Y. 2018) (deeming insufficient "placeholder copyright claim," in which plaintiff stated it owned rights in numerous other works defendants had infringed and requested leave to amend its claim after learning through discovery the full nature and extent of defendants' allegedly infringing activity); *Lambertini v. Fain*, 2014 WL 4659266, at *3 (E.D.N.Y Sept. 17, 2014) (dismissing complaint alleging defendant copied portions of plaintiff's art works sold online and attaching a list of all plaintiff's copyright registrations without indicating which of the registered works were at issue).

As such, I submit that DISH has sufficiently pleaded its copyright infringement claim, and that the Defendants' request for dismissal of this count should be denied.

2. *Ownership of the Copyrighted Works*

As noted above, a plaintiff seeking to establish a prima facie case of copyright infringement must show that it owns a valid copyright in the subject works. *Peter Letterese & Assoc.*, 533 F.3d at 1300. Proof of this element has implications for a plaintiff's standing to sue, and thus requires a discussion of the Copyright Act's registration requirements, as well as ownership of the intellectual property at issue both initially and by subsequent transfer.

Registration Requirements

Under the Act, copyright owners and exclusive licensees may enforce a copyright. 17 U.S.C. § 501(b) (conferring standing to the "legal or beneficial owner of an exclusive right" who "is entitled . . . to institute an action for any infringement . . . while he or she is the owner of it"); 17 U.S.C. § 201(d) (conferring on owner of any particular exclusive right comprised in a copyright "all of the protection and remedies accorded to the copyright owner by this title"); *see also Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869, 893 (S.D.N.Y. 2016) ("Only copyright owners and exclusive licensees may sue for infringement under the Copyright Act.") (citing *Urbont v. Sony Music Enter.*, 831 F.3d 80, 88 n.6 (2d Cir. 2016)). As a condition of such enforcement, however, the Act generally requires that copyright holders of United States works register those works before bringing an infringement

action.   17 U.S.C. 411(a);[11] *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) (citing section 411(a)); *Kernel Records*, 694 F.3d at 1301 (noting registration "of a United States work 'is a prerequisite for bringing an action for copyright infringement'") (citation omitted).   In addition to being a precondition to sue, a certificate of registration—if "made before or within five years after first publication of [a] work"—"constitute[s] prima facie evidence of the validity of [a] copyright and the facts stated in the certificate."   17 U.S.C. 410(c); *see also Kernel Records*, 694 F.3d at 1302 ("A certificate of registration serves as prima facie evidence of copyright validity.") (citing 17 U.S.C. § 410(c)).

While copyright holders of "United States works" are required under the Act to register their works before instituting an infringement action, the same is not true for owners of "foreign works."[12]   *Kernel Records*, 694 F.3d at 1302.   As long as certain conditions are met, owners of foreign works may also seek protection under the Act even if they have not registered their works.   Section 104(b)(2) of the Act provides, in particular, that "works first published in foreign countries are protected in the United States if the foreign country [in which the works were published], 'on the date of first publication, is a treaty party.'"   *Vergara Hermosilla v. Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010) (quoting 17 U.S.C. § 104(b)(2)).   A "treaty party" is

---

[11] Section 411(a) states, in pertinent part, that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."   17 U.S.C. § 411(a).
[12] What constitutes a foreign work is discussed in greater depth below.

statutorily defined as "a country or intergovernmental organization other than the United States that is a party to an international agreement."   17 U.S.C. § 101.

Here, there is no dispute that the six relevant foreign countries—the UAE, Qatar, Lebanon, Egypt, Cyprus, and Saudi Arabia—are parties to a copyright treaty with the United States known as the Berne Convention for the Protection of Literary and Artistic Works.[13]   *See Le Paradis Latin SA v. Paradis Latin, Inc.*, 2011 WL 13220781, at *6 n.3 (S.D. Fla. Feb. 4, 2011) (explaining that owners of foreign works from Berne Convention member countries may proceed for copyright claims for unregistered works).   As a result, as long as the works at issue were first published in one of these foreign countries, they are subject to protection under the Act, regardless of whether they have been registered.

This first publication requirement serves as the basis for the Defendants' threshold argument that DISH does not have standing to assert a copyright claim with respect to the Unregistered Works.   In particular, the Defendants contend that DISH cannot succeed on its copyright claims as to the Unregistered Works because those works are United States—not foreign—works and are therefore subject to the Act's registration requirement.   (Doc. 217 at 16-21).   Resolution of this contention requires an understanding of the meaning of the terms "United States work" and "publication" under the Copyright Act.

---

[13]   A   list   of   the   Berne   Convention   signatories   is   available   at https://www.wipo.int/treaties/en/ip/berne/.

A published work is a "United States work" only if it is first published:

(A) in the United States; (B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States; (C) simultaneously in the United States and a foreign nation that is not a treaty party; or (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States.

17 U.S.C. § 101.

The Act defines "publication," in relevant part, as:

the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership. . . . The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication.

*Id.*

A plaintiff claiming that works are exempt from the registration requirement must prove that the claimed publication in a treaty party foreign country actually occurred by showing "that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication."  *Kernel Records*, 694 F.3d at 1305. If the plaintiff carries this burden, it must then show "that the publication was, in fact, the first publication" and that the "geographic extent diverges from" the Act's definition of a United States work.  *Id.*

DISH asserts that the Unregistered Works were first published when the Networks offered to distribute them to providers—such as DISH—by inserting these

22

works into channel feeds in their home countries (i.e., UAE, Qatar, Egypt, Lebanon, Cyprus, and Saudi Arabia) for the purpose of further distribution and public performance around the world.   (Doc. 224 at 14-15) (citing Doc. 146-1).   DISH further asserts that after this insertion, the channel feeds containing the Unregistered Works were delivered to uplink facilities around the world for DISH and the other providers to further distribute.   *Id.* (citing Docs. 224-3 at ¶ 21; 146-3 at ¶¶ 5-6; 146-5 at ¶ 14; 146-8 at ¶¶ 9-12; 146-20 at ¶ 7).   DISH reasons that because the Networks' "offering" of the Unregistered Works occurred in these foreign countries (all of which are treaty parties), the works were first published in those countries.[14]   *Id.*

The Defendants counter this argument by asserting that each of the Unregistered Works were first "published," as that term is defined by the Act, upon the Networks' offering and sale of the works—through the licensing agreements—to DISH for further distribution and public performance in the United States.   (Doc. 217 at 16-19).   DISH responds by contending that it is not a "group of persons" as contemplated by section 101's definition of publication, and that its licensing

---

[14] Given these facts, cases such as *Kernel Records*, 694 F.3d at 1310-11, and *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1349-51 (S.D. Fla. 2017), upon which the Defendants rely (Doc. 228 at 5), are inapposite.   The party in *Kernel Records* seeking to prove first publication by means of a physical computer disk, as opposed to the internet, relied on a declaration that, *inter alia*, baldy attested to publication without addressing whether the disk was distributed, the breadth of the distribution, its purpose, and whether it included a transfer of rights.   694 F.3d at 1310-11.   The party in *Casa Dimitri* looking to prove first publication relied on a similar declaration, which asserted in conclusory fashion that the designs in dispute were first published through their sale and distribution in certain foreign countries and not on a website.   270 F. Supp. 3d at 1349-50.

agreements with the Networks therefore do not amount to first publication of the Unregistered Works.   (Doc. 224 at 16).

