# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C., | Case No. 8:16-cv-02549-TPB-CPT |
| Plaintiff, | |
| v. | |
| GABY FRAIFER, TELE-CENTER, INC., and PLANET TELECOM, INC., | |
| Defendants. | |

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff DISH Network L.L.C. ("DISH") objects to portions of Magistrate Judge Tuite's January 31, 2020 report and recommendation (Dkt. 246, "R&R") to deny in part DISH's motion for summary judgment[1] and deny Defendants' motion for summary judgment. The MSJs concern DISH's copyright infringement claim and Defendants' breach of contract counterclaim.

## I. INTRODUCTION

The Magistrate Judge correctly determines that DISH is entitled to summary judgment on Defendants' breach of contract counterclaim, which entirely disposes of that claim. (R&R at 51-57.) The Magistrate Judge also correctly determines that DISH is entitled to summary judgment on the first element of its copyright infringement claim because the undisputed facts establish that DISH owns valid copyrights in the Registered Works and Unregistered Works (collectively, the "Copyrighted Works") that aired on the Protected Channels and that the Unregistered Works are not United States works and therefore need not be registered with the Copyright Office. (*Id.* at 5, 9-45, 57.)[2] The Magistrate Judge, however, errs in recommending that a genuine issue of material

---

[1] *See* Dkts. 146 ("DISH's MSJ"), 146-1 ("DISH SOUF"), 150 ("Defs.' SODF"), and 151 (Defs.' Resp.").

[2] Capitalized terms are defined in the Magistrate Judge's R&R and given the same meaning here.

fact precludes granting summary judgment with respect to the second element of DISH's copyright infringement claim – that Defendants publicly performed the Copyrighted Works that aired on the Protected Channels. (*Id.* at 45-51, 57.)

There is no dispute that sending the Protected Channels to the users of Defendants' STBs constitutes a public performance of the Copyrighted Works aired on the Protected Channels. The Magistrate Judge, however, questioned whether Defendants are liable for that public performance or whether liability falls on the companies that sold the STBs to Defendants (the "STB Suppliers"). The Magistrate Judge erred in this regard because the Copyright Act and Supreme Court precedent makes clear that there can be multiple unlawful acts involved in the performance of a copyrighted work, and so long as the work reaches the public, each person engaging in each of the acts without authorization will have publicly performed the copyrighted work and thus be liable for copyright infringement. Therefore, it should have been a "one or the other" determination for the Magistrate Judge; Defendants may be found to have publicly performed the Copyrighted Works that aired on the Protected Channels even if the STB Suppliers are also found to have publicly performed the Copyrighted Works at some other point in the transmission process.

The undisputed facts establish that the Protected Channels were transmitted to the users of Defendants' STBs using content delivery networks or "CDNs" that were contracted for, paid for, and operated by Defendants. Whether Defendants acquired the Protected Channels from the STB Suppliers as Defendants allege – and which the Magistrate Judge deems the disputed material fact precluding summary judgment – is immaterial for purposes of determining Defendants' liability. What is important is that Defendants, after purportedly acquiring the Protected Channels from the STB Suppliers, indisputably made their own transmission of the Protected Channels to the users of their STBs by means of Defendants' CDNs, thereby infringing DISH's right to publicly perform

the Copyrighted Works that aired on the Protected Channels.

Defendants' active involvement in transmitting the Protected Channels to the users of their STBs extends beyond Defendants' operation of the CDNs, and while such conduct is not required to establish Defendants' liability, such conduct is additional undisputed evidence that Defendants publicly performed the Copyrighted Works. The undisputed facts establish that Defendants' used their servers to transmit or "push" the Protected Channels to Defendants' CDNs. The undisputed facts also establish that Defendants used their software (referred to as middleware) to connect their users' STBs to the Protected Channels transmitted by means of Defendants' CDNs. Defendants caused the public performance of the Copyrighted Works aired on the Protected Channels and thus are liable for copyright infringement

## II.     LEGAL STANDARD

The Magistrate Judge's R&R may be accepted, rejected, or modified, in whole or in part. *See* 28 U.S.C. § 636(b)(1)(C); Fed R. Civ. P. 72(b)(3). The Court reviews *de novo* those portions of the R&R to which a specific objection is made. *See id.*; *see also Kohser v. Protective Life Corp.*, 649 F. App'x 774, 777 (11th Cir. 2016) ("[W]here a litigant fails to offer specific objections . . . there is no requirement of *de novo* review.") "A specific objection must 'identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.'" *Id.* (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)).

