### UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DISH NETWORK L.L.C.,

        Plaintiff,

                        Case No. 8:16-cv-02549-TPB-CPT

v.

GABY FRAIFER, TELE-CENTER, INC.,
and PLANET TELECOM, INC.,

        Defendants.

_____/

### DEFENDANTS' *DAUBERT* MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY AND REPORT OF PLAINTIFF'S EXPERT WITNESS, PASCAL METRAL

Defendants, Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc. ("Defendants"), by and through their undersigned counsel, hereby file this Motion *in Limine* to Exclude the Testimony and Expert Report of Plaintiff's Expert Witness Pascal Metral ("Metral"), pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-593 (1993) and Federal Rules of Civil Procedure 26 & 37.

### I.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony and provides that: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of scientific and/or technical expert evidence.  *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n. 7, 597 (1993)[1].  These *Daubert* criteria apply equally to both "technical" and "specialized" knowledge. *Kumho*, 526 U.S. at 147-49.[2]

## II.     ARGUMENT

## A.     <u>MR. METRAL IS A LAWYER, NOT A QUALIFIED EXPERT</u>

---

[1] As the court in *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp.2d 1299, 1303 (S.D. Fla. 2010), explained: "Rule 702 requires courts to ensure "that proffered expert testimony *is both reliable and relevant*." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,* 555 F.3d 1331, 1338 (11th Cir.2009) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589–92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "This function inherently requires the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (alterations and internal quotation marks omitted). (emphasis added)."

[2] The reliability inquiry is context-specific, and the question before the court is "not the reasonableness [of the expert's methodology] in general," but rather "the reasonableness of using such an approach ... to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Id*. at 153-54 (emphasis in original).  It is well settled that speculative or conjectural expert testimony is properly excluded.  *See Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 311 (2d Cir. 2008). The burden of establishing qualifications, reliability and helpfulness by a preponderance of evidence rests on the proponent of the expert opinion. *Frazier*, 387 F.3d at 1260.

On December 22, 2017, pursuant to Fed. R. Civ. P. 26 Dish served upon Defendants its purported expert report, authored by Pascal Metral, Esq. Dish proposes to elicit testimony from Mr. Metral regarding his illicit and unlawful monitoring activities. Mr. Metral merely concludes, however, that his report entitled, "Technical Analysis of Channel Monitoring on UlaiTV and AhlaiTV Services" ("Report") (attached hereto as Exhibit 1) establishes that certain foreign network "channels" were accessible through a third-party application preinstalled on the UlaiTV and AhlaiTV digital media players ("DRMs") produced by a Chinese manufacturer and sold by Defendants.

Mr. Metral claims no particular expertise in the fields of computer engineering, network or systems analysis, software engineering or computer science. Hence, Mr. Metral is simply not an "expert ... qualified to testify competently regarding the matters he intends to address." *Id.* Indeed, nowhere in the Report does Mr. Metral discuss any qualifications relevant to the technical analysis of channel monitoring. Instead, to the contrary, Mr. Metral discloses in his Report that he is "employed as Vice President, Legal Affairs and Head of Anti-Piracy Litigation, with Nagravision, SA ("Nagravision")." Exhibit 1, at p.3. Furthermore, Metral does not even attempt to distinguish himself as an expert qualified to testify competently in the specific field of computer science of network analyses, instead admitting, as he must, that he had neither "testified as

an expert witness at deposition or trial in the past 4 years" nor "authored *any* publications in the past 10 years." *Id.* With regard to Mr. Metral's "background and qualifications" he states that they are "set forth in the curriculum vitae in Exhibit 1 [to the Report]." *Id.* Mr. Metral's CV fares no better in qualifying him as an expert qualified to testify in this matter on the issues he purports to address (attached hereto as Exhibit 2.) It reveals that Mr. Metral's "Education & Specialization" is limited to a Master in Law and passage of the Geneva Bar Examination. Mr. Metral's CV also provides his "Professional Experience Summary" which simply details his employment at a small law firm in Switzerland followed by his transition from trainee, to associate, to partner and, ultimately, to his current legal position, as Vice-President of Legal Affairs and Head of Anti-Piracy Litigation for Nagravision. Mr. Metral is by his education, specialization and professional experience, a lawyer, not a qualified expert in the field of computer science, specialized in network analyses. *See e.g.*, *Haman, Inc. v. Chubb Custom Ins. Co.*, No. 2:18-CV-01534-KOB, 2021 U.S. Dist. LEXIS 44447, at *9 (N.D. Ala. Mar. 10, 2021) (applying *Daubert* in finding the "qualifications set out in [purported expert's] curriculum vitae … [established he was] not qualified by education or experience to give an opinion").

"Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the

subject matter of the proposed testimony.'" *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012).      Where, as here, a proposed expert witness lacks the requisite qualifications to meet the threshold to opine on subject matter, their testimony must be excluded by the Court, in acting as the gatekeeper, under *Daubert* and Rule 702[3].  In a case which is directly on point to the subject matter at issue, a trial court excluded an expert's report and testimony relating to fields for which he was found to not be an expert:

> "[B]ased on a review of his education and experience, the Court finds that Sameh is not qualified to testify as an expert in the fields of computer programming, systems analysis or engineering, "applications expertise," or "software engineering. [A]ll portions of his report [] on areas outside his field of expertise are stricken."

