# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | No. 8:16-cv-02549-TPB CPT |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GABY FRAIFER, TELE-CENTER, INC., | ) | |
| and PLANET TELECOM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT PRETRIAL CONFERENCE STATEMENT

Pursuant to Local Rule 3.06, Plaintiff DISH Network L.L.C. ("DISH") and Defendants Gaby Fraifer ("Fraifer"), Tele-Center, Inc. ("TCI") and Planet Telecom, Inc. ("PTI," collectively "Defendants") file this joint pretrial conference statement for the bench trial scheduled for June 1-4, 2021.

## I.      Jurisdiction – LR 3.06(1)

This is an action arising under the copyright laws of the United States, Title 17 of the United States Code. The Court has subject matter jurisdiction over DISH's claim for direct copyright infringement pursuant to 28 U.S.C. §§ 1331, 1338. There are no other claims pending in this matter. Personal jurisdiction and venue are not disputed for purposes of this action.

## II.      Statement Of The Action – LR 3.06(2)

DISH asserts a claim against Defendants for direct copyright infringement under 17 U.S.C. § 501. On March 30, 2020, the Court ordered that DISH's motion

for summary judgment was granted as to DISH's "ownership of valid copyrights in the Registered and Unregistered Works." (Doc. 257 at 3.)

DISH alleges that Defendants infringed DISH's copyrights in the Registered and Unregistered Works by transmitting these works over the internet to the users of Defendants' UlaiTV and AhlaiTV set-top boxes ("STBs"), using content delivery networks ("CDNs") paid for and operated by Defendants. Pursuant to 17 U.S.C. §§ 502 and 504-505, DISH requests an award of statutory damages for Defendants' alleged infringement of each of the Registered Works, disgorgement of Defendants' profits for the alleged infringement of the Unregistered Works, attorney's fees and costs, and a permanent injunction.

Defendants disclaim any involvement in selecting or capturing Plaintiff's channels.  Instead, Defendants allege that they purchased STBs from a third-party supplier containing a preinstalled third-party software application that points or links to URLs already available on the Internet.  Defendants maintain that their use of a CDN (i.e., an internet service provider) was merely to improve the quality and reliability of Internet connectivity.  Defendants assert that Plaintiff's sole claim for *direct*, and not secondary, copyright infringement should be denied.

## III.   Statement Of Each Party's Position – LR 3.06(3)

### A.   DISH's Statement

1.     DISH's claim for direct copyright infringement has only two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340,

361 (1991). Copying means the violation of any of the exclusive rights of copyright, including the right to publicly perform a work. 17 U.S.C. § 106(4).

*DISH's Copyright Ownership*

2.     The first element requiring copyright ownership was established at summary judgment where the Court found DISH's "ownership of valid copyrights in the Registered and Unregistered Works." (Doc. 257 at 3; *see* Doc. 246 at 19-44.) The copyrights owned by DISH "are the exclusive right to distribute and publicly perform the Registered and Unregistered Works in the United States." (Doc. 246 at 37; *see also id.* at 4, 7.)

3.     The Registered Works consist of four audiovisual works registered with the United States Copyright Office ("USCO") that aired on Protected Channels exclusively licensed to DISH by the MBC Network. (Doc. 246 at 4-5, 30-34, 37-44.) The Unregistered Works consist of fifty-five audiovisual works not registered with the USCO that aired on Protected Channels exclusively licensed to DISH by the Networks MBC, IMD, World Span, Dream, and Al Jazeera. (*Id.* at 4-5, 30-44, citing to and adopting DISH's defined term "Unregistered Works" that included the fifty-five referenced works).

4.     DISH "prov[ed] first publication of the Unregistered Works in foreign countries that are treaty parties" and "[a]s a result, these works are protected under the Act even though they have not been registered." (*Id.* at 19-27.)

5.     The question for trial on Defendants' liability is whether Defendants' infringed DISH's copyrights in the Registered and Unregistered Works ("Works") by copying, i.e., publicly performing, those Works.

### *Infringement of DISH's Copyrights*

6.     To publicly perform means "to <u>transmit or otherwise communicate</u> a performance . . . to the public, <u>by means of any device or process</u>." 17 U.S.C. § 101. (emphasis added). Infringement of the public performance right is not confined to the content originator; instead, each party involved in the process of performing an audiovisual work is subject to liability. *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014) (streaming of content owners' broadcast television programming held to violate public performance right and observing that under the Copyright Act "*both* the broadcaster *and* the viewer of a television program 'perform'" and an intermediary "itself performs, even if when doing so, it simply enhances viewers' ability to receive broadcast television signals"); *see* H.R. Rep. No. 94-1476, at 63-64 (1976) ("[<u>A</u>]ny act by which the initial performance or display is transmitted, repeated, or made to recur <u>would itself be a 'performance'</u>" and such act may be accomplished by any means, "'either directly or by means of <u>any device or process</u>,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented") (emphasis added).

7.      Defendants infringed DISH's exclusive right to publicly perform the Works in at least <u>two ways</u> – either of which is sufficient alone to hold Defendants liable for direct copyright infringement. Defendants infringed DISH's copyrights in the Works by communicating or <u>delivering</u> the Protected Channels airing the Works from their CDNs to users of their STBs. Defendants also infringed DISH's copyrights in the Works by communicating or "<u>pushing</u>" the Protected Channels airing the Works from encoders to their CDNs. Encoders are a form of computer that transformed the Protected Channels and the Works airing on those channels into formats suited for streaming. Either action is grounds for finding Defendants liable for the infringement of DISH's copyrights.