The merits of DISH's response in this regard are unclear.   For instance, it acknowledges that approximately twenty providers other than itself had similar arrangements with MBC to distribute the MBC works in different countries outside the United States.   (Doc. 224-3 at 9).   Whether MBC's "similar arrangements" with other content providers would establish that entity's offering copies to a "group of persons for purposes of further distribution" is not sufficiently developed.   *See* (Doc. 224 at 16) (citing H.R. Rep. No. 94-1476, at 138 (1976), *reprinted in*, 1976 U.S.S.C.A.N. at 5754; Compendium of U.S. Copyright Office Practices (USCO Compendium) § 1906.1)).[15]

DISH, however, posits an alternative contention that fares better.   It submits that in order for an offering to distribute copies to constitute a "publication," the copies "must be in existence" and "ready for further distribution, public performance, or public display."   (Doc. 224 at 16-17) (citing the USCO Compendium § 1906.3). DISH points out that the Defendants' argument hinges on the false assumption that the Unregistered Works were extant and ready for distribution at the time of the licensing agreements and provides evidence to support its position that these works were not, in fact, in existence.   (Doc. 224 at 17) (citing Doc. 224-3 at ¶ 12).

---

[15] The USCO Compendium is available at https://www.copyright.gov/comp3/ (last visited January 28, 2020).

Section 1906 of the USCO Compendium covers when an offer to distribute copies is deemed a publication under the Act.   It explains that such an offering may constitute publication "provided that the copies or phonorecords exist when the offer is made."   USCO Compendium § 1906.3.   It goes on to state that an "[o]ffering to distribute copies or phonorecords before they exist or before they are ready for further distribution, public performance, or public display does not constitute publication." *Id.*   The Defendants do not address this language in their reply (Doc. 228), nor do they attempt to counter it with evidence of their own.

Instead, the Defendants concentrate their efforts on attempting to establish that the Unregistered Works are United States works because—they contend—DISH's agreements with the Networks expressly require that the Networks simultaneously publish their programming in the United States and the Middle East.   *Id.* at 9-10 (citing 17 U.S.C. §§ 101(C), 104).   To the extent this argument relies on the times at which the Networks' content was broadcast or transmitted globally through the internet or satellite, it fails because broadcasts and transmissions are distinct from publication, and because the Defendants do not refute DISH's argument as to publication via insertion into the channel feeds, as explained above.   Nor do the Defendants adequately explain how their supporting facts (Doc. 217 at 20-21) establish that DISH's agreements with the Networks required simultaneous publication. [16] Their contention that DISH has admitted that all of the works at issue were published

---

[16] Certain facts cited by the Defendants in this regard do not relate to this argument.   *See, e.g.,* (Docs. 217 at 20; 217-1 at 16-17).

simultaneously in the United States, as well as in Iran and Iraq (which are non-treaty countries), likewise lacks adequate evidentiary support.   (Docs. 217 at 21; 228 at 10; 217-1 at 8; 146-7 at 67).

Furthermore, the Defendants ignore language in section 101 of the Act, which defines a United States work as one first published simultaneously in the United States and another treaty party "whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States."   17 U.S.C. § 101; *see also* 17 U.S.C. § 302.   While the Defendants do not address this quoted language, DISH submits that the laws of the Networks' home countries afford a shorter term of copyright protection than does the United States.   (Doc. 224 at 19).   A plain reading of those laws bears out DISH's submission, and the Defendants do not argue otherwise.[17]   (Doc. 146-28 at 11-12, 27, 49, 108, 128-129, 146-147, 194-195).

Based on all of the above, I submit that DISH has carried its burden of proving first publication of the Unregistered Works in foreign countries that are treaty parties.

---

[17] Relatedly, the Defendants' passing reference to subsection 612.7(J) of the USCO Compendium (Docs. 217 at 20; 228 at 10) is undeveloped and thus unpersuasive, if not waived altogether.   *See Outlaw v. Barnhart*, 197 F. App'x 825, 828 n.3 (11th Cir. 2006) (finding an issue waived because the claimant did not elaborate on the claim or provide citation to authority); *Flanigan's Enters., Inc. of Ga. v. Fulton Cty., Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (finding party's failure to elaborate on or provide authority supporting the claim amounts to a waiver on that issue) (citations omitted), *superseded by statute on other grounds as noted in Buehrle v. City of Key West*, 813 F.3d 973, 980 n.3 (11th Cir. 2015).   Even were the Court to consider this contention, subsection 612.7(J) provides guidance to applicants submitting copyright registrations to the U.S. Copyright Office; it does not declare what constitutes a United States work as defined in section 101 of the Act.   And, the Defendants do not address DISH's contention that this provision conflicts with section 101's definition of United States work.   (Doc. 224 at 18 n.16).

As a result, these works are protected under the Act even though they have not been registered.

A separate registration-related issue pertains to the Registered Works. Specifically, DISH argues that MBC, the producer of these works, is entitled to a statutory of presumption of ownership pursuant to 17 U.S.C. § 410(c) because it registered each episode with the United States Copyright Office in June 2016.   (Doc. 146 at 2-3, 146-1 at 2).   In support of this contention, DISH relies on the Declaration of John Whitehead, MBC's Group General Counsel.   (Doc. 146-8).   Whitehead attests in his declaration to the registration of the MBC works and supports that attestation by including the certificates of registration themselves, which identify MBC as the copyright claimant.   *Id.*; (Doc. 146-12 at 53-56).   Whitehead's attestations and accompanying certificates of registration are sufficient to trigger the presumption of validity, and serves as prima facie evidence of ownership.   *Roberts v. Gordy*, 877 F.3d 1024, 1026, n.3 (11th Cir. 2017) (citing *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986)).

The fact that these works are foreign works does not—as the Defendants claim—dictate a contrary conclusion.   The plain language of section 410(c) draws no distinction between domestic and foreign works and thus confers upon MBC the presumption of a valid copyright in the Registered Works.   *See Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 633 F. Supp. 2d 159, 162-63 (S.D.N.Y. 2009) (explaining that where Congress expressly limited certain sections of the Copyright Act to United

States works, it should be presumed that Congress acted intentionally when omitting

that limitation from other sections of the same Act).

To the extent the Defendants argue that courts cannot rely on certificates of

registration in determining the validity of foreign works (Doc. 217 at 11), the cases

they cite are unpersuasive.   Those cases are not binding on the Court and appear to

conflict with the Eleventh Circuit's decision in *Kernel Records*.   In that action, the

Court addressed, among other issues, whether a musical composition was a foreign

work exempt from the Act's registration requirement.   *Kernel Records*, 694 F.3d at

1302.   In resolving this issue, the Court noted:

> Although registration of "foreign works" (i.e., non-United States works)
> is not statutorily required, foreign works can also be registered.   *Owners*
> *of foreign works may choose to apply for registration because Congress has*
> *granted substantial litigation benefits to owners of registered works.    A*
> *certificate of registration serves as prima facie evidence of copyright validity*.

*Id*. (emphasis added and internal citations omitted).   A fair reading of this passage is

that the Eleventh Circuit endorsed the view that the presumption of copyright validity

is among the "substantial litigation benefits" that may impel owners of foreign works

to apply for registration.