## III.     ARGUMENT

DISH respectfully objects to the Magistrate Judge's finding and recommendation that there is "a genuine issue of material fact with respect to the Defendants' alleged infringement, thereby precluding summary judgment for either side on this element of DISH's copyright claim." (R&R at 51.) The Magistrate Judge summarizes the perceived factual dispute as follows: "While DISH

3

submits that the Defendants used the CDNs to transmit channels . . . , the Defendants counter that such activity was accomplished by submitting requests to the STB Suppliers or Channel Providers, who then carried out the requested activities relative to the Protected Channels." (*Id.* at 47.)

The Magistrate Judge erred as the undisputed facts demonstrate that Defendants infringed DISH's right of public performance regardless of any alleged activities that Defendants attempt to attribute to the STB Suppliers. That is – even accepting Defendants' claim that the STB Suppliers provided initial internet links or "URLs" to the content and asked Defendants to engage the CDNs to have that content delivered to Defendants' customers – Defendants transmitted the content using those CDNs and are therefore liable for violating DISH's right of public performance. Defendants also have no evidence to support their attempt to pin the transmission of the Protected Channels on the STB Suppliers, which the record shows did nothing more than sell the STBs to Defendants some two years prior to the documented infringement.

DISH also objects to the extent the Magistrate Judge found that Defendants' Services "offer customers access to hundreds of Arabic-language channels." (*Id.* at 5 [citing Defs.' Resp. at 4].) The referenced material does not support this allegation; in fact, Defendants have no record of and are otherwise unable to identify the channels that aired on their Services or the time period during which these channels aired on the Services. (DISH SOUF 103.) The only competent evidence in the record concerns the Protected Channels that were transmitted on Defendants' Services on more than 850 instances between June 25, 2015 and May 3, 2017. (DISH SOUF 39-40.)

**A.      The Undisputed Facts Establish That Defendants Infringed DISH's Copyrights.**

The undisputed facts establish that Defendants infringed DISH's exclusive right to publicly perform the Copyrighted Works that aired on the Protected Channels by transmitting that content to users of Defendants' STBs by means of CDNs that were contracted for, paid for, and operated

4

by Defendants. Defendants' allegation that the STB Suppliers sent the Protected Channels to their CDNs at their request, even if true, is immaterial because infringement of the public performance right is not limited to one act or one actor – Defendants are liable for their own transmission of the Protected Channels from their CDNs to users of Defendants' STBs, regardless of any wrongdoing by the STB Suppliers in allegedly providing the Protected Channels to Defendants.

### 1. DISH's Exclusive Right To Publicly Perform The Copyrighted Works.

DISH holds the exclusive right to publicly perform the Copyrighted Works. (R&R at 37-44; *see also* 17 U.S.C. § 106(4) (granting right to publicly perform audiovisual works). To publicly perform means "to transmit or otherwise communicate a performance . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. To transmit a performance means "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.*

The Supreme Court in *Aereo* held that defendant Aereo infringed content owners' right of public performance by streaming their broadcast television programming to Aereo's subscribers. *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014). Aereo's conduct was described as follows:

> Aereo sells a service that allows subscribers to watch television programs, many of which are copyrighted, almost as they are being broadcast. In providing this service, Aereo uses its own equipment, housed in a centralized warehouse, outside of its users' homes. By means of its technology (antennas, transcoders, and servers), Aereo's system "receive[s] programs that have been released to the public and carr[ies] them by private channels to additional viewers." . . . It "carr[ies] . . . whatever programs [it] receive[s]," and it offers "all the programming" of each over-the-air station it carries.