*See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 647 (S.D.N.Y. 2014).[4]

Here, as in *Davis, Delta T, LLC* and *vonRosenberg*, Mr. Metral's report and testimony should be excluded because his education and background are entirely devoid of *any* substantial experience in computer forensic science,

---

[3] For example, in *Davis v. Carroll,* 937 F. Supp. 2d 390, 413-20 (S.D.N.Y. 2013), in striking those portions of an expert's testimony beyond the scope of his expertise, the Court held: "Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Malletier*, 525 F. Supp. 2d at 642.  Therefore, "a trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (quotation marks and citation omitted). This is particularly true where a field is characterized by established standards for arriving at expert conclusions and a proposed expert fails to engage with those standards, departs from them in a report, or cannot cite published works in support of a position. *See Dev. Specialists, Inc. v. Weiser Realty Advisors LLC*, 2012 U.S. Dist. LEXIS 8666 (S.D.N.Y. Jan. 24, 2012).

[4] *See also Delta T, LLC v. Dan's Fan City, Inc*., No. 8:19-cv-1731-VMC-SPF, 2021 U.S. Dist. LEXIS 24422, at *8 (M.D. Fla. Feb. 9, 2021) (excluding testimony where the purported expert "failed to include any qualifications in his report related to his ability [in the relevant field he intended to address.]"); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 451 (D.S.C. 2019) ("Dr. Edgar is not qualified to testify as an expert regarding internet search results. There is no indication on Dr. Edgar's CV or his testimony submitted to the Court that he has any specialized knowledge, training or experience in forming internet search results or in interpreting the meaning of those results.");

network, programming or application engineering, all of which are well outside of the purview of his education, experience and expertise as *a lawyer*.  Mr. Metral relies solely on his CV which only serves to confirm he is not an expert in any relevant field.   Additionally, Metral fails to cite to any published works in support of his methodology, analysis or conclusion. This, because the methodology he has utilized was unlawful and unreliable, not of a standard utilized and supported by experts in the field of computer forensic science, network analysis, programming and application engineering.  Metral fails to explain how his experience leads to the conclusions reached, why that experience is a sufficient basis for his opinion and how his experience is applied to the facts.[5]

Allowing Mr. Metral to testify as an expert in this litigation would contravene the gatekeeping purpose of Rule 702 and *Daubert*, amount to advocacy by a lawyer from the witness stand on topics he is not qualified to opine upon. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## B.   **METRAL'S OPINION IS UNRELIABLE**

The next question this Court must consider is whether Metral's methodology is reliable.[6] The focus of the Court's inquiry must be based solely

---

[5] ***When a witness relies*** "*solely ... on experience, then [he]* __must__ *explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience reliably applied to the facts.*" *Id.* (quoting Fed. R. Evid. 702) (emphasis added). *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 810 (11th Cir. 2015).

[6] "[The Eleventh Circuit has] held that "an expert may be qualified ... [but that] does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). A trial court cannot simply "tak[e] the expert's word for it." *Id.* "[I]t

on the principles and methodology of the expert, and not on the conclusions that the expert reaches. *Daubert*, 509 U.S. at 594. "A judge's role is to exclude unreliable and irrelevant information due to the potential to create confusion, prejudice and because it lacks probative value." *Welsh v. Newman Int'l Transp., Inc.*, No. 2:10-cv-582-FtM-SPC, 2011 U.S. Dist. LEXIS 101613, at *5 (M.D. Fla. Sep. 8, 2011) (*Allison v. McGhan Medical Group*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

"Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016).[7] A district court can take other factors into account as well. *Id.* "[T]he trial court is to *separate expert opinion evidence based on good grounds from* **subjective speculation that masquerades as scientific**

---

remains a basic foundation for admissibility that [p]roposed [expert] testimony must be supported by appropriate validation—i.e., good grounds, based on what is known." *Id.*

[7] It is undisputed that Dish is a joint venture partner with Nagravision SA, who together own NagraStar, LLC. NagraStar's sole U.S. client is Dish Network. Dish and IBCAP each employ Nagravision SA, including Mr. Metral as their legal counsel. Indeed, Mr. Metral, acting as legal counsel, claims to have sent Defendants and their CDN providers cease and desist letters on behalf of IBCAP. *See* Dkt. 146-23, at ¶13.

*knowledge*." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (emphasis added). "The proponent of expert testimony always bears the burden." *Frazier*, 387 F.3d at 1260.  The Court's analysis as to reliability 'focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" *Seamon*, 813 F.3d at 988. It is well recognized that an expert opinion that relies on a methodology contrary to law is improper and not admissible. *See Corwin v. Walt Disney Co.*, 2004 WL 5486639, at *6 (M.D. Fla. 2004); 475 F.3d 1239 (11th Cir. 2007).

Metral's opinion must be excluded because it is based on an unreliable monitoring model that is contrary to law since it relies on unlawfully acquired evidence in violation of both federal and state wiretapping, pen register and trap and trace and other prohibitions regarding the unlawful interception, storage and disclosure of electronic communications. Mr. Metral's opinion must also be excluded because it is based on a monitoring method which fails to provide any analysis whatsoever as to the source of origin of the "channels" allegedly available through a third-party application installed on the DRMs or any analysis relating to the alleged direct infringement of the specific Registered and Unregistered Works asserted in this matter, at best, is based on pure speculation.