8.      The Court correctly found at summary judgment that "Defendants do not meaningfully dispute that the Protected Channels were available through their set-top boxes." (Doc 246 at 46 ["Defendants maintain that the Protected Channels are accessible through their UlaiTV and AhlaiTV set-top boxes . . . ."]; *see id.* at 47 ["According to the Defendants, the entities that sold them the set-top boxes ('STB Suppliers' or 'Channel Providers') are the ones responsible for the accessibility or transmission of the Protected Channels."].) Likewise, the Court found no genuine dispute that the Works aired on the Protected Channels. (*Id.* at 4.) Defendants, however, are unwilling to stipulate the Protected Channels or Works aired to users of their STBs, necessitating testimony at trial on this previously undisputed issue.

9.      Accordingly, DISH will present testimony from its expert witness, Mr. Metral, who provided an expert report documenting more than 850 instances from

June 2015 through May 2017 where Protected Channels were transmitted to the STBs. Mr. Metral's testimony is supported by reports prepared concurrent with the monitoring, screenshots of the Protected Channels airing to the STBs, and network traffic logs that allowed for identification of the URLs and CDNs used in delivering the Protected Channels to the STBs.

10.     DISH will also present testimony from Networks (DISH's licensors of the Protected Channels) that reviewed Mr. Metral's findings concerning the dates Protected Channels were transmitted to users of Defendants' STBs. The Networks identified specific copyrighted works, i.e., the Registered and Unregistered Works, that aired on the Protected Channels on the same dates. In addition, the Networks identified all the Registered Works and certain Unregistered Works in screenshots provided by Mr. Metral that were taken while the Protected Channels were airing to users of Defendants' STBs. The airing of the Works to users of Defendants' STBs directly infringes DISH's exclusive right to publicly perform the Works.

<u>*Defendants' Liability For Infringing DISH's Copyrights*</u>

11.     The remaining question, and the one the Court found to create a fact issue at summary judgment, is who is responsible for airing the Works: Defendants or non-parties located abroad that sold Defendants the STBs (the "STB Suppliers"). (Doc. 246 at 46-47.)

12.     Defendants contracted for, paid for, and controlled the operation of the CDNs. The significance of Defendants' CDNs in transmitting the Works cannot be understated: turning off the content delivery services acquired from the CDNs

meant shutting down delivery of Protected Channels to users of Defendants' STBs. Defendants' unsupported claim that the Protected Channels were freely available on websites, even if true, is immaterial as the Protected Channels were transmitted to users of Defendants' STBs only one way and that was using Defendants' CDNs.

13.     Defendants' story claiming the STB Suppliers operated the CDNs and Defendants were only middlemen passing information from the CDNs to the STB Suppliers is uncorroborated and unbelievable. Defendants have not produced even a single communication with the STB Suppliers. However, DISH served subpoenas on the CDN companies that yielded a host of communications between Defendants and the CDN companies concerning the operation of the CDNs, not one of which copied the STB Suppliers. The communications between Defendants and the CDN companies clearly establish Defendants operated the CDNs. Even if Defendants' "middleman" story were believed, Defendants still operated the CDNs to transmit the Protected Channels using information that Defendants requested and obtained from the STB Suppliers. Defendants are liable for the first act of direct copyright infringement set out above – transmitting the Works from their CDNs to the users of their STBs – and that alone is sufficient to enter judgment for DISH.

14.     Defendants are also responsible for the second act of direct copyright infringement – pushing Protected Channels airing the Works to the CDNs – which is an independent basis for liability. Defendants operated encoders used to push Protected Channels to their CDNs – one encoder was located in Defendants' offices in Tampa and Defendants acquired other encoders in Germany from Cetel GmbH.

Defendants will be unable to transform their simple statements in emails with the CDN companies, for example "I can push stream fine from Gaby['s] encoders in Germany . . . Gaby [is] testing it," to mean that the STB Suppliers were responsible for pushing the Protected Channels to Defendants' CDNs.

15.    Defendants also used a type of computer software called middleware to connect their STBs to the channel streams being transmitted from their CDNs. Through the middleware, Defendants would also update channel stream URLs and restart the transmission of channels to their STBs when an existing URL stopped working, for example if the URL was disabled by Defendants' CDN in response to DISH's copyright infringement notice. Although Defendants and their CDNs were sent at least 182 copyright infringement notices concerning works aired on the Protected Channels, Defendants' copyright infringement continued for at least eight months after this case was filed.

16.    Defendants are jointly and severally liable for the willful infringement of DISH's copyrights. Defendants TCI and PTI are effectively the same company, as the Court recognized at summary judgment, and properly treated as alter egos. (Doc. 246 at 5.) Defendant Fraifer is equally liable because Fraifer is the founder, sole owner, and served as the sole officer of TCI and PTI during the time period of the infringement and all employees and consultants, whether working for TCI or PTI, reported to Fraifer. (Doc. 246 at 5.) Thus, Fraifer had the ability to supervise and a financial interest in the infringement. Fraifer also personally participated in the infringement, as established by his hands-on involvement with the CDNs that

were instrumental in transmitting the Works and the encoders used to deliver the Works to the CDNs.

**B.    Defendants' Statement**

1.    As this Court has already found, the Supreme Court's holding *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) and the cited legislative history of the 1976 Copyright Act does not support Dish's claim against the Defendants for direct copyright infringement.   (*Dkt.* 246 at 50.)   Indeed, *Aereo* did not change the longstanding requirement that "[a] defendant may be held directly liable only if it has engaged in volitional-conduct in violation of the Act." 573 U.S. at 453 (volitional-conduct requirement "is firmly grounded in the Act's text.").

2.    In denying Dish's motion for summary judgment, this Court found "[t]he cases upon which Dish primarily relies … do not lead [] to a contrary conclusion." *Dkt. 246* at 50. The United States Supreme Court in *Aereo* emphasized the importance of analyzing technological advancements on a case by case basis when determining whether a defendant has 'performed' under the Act including careful consideration under 17 U.S.C. §101. *Aereo*, 573 U.S. at 433 ("In other cases involving different kinds of service technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act."); Id., at 450.