The Defendants' case authority is also infirm insofar as it relies on the Second

Circuit's decision in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82

(2d Cir. 1998).   Contrary to the Defendants' suggestion, *Itar-Tass* did not address

registered works or the interplay between foreign copyright law and section 410(c)'s

presumption of validity.   As one court has observed in confronting arguments similar

to those the Defendants pose here, the "Second Circuit in *Itar-Tass* declined to disturb

the district court's holding that those plaintiffs who *had* timely registered their works in the United States *were* entitled to the [section] 410(c) statutory presumption, as well as to a finding of summary judgment in their favor and statutory damages for infringement of the works."   *Seoul Broad. Sys. Int'l, Inc. v. Young Min Ro*, 784 F. Supp. 2d 611, 615 (E.D. Va. 2011) (citing *Itar-Tass*, 153 F.3d at 88); *see also, e.g., DISH Network, L.L.C. v. Dima Furniture, Inc.*, 2019 WL 2498224, at *3 n.3 (D. Md. June 17, 2019) (finding that DISH's registration of eight foreign works with the U.S. Copyright Office "creates a presumption as to ownership and validity"); *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 222 F. Supp. 3d 95, 110 (D.D.C. 2016) (concluding that copyright registration certificates for foreign work television episodes constituted prima facie evidence of valid copyright under section 410(c)).

I am similarly unpersuaded by the Defendants' reliance on *Lahiri v. Univ. Music & Video Distrib., Inc.*, 513 F. Supp. 2d. 1172, 1178 (C.D. Cal. 2007), in which the court found United States copyright registrations for works originating in India irrelevant to the question of ownership.   While I recognize that the Eleventh Circuit quoted *Lahiri* in a published decision, *Saregama India Ltd. v. Mosley*, it did so for the general proposition that "[i]nitial ownership of a copyrighted work is determined by the laws of the work's country of origin."   635 F.3d 1284, 1290 (11th Cir. 2011).   *Saregama*, moreover, does not appear to concern foreign works registered in the United States or address the discrete issue of whether such registrations create a presumption of validity.   *Id*.

Although MBC should benefit from section 410(c)'s presumption of a valid copyright for the Registered Works, that presumption does not end the Court's inquiry regarding ownership.   Where, as here, the "plaintiff is not the author of the copyrighted work, then that plaintiff must prove a proprietary right through the chain of title."   *World Thrust Films, Inc. v. Int'l Family Entm't, Inc.*, 1996 WL 605957, at *3 (S.D. Fla. Aug. 1, 1996) (citing *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481 (1st Cir. 1985)).   "[C]ourts focus on two distinct points" when evaluating a chain of title: (1) "who initially owned the copyright;" and (2) "whether or not the initial owner transferred any of their exclusive rights."   *RCTV Int'l Corp. v. Rosenfeld*, 2016 WL 6818955, at *5 (S.D. Fla. Sept. 30, 2016) (citing *Saregama*, 635 F. 3d at 1290).   As such, I now turn to the issues of initial ownership and transfer of ownership for both the Registered and Unregistered Works.

<u>Initial Ownership</u>

Beginning with the Registered Works, DISH must show that MBC initially owned these works before it purportedly transferred the exclusive rights to the works to DISH.   In this regard, the parties agree that initial ownership of a copyrighted work is typically determined by the laws of the work's country of origin.   (Docs. 217 at 8; 224 at 6).   The question then becomes whether DISH establishes MBC's initial ownership of the Registered Works under the law of their country of origin, the UAE.

30

According to the parties, the answer to this question turns on whether these works are properly considered "Joint Works" or "Collective Works" under UAE's legal code.[18]

The Defendants submit UAE law dictates that the MBC works, like all audiovisual works, are Joint Works.   (Docs. 217 at 14-15; 228-1 at 3-11).   A Joint Work under the UAE's legal framework is one "in whose creation a number of persons participated, whether or not it is possible to separate each person's share, and which is not classified as a collective work."   (Doc. 217-3 at 21-22).   Relying on the Declaration of Bassel El Turk, a UAE-based intellectual property attorney and legal consultant, the Defendants argue that if the MBC works are Joint Works under UAE law, then each "author" or "creator" of the works had to transfer its rights in the Joint Works to MBC through a formal written instrument in order for MBC to own the works.   (Doc. 217-3 at 7-9).   The Defendants further contend that, because DISH has not produced any such agreements, they are entitled to summary judgment on the matter.   (Doc. 217 at 14-16).

DISH counters that the MBC works are instead Collective Works under the UAE's legal code, and that MBC, as their director, may properly exercise any rights in the works.   (Doc. 224 at 6-8).   UAE law provides that a Collective Work is one:

> created by a group of authors under the direction of a natural or legal person who is responsible for the work's publication in his name and under his supervision.   The contributions of the authors to the work are

---

[18] Federal Rule of Civil Procedure 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."   Because both parties rely, at times, upon the World Intellectual Property Organization translation of UAE law, I also look to that translation throughout this Report and Recommendation.

> incorporated into the work for the general purpose intended by the person who directed the work and are not able to be separated or distinguished.

(Doc. 217-3 at 21).

To support its contention that the MBC works are Collective Works under UAE law, DISH again relies on Whitehead's Declaration.   (Doc. 224-3). Whitehead attests therein that the MBC works were: (1) compiled by a group of authors employed by MBC, its affiliates, or its contractual agents; (2) produced under the direction of MBC (which constitutes a "legal person" for purposes of the above definition); (3) published in MBC's name and under its supervision; and (4) produced by MBC in a manner that assimilated the multiple authors' contributions, such that it is now impossible to separate and distinguish each author's contributions.   *Id.* at 2-3. Whitehead buttresses the last attestation by stating that the authors who participated in the creation of the MBC works performed overlapping roles, thereby precluding the differentiation of one author's contribution from another's; and that each MBC work has been produced to be viewed as a whole and has, in fact, been marketed and exploited in that manner.   *Id.* at 3.

After careful consideration of the matter, I find that DISH has the better argument.   Despite the parties' dueling interpretations, a straightforward reading of the UAE definitions of Joint and Collective Works supports DISH's construction of the terms.   I start with the fact that the plain language of the Joint Work definition establishes that works having multiple authors may be considered Joint Works only if the definition of Collective Work is not met.   *Id.* at 4; (Doc. 217-3 at 21-22).   And,

DISH has provided sufficient evidence showing that the MBC works meet the definition of Collective Works under UAE law.

While the Defendants argue that what constitutes a Collective Work is a "complex question of fact" (Doc. 217-3 at 6), they do not meaningfully dispute the facts upon which DISH relies (Doc. 237 at 5).   Instead, they submit screenshots[19] of credits to the MBC works and argue that the individuals listed are joint authors. (Docs. 228 at 7; 228-1 at 10, 51-74).

DISH convincingly counters, however, that even if the screenshots stem from the MBC works, the mere identification of individuals along with their titles in credits does not establish that each individual's contributions are "able to be separated or distinguished," as required by UAE law.   (Doc. 237-1 at 4-5).   The Defendants therefore fail to create a genuine issue of material fact as to whether the MBC works are Collective Works under UAE's legal framework.