*Id.* at 442 (citations omitted).

The Supreme Court found that "Aereo's activities are substantially similar to those of the

CATV companies that Congress amended the [Copyright] Act to reach." *Id.* CATV companies used antennas to receive local television broadcasts and coaxial cable to then carry the signals to the homes of subscribers, the purpose being to "amplif[y] and modulate[] the signals in order to improve their strength and efficiently transmit them to subscribers." *Id.* at 439, 443-44. Under earlier Supreme Court precedent, the broadcaster was deemed to perform the television programs, but the CATV company serving as the intermediary and the viewer of the programming were not. *Id.* at 439-441 (citing prior decisions in *Fortnightly* and *Teleprompter*.) Congress amended the Copyright Act in 1976 to overturn these decisions: now "*both* the broadcaster *and* the viewer of a television program 'perform'" and an intermediary "that acts like a CATV system itself performs, even if when doing so, it simply enhances viewers' ability to receive broadcast television signals." *Id.* at 441-442.

The legislative history regarding the enactment of the 1976 Copyright Act supports *Aereo's* finding that infringement of the public performance right is not confined to the content originator; instead, each party involved in the process of performing an audiovisual work is subject to liability:

> [T]he concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public. . . . [A] broadcasting network is performing when it transmits . . . ; a local broadcaster is performing when it transmits the network broadcast . . . . [A]ny act by which the initial performance or display is transmitted, repeated, or made to recur would itself by a "performance" . . . .
>
> The definition of "transmit" . . . is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in [an]y form, the case comes within the scope of clauses (4) or (5) of section 106.

H.R. Rep. No. 94-1476, at 63-64 (1976); *see Hubbard Broad., Inc. v. S. Satellite Sys., Inc.*, 593 F. Supp. 808, 813 (D. Minn. 1984) ("[A] transmission is a public performance whether made directly

6

or indirectly to the public and whether the transmitter originates, concludes or simply carries the signal. There is simply no practical basis for excluding certain transmitters from copyright liability based solely on their position in the distribution chain."), *aff'd* 777 F.2d 393 (8th Cir. 1985).

### 2. Defendants Publicly Performed The Copyrighted Works.

Defendants do not dispute that the Copyrighted Works that aired on the Protected Channels were made available to users of Defendants' STBs. (DISH SOUF 41-42; Defs.' SODF 41-42; *see also* R&R at 6-7, 46 ["Defendants do not meaningfully dispute that the Protected Channels were available through their set-top boxes . . . ."].)[3] Rather, Defendants disclaim any responsibility for transmitting the Copyrighted Works to users of their STBs, instead pointing the finger at the STB Suppliers – albeit without any evidence that corroborates their testimony. (*See, e.g.,* Defs.' SODF 70, 72, 75-77; R&R at 46-50.) Defendants publicly performed the Copyrighted Works, regardless of any wrongful conduct that Defendants attempt to attribute to the STB Suppliers.

Defendants used content delivery networks or "CDNs" to provide their Services. (DISH SOUF 48-50; Defs.' SODF 48-50; R&R at 46 ["Defendants do not meaningfully dispute . . . that they utilized CDNs as part of their business."].) Defendants contracted for and paid for the CDNs. (DISH SOUF 53, 55, 62, 66; Defs.' SODF 53, 55, 62, 66; R&R at 6-7.) Defendants operated the CDNs, as established by Defendants' communications with the CDNs concerning Defendants' use of the CDNs to deliver content to Defendants' STBs – several referencing the Protected Channels. (DISH SOUF 56-60, 63-64, 68; Defs.' SODF 56-60, 63-64, 68.) Defendants also acted on DISH's

---

[3] Defendants instead claim that the Network Declarations should not be considered "due to evidentiary considerations" raised in their motion to strike the declarations, which is an invalid argument because Defendants' motion was denied. (Defs.' SODF 41-42; Dkt. 187; *see* R&R at 10 n.5 [finding Defendants' new evidence arguments already "addressed and rejected"].) Defendants also claim DISH's expert is biased, but Defendants fail to establish any alleged bias – let alone bias that might warrant excluding the expert's findings – and the screenshots of the Protected Channels attached to the expert's report speak for themselves and are sufficient undisputed evidence of the transmission of the Protected Channels on Defendants' Services. (Defs.' SODF 39-42; DISH SOUF 39-42.) *See Adams v. Lab Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014) (finding expert bias arguments inappropriate for purposes of summary judgment).