**1.     Metral's Opinion Should Be Excluded As Contrary to Law**

**a.     Metral's Methodology Violates the Federal and Florida Wiretap Acts.**

The Electronic Communications Privacy Act of 1986, previously referred to as the Federal Wiretap Act ("Wiretap Act"), 18 U.S.C. §§ 2510-2520, "is designed to prohibit 'all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in investigation of specified types of major crimes.'" *Greenfield v. Kootenai County*, 752 F.2d 1387, 1388 (9th Cir. 1985). The Wiretap Act has both civil and criminal application and communications unlawfully acquired in violation of the Act have been excluded from use at trial, including from expert reports, by courts under both Federal and State wiretapping laws.[8] *See e.g., Collins v. Collins*, 904 S.W.2d 792, 799 (Tex. App. 1995) ("To permit such evidence to be introduced at trial when it is illegal to disseminate it would make the court a partner to the illegal conduct the statute seeks to proscribe. *Gelbard*, 408 U.S. [41] at 51, 92 S. Ct. at 2362-63; *Turner*, 765 S.W.2d at 470. We hold the illegally obtained tapes were not admissible and should not have been given to the expert for her to use in forming her opinion on the issue of custody."); *see also O'Brien v. O'Brien*, 899 So. 2d 1133, 1137-8 (Fla. Dist. Ct. App. 2005) (affirming the trial court's holding excluding evidence under the Federal and Florida Wiretap Acts in a civil action, the 5th DCA held, "The trial court found that the electronic communications were illegally intercepted in violation of the Act and ordered that they not be admitted in evidence. . . .

---

[8] Sicker, D.C., Ohm, P. & Grunwald, D. (2007), Legal Issues Surrounding Monitoring During Network Research (Invited Paper), *IMC '07: Proceedings of the 7th ACM SIGCOMM Conference On Internet Measurement*, Pages 141–148 (providing a comprehensive summary of laws relating to network monitoring)(attached as **Exhibit 2**).

Because the evidence was illegally obtained, we conclude that the trial court did not abuse its discretion in refusing to admit it."[9]

Here, Mr. Metral, Nagravision SA, NagraStar LLC, and those procuring their services, acting at his/their direction, admittedly, intentionally and knowingly violated 18 U.S.C. 2511(1)(a) and Fla. Stat. § 934.03(1)(a-d), which makes it unlawful for any person to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." *See also* 18 U.S.C. 2511(2)(d); *see also* Fla. Stat. § 934.03(1)(a-d) (Florida's Wiretap Act adopting nearly identical provisions). The Metral Report illustrates (Section 3.1) and admits that a workstation was utilized to intercept real-time network traffic input to and output from the UlaiTV and AhlaiTV DRMs using an application called Wireshark.[10]  *See* Report, pp. 4-5, Figs. 1 & 2 ("The switch is also connected to a network traffic review workstation (4), and is configured to redirect all network traffic to and from [the

---

[9] *Potter v. Havlicek,* 2007 U.S. Dist. LEXIS 10677, at *17-21 (S.D. Ohio 2007) ("Even if there was testimony regarding the contemporaneousness of the screen shot software's recording, the Court would join with the decision reached in the Florida case of *O'Brien v. O'Brien* . . . We conclude that because the spyware installed by the [Plaintiff] intercepted the electronic communication contemporaneously with transmission, copied it, and routed the copy to a file in the computer's hard drive, the electronic communications were intercepted in violation of the Florida Act."); *Joffe v. Google, Inc.*, 746 F.3d 920, 922-23 (9th Cir. 2013) ("Google argues that its data collection did not violate the Act because [unencrypted] data transmitted over a Wi-Fi network is an "electronic communication" that is "readily accessible to the general public" and exempt under the Act. 18 U.S.C. § 2511(2)(g)(i). The district court rejected Google's argument. *In re Google Inc. St. View Elec. Commc'n Litig.*, 794 F. Supp. 2d 1067, 1073-84 (N.D. Cal. 2011). We affirm.").

[10] *See* Cybersecurity Blue Team Tool Kit, Ch.7, Tanner, Nadean H., 2019 *available at:* https://onlinelibrary.wiley.com/doi/abs/10.1002/9781119552963.ch7 *(last accessed May 10, 2021)* ("Wireshark is legal to use, but it can become illegal if cybersecurity professionals attempt to monitor a network that they do not have explicit authorization to monitor."); *see also* Security Research and the Law: What You Need To Know, Kerner, Sean Michael, 2014 *available at:* https://www.esecurityplanet.com/networks/security-research-and-the-law-what-you-need-to-know/ *(last accessed May 10, 2021)* ("Simply running the open-source Wireshark packet sniffer on a network without authorization or consent could possibly be a felony under the Wiretap act, Bankston said.").

DRMs] to the workstation, which is dedicated to network traffic review. . . . *Wireshark allows Nagra to visualize and record in real-time incoming and outgoing traffic on Nagra's network, including network traffic generated by [the DRM's].* An example of the Wireshark viewing window displayed on the network traffic review workstation is shown in Figure 2." *Id.*, at p.4.

The Report misleadingly claims that "the workstation is not connected to the Internet." Instead, as Figure 2 of the Report shows, all of the devices are interconnected to the Internet through a network monitoring switch which is configured to intercept and "record in real-time incoming and outgoing traffic" through mirroring (e.g., likely through a SPAN Port) communications which are then monitored, captured, recorded and stored on a laptop running Wireshark. *Id.* That Metral and NagraStar allegedly connected a network switch to the Internet, used a VPN to covertly anonymize their IP address to a private IP, the location of which cannot be determined, then monitored traffic in real-time using a dedicated workstation using Wireshark to intercept and capture incoming and outgoing electronic communications, which were then stored, transferred and disclosed, all without express permission, is by definition an unlawful Wiretap under the Act. *See* 18 U.S.C. § 2515(1)(a-d); *see also* § 2510(1) ("including the use of such connection in a switching station") or § 2510(12) (broadly defining an "electronic communication" as "any transfer of . . . data").