3.    Dish fails to establish direct copyright infringement because a third party, not Defendants, selected and provided links or "delivered" or "pushed" the

purported channel streams containing the allegedly infringing works, which were, in turn, allegedly requested, sent to and accessed by end users of a third-party application preinstalled on the STBs by a third-party manufacturer, Lenkeng, to access such content.  Defendants did not capture a broadcast signal, originate, copy, select nor provide any transmissions or content.  Instead, third-parties were responsible for originating any allegedly infringing content or transmission through a third-party application preinstalled by the STB providers.

4.     Defendants simply did not publicly perform the Works because their purchase of the STBs and use of a CDN (an internet service provider) does not constitute a volitional act rising to the level of direct infringement under the Copyright Act. See *Cartoon Network LP, LLLP*, 536 F.3d at 130-33 (requiring volitional act for direct liability for copyright infringement); *CoStar Group, Inc.* 373 F.3d at 550; see *Aereo, Inc.*, 573 U.S. at 453 (emphasizing that the volitional act requirement "…is firmly grounded in the Act's text."); *Bwp Media United States v. T&S Software Assocs.*, 852 F.3d 436, 444 (5th Cir. 2017) (requiring a volitional act for direct infringement liability).

5.     The Defendants sold STBs which were operated by end users for multiple non-infringing uses and functions including internet access, browsing, e-mail, word *processing* and a host of other common applications available from the Google Play Store such as YouTube or Pandora.  Indeed, the products sold by Defendants were Android-based micro-computers not unlike many other smart

devices in the marketplace.  Like any computer, they may be used with a keyboard, mouse, USB drive, monitor and other peripherals.

6.     The Court distinguished the facts in *Aereo* from the instant case, stating, "[u]nlike here . . . the defendant [in *Aereo*] not only supplied equipment to its customers, but also used its own technology (antennas, transcoders, and servers) to capture the broadcast signal, translate it into digital data, and then store and transmit the data to the subscriber over the internet." (Doc. 246 at 50). Defendants did not create or originate any alleged transmission; capture, transcode, or transmit the alleged transmission or any broadcast signals; own or rent transcoders, antennas or servers; or store, translate, save, or make any copies in way whatsoever. Instead, third-parties were responsible for any allegedly infringing content or transmission through a third-party application on the STBs. *See* 573 U.S. at 431.

7.     Defendants' mere use of a CDN cannot be classified as a cable television provider under the Copyright Act, nor does it constitute 'equipment' being 'leased' as described in *Aereo*. See *id*. Defendants sold STBs (Android-based microcomputers) capable of and intended for non-infringing uses and the use of a CDN to improve and provide reliable internet connectivity is not the equivalent of the infringement-specific 'equipment' installed and controlled by Defendants in *Aereo* "to capture the broadcast signal, translate it into digital data, and then store and transmit the data." *Id.*; *Dkt. 246* at 50.

8.     Defendants will present testimony from Mr. Gaby Fraifer and Mr. Adib Sfeir establishing that the Defendants did not create or originate any alleged transmission; capture, transcode, or transmit any alleged transmission nor any broadcast signals; own or rent transcoders, antennas or servers; nor store, translate, save, or make any copies whatsoever.   Instead, third-parties were responsible for any allegedly infringing content or transmission through a third-party application preinstalled on the STBs by its manufacturer, Lengkeng, a Chinese company.

9.     As this Court found at summary judgment, Defendants' account is "buttress[ed]" by testimony "including that third parties ZaapTV and Lenkeng offered channels for Defendants' PlanetiTV and UlaiTV" STBs. *Dkt. 246* at 49.   In denying Dish's motion for summary judgment, the Court also found that "[t]he record also contains evidence of an agreement by which a different third party, Cressida Telecom, provided the Defendants with audiovisual streams of channels as they are available on the internet." *Id.*   Plaintiff does not deny that PTI entered into an agreement with Cressida Telecom AB which predated the alleged infringement.   Nor does Plaintiff deny that CDN services were not required to use the STBs purchased from Cressida Telecom.   As the Magistrate Judge Tuite found, "these facts and the justifiable inferences that can be drawn from them ... could reasonably be viewed as bolstering Fraifer's assertion that the STB Suppliers provided the Protected Channels during the relevant timeframe." *Id.*, at 49-50.

10.     Plaintiff's emphasis on the Defendants' use of the CDN is misplaced. While Defendants certainly contracted for, paid for, and controlled the CDNs they did not originate, control or generate any transmission.  As this Court recognized "they used the CDNs only to improve the quality of the content available through the set-top boxes" and "the entities that sold them the set-top boxes (STB Suppliers or Channel Providers) are the ones responsible for the accessibility or transmission of the Protected Channels." (Doc. 246 at 46-47). The Magistrate correctly relies on Fraifer's corroborated testimony in "that the set-top boxes arrive equipped with software or an application that points or links to channels already available on the internet, as well as hardware or a player that converts the link to something watchable over the internet." (Doc. 246 at 47).

11.     Dish's misplaced emphasis on the Defendants' CDN fails to recognize and accurately characterize the use and functionality of the CDNs which essentially act as an Internet service provider to end users of the STBs. *See Limelight Networks, Inc.*, 241 F. Supp. 3d at 604; 17 U.S.C. 512(a). It is unremarkable that removing Internet access would result in the inaccessibility of any URL streaming on the Internet. If any CDN (like any Internet service provider) were to be turned off, of course, no data would flow through it but that fact does not equate to control over preexisting content, available on the Internet from third-parties, or direct liability for any such content passing through such systems which are indisputably selected or requested from end users and originated by third parties.  To be sure, disabling an internet connection

12. What is probative is who transmitted the works, who committed a volitional act and whether such an act substantiates a performance or distribution of the Works. Here, there can be no question that end users requested, and third-party STB suppliers and channel providers selected and provided such content, not Defendants. And, contrary to Plaintiff's position, Defendants used middleware to provide technical maintenance support services to address complaints relating to internet connectivity issues.