The Defendants' related argument that DISH fails to produce evidence of agreements between MBC and the "performers" appearing in its works (Docs. 217-3 at 10; 228-1 at 14-15) is likewise unconvincing.   Article 17 of UAE copyright law sets forth the financial rights of performers (Doc. 217-3 at 24), and the parties appear to agree that performers in audiovisual works have, at a minimum, the economic right to

---

[19] The admissibility of these screenshots is unclear, as they contain foreign language content and may not be properly authenticated.

"fix"[20] their performances in such works "unless otherwise agreed" (Docs. 228-1 at 14-15; 237-1 at 11).   The Defendants maintain, however, that DISH has not produced agreements evidencing the performers' assent to licensing or assigning their right of fixation pursuant to Article 17.   (Doc. 228-1 at 14-15).   DISH responds by citing portions of Whitehead's Declaration, in which he attests that MBC obtained each performer's agreement to fix their performance in the MBC works.   (Docs. 224 at 8-9; 224-3 at 8).   DISH also points out that the plain language of Article 17—unlike other articles of UAE copyright law—does not require such agreements to be made in writing.   (Doc. 237-1 at 11).   In addition, DISH explains that its agreements with MBC do not concern the right of fixation, because the performances at issue have already been fixed or recorded.   *Id.* at 12.   Rather, DISH asserts that its agreements with MBC concern the right to distribute and publicly perform the MBC Works—a right that is distinct from the performer's fixation right discussed in Article 17.   *Id.*

DISH is correct that the plain language of Article 17 does not specify that such agreements with performers must be in writing, and the distinction it draws regarding the discrete right MBC has transferred to DISH is both logical and sound.   As a result, I find that DISH has established MBC's initial ownership of the asserted copyrights in the Registered Works.

---

[20] The parties do not define the term "fix," but UAE copyright law provides that it is tantamount to "record."   United States copyright law similarly considers works fixed when reduced to a tangible or durable form that is "sufficiently permanent . . . to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."   17 U.S.C. § 101; *see also United States v. Moghadam*, 175 F.3d 1269, 1273-74, 80-81 (11th Cir. 1999).

With respect to the Unregistered Works, DISH similarly contends that it has established that the Networks had initial ownership of copyrights in those works under the laws of the countries in which the works were first published.   (Doc. 146 at 4-5). To support this contention, DISH provides copies of the relevant foreign copyright laws (Doc. 146-28) and offers the declarations of: (1) counsel for Al Jazeera (Doc. 146-3); (2) the president of World Span (Doc. 146-20); and (3) a director of IMD (Doc. 146-5).   Each of these declarants attests that the entities with which they are affiliated acquired copyrights in their respective programs by authoring, creating, or producing the asserted unregistered works under the laws of the country in which they originated.

Specifically, Al Jazeera's counsel attests that Al Jazeera produced the allegedly infringed television and news programs, all of which were first published in Qatar. (Doc. 146-3 at 2).   World Span's president states that World Span possesses the exclusive right to distribute in the United States the programming at issue that Trenta authored and created, and that World Span also serves as the licensing agent for Dream Media's channels in the United States.   (Doc. 146-20).   He further explains that these two entities (Trenta and Dream Media) authored and created the allegedly infringed television episodes, which were first published in Egypt.   *Id.* at 2-3.   IMD's director likewise explains that IMD acquired exclusive distribution rights in the United States from the various networks that produced its allegedly infringed works,[21] that

---

[21]  The agreements between World Span, IMD, and the producers of the relevant programming are also attached to these declarations.

those producers authored and created the works, and the works were first published in Egypt, Lebanon, Saudi Arabia, and Cyprus.[22]   (Doc. 146-5).

In addition to these attestations, the copyright laws for these countries tendered by DISH contain substantially similar Collective Work provisions vesting copyrights in the person or entity that produced or commissioned the works.   (Doc. 146-28 at 22, 42, 44, 100, 133, 187).   By way of example, the copy of Qatar's copyright laws provided by DISH includes a definition of Collective Work that closely resembles the UAE's and provides that the person who initiated and directed the work is the original owner of the copyright, unless otherwise provided for by contract.   (Doc. 146-28 at 22, 32).

DISH argues that this evidence establishes that Al Jazeera, Dream, and the producers of the World Span and IMD channels acquired ownership of the copyrights in their respective Unregistered Works by producing or otherwise directing the creation of those Collective Works.   (Doc. 224 at 12).   DISH also points out that the Defendants do not argue otherwise and that they instead focus their efforts on disputing initial ownership of the MBC Works.   *Id.*   I agree.

In short, the Defendants fail to produce sufficient evidence contesting the above facts or to persuasively contend that the Unregistered Works are not Collective Works under the relevant foreign laws.   As such, I find that DISH has established initial ownership of the asserted copyrights in the Unregistered Works.

---

[22] The IMD director's declaration contains a table setting forth each allegedly infringed work, the channel on which it aired, its producer, and either the producer's home country or the country in which the work was first published.   (Doc. 146-5 at 4-5).

Transfer of Ownership

As noted above, DISH contends the Networks transferred to DISH the exclusive right to distribute and publicly perform the Registered and Unregistered Works in the United States through signed, written agreements that are valid under the Copyright Act.   The parties' competing positions on the transfer issue are akin to their disputes regarding the matter of initial ownership.    The parties' first disagreement is whether United States or foreign law governs the validity of the transfers.   DISH asserts that United States law applies but argues in the alternative that the transfers at issue satisfy both United States and any applicable foreign laws. The Defendants, on the other hand, submit that foreign law governs, and that DISH has failed to prove that the copyright transfers are valid under each country's legal framework.

I begin with whether United States or foreign law controls the transfers of ownership here.   DISH relies primarily on *DISH Network L..L.C. v. TV Net Sols., L.L.C.*, 2014 WL 6685351, at *3-4 (M.D. Fla. Nov. 25, 2014), for the proposition that the Court should look to United States law in evaluating the transfer of copyrights in works created abroad.   (Doc. 224 at 9).   DISH further submits that, because there is no disagreement between itself and the transferor Networks that the copyrights were indeed transferred to DISH, Eleventh Circuit precedent—namely, *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96 (11th Cir. 1995)—bars the Defendants from asserting otherwise.   (Docs. 146 at 2; 224 at 10-11).    The Defendants counter by citing cases where courts have looked to foreign law under purportedly similar

37

circumstances to those present here, and they dispute the applicability of *Imperial Residential Design* to the facts at hand.   (Docs. 217 at 7-9, 11-13, 16; 228 at 6).

After careful consideration of the parties' positions and the authority presented, I find that United States law governs the validity of the licensing agreements between the Networks and DISH.   In *Saregama*, the Eleventh Circuit noted that "there is no guiding case law regarding which country's law governs the issue of copyright transfer."   635 F.3d at 1291-92 (citations omitted).[23]   When the relevant foreign law diverges from United States law, however, courts generally ask which country has the most significant relationship to the transaction.   *See, e.g., Rosenfeld*, 2016 WL 6818955, at *12-13; *TV Net*, 2014 WL 6685351, at *2.