7

infringement notices that were forwarded to Defendants from their CDNs, the result being that the streams of the Protected Channels were removed or disabled from the CDNs, albeit temporarily. (DISH SOUF 51, 61, 65, 87-88; Defs.' SODF 51, 61, 65, 87-88.)  Indeed, Defendants admittedly "owned or operated" the URLs that correspond with the Protected Channels transmitted using their CDNs.  (DISH SOUF 54-55, 62, 67 [citing Defendants' RFA responses].)[4]  It makes no difference that Defendants operated the CDNs using information that Defendants purportedly requested from the STB Suppliers.

The Protected Channels were transmitted to users of Defendants' STBs through the CDNs. (DISH SOUF 39-42, 48 [citing, *inter alia*, evidence from DISH's expert].)  Defendants' argument that their *purpose* in using CDNs as an alternative to the public internet was to improve the quality of the delivery of the Protected Channels, while perhaps true, does not alter the fact that the CDNs were used to transmit the Protected Channels.  (Defs.' SODF 39-42, 48.)  *See Aereo*, 573 U.S. at 441-442 (recognizing that an intermediary, between the broadcaster and viewer, "itself performs, even if when doing so, it simply enhances viewers' ability to receive broadcast television signals"). In fact, it is not surprising at all that Defendants would expect improved quality of the delivery of the Protected Channels by transmitting the content through a CDN; that is why content distributors use CDNs to transmit content rather than rely exclusively on the public internet.

The importance of Defendants' CDNs cannot be understated:  turning off the CDNs meant stopping the transmission of the Protected Channels to users of Defendants' STBs. (DISH SOUF 50.)  For example, when Verizon terminated Defendants' CDN services, Defendants contend that this "put us out of business" because "all our network was down[;] [a]ll our channels were down,

---

[4] *See also* Dkt. 104, Defs.' Am. Countercl. ¶¶ 4-26 (asserting claims for conversion and trespass that have since been dismissed, wherein Defendants alleged, among other things, "[t]hese URLs were the property of and in the possession of the Defendants").

8

everything[;] [a]ll our service was down completely." (*Id.* [citing quoted deposition testimony].) Defendants acknowledge that, if the CDNs are eliminated, the STBs are "no longer able to access channels" and "channels would not be sent to the set-top boxes." (*Id.*) Even taking Defendants' version of the events as true – that is, the Protected Channels were acquired from Defendants' STB Suppliers, pushed to Defendants' CDNs to improve the quality of the streams, and then conveyed from Defendants' CDNs to the users of Defendants' STBs – this is clear evidence of Defendants' transmission of the Protected Channels.

Defendants' rebuttal that their Services did not depend on CDNs to transmit the Protected Channels because the public internet was another viable option misses the point. Defendants only used the content delivery services acquired from their CDNs to deliver the Protected Channels to users of their STBs; Defendants did not use the public internet. (Defs.' SODF 50; DISH SOUF 48-49.) Defendants elected to use the CDNs to transmit the Protected Channels and it is immaterial that the Protected Channels hypothetically could have been transmitted a different way. Relatedly, Defendants' unsupported claim that the STB Suppliers made the Protected Channels available over the public internet is irrelevant because that is not how the Protected Channels were transmitted to users of Defendants' STBs;[5] the Protected Channels were transmitted to users of Defendants' STBs using the CDNs that were contracted for, paid for, and operated by Defendants. (*Id.*)

By controlling the operation of the CDNs, Defendants publicly performed the Copyrighted Works that aired on the Protected Channels. Under the Copyright Act, Defendants "transmit[ted] or otherwise communicate[d] a performance . . . to the public, by means of a[] device or process." 17 U.S.C. § 101 (defining perform publicly). A performance was transmitted because the images and sounds comprising the Copyrighted Works were "received beyond the place from which they

---

[5] Just to be clear, there is no evidence that any of the STB Suppliers that purportedly provided the Protected Channels over the public internet did so with the authorization of any of the relevant copyright owners, including DISH.