The Wiretap Act also imposes liability on any person who "intentionally discloses" to "any other person the contents of any wire, oral, or electronic communication," or "intentionally uses" the "contents of any wire, oral or electronic communication" while "knowing or having reason to know that the information was obtained through the [unlawful] interception." *Id*. § 2511(1)(c),(d); Fla. Stat. § 934.03(1)(c),(d).   Finally, the Act prohibits use as evidence in "any trial," intercepted wire or oral communications or any part thereof "if the disclosure of that information would be in violation of this chapter." *See* 18 U.S.C. 2515; Fla. Stat. § 934.06.

Mr. Metral's Report *admits* that his methodology incorporated use of a "monitoring computer" in conjunction with a software application called Wireshark which both he and NagraStar employees used to unlawfully intercept inbound and outbound encrypted electronic communications, capture and record such data, content and communications across networks, store the same in a database and, ultimately, to disclose the same to others, all in violation of the Wiretap Act and Florida law.[11]   Moreover, Metral's and Nagravision's unlawful methodologies and acts do not fall within any of the exceptions to the Federal or

---

[11] Wireshark is a software program that allows a user to intercept and record electronic communications and data transmissions across computer networks by capturing data in a file format with a ".pcap" file extension, short for "packet capture."  Metral's Report includes a screenshot of the unlawful interception of electronic communications using the Wireshark program in his Report and attaches actual PCAP files evidencing hundreds unlawfully intercepted electronic communications. *See* Report, at p. 5; *see also* p. 6, ¶f (detailing the process, devices and software used in the unlawful real-time interception of incoming and outgoing electronic communications, capture, recording, storage and disclosure of the same).

Florida Wiretap Acts.  For example, 18 U.S.C. 2511(2)(d) does not protect Metral

and Nagravision because they were intentionally conducting their unlawful

activities for "the purpose of committing any criminal or tortious act in violation

of the Constitution or laws of the United States or of any State."  Indeed, Florida

makes it a crime to intercept or record an "electronic communication" unless all

parties to the communication consent. See Fla. Stat. § 934.03.[12] Finally, the

methodology utilized by Metral and NagraStar should be excluded as inherently

unreliable because it cannot be repeated, reproduced or tested for reliability

without violating federal and state laws. This fact alone takes the methodology

used by Metral and NagraStar well outside of what can reasonably relied upon

by *any* trier of fact.  A methodology incapable of testing and duplication is by

definition unreliable under the scientific method. *Seamon*, 813 F.3d 983, 988 (11th

Cir. 2016).

For the reasons above and cited in *O'Brien, Collins, Potter* and *Joffe* and

because his opinion relies on a methodology contrary to state and federal law

which is improper and thus not admissible, this Court can and should use its

discretion to exclude Mr. Metral's Report and testimony.  To hold otherwise

---

[12] Similarly, the Senate Report accompanying enactment of § 2511(2)(g)(i) explains that whether an electronic communication is readily accessible depends on whether the public is freely authorized to access the electronic communication.  *See* S. Rep. 99-541, 1986 U.S.C.C.A.N. 3555, 3590 (1986).  It explains that a service is generally accessible only if it "does not require any special access code or warning to indicate that the information is private." The purchase of an UlaiTV and AhlaiTV required agreement to an End User Licensing Agreement and an activation code.

would set a dangerous precedent, approving the use of unlawfully acquired evidence and methodologies violative of state and federal law, privacy rights and due process in civil proceedings. Metral's report should be excluded as unlawful.

**b.    Metral's Methodology Violates the Federal and Florida State Pen Register and Trap and Trace Acts.**

In 2001, the Federal Pen Register and Trap and Trace Act was amended under the Patriot Act to broaden the definition of "pen register" to any "device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication."[13]  Metral and NagraStar violated the Federal Pen Register and Trap and Trace Act ("PRTTA") and Florida Law when they admittedly utilized a methodology contrary to law to covertly sniff, capture, record, store and disclose the packets of data without all party consent or a Court order.  *See* 18 U.S.C. § 3121(a); Fla. Stat. § 934.31(a). As discussed, Metral and Nagrastar used a workstation (device) and Wireshark (process) to record incoming and outgoing network traffic, unlawfully capturing, recording as PCAP files and monitoring the very type of information proscribed by the PRTTA under the Patriot Act and the Florida Pen Register Act, including

---

[13] 18 U.S.C. §§ 3121(a), 3127(3) (defining a pen register) 3127(4) (defining a trap and trace device).  The Internet is such a "packet-switched data network." See *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1345 n. 2 (Fed. Cir. 2004).  Florida has adopted a similar statute.  Fla. Stat. § 934.31(a) (2020).

at least the routing information, IP addresses and other identifying information of the sender. *Id.* It is unlawful under 18 U.S.C. § 3121(a) and Florida Law to install or use a pen register or trap and trace device. *See also* Fla. Stat. § 934.41. Significantly, the definition of a pen register under the PRTTA has not been read to exclude address or routing recording devices that also record content, but instead, prohibit court orders allowing the use of pen registers that *also* collect content. *See In re U.S. for Orders Authorizing Use of Pen Registers and Trap and Trace Devices,* 515 F.Supp.2d 325 E.D.N.Y., 2007, *citing* 147 Cong. Rec. S10990, *S11000 (Oct. 25, 2001) ("When I added the direction on use of reasonably available technology ... to the pen register statute … I recognized that these devices collected content and that such collection was unconstitutional on the mere relevance standard."). Accordingly, the workstation, Wireshark software and overall methodology described in the Report, as utilized and relied upon by Metral and NagraStar to capture and record electronic communication packets and information containing incoming and outgoing the IP addresses, header information and other information identifying senders fits squarely into the definition of a pen register as "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is

transmitted."   Thus, Metral and NagraStar's methodology is improper and contravenes the PRTTA and Florida law.[14]