13. While Defendant Fraifer was the President and sole shareholder of TCI and PTI, it must be emphasized he did not earn and or receive *any* salary, distribution and/or dividend in direct relation to the sale of the STBs nor directly related to any alleged infringement activity. Indeed, TCI certainly did not heavily profit from the sales of the STBs, and such monetary value was a relatively small part of TCI's entire business during the relevant time period. Mr. Fraifer, acting in his corporate capacity, in a company he worked decades to build, simply did not possess the requisite involvement nor direct financial interest with respect to TCI's and PTI's alleged infringement activity and he certainly should not be held individually liable for the acts of a third-party manufacturer.

## IV. Exhibit List With Objections – Local Rule 3.06(4)

DISH's exhibit list with Defendants' objections is attached as <u>Exhibit 1</u>, while Defendant's exhibit list with DISH's objections is attached as <u>Exhibit 2</u>. The parties agree that, for good cause shown, limited supplementation of exhibit lists will be permitted through the conclusion of trial unless the opposing party will be unfairly

prejudiced by such supplementation. A party may offer an exhibit identified on the other party's exhibit list. Each party reserves the right to add, subtract, or modify its objections set forth on the other party's exhibit list.

## V.      Witness List With Objections – Local Rule 3.06(5)

**DISH** intends to call or may call for trial the following fact witnesses, either as part of DISH's case in chief or in rebuttal. DISH reserves the right to change its list of witnesses based on the Court's ruling on pending or later filed motions or the resolution of any objections. DISH may call these fact witnesses, as well as its expert witness, in any order to accommodate the witnesses' schedules.

1.      <u>Elizabeth Reimersma</u>. Ms. Reimersma is likely to testify as corporate representative on behalf of Plaintiff DISH Network L.L.C.

Objection:  Defendants do not object to Ms. Reimersma's substitution as Plaintiff's corporate representative subject to Plaintiff being bound by the testimony of its prior corporate representative, Ms. Izabela Slowikowska.

2.      <u>Defendant Gaby Fraifer</u>. Mr. Fraifer is likely to testify individually and as corporate representative on behalf of Defendants TCI and PTI.

Objection:

3.      <u>Adib Sfeir</u>.  Mr. Sfeir is  a former employee of Defendants TCI and PTI and likely to testify.

Objection:

4.      <u>George Ferzli</u>. Mr. Ferzli is Defendants' accountant and likely to testify if reasonable stipulations concerning Defendants' revenues cannot be reached.

Objection:

5.      <u>Pascal Metral</u>. Mr. Metral is DISH's expert witness but also previously emailed notices of copyright infringement to Defendants and CDNs which is not subject matter constituting expert testimony. Mr. Metral is likely to testify as a fact witness if reasonable stipulations to the sending of such notices cannot be reached. Mr. Metral may also testify as a fact witness to aspects of monitoring the Protected Channels on the STBs if that testimony is found to be non-expert in nature.

Objection:  Defendants object to Mr. Metral's expert testimony for the reasons stated in Defendants' *Daubert* Motion *In Limine* filed at Doc. 298.

6.      <u>Stephen Ferguson</u>. Mr. Ferguson is DISH's counsel of record, having only recently appeared in the case, but also previously emailed and mailed notices of copyright infringement to Defendants and CDNs. Mr. Ferguson is likely to testify if reasonable stipulations to the sending of such notices cannot be reached.

Objection:

**Defendants** intend to call or may call for trial the following fact witnesses, either as part of Defendants' case in chief or in rebuttal. Defendants reserve the right to change their list of witnesses based on the Court's ruling on pending or later filed motions or the resolution of any objections. Defendants may call these fact witnesses, as well as DISH's expert witness, in any order to accommodate the witnesses' schedules:

1.      <u>Gaby Fraifer</u>. Mr. Fraifer is likely to testify individually and as corporate representative on behalf of Defendants TCI and PTI.

Objection:

2.      <u>Adib Sfeir</u>.  Mr. Sfeir is  a former employee of Defendants TCI and PTI and likely to testify on behalf of Defendants.

Objection:

3.      <u>George Ferzli</u>.  Mr. Ferzli is Defendants' accountant and likely to testify if reasonable stipulations concerning the admissibility of Defendants' produced tax returns and financial documents cannot be reached.

Objection:

4.      <u>Elizabeth Reimersma</u>. Ms. Reimersma is likely to be offered by Plaintiff as a substitute corporate representative on behalf of Plaintiff DISH Network L.L.C.

Objection:

5.      <u>Pascal Metral</u>. Mr. Metral is likely to be offered as DISH's expert witness.  Pending the Court's consideration of Defendants' *Daubert* Motion *In Limine [Doc. 298]*, Defendants reserve the right to call Mr. Metral.

Objection:

## VI.      Expert Witness List With Objections – Local Rule 3.06(6)

DISH intends to call Pascal Metal of Nagravision, SA as its expert witness. The Court authorized Mr. Metral to appear by videoconference at trial. (Doc. 301.) Mr. Metral will testify that the Protected Channels were transmitted to users of Defendants' STBs on more than 850 instances between June 25, 2015 and May 3, 2017, which Protected Channels are identified in the daily monitoring reports and

screenshots attached to his expert report. Mr. Metral will also testify concerning CDNs used in transmitting the Protected Channels to users of Defendants' STBs, which CDNs are identified through the network traffic logs attached to his expert report and documented in the attached monitoring reports that incorporate URLs of the channel streams transmitted using the CDNs.

Objections: Defendants object for the reasons stated in Defendants' *Daubert* Motion *In Limine* to Exclude the Report and Testimony of Pascal Metral (Doc. 298).