Here, DISH persuasively argues that the United States has a closer relationship to the copyright assignments because the licensing agreements were to be performed in the United States and each agreement specifies that United States law (or the laws of one of its states) applies to the agreement.   (Doc. 224 at 9, 13); *see, e.g.*, *TV Net*, 2014 WL 6685351 at *3 (finding United States has most significant relationship to issue of validity of licensing agreements which are the same as or similar to those presented here); *Dima Furniture*, 2019 WL 2498224, at *3 (indicating that the United States Copyright Act applied to agreements transferring copyrights from foreign networks to DISH).

---

[23] The Court in *Saregama* ultimately did not have to decide this issue because it determined that the result would be the same under the "strikingly similar" copyright laws of the United States and the foreign country at issue.   *Id*. at 1292.

The cases on which the Defendants rely are not at odds with this finding.   In *Rosenfeld*, for example, the court applied a conflict-of-laws analysis in determining that the law of the works' country of origin (i.e., Venezuela) controlled issues concerning assignment of those works, in part because Venezuela had a "substantial relationship" to both the parties and the transaction.   2016 WL 6818955, at *12-16.   And, in *Glass Egg Dig. Media v. Gameloft, Inc.*, 2018 WL 3659259 (N.D. Cal. Aug. 2, 2018), the court did not parse initial ownership from *transfer* of ownership, thereby leading it to consider only which country had the most significant relationship to the works themselves. 2018 WL 3659259, at *3-4.

Applying United States law, DISH maintains that its licensing agreements with the Networks properly transferred copyrights under sections 201(d) and 204(a) of the Copyright Act.   (Doc. 146 at 2, 5).   Section 201(d) provides, in relevant part, that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance," and that "[a]ny of the exclusive rights comprised in a copyright . . . may be transferred . . . and owned separately."   17 U.S.C. § 201(d).   Section 204(a) states that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."   *Id.* at § 204(a).

By its terms, section 204(a) does not require that any "magic words . . . be included in a document" to effectuate a transfer.   *Dellacasa, LLC v. John Moriarty & Assocs. of Fla., Inc.*, 2008 WL 299024, at *14 (S.D. Fla. Feb. 1, 2008) (citing *Radio*

*Television Espanola, S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999)).

"Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Id*.   As the Ninth Circuit has explained:

> Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.   It doesn't have to be the Magna Charta; a one-line pro forma statement will do.

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990).

In their response to DISH's summary judgment motion, the Defendants point to purported deficiencies in DISH's licensing agreements.   (Doc. 151 at 5-7).   They note, for example, that the agreements "contain many material redactions, authentication and evidentiary issues," and fail to establish the exclusivity of any rights conveyed to DISH.   *Id.* at 3.   The Defendants, however, fail to elaborate on these thoughts, provide supporting legal authority, or offer any meaningful argument addressing how these alleged defects render the licensing agreements insufficient under the relevant provisions of the Copyright Act or the Rules of Evidence.   This undeveloped line of argument by the Defendants is unavailing.   *See Outlaw*, 197 F. App'x at 828 n.3; *Flanigan's Enter.*, 242 F.3d at 987 n.16.

I also agree with DISH that allowing the Defendants to deploy section 204(d) as part of their attempt to escape liability would run counter to the Eleventh Circuit's guidance in *Imperial Residential Design*.   In that case, the Court observed that "the chief purpose of section 204(a) . . . is to resolve disputes between copyright owners and

transferees and to protect copyright holders from persons mistakenly or fraudulently claiming . . . copyright ownership." *Imperial Residential Design*, 70 F.3d at 99.   As a result, the Court found that it would be "unusual and unwarranted to permit a third-party infringer to invoke section 204(a)" where, as here, "there is no dispute between the copyright owner and the transferee about the status of the copyright." *Id.*; *see also Crunchyroll, Inc. v. Pledge*, 2014 WL 1347492, at *14 (N.D. Cal. Mar. 31, 2014) ("At least four circuit courts . . . have noted that in situations in which the copyright holder appears to have no dispute with its licensee on [the issue of transfer], it would be anomalous to permit a third party infringer to invoke this provision against the licensee.") (internal quotation marks and citations omitted).

In this case, DISH has provided declarations, in which the Network representatives attest that they have transferred the exclusive rights at issue to DISH. (Docs. 146-3; 146-5; 146-8; 146-20).   These declarations provide support for DISH's position that the Networks validly transferred their copyrights in works airing on the Protected Channels.   In accord with *Imperial Residential Design*, it would be "unusual and unwarranted" to permit the Defendants, as the alleged third-party infringers, to invoke section 204(a) against DISH, the licensee.

Even were the laws of the relevant foreign countries to govern the validity of the licensing agreements, DISH maintains that the agreements do not run afoul of those laws.   To counter DISH's argument, the Defendants submit that the licensing agreements are invalid under the copyright laws of the six nations at issue here—i.e., UAE, Qatar, Lebanon, Egypt, Cyprus, and Saudi Arabia—because those laws prohibit

41

an author from agreeing to assign or prospectively transfer all works.   (Docs. 217 at 16; 217-1 at 7).   The Defendants point, in particular, to Article 15 of UAE copyright law, which provides that "[a]ny *disposal* by the author of *all* of the author's future intellectual production or more than five of his future works is null and void."   (Doc. 217-3 at 24) (emphases added).   The Defendants assert that the other relevant foreign countries "have corollaries" to this provision.   (Doc. 217 at 16).[24]

DISH responds that the Defendants' argument is flawed in two respects. (Doc. 224 at 11-12).   It first contests the applicability of Article 15 to the transfers at issue because they confer "exclusive licenses" to DISH that do not constitute a "disposal" or "permanent transfer" of the authors' rights.   *Id.* at 11.   DISH also submits that even if Article 15 applies, it has not been transgressed because the transfers to DISH do not include an assignment of *all* copyrights.   *Id.* at 12.   DISH notes in this regard that MBC retained all copyrights not licensed to DISH, including the exclusive right to distribute and publicly perform the MBC works any place outside the United States.   *Id.*

Irrespective of whether the assignments at issue can be deemed a "disposal" of rights under UAE Article 15, I agree with DISH that the licensing agreements do not violate this provision.   DISH's position that it has not received a prospective assignment of *all* the authors' copyrights is well taken (Docs. 224-3 at 6-7; 237 at 7), and the Defendants do not specifically rebut it.   And, as the remaining foreign

---

[24] The Defendants do not tender any argument applying the laws of each of the remaining foreign countries to the facts of this case.

countries have "corollaries" to Article 15 (as described by the Defendants), the same conclusion applies to the other Networks' transfers of copyrights to DISH.