9

are sent." *Id.* (defining transmit a performance.)  The Copyright Act does not define "the public;" however, *Aereo* and other case law makes clear that Defendants' performance of the Copyrighted Works to users of Defendants' STBs constitutes a performance to the public.  *Aereo*, 573 U.S at 448-449.  The Court should grant DISH summary judgment on its copyright infringement claim.

**B.     The Magistrate Judge Erred When Finding A Fact Issue On Infringement.**

The Magistrate Judge erred by considering unsupported and irrelevant allegations made by Defendants, which to the extent they constitute or influenced the Magistrate Judge's findings are objected to in accordance with 28 U.S.C. § 636(b)(1)(C) and Fed R. Civ. P. 72(b)(3).

*First*, the statement that Defendants used "CDNs only to improve the quality of the content available through the set-top boxes," which "arrive equipped with software or an application that points or links to channels already available on the internet" is flawed.  (R&R 46-47.)  Defendants used CDNs to transmit the Protected Channels to users of Defendants' STBs, as established above.  (DISH SOUF 40-42, 48; *see supra* Part III.A.2.)  The undisputed facts establish that turning off the CDNs stopped the transmission of the Protected Channels.  (DISH SOUF 50.)  If Defendants' STBs "point[] or link[] to channels already available on the internet" (rather than the CDNs), this would not be true – transmission of the Protected Channels would not cease when the CDNs were eliminated.[6]  Any increase in quality was because the Protected Channels were transmitted using Defendants' CDNs rather than the public internet.  The Magistrate Judge erred to the extent it was found that the CDNs only improved the quality of content already being transmitted to Defendants' STBs by means other than the CDNs.  There was one way and only one way the Protected Channels were transmitted to users of Defendants' STBs and that was through Defendants' CDNs.

---

[6] Likewise, the statement that "the STB Suppliers create the initial URLs that correspond to and render the Protected Channels" is incorrect.  (R&R at 47.)  Defendants acknowledge the URLs that correspond to and render the Protected Channels are the URLs that Defendants obtained from their CDNs, not the so-called initial URLs allegedly created by the STB Suppliers.  (*Id.* [citing Dkt. 151-9 at 13-15]; *see also* Dkt. 151-7 at 6 and Dkt. 151-8 at 7.)

10

*Second*, to the extent that the Magistrate Judge construed *Aereo* as requiring evidence that Defendants used their own equipment (and not rented or leased equipment) to capture and transmit the Protected Channels from their source to users of Defendants' STBs, that was error. (R&R at 50.) *Aereo* found that the Copyright Act's definition of public performance was satisfied because "[w]hen an Aereo subscriber selects a program to watch, Aereo streams the program over the internet to that subscriber." 573 U.S. at 445-446. Whether Aereo itself went out and acquired the program that was streamed (as opposed to a third-party providing the program to Aereo to stream, as Defendants claim here), and whether Aereo owned the equipment used to stream the program (as opposed to equipment being leased from a third-party, as Defendants do here with the CDNs), were not facts the Supreme Court identified when finding the Copyright Act's definition of public performance was met. *Id.*

In fact, the legislative history pertaining to the Copyright Act of 1976 that introduced this broad right of public performance makes clear that "[a]ny act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance.'" H.R. Rep. No. 94-1476, at 63 (emphasis added). The "any act" may also be accomplished by any means: "'either directly or by means of any device or process,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented." *Id.* at 64 (emphasis added). Defendants' unsupported allegation that the STB Suppliers sent the Protected Channels to Defendants' CDNs, even if true, is immaterial because the undisputed facts establish that Defendants, by controlling the operation of the CDNs used to transmit the Protected Channels to users of their STBs, engaged in their own actions constituting a public performance.