Further, the Model Rules of Professional Conduct also forbid "methods of obtaining evidence that violate the legal rights of . . . a [third] person."   Rule 4.4. The methods of obtaining evidence employed by Metral, a lawyer, and those he "supervised" at NagraStar violated the legal rights of Defendants under, at least, the State and Federal PRTTA and Wiretap Acts.[15] As a matter of federal substantive law, this Court has the inherent power to exclude evidence obtained in violation of law or the ethics rules that apply in federal court.[16]   That Metral chose to utilize and allegedly direct others to utilize an unlawful, unethical and improper methodology to unlawfully collect alleged evidence—including screenshots, to rely upon for his opinion, and in view of the many other lawful methodologies or processes he could have utilized—strongly suggests that he is

---

[14] For the same reasons cited with regard to the Wiretap Act, this Court should exclude Metral's Report and testimony (as well as NagraStar's testimony) as improper and contrary to law. See *In re United States*, 416 F. Supp. 2d 13, 15-17 (D.D.C. 2006) ("These definitions make clear that both a pen register and a trap and trace device may be a "process" used to gather information relating to "electronic communication."); *U.S. v. Forrester*, 512 F.3d 500, 504 (9th Cir. 2008) (concluding "computer surveillance that enabled the government to learn . . . the Internet protocol ("IP") addresses of the websites that he visited and the total volume of information transmitted to or from his account" was "analogous to the use of a pen register"); *Meisler v. Chrzanowski*, 2013 WL 5375524, at *14 (D. Nev. 2013); *In re in re United States of Am. for PRTT Order for One WhatsApp Account*, 2018 U.S. Dist. LEXIS 43599, at *12-14 (D.D.C. 2018) (collecting cases relevant to unlawful use in Internet applications like Wireshark).
[15] *See* ABA Formal Opinion 01-422: Electronic Recordings by Lawyers (holding, in the context of voice recordings, that violation of state wiretap laws is violation of rules of professional conduct); *see also Aiken v. Business and Industry Health Group, Inc.*, 885 F. Supp. 1474, 1480 n.7 (D. Kan. 1995) ("Strict adherence to these rules is demanded and any information gained in violation of an applicable ethical guideline remains subject to suppression.").
[16] *See O'Brien v. O'Brien*, 899 So. 2d 1133, 1137–38 (Fla. App. 2005) (excluding evidence, screen shots, obtained in violation of the Wiretap Act and collecting cases on discretion of trial courts to exclude such evidence); *Potter v. Havlicek*, 2007 U.S. Dist. LEXIS 10677, at *17-21 (S.D. Ohio 2007) (adopting *O'Brien* to exclude screen shots).

not a qualified to serve as an expert, that his chosen methodology and resulting

opinion is unreliable and should be excluded.  *See* **Exhibit 2**, at 5-7.

**c.      Metral's Methodology and Opinion Rely on Incomplete Facts and Data**

Even setting aside that Metral's methodology and opinion as unreliable

because they are contrary to law, the methodology Metral used is inherently and

fatally flawed.  First, Metral's report merely concludes that certain channels were

available through a *single* third-party application preinstalled on the UlaiTV and

AhlaiTV DRMs by their manufacturer, situated in China, which were sold by

Defendants.  Report, at 25, ¶a.   His Report wholly ignores the existence of any

other indisputably non-infringing uses or any of the other applications

preinstalled or capable of being installed and utilized on the UlaiTV and AhlaiTV

DRMs.  The Report also fails to identify with any specificity, channels allegedly

available through the third-party application which Plaintiff does not complain

of and which of the alleged monitoring instances were "manual or automated"

bringing into question the authenticity and admissibility of the methods by

which any such evidence was collected. Report, at 6.   Most significantly,

however, the Report fails to discuss *any* facts, data or methodology that lawfully

or reliably identifies the source of origin of the application or the alleged channel

streams Plaintiff claims an exclusive right to and fails to identify any of the

asserted works in this litigation.

Metral's sole reliance on a monitoring report, created for purposes of this litigation, which shows nothing more than URLs of a content delivery network ("CDN") does nothing to confirm the true source of origin of the alleged channel streams.  Metral does not claim or even suggest in his report that the alleged channel streams originated from Defendants, he assumes it.  Without explaining how, why or upon what facts or methodologies he has relied upon, Metral opines on an ultimate issue, concluding Defendants "retransmitted" the channel streams and operated a "service."  Examination of the exhibits to Mr. Metral's report does nothing to bolster his conclusion.  Indeed, the URLs contained in the Monitoring Report (*See* Report, Exh. 2), at best, unremarkably show that a CDN[17] (an ISP) connected to the DRMs.  It is indisputable, however, that one cannot reach beyond the last node of a CDN due to the security firewalls such ISPs have in place.  Thus, the Monitoring Report, at best, show only URLs that from the last node within a CDN, they simply do not show the source of any streams originated or "retransmitted" by Defendants.  Accordingly, Mr. Metral's methodology and Report simply can not and does not contain sufficient facts and data to show the true source of origin of any alleged channel streams.