## VII.  Damages – Local Rule 3.06(7)

**DISH** requests the following damages and other relief:

1.     Statutory damages of $150,000 for each of the four Registered Works Defendants' willfully infringed, for a total of $600,000, under 17 U.S.C. § 504(c). Defendants and their CDNs were sent at least 182 copyright infringement notices and Defendants continued transmitting the Protected Channels to the users of their STBs for approximately eight months after DISH filed this case against them.

2.     Defendants' profits attributable to Defendants' infringement of the Unregistered Works under 17 U.S.C. § 504(b). Defendants' profits attributable to the infringement consist of revenues received from the sale of STBs and related subscription plans, which total at least $457,290 from July 1, 2015 to March 31, 2017 – a period slightly less than the time period of the documented infringement.

3.     Attorney's fees and costs under 17 U.S.C. § 505.

**Defendants** request the following damages and relief:

1.      Plaintiff's alleged damages have no basis in fact or law, and thus should not be granted by this Court.

2.      Defendants seek recovery of reasonable attorney's fees and costs pursuant to 15 U.S.C. § 505.

3.      All other monetary relief that is determined by the Court to be just and proper.


## VIII. Deposition Testimony – Local Rule 3.06(8)

**DISH** intends to offer the following deposition transcripts at trial in lieu of the witness's live testimony:

1.      <u>Sajid Maqsood</u>, deposition taken on January 8, 2018. Mr. Maqsood is Defendants' CDN consultant and believed to reside in California. Defendants have expressed that Mr. Maqsood is unwilling to voluntarily attend trial.

2.      <u>Haytham Elmokadem</u>, World Span Network, deposition taken on May 19, 2021, per agreement of the parties.

3.      <u>Pierre Ayoub</u>, IMD Network, deposition taken on May 20, 2021, per agreement of the parties.

4.      <u>Eithar Abutaha</u>, Al Jazeera Network, deposition to be taken May 24, 2021, per agreement of the parties.

5.      <u>John Whitehead</u>, MBC Network, deposition to be taken May 25, 2021, per agreement of the parties.

**Defendants** intend to offer the following deposition transcripts at trial in lieu of the witness's live testimony:

1.   Sajid Maqsood, deposition taken on January 8, 2018.  Mr. Maqsood, is the owner of Unisoft, an independent contractor, responsible for providing consulting and IT services to Defendants.  Mr. Maqsood is believed to reside in California.

2.   Haytham Elmokadem, World Span Network, deposition taken on May 19, 2021, per agreement of the parties.

3.   Pierre Ayoub, IMD Network, deposition taken on May 20, 2021, per agreement of the parties.

4.   Eithar Abutaha, Al Jazeera Network, deposition to be taken May 24, 2021, per agreement of the parties.

5.   John Whitehead, MBC Network, deposition to be taken May 25, 2021, per agreement of the parties.

6.   Kevin McMonnies, an employee of NagraStar, LLC, deposition taken on March 23, 2018.

7.   Izabela Slowikowska, Dish Network, L.L.C.'s designated corporate representative, deposition taken on January 7, 2013.  Plaintiff has indicated that Ms. Slowikowska is no longer employed by Dish Network, L.L.C. and unavailable to testify at trial.  Ms. Slowikowska is believed to reside in Colorado.

## IX.   Admitted Facts – Local Rule 3.06(9)

### A.   Facts Stipulated By DISH

8.     "TCI" means Tele-Center, Inc., a Florida corporation.

9.     "PTI" means Planet-Telecom, Inc., a Florida corporation.

10.    "Fraifer" means Gaby Fraifer, an individual resident of Florida.

11.    "Dish" means DISH Network L.L.C., a Colorado limited liability company.

12.    "EchoStar" means DISH's sister company that was part of a joint venture as an owner in NagraStar LLC prior to 2017.

13.    "STBs" means the UlaiTV set-top box or digital media player and AhlaiTV set-top box or digital media player.

14.    "Plan" means the 1 Year Maintenance/Support plan for the UlaiTV set-top box or digital media player and AhlaiTV set-top box or digital media player.

15.    "CDN" is an acronym for content delivery network.

16.    Fraifer is the sole shareholder and President of TCI and PTI, and has been at all times.

17.    TCI started selling STBs around 2009/2010

18.    PTI entered into an agreement with Cressida Telecom AB dated May 5, 2011.

19.    CDN services were not required in order to use the STBs purchased from Cressida Telecom AB.

20.     From 2013 to 2016, TCI sold and distributed prepaid telephone calling cards, pre-paid long-distance cards, in addition to STBs.

21.     PTI entered into that certain service order form with Octoshape for CDN services on June 1, 2014, which was signed by Fraifer as President of PTI and paid for by TCI, and such service ended on June 30, 2015.

22.     PTI entered into an agreement with Verizon for CDN services on May 21, 2015, which was signed by Fraifer as President of PTI and paid for by TCI, and such agreement was terminated on May 23, 2016.

23.     PTI entered into an agreement with Tulix for CDN services on May 26, 2016, which was signed by Fraifer as President of PTI and paid for by TCI.

24.     "Foreign Channels" means Al Arabiya, Al Hayah 1/Al Hayat, Al Jazeera Arabic News, Al Nahar, Al Nahar Drama, Al Nahar Sport, Dream 2, Future TV/Future International, Iqraa, LBC, LDC, MBC1, MBC Drama, MBC3/Kids, MBC Masr, Murr TV/MTV, New TV/Al Jadeed, Noursat, ONTV, and OTV.

25.     "Registered Works" means the works as referenced as follows: "Chef Hassan, (Episode 289)" Reg. #PA 1-992-315; "Tasali Ahla Alam (Episode 51)," Reg. #PA-1-992-317; "Saherat Al Janoub (Season 2, Episode 15)," Reg. #PA-1-992-319; "Sabah Al Khair Ya Arab (Episode 85)," Reg. #PA-1-992-320.