The Defendants' alternative argument challenging the validity of MBC's transfers to DISH pursuant to Article 9 of UAE copyright law is similarly unpersuasive.   Article 9 requires that a transfer of rights "be in writing and the right the subject of the disposal be specified" (Doc. 217-3 at 23), or "be in writing specifying the object of the right to be exploited," *id.* at 8.   Assuming *arguendo* that this article applies to the MBC agreements, it does not appear to require that the agreements set forth each of the specific works subject to transfer, as the Defendants contend.   (Doc. 217 at 16).   Under each translation the Defendants offer, the parties were obligated to specify the *rights* being transferred through the agreements or the *object of those rights*. The MBC agreements satisfy this obligation by identifying the subject or object of the rights to be transferred as the exclusive right to distribute and publicly perform, by certain specified means, the programs airing on the MBC Channels delineated in the agreement for the agreement's term.[25]   And, because the remaining foreign countries

---

[25] I likewise reject the Defendants' assertion that, under section 204(a) of the Act, the parties' failure to identify in their agreements the specific works being transferred (because they had not yet been created) renders those transfers invalid.   (Docs. 217 at 23; 228 at 8).   The Defendants neither identify what language within section 204(a) proscribes transfer of ownership in works yet to be created, nor do they support this argument with any legal authority.   DISH, on the other hand, furnishes case law demonstrating that such transfers are permissible under the Act.   *E.g., Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, 546 F. Supp. 2d 120, 127 (S.D.N.Y. 2008) ("Plaintiff appears to be arguing that Assignments for future work, or work that has not yet been created, are invalid under the Copyright Act. Plaintiff's theory has no merit.").

have "corollaries" to UAE Article 9 (Doc. 217 at 16), the same conclusion applies to the validity of the other Networks' transfers of copyright ownership to DISH.

The Defendants' remaining challenges to the validity of the MBC licensing agreements also lack merit.   The Defendants dispute the exclusivity of the rights MBC conferred upon DISH, pointing to a provision in the MBC agreement referencing an agreement MBC entered into with another entity, JumpTV.   (Doc. 217 at 23-24). This "Exclusivity Limitation" permits MBC to "maintain its current distribution agreement with JumpTV for distribution via Internet streaming."   (Doc. 146-9 at 12). Based on this limitation, the Defendants argue that DISH is a non-exclusive licensee that lacks standing to sue.   (Doc. 217 at 23-24).

This argument fails for two reasons.   As DISH explains, the agreement between MBC and JumpTV ended in 2009, years before the alleged infringing conduct in this case occurred.   (Docs. 224-1 at 4; 224-3 at 8-9; 224-4).   In addition, as DISH also explains, the internet streaming rights JumpTV possessed while the agreement was in effect are distinct from the IPTV and STB/OTT rights the MBC agreement granted to DISH.   *Id.*   Indeed, to both of these points, the amended JumpTV agreement shows a term ending twelve months from its August 2008 contract date (i.e., in August 2009) and draws a distinction between JumpTV's right to rebroadcast MBC content over the internet and the other forms of distribution identified above. (Doc. 224-4 at 22, 24).

### 3. Infringement

Moving on to the issue of infringement, as noted *supra*, DISH contends that the Defendants transmitted the Registered and Unregistered Works through the Protected Channels on the Defendants' Services in violation of DISH's exclusive rights to do so. (Doc. 146 at 7).   DISH's evidentiary support for this contention consists primarily of the Declaration and Expert Report of Pascal Metral, the Vice President, Legal Affairs and Head of Anti-Piracy Litigation and Intelligence Operations for Nagravision SA. (Docs. 146-23 at 1; 146-24).   On behalf of the International Broadcaster Coalition Against Piracy (IBCAP), of which DISH is a member, Nagravision and its affiliate (collectively, Nagra) obtained and monitored UlaiTV and AhlaiTV set-top boxes for infringing content.   (Doc. 146-23 at 1).

In his expert report, Metral explains that Nagra monitored the set-top boxes by powering them on, locating the programming guides for the UlaiTV and AhlaiTV services, identifying one of the Protected Channels by name or logo, selecting that channel for viewing, and then verifying the content being transmitted.   (Doc. 146-24 at 8).   Nagra prepared daily reports of its findings (Doc. 146-25) and took screenshots of the Protected Channel being transmitted on the Defendants' Services (Doc. 146-24 at 8).   These screenshots purport to show "the current date and time in the city where the [virtual private network] output is located," and—to demonstrate same—Metral includes samples of the screenshots with his report.   (Doc. 146-24).   Based on this monitoring, Metral concluded that the Protected Channels, showing the Registered and Unregistered Works, were transmitted on the UlaiTV service on at least 861

separate occasions from June 2015 through May 2017.   (Doc. 146-23 at 3-4).   Metral also found that the AhlaiTV service transmitted the Protected Channels in March 2017.   *Id.* at 4.

DISH asserts that the Defendants' actions caused this alleged infringement. (Doc. 146 at 7-8).   In particular, according to DISH, the Defendants contracted with CDNs to transmit the Protected Channels over the internet to the UlaiTV and AhlaiTV set-top boxes the Defendants sold on their websites.   *Id.* at 7.   To demonstrate the Defendants' operation of and control over the CDN's content delivery services, DISH cites evidence of the Defendants' correspondence with the CDNs, *id.*,[26] and highlights the fact that the Defendants had the ability to stop the transmission of the Protected Channels through the CDNs (Doc. 146-1 at 8).   In sum, DISH argues that the Defendants' control of the CDNs establishes their control of the transmission of the Protected Channels and the copyrighted works airing on those channels.

The Defendants do not meaningfully dispute that the Protected Channels were available through their set-top boxes or that they utilized CDNs as part of their business.   They do, however, take issue with the term "transmit" and contest that they were accountable for the "transmission" of the Protected Channels to their set-top boxes.   The Defendants claim instead that they used the CDNs only to improve the quality of the content available through the set-top boxes.   (Doc. 151 at 9-10).

---

[26] DISH relies, in part, on excerpts from the deposition of the Defendants' consultant, Maqsood, to establish the Defendants' transmission of the Protected Channels.   (Doc. 146-1 at 8).   The snippets DISH provides, however, do not prove transmission as DISH employs the term.   (Doc. 146-29 at 1-20).

According to the Defendants, the entities that sold them the set-top boxes (STB Suppliers or Channel Providers) are the ones responsible for the accessibility or transmission of the Protected Channels.[27]   The Defendants explain through Fraifer's deposition testimony that the set-top boxes arrive equipped with software or an application that points or links to channels already available on the internet, as well as hardware or a player that converts the link to something watchable over the internet for subscribers of the Defendants' Services.   (Doc. 151-7 at 2-3).

The Defendants disclaim any involvement in selecting or capturing the Protected Channels and instead maintain that the STB Suppliers create the initial URLs that correspond to and render the Protected Channels accessible.   *Id.*; (Docs. 151 at 9-10; 151-9 at 13-15).   They characterize their role as that of an intermediary between the STB Suppliers and the CDNs, which is aimed at enhancing the quality of the content available through the set-top boxes.   *Id.*; (Docs. 151-7 at 7-19; 151-10 at 29-31).

In short, while DISH submits that the Defendants used the CDNs to transmit channels (Doc. 146-1 at 8-11), the Defendants counter that any such activity was accomplished by submitting requests to the STB Suppliers or Channel Providers, who then carried out the requested activities relative to the Protected Channels.   (Docs. 150 at 7-8; 151-8 at 9; 151-10 at 26-28).   The Defendants state through Fraifer's testimony, for example, that the CDNs would provide a URL, which the Defendants

---

[27] Fraifer identified these third-party suppliers of UlaiTV and AhlaiTV set-top boxes as Verismo, Lenkeng, and Genaitech.   (Doc. 151-5 at 20).

would provide to the STB Suppliers, which would then push or transmit the Protected Channels through the CDN. (Doc. 151-7 at 6-8). Fraifer, moreover, denied knowledge or possession of the technology that enabled these steps, including the servers or encoders being utilized to "push" the channels, submitting that any use by the Defendants of this technology was indirect and accomplished through the STB Suppliers. *Id.* at 7-19; (Doc. 151-20 at 9).