*Third*, though the Magistrate Judge states that *Aereo* and the other cases cited by DISH are

11

distinguishable, neither the Magistrate Judge nor Defendants discuss the language in the Copyright Act defining what it means to publicly perform, and do not identify any case law that supports the argument that Defendants' conduct does not violate the right of public performance. Defendants' reliance upon *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) is misplaced because Defendants did not merely offer equipment that a customer used to make an illegal copy. (Defs.' Resp. at 10.) Rather, Defendants more closely resemble the streaming television services provider in *Aereo*.[7] The distinction has been summarized as follows:

> Aereo did not just provide equipment. It also provided access and the means to transmit the infringing material. . . . Aereo played an active role in the infringement. That role was to route infringing content to its users. True, its users would request the content, but they did not merely utilize Aereo's service to store infringing content they obtained elsewhere. Aereo, not its users, provided the means to obtain and transmit copyrighted performances. Aereo's involvement, in other words, was more than passive.

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 442 (5th Cir. 2017). CDNs themselves may be able to claim the status of a passive equipment supplier; Defendants were the customers controlling the operation of these CDNs and thus Defendants were actively involved in the public performance of the Copyrighted Works. *See Aereo*, 573 U.S. at 440-44; *ALS Scan, Inc. v. Cloudflare, Inc.*, No. 16-cv-05051-GW, Dkt. 188 at 5-6, 13-14 (C.D. Cal June 1, 2017) (finding customers that sign up for, pay for, and use Cloudflare's CDN services, which function by storing a copy of the customer's content on Cloudflare's domestic servers so that it can be more effectively accessed by others, were subject to liability for direct copyright infringement.)[8]

---

[7] *Cartoon Network* is also distinguishable because the court only found the equipment supplier did not violate the right of reproduction and instead the customer was deemed to have copied the content; however, the court assumed that the equipment supplier transmitted the content for purposes of the public performance right at issue here. *Id.* at 133-34.

[8] The Magistrate Judge finds *Cloudflare* is distinguishable because "the direct infringers created copies of the images at issue and uploaded those copies to their websites." (R&R at 50.) The *Cloudflare* court, however, was not concerned with the images uploaded to the websites because these websites were hosted on servers abroad; instead, to find non-extraterritorial conduct the court looked at cache copies stored on Cloudflare's domestic CDN servers and concluded that Cloudflare customers that "sign up, pay for, and utilize" Cloudflare's services (as Defendants do with the CDNs here) are deemed to have "caused the infringing copies to be created." *Cloudflare*, Dkt. 188 at 7-14.

*Fourth*, Defendants' active involvement in the transmission of the Protected Channels goes beyond operating the CDNs and it was error to the extent the Magistrate Judge found otherwise in stating the STB Suppliers "would . . . push or transmit the Protected Channels through the CDN" and Defendants had no "knowledge or possession of . . . the servers and encoders being utilized to 'push' the channels." (R&R at 47-48.) For example, servers used to push the Protected Channels to the Verizon CDN were assigned to Defendant Fraifer. (DISH SOUF 71-72 [citing documentary evidence].) Defendants do not dispute that these servers were used to push the Protected Channels to their CDNs, and Defendants' mere denial that the servers were assigned to Fraifer fails to create a genuine issue of material fact. (Defs.' SODF 71-72.)[9] *See Endurance Am. Specialty Ins. Co. v. United Constr. Eng'g, Inc.*, 786 F. App'x 195, 198 (11th Cir. 2019) ("[M]ere denials, lacking any supporting evidence, will not be enough to defeat a well-founded summary judgment motion[.]"). The Magistrate Judge erred to the extent it was found that Defendants were not involved in pushing the Protected Channels to their CDNs.