**d.    Metral's Report and Opinion Are Unreliable Because They Ignore The Frequency And Rate of Error And Fail To Address A Critical Fact.**

---

[17] *See* Cloudflare, Is a CDN the same as a web host? ("While a CDN does not host content and can't replace the need for proper web hosting, it does help cache content at the network edge, which improves website performance. Many websites struggle to have their performance needs met by traditional hosting services, which is why they opt for CDNs.") *available at* https://www.cloudflare.com/learning/cdn/what-is-a-cdn/.

Metral's Report, albeit buried on the final page, acknowledges that "[t]here is frequent interruption or downtime associated with the retransmission of the [] Channels on the UlaiTV services … At times, there is freezing or glitches in the retransmissions such that the [] Channels do not display properly or otherwise lack in picture quality."  *See* Report at p. 26, ¶b.  Metral fails to opine on whether, when or just how "frequent" this "interruption or downtime" was and fails to discuss its effect on the alleged airing of the asserted works in this case bringing into serious doubt the reliability of his methodology and conclusions.  Indeed, the screenshots Metral relies upon in Exhibit 3 of his Report, which amount to nothing more than inadmissible hearsay[18], do nothing to resolve this critical fact.  Even assuming the admissibility of screen shots *arguendo* they do nothing more than reflect a single frame or small fraction of a second of an alleged stream.[19]

---

[18] The Federal Rules of Evidence defines "hearsay" as "…[a] statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls into an exception. Fed. R. Evid. 802; see *United States v Thomas*, 631 F. Appx. 847, 848-49 (11th Cir. 2015); see also *Broad Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) (ruling that under Fed. R. Evid. 802, "…hearsay is not admissible except as provided by [the Federal] Rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress, " and **neither this rule nor any other rule or statute creates an exception for bench trials** (emphasis added); see *Moore v. Unites States*, 429 U.S. 20, 22 (1976). The screenshots are nothing more than Plaintiff's self-serving documents amounting to "[m]ere accumulations of hearsay" prepared for the purposes of litigation and therefore is not admissible as the business record under Rule 803(6). See *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1161 (11th Cir. 2004) (citing *Noble v. Alabama Dep't of Envtl. Mgmt.*, 872 F.2d 361, 366 (11th Cir. 1989) (court ruling exhibit was not admissible under Rule 803(6) where underlying materials or information on which exhibit was based were not admissible under Rule 803(6) because they were not prepared during course of business but were prepared during and **for use in litigation**) (emphasis added); see also *United States v. Ignasiak*, 667 F.3d 1217, 1231 (11th Cir. 2012) citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009) ("business record exception does not encompass documents generated by an entity that regularly "produc[es] …evidence for use in litigation"); see also *United States v. Dreer*, 740 F.2d 18, 20 (11th Cir. 1984) (affirming district court's decision finding record inadmissible because the testimony and foundation upon which admission for the record was based failed to indicate reliability in the "[c]ircumstances surrounding the origin and the nature of the compilation").

[19] *See E.g.*, Intro To Video Frame Rates and Frames Per Second Shooting Speed, available at https://www.borrowlenses.com/blog/intro-to-video-frame-rates-and-frames-per-second-shooting-speeds/.

Given Mr. Metral's admission that there was "frequent" interruption or downtime, without a reliable measure of when such interruption or downtime occurred, results in a methodology which simply cannot be relied upon. This fact is compounded when one considers that the Report fails to identify any asserted works, fails to establish which, if any, screen shots were taken manually or automatically, by whom and whether any of those screen shots accurately relate to any of the asserted works in this matter.

Metral's Report allegedly identifies channels, not works. Channels are ideas, not protected works under the Copyright Act, instead, only works as tangible expressions of an idea, fall under the ambit of the Copyright Act[20]. Worse more, Mr. Metral admits that he used the methodology discussed in the Report, including his capture of screenshots, while situated in Switzerland, which is extraterritorial, well beyond the reach of the Copyright Act.[21] Metral's alleged use of a VPN does not change the soil on which he stood when allegedly capturing screenshots.[22] Moreover, Metral relied on still other screenshots and

---

[20] In *Corwin*, 475 F.3d 1239, 1250-51 (11th Cir. 2007): [T]he court excluded the expert reports on the grounds that they were based upon improper methodology and failed to assist the trier of fact. Ideas, as opposed to expression of those ideas, are not protected by copyright law." citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999) (per curiam).[] Thus, if an expert relies on uncopyrightable ideas rather than on expression of those ideas in analyzing alleged copyright infringement the report is excludable. See *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003).

[21] "Every court to have examined the issue has held that Congress did not intend the Copyright Act to be applied extraterritorially, beginning with the Supreme Court in 1908. Extraterritorial acts of infringement are, therefore, beyond the subject matter jurisdiction of U.S. federal courts." *Illustro Sys. Int'l, LLC v. IBM*, 2007 U.S. Dist. LEXIS 33324, at *37-38 (N.D. Tex. May 4, 2007) citing 7 William F. Patry, PATRY ON COPYRIGHT § 25:86 (emphasis in original); *Subafilms, Ltd. v. Mgm-Pathe Communs. Co.*, 24 F.3d 1088, 1089 (9th Cir. 1994).