26.     "Network Contracts" means the copies of DISH's written agreements with licensing agents and foreign networks for DISH's alleged license for the Channels.

27.     On December 22, 2017 Dish served upon Defendants an expert report entitled, "Technical Analysis of Channel Monitoring on UlaiTV and AhlaiTV Services" authored by Pascal Metral.

28.     With regard to Pascal Metral's background and qualifications the Metral Report states that they are set forth in the curriculum vitae ("CV") attached to the Metral Report as Exhibit 1.

29.     The Metral Report confirms that, as of the date of the Metral Report, Pascal Metral has not testified as an expert witness at deposition or trial in the past 4 years and that he has not authored any publications in, at least, the past ten years.

30.     The screen captures contained in the Metral Report do not include a uniform source locator ("URL").

31.     Dish is a member of IBCAP.

32.     At some point between 2016 and 2017, Mr. Chris Kueling served simultaneously as Executive Director for IBCAP and also as Dish's Senior Vice President for international programming.

33.     Nagra alleges that Nagra physically stored and monitored one UlaiTV STB (MAC address ending D1:15) at Nagravision in Switzerland.

34.     Nagra alleges that Nagra physically stored and monitored one UlaiTV STB (MAC address ending D4:E9) at NagraStar in Colorado.

35.     Nagra alleges that Nagra physically stored and monitored one AhaliTV STB (MAC address ending A9:48) at NagraStar in Colorado.

36.   "MBC" means MBC FZ LLC which is organized under the law of the United Arab Emirates (the "UAE") with its headquarters located in Dubai, UAE.

37.   "IMD" means the International Media Distribution (Luxembourg) S.A.R.L.

38.   "IMD Channels" means the following the Arabic language television channels: Al Hayah 1 channel; Future TV; Iqraa; LBC; LDC; Murr TV a/k/a MTV Lebanon; New TV a/k/a Al Jadeed; Noursat; ONTV; OTV.

39.   "World Span" means the World Span Media Consulting, Inc.

40.   "Trenta" means Trenta for Art Production and Distribution.

41.   "Al Nahar Channels" means the following the Arabic language television channels: Al Nahar; Al Nahar Drama; Al Nahar Sport.

42.   "Dream Media 2 Channel" means the Arabic language television channel Dream 2.

43.   "Al Jazeera" means the Al Jazeera Media Network with its headquarters located in Doha, Qatar.

44.   "Al Jazeera Channel" means the Arabic language television channel Al Jazeera Arabic News.

## B.   Facts Stipulated By Defendants

1.   The STBs and Plans were sold on websites located at the domain names ulaitv.com and planetitv.com.au, which domain names were registered to PTI and paid for by TCI.

2.      PTI entered into an agreement with Verizon for CDN services on May 21, 2015, which was signed by Fraifer as President of PTI and paid for by TCI, and such agreement was terminated on May 23, 2016.

3.      Fraifer is the founder of TCI and PTI and has been the sole shareholder of TCI and PTI at all times.

4.      Fraifer served continuously as the sole officer of TCI and PTI from 2013 until at least May 3, 2017.

5.      PTI had no source of revenue, no employees, and was considered to be a department within TCI from June 25, 2015 to May 3, 2017.

6.      TCI shared office space with PTI, paid the expenses of PTI, and employees of TCI performed the work of PTI from June 25, 2015 to May 3, 2017.

7.      TCI and PTI were effectively the same company from June 25, 2015 to May 3, 2017.

8.      The parties stipulate that Joint 1a -Joint 1e and Joint 2a-Joint 2b should be admitted into evidence at trial and further stipulate that:

a.   The 7 notices in Joint 1a were emailed by HNB on the dates identified in the emails and were received by Defendants;

b.   The 50 notices in Joint 1b were emailed by HNB on the dates identified in the emails to each of the recipient email addresses identified in the emails;

c. The 8 notices in Joint 1c were emailed by Nagra on the dates identified in the emails to each of the recipient email addresses identified in the emails;

d. The 15 notices in Joint 1d were mailed by HNB on the dates identified in the letters to the recipient mailing address identified in the letters;

e. The 2 notices in Joint 1e were mailed by HNB on the dates identified in the letters to the recipient mailing address identified in the letters.

f. The 93 notices in Joint 2a were emailed by HNB on the dates identified in the emails to the recipient email addresses identified in the emails;

g. The 7 notices in Joint 2b were emailed by Nagra on the dates identified in the emails to the recipient email addresses identified in the emails.

This stipulation concerns only the sending of the notices identified above and nothing in this stipulation shall impact any party's ability to make arguments or present evidence at trial concerning receipt of any notices, the content or adequacy of any notices.

9.     TCI and PTI's office address was 4701 W. Hillsborough Ave., Tampa, Florida 33614 throughout 2015, 2016, and 2017.

10.     Fraifer's home address was 4801 Longwater Way, Tampa, Florida 33615 throughout 2015, 2016, and 2017.

## X.     Agreed Principles Of Law – Local Rule 3.06(10)

### A.     Principles Of Law Stipulated By DISH

Pending.

### B. Principles Of Law Stipulated By Defendants

1. Copyright infringement is determined under the laws of the United States.

## XI. Issues Of Fact – Local Rule 3.06(11)

### A. DISH's Statement Of Issues Of Fact For Trial

1. Whether Defendants distributed or publicly performed the Works, which can be established in <u>either of two ways</u>:

  a. If Defendants communicated or "<u>delivered</u>" Protected Channels airing the Works to users of their STBs through their operation of the CDNs;

<u>or</u>

  b. If Defendants communicated or "<u>pushed</u>" Protected Channels airing the Works from encoders to their CDNs.