Notwithstanding DISH's assertions to the contrary (Docs. 146-1 at 11; 151-8 at 10), Fraifer's testimony constitutes evidence supportive of the Defendants' assertions as to their role in the retransmission of the Protected Channels through the set-top boxes. That the Defendants may lack corroboration of Fraifer's testimony at this juncture does not—as DISH suggests—mean that this testimony is insufficient to defeat summary judgment. *See United States v. Stein*, 881 F.3d 853, 857-58 (11th Cir. 2018) (rejecting the proposition that litigant's self-serving and unsupported testimony can be disregarded by the court as one that has "no place at summary judgment"); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.") (citations omitted); *United States v. Davis*, 809 F.2d 1509, 1512-13 (11th Cir. 1987) (explaining that defendant's self-serving testimony may suffice to create jury question).

And, while DISH has presented evidence and identified other portions of Fraifer's deposition testimony that may undercut the Defendants' version of events, such evidence does not render Fraifer's deposition testimony "so fantastic, so

48

internally inconsistent, or so speculative that it [has] no probative value."   *Id.* at 1513; *see also Anderson*, 477 U.S. at 255 (advising against making credibility determinations, weighing evidence, and drawing inferences from facts when ruling on summary judgment and in favor of acting with caution in granting summary judgment); *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848-850 (11th Cir. 2000) (stating that court must avoid weighing conflicting evidence in ruling on summary judgment and reversing because district court improperly discredited non-moving plaintiff's testimony).

Fraifer's testimony, moreover, finds some support in the deposition testimony of Adib Sfeir, whom the Defendants employed as a project manager.   (Doc. 146-29 at 29, 133-34).   According to the evidence, Sfeir rendered technical assistance during the relevant timeframe and was a party to several of the communications about which DISH deposed Fraifer.   Sfeir's testimony buttresses Fraifer's account, including that third parties ZaapTV and Lenkeng offered channels for the Defendants' PlanetiTV and UlaiTV services.   The record also contains evidence of an agreement by which a different third party, Cressida Telecom, provided the Defendants with audiovisual streams of channels as they are available on the internet.   (Doc. 151-6 at 5).   While ZaapTV and Cressida's involvement with the Defendants pre-dates the infringement alleged in this action (Docs. 151-5 at 19; 151-6 at 4-5), these facts and the justifiable inferences that can be drawn from them, construed in the light most favorable to the

Defendants, could reasonably be viewed as bolstering Fraifer's assertion that the STB Suppliers provided the Protected Channels during the relevant timeframe.

Given such factual disputes, it is unclear at this stage that the Defendants' challenged actions constitute infringing conduct.  The cases upon which DISH primarily relies are distinguishable and do not lead me to a contrary conclusion. (Doc. 146 at 7-8).  In *American Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014), for example, the defendant sold a service that allowed customers to watch television programs on the internet around the time the programs were broadcast. Unlike here, however, the defendant not only supplied equipment to its customers, but also used its own technology (antennas, transcoders, and servers) to capture the broadcast signal, translate it into digital data, and then store and transmit the data to the subscriber over the internet.  *Id.* at 442-43, 456.

Similarly, in *ALS Scan, Inc. v. Cloudfare*, No. 16-cv-5051-GW, (Doc. 188 at 15) (C.D. Cal. June 1, 2017), which DISH also cites, it appears undisputed that the direct infringers created copies of the images at issue and uploaded those copies to their websites.

DISH's reliance on *TV Net*, 2014 WL 6685351, at *4, is likewise unavailing. In that infringement action, the matter came before the court by way of a motion for default judgment.   As a result, the defaulted defendants were deemed to have admitted DISH's allegations, including that they captured satellite broadcasts of the channels at issue, encoded them for internet transmission, and then retransmitted them to customers in the United States.  *TV Net*, 2014 WL 6685351, at *4; *see also DISH*

*Network, L.L.C. v. Shava IPTV Network LLC*, No. 1:15-cv-706 (TSE/IDD), (Doc. 120) (E.D. Va. Sept. 15, 2016).

In light of all of the above, I find that the record contains a genuine issue of material fact with respect to the Defendants' alleged infringement, thereby precluding summary judgment for either side on this element of DISH's copyright claim.[28]

### B.   Defendants' Counterclaim

Finally, I address DISH's motion for summary judgment on the Defendants' counterclaim for breach of contract.   To prevail on this claim, the Defendants must prove: (1) a valid contract, (2) a material breach of that contract, and (3) damages resulting from the breach.   *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019).   The Defendants can defeat DISH's summary judgment motion only if they make a showing at this juncture sufficient to establish each of these elements.   *Celotex, Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Upon thorough review of the parties' submission here, I submit that the Defendants fail to provide adequate evidence as to elements one and three of their breach of contract claim—i.e., that a valid contract existed between DISH and the

---

[28] Given this finding, this Report and Recommendation pretermits discussion of the evidentiary issues the Defendants raise relative to the Metral report and the issue of DISH's damages.

Defendants, and that the Defendants sustained damages as a result of the alleged breach.   As a result, summary judgment in DISH's favor on this claim is warranted.

With respect to the first element, the Defendants allege that DISH entered into a contract with the Defendants by purchasing a set-top box from the Defendants' website and by agreeing to abide by the terms of use set forth in the set-top box's "End User License Agreement" (EULA).   (Doc. 104 at 4-12).[29]   Among other things, the EULA prohibits a purchaser from: (1) attempting to derive the source code of or to modify any data or content; (2) using the Defendants' Services with any hardware or software other than a UlaiTV or AhlaiTV device for any purpose; (3) invading or otherwise hacking into the software or data; or (4) invading, opening, copying, modifying, or altering the set-top box, its software, and the related content or data. *Id.* at 5-6.

The Defendants claim that DISH agreed to be bound by the EULA by clicking on an "I agree" checkbox on one of the Defendants' websites when purchasing the set-top box, as well as by subsequently utilizing the set-top box after receiving it along with certain materials advising that use of the box constituted an agreement to the EULA's terms.   *Id.* at 4-5, 8-12.   The Defendants further assert that when DISH employed the set-top box to access the Defendants' privately-owned URLs, it "hacked" those URLs in breach of several provisions of the EULA.   *Id.* at 5-6.   The

---

[29] It is noteworthy that the relevant language in the EULA attached to the Defendants' counterclaim pertains only to the UlaiTV (not the AhlaiTV) product and services.   (Doc. 104 at 8-12).   As such, it would appear that the Defendants' counterclaim would be confined to DISH's alleged breach of the UlaiTV agreement.

Defendants additionally contend that DISH's "hacking" into the set-top box and its utilization of the Defendants' URLs for its own purposes caused the Defendants to suffer damages "presently, for the past and into the future." *Id.* at 6.

It is undisputed, however, that DISH did not directly purchase, possess, or use any set-top boxes from the Defendants.  (Docs. 146-1 at 17; 150 at 16-17).  Rather, the set-top boxes identified by the Defendants consisted of: (1) UlaiTV set-top boxes purchased on March 30, 2015, by Mason Morcos of Ethos Risk Services (Ethos),[30] and on June 30, 2016, by Kevin McMonnies of Nagrastar; and (2) an AhlaiTV set-top box purchased on November 22, 2016, by Sarah Weller of the law firm of Hagan Noll & Boyle (Hagan Noll), which represents DISH in this action.  (Docs. 151 at 19; 151-26, 151-27, 151-28, 151-29).