*Fifth*, the Magistrate Judge does not take into consideration Defendants' middleware used to connect Defendants' STBs to streams of the Protected Channels transmitted using Defendants' CDNs. (DISH SOUF 73-74; R&R at 45-51.) Defendants claim to contest these facts, but do not provide any evidence to contradict DISH's description of the middleware – a description that comes directly from Defendants' own deposition testimony. (DISH SOUF 73-74, Defs.' SODF 73-74.) Defendants used the middleware and the CDN companies' websites to update URLs and restart transmission of channels to users of their STBs, for example when an existing URL ceased

---

[9] Defendants also admit using a server at their offices in Tampa to push channels to the Verizon CDN, but unlike their servers discussed above, Defendants claim – albeit without any support – that this server was only used for testing in connection with channels other than the Protected Channels. (DISH SOUF 69-70, Defs.' SODF 69-70.) Given this admission, Fraifer's denial of any "knowledge or possession of the technology" involved in encoding or pushing the content to Defendants' CDNs is disingenuous. (R&R at 48.)

13

working.  (DISH SOUF 75.)  Defendants attempt to refute this fact by claiming the STB Suppliers updated the URLs; however, the testimony from Defendants' employee is clear that he personally performed these tasks as part of his employment with Defendants; Defendant Fraifer deferred to that testimony when questioned on the middleware during his own deposition; and Defendants fail to offer any contrary evidence.  (*Id.*; Defs.' SODF 75.)[10]  While Defendants' operation of the CDNs is sufficient to impose liability, Defendants' push servers and middleware are further undisputed evidence of Defendants' active role in transmitting the Copyrighted Works to users of Defendants' STBs, thereby infringing DISH's exclusive right to publicly perform these works.

*Finally*, the Magistrate Judge erred in finding there was a fact issue concerning Defendants' infringement because Defendants provided at least some evidence to show the STB Suppliers were transmitting the Protected Channels and Defendants were merely middlemen passing information from the CDNs to the STB Suppliers.  (R&R at 47-48.)  Defendants' alleged evidence – consisting of their unsupported deposition testimony and that of their employee, along with an agreement that Defendants had with an unrelated STB supplier – does not create a genuine issue of material fact.

Defendants claim to have passed information from their CDNs to the STB Suppliers, and vice versa, but have not produced a single communication with the STB Suppliers.  DISH served subpoenas on the CDNs that yielded a host of communications between Defendants and the CDNs, not one of which copied the STB Suppliers.  (DISH SOUF 56-61, 63-65, 68, 72, 87 [citing exhibits comprising several hundred pages of communications].)  Similarly, Defendants have not produced a record of even a single telephone call to or from the STB Suppliers.  Defendants' claim of having merely passed information between the CDNs and STB Suppliers, when no such communications

---

[10] Defendants cite portions of Fraifer's deposition where he claimed to have sought assistance from the STB Suppliers to remove or disable channels in response to infringement notices, whereas Defendants' employee testified to having personally updated URLs to restart transmission of a channel, for example when a user of Defendants' STB reported the channel was not working properly.  (Defs.' SODF 75; DISH SOUF 75.)

14

are shown to exist and should easily be shown by Defendants to exist, fails to raise a genuine issue of material fact. *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations . . . in an affidavit or deposition will not create an issue fact for trial sufficient to defeat a well supported summary judgment motion."). Defendants purchased STBs from the STB Suppliers and nothing more.