[22] Metral admits that: (1) he intentionally manipulated, modified and cropped the Screenshots, allegedly prepared by these employees, to exclude data according to what Metral unilaterally deemed to be "[ir]relevant data." (See Dkt.

data allegedly captured either by employees of Nagrastar or through an alleged automated process without a human actor, again, without knowledge of how the admitted frequent downtime effected such data. Finally, even the Wireshark pcap monitoring data fails to establish that any perceptible airing of any asserted works in this matter occurred. IP addresses, routing information and the like cannot establish perceptible sounds and images. Given the Report's admission of "frequent downtime" it would be improper to assume without admissible and reliable evidence that *any* infringement occurred. For the reasons discussed, Metral's opinion is unreliable, failing to make any reasonable connection between damages and alleged infringement.[23] His opinion fails to meet the rigors required by *Daubert,* is speculative, unreliable and should be excluded.[24]

## C.    METRAL'S OPINION DOES NOT ASSIST THE TRIER OF FACT.

---

228-2 ¶ 7); (2) that the Screenshots were not all created according to the process described in his Report allegedly used to capture and prepare the Screenshots (Dkt. 228-2 ¶8) (Metral explaining that hundreds of the Screenshots "[o]btained by NagraStar that did not have the separate browser window showing the date and time in the city where the VPN output was located" and "[w]ere taken outside of the course of NagraStar's regularly scheduled monitoring"). Indeed, the Screenshots were not captured or prepared according to a contemporaneous or routine procedure to ensure accuracy, but instead are merely a result of a biased process serving Plaintiff's litigation objective, which has produced inaccurate and inconsistent results along with inherently unreliable documents purporting to be Screenshots. (*Id.*; Dkts. 146-23; 146-24, Ex. A ¶5).

[23] *See, e.g., Thornton, supra; Gastaldi*, *supra,* 709 F. Supp.2d at 1309 ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."), quoting *Mich. Millers Mut. Ins. Corp. v. Benfield,* 140 F.3d 915, 921 (11th Cir. 1998) (alterations and internal quotation marks omitted).

[24] Metral's opinion and methodology is unreliable under the *Seamon* factors. 813 F.3d 983, 988 (11th Cir. 2016). First, Metral's methodology involves acts which are unlawful under state and federal law. Thus, they cannot be tested nor are they capable of being tested. Second, Metral's technique has not been subjected to peer review and publication. In fact, his methodology is contrary to peer reviewed expert publication in the pertinent field. Third, Metral admits to "frequent downtime" of the alleged channel streams but entirely failed to record and disclose any known and potential error rate of the methodology he used. Fourth, he fails to establish his technique is accepted in the scientific community.

Under the relevancy prong of Rule 702, the Court must determine if the expert's testimony will assist the trier of fact.  *See Daubert,* 509 U.S. at 591. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id*. at 591-592.  To be admissible, the expert's testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  "Because of the powerful and potentially misleading effect of expert evidence, [citations omitted] sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263.  As the Eleventh Circuit has emphasized: "[E]xpert testimony may be assigned talismanic significance in the eyes of lay [factfinders], and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse."  *Id*.

Expert testimony must also assist the trier of fact. Fed. R. Evid. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citation omitted). "[T]he court must 'ensure that the proposed expert testimony is "relevant to the task at hand." *Allison*, 184 F.3d at 1312 (citation omitted). So, while "[t]he 'basic standard of relevance . . . is a liberal one,' *Daubert*, 509 U.S. at 587, . . .[,] if an expert opinion does not have a 'valid scientific connection to the

pertinent inquiry[,]' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). Expert testimony lacks "fit" when an analytical leap or assumptions must be made between the facts and the opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Haegele v. Judd*, No. 8:19-cv-2750-T-33CPT, 2020 U.S. Dist. LEXIS 218456, at *15-16 (M.D. Fla. 2020) (quoting *Frazier*, 387 F.3d at 1262-63; excluding expert as unhelpful to Court).

The Federal Circuit and Eleventh Circuit have warned of the unique risk in allowing an attorney unqualified in the relevant art to provide testimony as an expert witness.[25] Metral's opinion is so reliant on speculation and suffers from a complete lack of any true analysis or methodology connecting his opinion with the alleged infringement, that it is simply not helpful to this Court.[26]

---

[25] Indeed, "allowing a patent law expert without any technical expertise to testify on issues of infringement and validity amounts to nothing more than advocacy from the witness stand." *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1364-5; n.8 (Fed. Cir. 2008) (citing *Daubert*, 509 U.S. at 597) at 1364-65. As the Federal Circuit has stated: Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. This concern is further compounded where the purported witness is an attorney. It is already difficult enough for courts to separate intricate questions of fact in patent cases from equally intricate questions of law. A technically unqualified patent attorney can do much mischief by leading the factfinder to seemingly sound conclusions without ever providing a well-grounded factual basis in the pertinent art. *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1319 (S.D. Fla. 2011); *see also Flexiteek Ams., Inc. v. Plasteak, Inc.*, 08-CV-60996-JIC, ECF No. 157, 2009 U.S. Dist. LEXIS 65644 (S.D. Fla. 2009) (excluding attorney as expert with no skill in the pertinent art).