DISH contends there is no genuine issue of fact that the Works aired on the Protected Channels sent to users of Defendants' STBs, as determined by the Court at summary judgment and set forth above. However, Defendants will not stipulate that the Works aired on the Protected Channels, despite the summary judgment ruling and despite recent trial depositions of Networks establishing this fact, thus creating the following sub-issue of fact to the question above.

2. Whether the Works were aired to users of Defendants' STBs as part of the Protected Channels, including whether:

a.      Mr. Metral, DISH's proposed expert witness that monitored the STBs, correctly observed the Protected Channels being transmitted to the STBs on the dates identified in his expert report and screenshots; and

b.      The Networks are correct the Works aired on their respective Protected Channels on the dates identified in the expert report, and in cases are depicted in the accompanying screenshots attached to that report.

3.      Whether Defendants' copyright infringement of the Registered Works was willful to warrant enhanced statutory damages, including if Defendants were aware of any of the 175 copyright infringement notices sent to Defendants or their CDNs companies. Defendants stipulate to receiving only 7 copyright infringement notices sent to their counsel after this case was filed.

4.      What amount of statutory damages should be awarded to DISH for Defendants' infringement of the Registered Works;

5.      What amount of Defendants' profits should be awarded to DISH for Defendants' infringement of the Unregistered Works, bringing into consideration:

a.      Whether Defendants' revenue from selling the STBs and related subscription or "warranty" plans are attributable to the infringement;

b.      What amount of gross revenue did Defendants earn during the June 2015 to May 2017 time period the Unregistered Works were infringed; and

c.      Do Defendants have any deductible expenses, and what amount of  Defendants' gross revenue, if any, is attributable to elements other than Works that were infringed.

6.      Whether DISH should be awarded attorney's fees for prevailing in the case, which will be quantified post-trial along with costs under the Local Rules.

7.      Whether Defendants should be held jointly and severally liable for the damages and other monetary relief awarded to DISH, including whether:

a.      Defendants TCI and PTI each committed infringement or are otherwise properly treated as alter egos, rendering them equally liable; and

b.       Defendant Fraifer is individually liable for having either (1) personally participated in the infringement, or (2) supervised the infringing activity and having a financial interest in that activity.

8.      Whether Defendants should be permanently enjoined from infringing DISH's copyrights in the Works and transmitting the Protected Channels in which DISH holds the exclusive right to distribute and publicly perform the works.

**B.      Defendants' Statement Of Issues Of Fact For Trial[1]**

1.      Whether Plaintiff has met its burden, as it must, in proving where and when "first publication" of each of the specific asserted unregistered foreign works occurred, and whether such publication occurred in a nontreaty country (e.g., Iraq and Iran) and the United States within 30 days, rendering the works United States

---

[1] Defendants expressly reserve the right to amend this, and any other relevant section, of the Joint Final Pretrial Statement prior to trial given the recent trial depositions of World Span and IMD, and the upcoming scheduled depositions of Al Jazeera and MBC.

works subject to the registration requirement under 17 U.SC. 411(a). See 1 Nimmer on Copyright § 4.03 (2021) ("Insofar as national eligibility is concerned, U.S. copyright law adopts the thirty-day grace period regarding works "simultaneously" first published in two different nations."); 17 U.S.C. 104(b).

2.      Whether the products sold by Defendants are capable of substantial noninfringing use.

3.      Whether Defendants use of a CDN to improve the quality of Internet connectivity meets the volitional conduct requirement for direct liability.

4.      Whether Plaintiff has met its burden under Eleventh Circuit law in establishing, as it must, that Defendants' have directly, and not secondarily, infringed each of the specific asserted registered and unregistered foreign works.

5.      Whether Defendants are service providers as defined by the Copyright Act and thus protected by the safe harbor of 17 U.S.C. 512(a),(b), (k)(1).

6.      Whether Plaintiff's notices meet the required elements of 17 U.S.C. 512(c)(3)(A).

7.      Whether Plaintiff can meet its burden in showing any of Defendants' revenues are attributable to the alleged infringement of any of the asserted works.

8.      Whether the UlaiTV and AhlaiTV STBs are comprised of hardware, and pre-installed software applications which can be used to perform functions such as Internet browsing, accessing e-mail and viewing home movies or digital photos.  The UlaiTV and AhlaiTV STBs are also capable of downloading and running other Android applications from http://play.google.com ("Google Play").

9.     Whether a CDN is an internet service provider.

10.    Whether TCI and PTI have operated in the telecommunications business including the selling of telephone cards, VOIP telephone systems and prepaid long-distance since their inception.

11.    Whether "FTA" or "free-to-air" television and radio broadcasts in clear form which allows any person, individual or entity with the appropriate equipment to receive a broadcast signal and to view or listen to the content without requiring a subscription, other ongoing cost, or one-off fee.

12.    Whether the UlaiTV and AhlaiTV products were shipped to Defendants with a preinstalled Android operating system and preinstalled software applications.

13.    Whether the UlaiTV and AhlaiTV products were manufactured by Lenkeng, a Chinese company, not Defendants.

14.    Whether Nagravision SA, a Swiss company is a joint venture partner of Dish Network, LLC in the ownership of Nagrastar, LLC.

15.    Whether IMD, World Span, Dream Media, Al Jazeera and MBC simultaneously publish works aired on the channels they license to Plaintiff to non-treaty countries, Iraq and Iran, and the United States within 30 days.

16.    Whether Defendants disclosed the names, contact information and addresses of the STB providers and Channel providers early in this litigation for the purposes of confirming, third parties, not Defendants provided the AhlaiTV and UlaiTV STBs with preinstalled software.

17.     Whether Dish contends that the fee schedules and provisions contained in the Network Contracts are true, accurate and complete in all respects for each reporting period, including but not limited to all fee rates and schedules, net income allocations, and advertising income allocations, due and owing thereunder as confirmed by the foreign network representative trial depositions.