Undeterred, the Defendants submit that DISH should nonetheless be deemed contractually bound by EULA because, they maintain, Nagrastar (which engaged Ethos) is part of a joint venture with DISH[31] and Hagan Noll (DISH's law firm) is DISH's agent.  (Docs. 151 at 19).  These positions lack sufficient support to survive summary judgment.

---

[30] According to the Defendants, Nagrastar engaged Ethos to purchase a UlaiTV set-top box. (Doc. 150 at 16).

[31] A joint venture arises out of contract and also includes: "1) a community of interest in the performance of a common purpose; 2) joint control or right of control; 3) a joint proprietary interest in the subject matter; 4) a right to share profits; and 5) a duty to share losses which may be sustained."  *BCIJ, LLC v. LeFevre*, 2010 WL 1142032, at *3 (M.D. Fla. Mar. 24, 2010) (quoting *Browning v. Peyton*, 918 F.2d 1516 (11th Cir. 1990)).

First, the evidence upon which the Defendants rely for their joint venture argument does not demonstrate that Nagrastar and DISH were involved in a joint venture at the time the UlaiTV set-top boxes were purchased in 2015 (by Ethos at the direction of Nagrastar) and in 2016 (by Nagrastar).   In particular, that evidence shows only that Nagravision was involved in a joint venture with DISH beginning sometime in 2017 and ending in March 2018 (Doc. 151-33 at 7-8) and that, prior to that time, Nagravision was involved in a joint venture with EchoStar, a sister company of DISH, *id.*; (Doc. 151-32 at 3).   The Defendants do not present any authority supporting their joint-venture theory based on this evidence, including any case law establishing that DISH would be responsible for the purchase and use of a set-top box by its sister company, Echostar.

The Defendants similarly fail to tender any evidence or supply meaningful argument to bolster their conclusory assertion that DISH would be responsible for the purchase and use of the set-top boxes through an agency relationship with its law firm, Hagan Noll (or, for that matter, Nagrastar or Ethos).   (Doc. 151 at 18).[32]   "Essential to the existence of an actual agency relationship is (1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the action of the agent."   *Marchishio*, 919 F.3d at 1311 (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

---

[32] The cases the Defendants cite do not address this particular issue.   (Doc. 151 at 18) (citing *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042 (Fla. Dist. Ct. App. 1977) and *Mettler, Inc. v. Ellen Tracy, Inc.*, 648 So. 2d 253 (Fla. Dist. Ct. App. 1994)).

DISH, through the Declaration of Izabela Slowikowska, Vice President of International Business and former Vice President of International Programming for DISH, denies that it directed, supervised, or controlled any person or entity in purchasing the Defendants' products.   (Docs. 146 at 17-18; 146-13 at 6). Slowikowska also testified at her deposition that DISH was not involved in the purchase of any set-top boxes from the Defendants, that neither Nagrastar nor Ethos purchased the set-top boxes on DISH's behalf or were working for DISH when they did so, and that DISH did not have attorney Weller of Hagan Noll purchase a set-top box.   (Docs. 151-33 at 7-14); *see also* (Doc. 146-13 at 6).   And, although the Defendants assert that that DISH had a controlling interest in Nagrastar's activities by virtue of its membership in IBCAP, this assertion is unsupported by citations to the record or legal argument.   (Doc. 150 at 16).

In sum, the Defendants' bare assertion of an agency relationship between DISH and the third parties that purchased the set-top boxes is unavailing.   *See O'steen v. Wells Fargo Bank, N.A.*, 2017 WL 4243564, at *3 (M.D. Fla. Sept. 25, 2017) ("The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.") (citing *Evers v. Gen. Motors Corp.*, 77 F.2d 984, 986 (11th Cir. 1985)).

Second, even assuming *arguendo* that DISH contracted with the Defendants through the purchase and use of set-top boxes by a party to a joint venture and/or by DISH's agents, the Defendants nevertheless fail to shoulder their burden of proving recoverable damages resulting from DISH's alleged breach of contract.   It is well

settled that a breach of contract claim cannot succeed without viable damages resulting from the alleged breach.   *Marchisio*, 919 F.3d at 1314; *see also Mortg. Pymt. Prot., Inc. v. Cynosure Fin., Inc.*, 2010 WL 11507479, at *4-5 (M.D. Fla. July 15, 2010) ("Damages are an element of a breach of contract action.   Therefore, if there are no damages, it is appropriate to grant summary disposition on a breach of contract claim.") (citations omitted).   The party bringing such a claim must therefore show "both that it sustained a loss and that its [loss was] a direct result of" the other party's breach.   *Ingenuity, Inc. v. Linshell Innovations Ltd.*, 2014 WL 1230695, at *8 (M.D. Fla. Mar. 25, 2014) .

Here, as noted above, the Defendants allege in their counterclaim that they suffered damages "presently, for the past and into the future" as a result of the breach. (Doc. 104 at 6).   In support of this allegation, the Defendants assert in their opposition to DISH's summary judgment motion that DISH's "hacking" resulted in "relentless pressure on the CDNs to cease service," ultimately "forcing the CDNs to discontinue service to TCI and PTI."   (Doc. 151 at 21).   The Defendants further assert that their damages consist of the loss of business and time away from business, family, and more. (Doc. 150 at 21).   Fraifer relatedly testified at his deposition that the damages of which he was aware were having to sit for the two-day deposition and being taken away from his business, family, and "everything else."   (Doc. 151-18 at 1-2).

The Defendants put forth no legal authority demonstrating that these types of damages are recoverable on their breach of contract claim.   Nor have they supported their broad, vague, and speculative assertions of causation and damages.   At this stage of the proceedings, it falls on the Defendants to support their damages allegations with

appropriate evidence demonstrating a genuine issue of material fact precluding summary judgment.  They have not done so.  As a result, I submit that DISH is entitled to summary judgment on the Defendants' breach of contract counterclaim. *See, e.g., HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323-24 (M.D. Fla. 2016) (concluding that summary judgment was mandated because party bringing the claim failed to provide meaningful evidence of damages and left the issue to the court's conjecture); *Cynosure*, 2010 WL 11507479, at *4-5 (M.D. Fla. July 15, 2010) (finding deposition testimony similar to that offered here insufficient to create triable damages issue on breach-of-contract claim).

IV.

For the reasons discussed above, I recommend that the Court:

1.        Grant in part the *Plaintiff's Dispositive Motion for Summary Judgment* (Doc. 146) and enter partial summary judgment in the Plaintiff's favor on the issue of ownership of valid copyrights in the Registered and Unregistered Works, enter summary judgment in the Plaintiff's favor on the Defendants' amended counterclaim (Doc. 104), and otherwise deny the Plaintiff's summary judgment motion; and

2.        Deny the *Defendants' Amended Motion for Summary Judgment* (Doc. 217).

Respectfully submitted this 31st day of January 2020.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
Honorable Thomas P. Barber, United States District Judge
Counsel of record