The communications between Defendants and the CDNs also contradict Defendants' story that the STB Suppliers had a hand in operating the CDNs. The communications include page after page of CDN customer support tickets, containing lengthy discussions of a technical nature, where Defendant Fraifer personally, and another employee and consultant hired by Defendants, discuss the transmission of content to and from the CDNs, including the Protected Channels. (DISH SOUF 56-60, 63-64, 72.) Defendants' testimony that the STB Suppliers relayed this information to them over the telephone, including long URLs, and Defendants then typed out that information and sent it electronically to the CDNs makes no sense, especially when considering the amount of back and forth between Defendants and the CDNs by email that could have easily copied the STB Suppliers. (*Id.*) Defendants' allegation that references to "I," "we," and "our" in Defendants' emails with the CDNs actually refer to the STB Suppliers is equally incredible. (Defs.' SODF 72.) Defendants may not create a genuine issue of material fact by transforming a simple statement, for example "I can push stream fine from Gaby['s] encoders in Germany . . . Gaby [is] testing it," to mean that the STB Suppliers provided the Protected Channels and that Defendants have no knowledge or possession of the encoders or servers used to push the Protected Channels to Defendants' CDNs. (DISH SOUF 72.) Defendants' proffered testimony is "'so fantastic, so internally inconsistent, or so speculative that it ha[s] no probative value.'" *United States v. Davis*, 809 F.2d 1509, 1513 (11th Cir. 1987).

15

As a last point, the Magistrate Judge erred by relying on Defendants' previous relationship with Cressida as evidence of their relationship with the STB Suppliers. (R&R at 49-50.) Cressida allegedly sold PlanetiTV and ZaapTV branded STBs to Defendants (not the UlaiTV or AhlaiTV STBs at issue), and stopped selling those STBs to Defendants in 2012 (long before the documented infringement taking place between June 25, 2015 and May 3, 2017). (DISH SOUF 39-40, 76-77.) Furthermore, the Cressida agreement reflects a cost of $195 per unit, which allegedly included the channels, while the STB Suppliers only charged Defendants $35 or $50 for each unit acquired in 2015. (Dkt. 151-23; DISH SOUF 99.) CDNs were not used with the STBs obtained from Cressida. (Defs.' SODF 48.) Defendants' previous relationship with Cressida is no evidence of Defendants' relationship with the STB Suppliers – which are different companies, that provided different STBs, during different time periods, for vastly different amounts, and that did not utilize any CDNs.

Accordingly, Defendants' claim of having merely passed information between the CDNs and the STB Suppliers that allegedly provided the Protected Channels fails to raise a genuine issue of material fact to preclude summary judgment. *Solliday*, 413 F. App'x at 207; *Davis*, 809 F.2d at 1513. Regardless if Defendants' alleged evidence is considered, the undisputed facts demonstrate that Defendants controlled the operation of the CDNs and thus infringed DISH's right to publicly perform the Copyrighted Works.

## IV. <u>CONCLUSION</u>

The Court should modify the Magistrate Judge's R&R to grant summary judgment in favor of DISH on the issue of Defendants' copyright infringement. The remaining portions of the R&R that recommend granting DISH summary judgment on the issue of DISH's copyright ownership and granting DISH summary judgment on Defendants' breach of contract counterclaim should be accepted in full, with the exception of the objected to portion of the R&R at 5 discussed *supra* Part

16

III. (R&R at 10-44, 52-57.) The Court should rule on the outstanding issues the Magistrate Judge did not reach in the R&R, which include Defendant Fraifer's individual liability, DISH's monetary recovery, and DISH's unopposed request for a permanent injunction.

Dated: February 14, 2020

/s/ Timothy M. Frank
Joseph H. Boyle (*pro hac vice*)
Timothy M. Frank (*pro hac vice*)
HAGAN NOLL & BOYLE, LLC
Two Memorial City Plaza
820 Gessner, Suite 940
Houston, Texas 77024
Telephone:  (713) 343-0478
Facsimile:  (713) 758-0146
Email:  joe.boyle@hnbllc.com
Email:  timothy.frank@hnbllc.com

James A. Boatman, Jr.
Florida Bar No. 0130184
THE BOATMAN LAW FIRM PA
3021 Airport-Pulling Road North, Suite 202
Naples, Florida 34105
Telephone:  (239) 330-1494
Facsimile:  (239) 236-0376
Email:  jab@boatman-law.com

Attorneys for Plaintiff DISH Network L.L.C.

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will provide notice to Defendants.

/s/ Timothy M. Frank
Timothy M. Frank (*pro hac vice*)