[26] Indeed, despite disclosures by Defendants of the manufacturers of the UlaiTV and AhlaiTV DRMs and admissions by UniSoft that it owned and operated encoders, nowhere in Metral's Report does he discuss any desire to identify the source of origin of the allegedly infringing content. He does not cite any materials from the record whatsoever. Instead, without citing any evidence in support of the same, he begins and ends his Report with the

## D.   METRAL'S OPINION SUFFERS FROM BIAS AND SELF INTEREST

Mr. Metral's opinion must also be excluded as unhelpful to the Court and unreliable because his bias, self-interest and conflict of interest in the outcome of this case is manifest.  Mr. Metral admits to serving as legal counsel for Plaintiff, both through his legal position at Nagravision SA, a joint venture partner of Plaintiff, and also as legal counsel for IBCAP, an organization which Dish finances and shares employees with.[27]  Worse more, Metral's opinion is also based on the unlawful monitoring of employees of NagraStar, which is owned by Dish, its sole customer in the U.S.[28]  In addition to his own acts, Metral claims to have supervised NagraStar employees' unlawful monitoring, while thousands of miles away at his offices in Switzerland.[29] Mr. Metral's conflict of interest and

---

assumption that the availability of channel streams on a preinstalled third-party application on a device manufactured by a disclosed manufacturer in China, were somehow attributable to Defendants.  Metral's Report includes absolutely no analysis or connection between Defendants and any alleged infringement other than Defendants' admitted use of a CDN ISP to improve the quality of the data output of the product it sold.

[27] *See* Deposition Transcript of Izabela Slowikowska, January 7, 2013 (attached as Exhibit 3) p. 32, lines 9-17 (Q: Okay. So he went – while he was simultaneously you've testified, and correct me if I'm wrong, I want to know, I want to find out what the truth here, Mr. Kuelling worked for Dish Network L.L.C. and IBCAP at the same time. A: There was a period where Mr. Kuelling was the Senior Vice President of – of – of – Dish Network L.L.C. for the international programming and he was also an executive director of - - of IBCAP.")

[28] *See* Deposition Transcript of Kevin McMonnies, March 23, 2018, (attached as Exhibit 4) p. 7, lines 3-5 (Q: And who do you work for today? A: I work for NagraStar."); p. 26, lines 12-23 (Q: Bell TV Canada and Dish Network LLC are the two major ones, are the two. Are there more than that?  MR. HAGAN: Objection, foundation. A: No.); p.56, lines 17-22 ("Q: Did you ever work as an employee of Dish Network, LLC affiliates? MR. HAGAN: Objection to form. A: Well, I believe the correct answer would be that we are now partly owned by Dish Technology as of sometime last year."); see also (Dkt. 217-1 ¶¶ 126-131); (Slowikowska, Dep. at 17:6, 35:20-25, 36: 24-37:2-17) (NagraStar is an anti-piracy joint-venture between Plaintiff and Nagravision, and Plaintiff has an ownership interest in NagraStar).

[29] Mr. Metral admits that he decided to modify the Screenshots to focus on what he thought was relevant, stating that "[T]he cropping resulted in ***screenshots that focused on the relevant information***, i.e., a still capture of the video of the Protected Channel including the channel logo and the ***location and time the Protected Channel was observed based on the VPN output***.". (Dkt. 224-2 ¶7) (emphasis added). Despite his intentional manipulation and cropping to "…focus on relevant information", none of the Screenshots contain 'relevant information' such as on-screen URLs, and the vast majority of the Screenshots do not reflect any time zone in the United States. (*Id.*). Additionally, Metral also attaches the poor quality and cropped Screenshots to his Report despite readily admitting that the "…there is

bias is manifest.[30] Metral's testimony and Report is not "helpful" in a *Daubert* sense because his Report discloses nothing an average layperson could not understand.   Instead, clothed in the title of "expert" Metral, without any analysis relating to the alleged infringement of the asserted works, is improperly being utilized as a conduit for otherwise inadmissible and prejudicial hearsay evidence and to advocate from the witness stand, as a lawyer.   His opinion and methodology are unlawful, unreliable, irrelevant, prejudicial, biased, unhelpful and should be excluded.[31]

Dated: May 11, 2021                           Respectfully submitted,

By:   */s/ Joseph R. Sozzani*
Joseph R. Sozzani, Esq.
Florida Bar Number: 120297
E-Mail: JSozzani@InfinityIPLaw.com
INFINITY IP, PLLC
222 West Bay Drive
Largo, FL 33770
Tel: 727.687.8814

Derrick L. Clarke, Esq.

---

freezing or glitches in the retransmissions such that the Protected Channels do not display property or otherwise lack in picture quality." (Dkts. 146-23 ¶10; 146-24, Ex. A §5(b)).

[30] He has been directly involved in this matter as legal counsel for IBCAP, which DISH finances, serves as an employee of DISH's joint venture partner, Nagravision SA, and allegedly supervised employees of NagraStar, owned by DISH.  He will be incapable of providing this Court with an objective opinion based solely on science or reliable, helpful and unbiased expert testimony.  To allow Mr. Metral to proffer his Report and opinion, based on methodologies and evidence contrary to law would be to allow Mr. Metral to advocate from the witness stand.  Mr. Metral should not be permitted to testify at trial.

[31] Moreover, under Rule 702, the subject matter of the proffered opinion must be beyond the common knowledge of the average layman to be admissible. *United States v. Rouco*, 765 F.2d 983, 995-96 (11th Cir. 1985).  Expert testimony is not necessary if such facts can be accurately and intelligibly described to the Court by counsel or fact witnesses, and if the Court is as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training on the subject under investigation. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 415-6 (3dCir. 1999).

Florida Bar Number: 95550
E-Mail: dclarke@dclarkelegal.com
Law Office of Derrick L. Clarke, PA
146 2nd Street North. Suite 310
St. Petersburg, FL 33701
Tel: 727.379.4434

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on this 11th day of May, 2021, I electronically filed the foregoing document with the Court's CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties not authorized to receive electronically, Notices of Electronic Filing.

*/s/ Joseph R. Sozzani*
Joseph R. Sozzani