18.     Whether Nagravision SA and Nagra, receive consideration in the form of compensation or other benefits either directly or indirectly from Dish and the Networks.

19.     Whether Pascal Metral's CV contains a section entitled "Professional Experience Summary" which confirms Mr. Metral has been employed solely as an attorney since the date he received a Master of Law.

20.     Whether the Metral Report fails to disclose any experience regarding computer science, computer programming, engineering or any other professional position relating to these fields.

21.     Whether Pascal Metral does not hold a science or technical degree of any kind.

22.     Whether The Metral Report fails to explain how Mr. Metral's experience led to the conclusions reached, why that experience is a sufficient basis for his opinion or how that experience reliably applied to the facts asserted in the Metral Report.

23.   Whether Pascal Metral and Nagra conducted monitoring of network traffic to and from the STBs without the express consent of Defendants or any CDN.

24.   Whether the Metral Report fails to identify any end users of the STBs.

25.   Whether the Network traffic as that term is used in the Metral Report is comprised of electronic communications as defined by 18 U.S.C. 2510(12).

26.   Whether the screen captures contained in the Metral Report fail to include a printout of the date and time corresponding with the date and time said screen captures were allegedly captured or printed as generated by the computer system from which they were allegedly captured or printed.

27.   Whether Dish was aware of the processes used by Pascal Metral and Nagra as described in the Metral Report.

28.   Whether the Metral Report details a process utilizing Wireshark software in combination with other hardware and software to capture content and network traffic to and from the STBs which was subsequently stored on NagraStar, LLC's and/or Nagravision SA's database.

29.   Whether the Metral Report including the exhibits thereto were prepared for purposes of litigation.

30.   Whether Nagra implemented a different screenshot capturing process to generate many of the screenshots included in the attached exhibit to the Nagra Report in comparison to Nagra's screenshot capturing process as described in the Nagra Report.

31.     Whether the preinstalled software application of the STBs provided access to FTA Channels as transmitted by the foreign networks in the Middle East, not as Dish allegedly transmits or otherwise provides such Channels in the United States.

32.     Whether the Metral Report fails to include a rate of error or otherwise specifically describe how frequent downtime was in the alleged availability of channels allegedly monitored on the AhlaiTV and UlaiTV STBs.

33.     Whether the frequent downtime and freezing reported in the Metral Report precluded the airing of, or impaired the ability to perceive images and/or sound for any of the allegedly infringed Registered or Unregistered Works.

34.     Whether the foreign network representatives relied on personal knowledge or hearsay in submitting the declarations relied upon by this Court in ruling on the issue of ownership at summary judgment.

35.     Whether the foreign network representatives alleged identification of unregistered works airing on their respective networks relied upon hearsay and not personal knowledge as stated in their declarations at Dkt. 146.

## XII.   Issues Of Law – Local Rule 3.06(12)

### A.     DISH's Statement Of Issues Of Law For Trial

1.     Whether Defendants' communication or delivery of the Works from their CDNs to users of their STBs constitutes a public performance?

2.     Whether Defendants' communication or pushing of the Works from encoders to their CDNs constitutes a distribution or public performance?

**B.     Defendants' Statement Of Issues Of Law For Trial**

Defendants' Statement of Issues of Law For Trial are attached hereto as

Exhibit 3.

## XIII. Pending Motions

Pending before the Court is Defendants' *Daubert* Motion *In Limine* To

Exclude the Testimony and Report of Plaintiff's Expert Witness, Pascal Metral

(Doc. 298.).

## XIV.  Further Settlement Discussions – Local Rule 3.06(13)

The parties have participated in mediation with a private mediator and three

settlement conferences with Magistrate Judge Flynn, most recently a settlement

conference with Judge Flynn on April 19, 2021 that resulted in an impasse. The

parties do not believe that further settlement discussions will be useful.

## XV.   Certifications – Local Rule 3.06(14)

In preparing this final pretrial statement, I have aimed for the just, speedy,

and inexpensive resolution of this action

Dated:  May 21, 2021

/s/ Timothy M. Frank                              /s/ Joseph R. Sozzani
Joseph H. Boyle (*pro hac vice*)                  Joseph R. Sozzani
Timothy M. Frank (*pro hac vice*)                 Florida Bar Number 120297
HAGAN NOLL & BOYLE, LLC                           INFINITY IP, PLLC
Two Memorial City Plaza                           222 West Bay Drive
820 Gessner, Suite 940                            Largo, Florida 33770
Houston, Texas 77024                              Telephone:  (727) 687-8814
Telephone:  (713) 343-0478                        JSozzani@InfinityIPLaw.com
Facsimile:  (713) 758-0146
joe.boyle@hnbllc.com                              Derrick L. Clarke
timothy.frank@hnbllc.com                          Florida Bar Number 95550

James A. Boatman, Jr.
Florida Bar No. 0130184
THE BOATMAN LAW FIRM PA
3021 Airport-Pulling Rd. N., Ste. 202
Naples, Florida 34105
Telephone: (239) 330-1494
Facsimile: (239) 236-0376
jab@boatman-law.com

*Attorneys for Plaintiff DISH
Network L.L.C.*

Law Office of Derrick L. Clarke, PA
146 2nd Street North, Suite 310
St. Petersburg, Florida 33701
Telephone: (727) 379-4434
dclarke@dclarkelegal.com

*Attorneys for Defendants Tele-
Center, Inc., Planet Telecom, Inc.,
and Gaby Fraifer.*

## CERTIFICATE OF SERVICE

I certify that on May 21, 2021, I electronically filed the foregoing with the Clerk of the Court using the NextGen CM/ECF system which will provide notice to Defendants.

/s/ Joseph R. Sozzani
Joseph R. Sozzani