# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C., | ) No. 8:16-cv-02549-TPB-CPT |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| GABY FRAIFER, TELE-CENTER, INC., | ) |
| and PLANET TELECOM, INC., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S CLOSING ARGUMENT

Plaintiff DISH Network L.L.C. ("DISH") files this closing argument to the June 1-3, 2021 bench trial of its copyright infringement claim against Defendants. (Doc. 323.) DISH's claim for direct copyright infringement has only two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. Copying means to violate any exclusive right of copyright, including the right to publicly perform an audiovisual work.

## I.      Copyright Ownership

DISH's copyright ownership was established at summary judgment, leaving only Defendants' copying and DISH's entitlement to damages and other relief as issues for trial. (Doc. 246, R&R on MSJs; Doc. 257, adopting R&R.)[1] In granting summary judgment for DISH and finding DISH's "ownership of valid copyrights in the Registered and Unregistered Works," the Court held that:

---

[1] Capitalized terms are defined in the Court's MSJ orders and given the same meaning here

a.      The copyrights asserted by DISH "are the exclusive right to distribute and publicly perform the Registered and Unregistered Works in the United States." (*Id.* at 37; *see also id.* at 4, 7.)

b.      DISH "established MBC's initial ownership of the asserted copyrights in the Registered Works." (*Id.* at 30-34.)

c.      DISH "established initial ownership of the asserted copyrights in the Unregistered Works" by the Networks. (*Id.* at 34-36.)

d.      DISH established that MBC and the remaining Networks "transferred to DISH the exclusive right to distribute and publicly perform the Registered and Unregistered Works in the United States through signed, written agreements that are valid under the Copyright Act." (*Id.* at 37-44.)

e.      DISH "prov[ed] first publication of the Unregistered Works in foreign countries that are treaty parties" and "[a]s a result, these works are protected under the Act even though they have not been registered." (*Id.* at 19-27.)

## II.      Copyright Infringement

The issue for trial on Defendants' liability is whether Defendants infringed DISH's copyrights by publicly performing the Registered and Unregistered Works. The same two-step analysis applies to determine Defendants' infringement of the Registered and Unregistered Works (collectively, the "Works"): (1) were the Works transmitted to users of Defendants' STBs; and (2) were Defendants responsible for transmitting the Works to those users. The evidence presented at trial establishes each question is to be answered in the affirmative.

2

## A.    The Works Were Transmitted To Defendants' STB Users

DISH established that the Works aired to users of Defendants' STBs through the testimony of DISH's expert witness, Pascal Metral, and the trial deposition testimony of four Networks that exclusively licensed the Works to DISH. Metral established 861 instances in which Protected Channels were transmitted to users of Defendants' STBs, while the Networks established the Works were among the programs transmitted to Defendants' users as part of those Protected Channels.

### 1.    The Protected Channels Were Transmitted

Metral's testimony that the Protected Channels were transmitted to users of Defendants' STBs on the dates identified in his expert report is the *only* evidence concerning the channels that were transmitted to Defendants' users. Defendants provided no evidence on this subject. Instead, Defendants concocted a story that an STB Supplier in China is responsible for providing all the channels, and to keep with that storyline, Defendants disclaim having any record of the channels aired to their STB users. Defendants also have no counter-expert to testify to the channels transmitted to their users. As a result, Defendants are unable to establish that even one of the 861 instances in which Protected Channels were transmitted to users of Defendants' STBs did not occur as described in Metral's report.

Defendants did not even question Metral on the 861 instances of Protected Channel retransmissions documented in his report; rather, Defendants focused on Metral's qualifications, his alleged biases, and what Defendants in their non-expert opinion perceive as possible *opportunities* for error – but not showing any actual

3

error in Metral's process or conclusions. Defendants' attempt to paint Metral as nothing more than DISH's self-interested, unqualified legal counsel fails for several reasons established at trial.

a.     Metral was not serving as DISH's legal counsel during the analysis conducted using Defendants' STBs; rather, during that analysis, Metral was serving as Vice President in charge of anti-piracy operations for his employer Nagravision SA and was responsible for investigating not only Defendants' STBs but more than 100 additional television streaming services on behalf of members of the International Broadcaster Coalition Against Piracy ("IBCAP").

b.     Metral does not lack qualifications to speak to the analysis conducted using Defendants' STBs because he is an attorney; rather, Metral managed teams of security technicians in the investigation of *several hundred* television streaming services while heading up Nagravision's anti-piracy operations for the past 12 years – for IBCAP and other clients of Nagravision – and his testimony in other civil and criminal proceedings concerning those investigations was universally accepted.

c.     Metral's report is not based on flawed analysis; rather, Metral reports on Protected Channels observed while watching television using Defendants' STBs, attaches screenshots of programs observed, and identifies the video stream URLs corresponding with the content delivery networks or "CDNs" used in transmitting the Protected Channels to users of Defendants' STBs. Even though the process was automated at times, a security technician reviewed the findings for accuracy – and again, Defendants have not established any inaccuracy in Metral's reporting of the

Protected Channels transmitted to users of Defendants' STBs. The portion of the analysis involving identification of video stream URLs and corresponding CDNs is equally sound; in fact, Defendants admit the video stream URLs identified during the analysis of Defendants' STBs are associated with Defendants' CDN accounts. And, bringing the analysis full circle, Defendants' video stream URLs often contain the name of the Protected Channel accessible at the stream URL, which is the same Protected Channel that Metral reports being observed using Defendants' STBs and the same Protected Channel depicted in the screenshots attached to his report.

In sum, whatever criticisms Defendants have of Metral – whether directed at purported biases, qualifications, or *potential* room for error in the analysis – the findings in Metral's report concerning 861 instances in which Protected Channels were transmitted to users of Defendants' STBs and the identification of the CDNs used in transmitting those Protected Channels are correct.

**2.    The Works Were Transmitted On The Protected Channels**

The four Networks that exclusively licensed the Protected Channels to DISH reviewed the findings in the Metral report, including the dates Protected Channels were transmitted to users of Defendants' STBs and corresponding screenshots. The Networks identified specific, copyrighted audiovisual works exclusively licensed to DISH that are depicted in the screenshots or that otherwise aired on the Protected Channels on the dates the channels were transmitted to users of Defendants' STBs based on the findings in the Metral report.

The Networks' trial depositions establish the following:

a.      4 MBC Registered Works are depicted in the screenshots attached to the Metral report taken while monitoring Defendants' STBs.

b.      32 MBC Unregistered Works and Al Jazeera Unregistered Works are depicted in the screenshots attached to the Metral report.

c.      23 additional Unregistered Works (not depicted in screenshots) exclusively licensed to DISH by the MBC, Al Jazeera, IMD, and World Span Networks aired on the Protected Channels on dates that Metral reports such channels were transmitted to Defendants' STBs.

In sum, all the Works were transmitted to users to Defendants' STBs.

**B.      Defendants Transmitted The Works To Their STB Users**

Defendants infringed DISH's exclusive right to publicly perform the Works in at least *two ways* – either of which is sufficient alone to hold Defendants liable for direct copyright infringement. Defendants infringed DISH's copyrights in the Works by <u>delivering</u> the Protected Channels airing the Works from their CDNs to users of their STBs. Defendants also infringed DISH's copyrights in the Works by <u>pushing</u> the Protected Channels airing the Works from encoders to their CDNs. Either action is grounds to find Defendants liable as direct copyright infringers.

**1.      DISH's Public Performance Copyright**

Section 101 of the Copyright Act states that an audiovisual work is publicly performed when "transmit[ted] or otherwise communicate[d] . . . to the public, by any device or process." If the images or sounds comprising the work "are received beyond the place from which they are sent," the work was transmitted for purposes

of the public performance right as defined in section 101 of the Copyright Act.

Infringement of the public performance right is not confined to the content originator; instead, each party involved in the process of performing an audiovisual work is subject to liability. The Supreme Court in *Aereo* recognized this broad right of public performance when discussing the 1976 amendments to the Copyright Act intended to overturn earlier Supreme Court cases holding that only a broadcaster of television programs violates the public performance right. *Aereo* observed that, under the 1976 Copyright Act, "both the broadcaster and the viewer of a television program 'perform'" and an intermediary "*itself performs, even if when doing so, it simply enhances viewers' ability to receive broadcast television signals.*"

The House Report on the 1976 Copyright Act supports *Aereo's* finding that each party involved in the process of performing an audiovisual work is subject to liability, stating "<u>any act</u> by which the initial performance or display is <u>transmitted, repeated, or made to recur</u> would itself be a 'performance.'" And, the House Report makes clear such act may be achieved "'<u>either directly or by means of any device or process</u>,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented."

## 2.    Defendants' Transmission #1 – CDNs To STB Users

Defendants directly infringed DISH's exclusive right of public performance by delivering the Works aired on the Protected Channels from their CDNs to users of their STBs. Defendants admitted in the joint pretrial conference statement that

"Defendants certainly contracted for, paid for, and controlled the CDNs."

*Defendants' CDNs*

a.      Fraifer testified at trial that Defendants used CDN services from Verizon and Tulix in connection with their STBs for "production" purposes, as well as the CDN services obtained from Octoshape, Akamai, and Internap on a "testing" basis. As Fraifer testified, "production" versus "testing" are labels without meaning for purposes of this case because in either scenario the CDNs were used to deliver content to users of Defendants' STBs. Metral confirms the CDNs used for "testing" delivered Protected Channels to users of Defendants' STBs as the Metral report identifies video stream URLs associated with these CDNs used for "testing."

b.      Metral identified a sixth CDN, OVH, that was used in delivering Protected Channels to Defendants' STBs, though Defendants denied any relationship with OVH. The OVH video stream URLs contained the domain name kakalinka.com, which was registered to a "Gaby Fraser" associated with a street address in Montreal, Canada. The same street address is listed as Defendants' billing address on what Defendants admit is their GoDaddy domain name registration account. Kakalinka.com is Defendants' domain name, and the OVH video stream URLs that contain this domain name are related to Defendants' OVH CDN account, notwithstanding Defendants' denials to the contrary.

c.      Metral testified that a CDN is used to deliver content over the internet – in this case the Protected Channels. The Protected Channels are sent or "pushed" from an encoder to the CDN's ingest location. An encoder alters the

8

format of the Protected Channels to make them more suitable for transmission over the internet. After the Protected Channels are pushed to the CDN, the Protected Channels are then sent to the CDN's geographically distributed edge servers. The Protected Channels are delivered from the CDN's edge servers to the users of Defendants' STBs.

   d. Defendants' use of a CDN placed the Protected Channels closer to users of Defendants' STBs and avoided server overload. The Protected Channels were delivered to STB users from the CDN's nearest available edge server based upon server load, rather than having all STB users routed to a single server, possibly located far away and unable to accommodate all STB users' concurrent requests for a Protected Channel. As Fraifer testified, Defendants attempted to deliver channels to users of Defendants' STBs without a CDN, but the process "didn't work good."

   e. Fraifer testified that Defendants' delivery of Protected Channels relied upon CDNs because if a CDN was turned off, then users of Defendants' STBs would stop receiving the Protected Channels. Users of Defendants' STBs would connect to the CDN edge servers using their own internet service provider, such that if Defendants' CDNs were disabled, users could still access the internet, for example to browse a website or access YouTube – what Defendants' STB users could not do is receive Protected Channels delivered over Defendants' CDNs. Thus, Defendants' CDNs only provided "internet connectivity" by connecting users of Defendants' STBs to the Protected Channels delivered using Defendants' CDNs.

*Defendants Operated The CDNs*

f.      Fraifer's testimony regarding various emails he exchanged with the Verizon CDN regarding operation of Verizon's CDN service – that the statements he made to Verizon, such as "we [are] pushing" channels to the Verizon CDN from "our encoders," actually refer to actions being undertaken by a STB Supplier in China, Lenkeng, and that Fraifer is merely passing messages from Lenkeng to Verizon and vice versa – defies common sense. There were more than 500 pages of Verizon communications entered into evidence at trial – not one of which was sent to, sent from, or even copied Lenkeng. Fraifer's communications with Verizon stating "we" and "our" refer to Fraifer, Defendants' former employee Sfeir, and Defendants' paid consultant Maqsood – the individuals involved in these communications. Likewise, when Fraifer informs Verizon that "I" stopped pushing a channel or "I" reset a channel stream, Fraifer means himself.  And, when Maqsood refers Verizon to "Gabys encoders" he means Gaby Fraifer's encoders and not encoders operated by someone other than Fraifer. Defendants cannot re-write the English language to suit the story they have concocted as a defense in this case.

g.      Defendants' former employee Sfeir, who worked for Defendants for 13 years, was presented with similar emails that he exchanged with Verizon and other CDNs. Sfeir claimed to have virtually no recollection of the matters discussed in the emails, despite Sfeir sending these emails and despite Sfeir having a resume that reads like how-to guide on capturing channels and transmitting them over a CDN to the user of a STB. Sfeir testified that he lied on his resume, but the

10

communications between Sfeir and the CDNs – discussing technical matters involving Defendants' STBs – evidence that Sfeir's resume was correct and Sfeir's actual lie is his attempt to distance himself from the use of Defendants' CDNs to deliver the Protected Channels to Defendants' STBs.

       h.    Defendants' attempt to fault their CDN consultant Maqsood fares no better than Defendants' attempt to blame Lenkeng. Fraifer's testimony – that Maqsood was working with Lenkeng when Fraifer first met with them in 2014 and that Maqsood later convinced Fraifer to use CDNs to deliver channels to Defendants' STBs – is false. Fraifer used CDNs prior to 2014 when he was allegedly introduced to Maqsood, as shown by the California lawsuit filed against Fraifer's company for breaching a CDN service agreement executed in 2013. Additionally, Maqsood was deposed during discovery in this case, and Maqsood testified that he never worked with Lenkeng or any other alleged channel provider. Maqsood testified that he only worked with CDNs and that work was performed on behalf of Defendants. Fraifer likewise testified that Maqsood was working for Defendants when Maqsood communicated with the CDNs. Defendants are responsible for the actions they attribute to Maqsood concerning the operation of the CDNs because he performed these actions as Defendants' agent and at Defendants' request.

       i.    Fraifer testified that Defendants also paid for middleware used to connect their STBs to channel streams coming through Defendants' CDNs, which include the Protected Channels. Sfeir testified that the middleware controlled the video stream URLs corresponding with the channels delivered using

11

Defendants' CDNs and that when there was a new URL for a channel stream, Sfeir entered that new URL in place of the existing URL by logging into a website.

In sum, Defendants used CDNs to deliver the Works aired on the Protected Channels to users of Defendants' STBs. Lenkeng did nothing more than sell STBs to Defendants, which sales ended in 2015 – approximately 18 months prior to the last documented infringement. And even if Lenkeng gratuitously sent the Protected Channels to Defendants' CDNs – not only for Lenkeng's STBs but also for the STBs Defendants purchased from another supplier – Defendants themselves still delivered the Works from their CDNs to users of Defendants' STBs by operating the CDNs.

### 3. Defendants' Transmission #2 – Encoders To CDNs

Defendants also directly infringed DISH's exclusive right to publicly perform the Works by pushing the Protected Channels that aired the Works to Defendants' CDNs from their encoders in Tampa and Germany.

#### *Tampa Encoder*

a. Fraifer was questioned on a number of emails that Defendants exchanged with the Verizon CDN discussing encoders used to push channels to the Verizon CDN. Fraifer testified that one of the encoders identified in these Verizon communications was located at Defendants' offices in Tampa. Fraifer testified that Defendants used this encoder to send channels to the Verizon CDN for purposes of "testing" the CDN. Defendants' definition of "testing" was previously explained – "testing" means delivering the channel to actual users of Defendants' STBs. The

channels sent to the Verizon CDN from this encoder located at Defendants' offices include Protected Channels, as made clear in Defendants' emails with Verizon that discuss pushing channels from this encoder and list Protected Channels by name.

### *Germany Encoders*

b.       Additional encoders used to push the Protected Channels to the Verizon CDN have IP addresses that geo-locate to Germany and were allocated to a company in Germany called Cetel GmbH. Fraifer claimed that Defendants were not assigned these IP addresses from Cetel, never used the IP addresses, and never communicated with Cetel, instead attempting to pin the use of these encoders on Maqsood and Lenkeng. Fraifer testified falsely on all three fronts.

c.       Maqsood testified at his deposition that he was not involved in pushing channels to Defendants' CDNs and that any information Maqsood emailed to a CDN regarding pushing channels is information he received from Defendants. Maqsood testified that Defendants owned or operated at least 21 encoders.

d.       Fraifer was assigned the IP addresses of the Germany encoders, as established by the IP address registration record obtained in November 2017. In addition to identifying Fraifer and Defendants' office address, the registration record also identifies the name of one of Defendant TCI's former employees that left TCI in 2010 or 2011 – years before Defendants claim to have been introduced to Maqsood and Lenkeng in 2014. Fraifer's claim that Maqsood or Lenkeng must have acquired from Cetel the IP addresses of the Germany encoders using Fraifer's name and the name of an employee who departed years earlier is unbelievable.

e.      Fraifer provided an interrogatory response stating Defendants used a server having one of the Cetel IP addresses in the above registration record for a component of Defendants' business (telephones) that was unrelated to the STBs. Fraifer testified at trial that Lenkeng had no involvement with Defendants' telephone business, and Maqsood testified that he also had no involvement with that business, so this Cetel IP address is not attributable to Lenkeng or Maqsood.

f.      Records from a PayPal account created in the name of Fraifer's brother located in Canada showed payments of approximately $5,000 and $6,000 to Cetel. Fraifer denied using the PayPal account or instructing his brother to make the payments to Cetel; however, when examining the logins to the PayPal account at the times of the Cetel payments, the logins were from an IP address assigned to Defendants and used at Defendants' offices in Tampa. In fact, the PayPal account was accessed 351 times between November 2016 and April 2017, of which 345 logins came from the IP address used at Defendants' Tampa offices. Defendants used the PayPal account held in the name of Fraifer's brother to make payments to Cetel – the same company that assigned the IP addresses of the Germany encoders to Fraifer according to the registration record. The sizeable payments to Cetel are also consistent with Maqsood's testimony that Defendants had at least 21 encoders.

g.      Fraifer testified that he had no communications with Cetel, only to be presented at trial with an email that Fraifer sent to Cetel concerning channel streams. Fraifer's claim that he sent the email for Maqsood does not undo his false testimony, and Fraifer's claim is nonsensical as Maqsood was copied on Fraifer's

communication to Cetel and Maqsood would have been able to send the email himself because he sent several other emails around that exact time.

In sum, Fraifer testified falsely regarding the Tampa and Germany encoders. The evidence presented at trial establishes that Defendants used the encoders in Tampa and Germany to push Protected Channels to Defendants' CDNs. That is the true explanation for the host of emails from Fraifer, Sfeir, and Maqsood to Verizon stating that "we" are pushing channels to the Verizon CDN from "our encoders" or "Gabys encoders." That is also why Sfeir's resume touts his experience "installing encoders at multiple colocations to provide the sources for TV channels and push them over the web [to] content distribution providers." Defendants transmitted the Works aired on the Protected Channels from encoders to Defendants' CDNs.

### 4.    Defendants Infringed DISH's Public Performance Rights

*Aereo* makes clear that each person involved in the process of performing an audiovisual work is subject to liability as a direct copyright infringer – whether the broadcaster, the viewer, or the intermediary that enhances the communication from the broadcaster to the viewer. *Aereo* distinguished those persons involved in performing the work from a mere supplier of equipment that someone else uses to copy a work, for example the copy shop serving its patrons discussed in the *Aereo* dissent. Defendants are not a mere equipment supplier. Defendants did more than sell STBs; Defendants used their encoders and CDNs to transmit the Works aired on the Protected Channels to users of their STBs. While the company hosting the encoder such as Cetel, or the CDN provider such as Verizon, might not be subject

to liability for direct infringement, the persons using the encoder or CDN services to transmit copyrighted content, i.e., Defendants, are direct infringers.

It is immaterial how Defendants acquired the Protected Channels – whether on their own using the colocation facilities identified in their P&L statements or from Lenkeng as they claim – because under *Aereo*, Defendants need not be involved in every step of the process by which the Works were transmitted, or even the first step, as intermediaries are equally subject to liability. One step of the transmission process is all that is needed, and here the evidence establishes that Defendants engaged in at least two: transmitting the Works from encoders to their CDNs; and transmitting the Works from their CDNs to users of their STBs. Either action is sufficient to hold Defendants liable as direct copyright infringers.

The Court's hypothetical posed at trial of a person holding a magnifying glass over a copyrighted poem printed in small text and then allowing others to view the magnified text does not capture Defendants' conduct because the poem implicates the display right rather than the public performance right. The magnifying glass is not what causes the infringement in the hypothetical; instead, the infringement is the public display of the poem, whether the person holds a magnifying glass over the text or not. In contrast, Defendants cause the infringement of DISH's public performance rights by transmitting the Works using their encoders and CDNs. Defendants, by amplifying the Works for users of their STBs, make a transmission of the Works and that transmission infringes DISH's public performance rights. Defendants are no different than a person that installed a microphone at a concert

16

and placed speakers down the street in another venue – a transmission is made, even if only an amplification of the original concert.

### 5. Defendants Are Each Liable For The Infringement

Defendants are jointly and severally liable for infringing DISH's copyrights. The parties stipulated that during the time period of the infringement, Defendants PTI and TCI were effectively the same company. PTI had no source of revenue, no employees, and was considered a department within TCI; TCI shared office space with PTI, paid the expenses of PTI, and TCI employees performed the work of PTI. Defendants TCI and PTI are properly considered alter egos.

Defendant Fraifer is equally liable for two reasons: *first*, because Fraifer had the ability to supervise the infringing activity and a financial interest in the activity; and *second*, because Fraifer personally participated in the infringing activity. The parties stipulated that Fraifer is the founder, sole owner, and served as the sole officer of Defendants TCI and PTI during the time period of the infringement. In addition, Fraifer testified that all employees reported to him; Sfeir testified that he reported to Fraifer; and Maqsood testified that he reported to Fraifer. Fraifer had a financial interest in the infringing activity as he was the sole owner of TCI and PTI and stood to receive the profits. Accordingly, Fraifer had the ability to supervise and a financial interest in the infringing activity.

Fraifer also personally participated in the infringing activity, which provides a separate basis to hold Fraifer individually liable. Not only did Fraifer set up the CDN accounts, Fraifer actively participated in the operation of the CDNs, as shown

by the Verizon communications reviewed at trial. The Cetel IP addresses of the Germany encoders were registered in Fraifer's name, Fraifer communicated with Cetel, and payments to Cetel were made using a PayPal account created in the name of Fraifer's brother in Canada though the login activity shows it was Fraifer actually using the PayPal account to pay Cetel for the Germany encoders. Fraifer is individually liable for personally participating in the infringing activity.

### III.   DAMAGES & OTHER RELIEF

### A.   Statutory Damages For The Registered Works

DISH should be awarded statutory damages of $150,000 for each of the four Registered Works, which are Works aired on MBC Protected Channels, for a total of $600,000. Maximum statutory damages are appropriately awarded in this case under section 504(c) of the Copyright Act for several reasons:

  a. Defendants' infringement of the Registered Works was willful. Willfulness means the infringer knew of the infringement or recklessly disregarded the possibility that its conduct was infringing. There were 182 separate notices of copyright infringement sent to Defendants or their CDNs regarding copyrighted works aired on the Protected Channels, including infringement notices addressing the MBC Protected Channels on which the Registered Works aired that were sent to Defendants and their CDNs prior to the time the Registered Works aired.

  b. Fraifer testified to receiving several of the infringement notices and offered no explanation for allegedly not receiving the others, even though the infringement notices were mailed and emailed to valid addresses. Fraifer further

testified that he understood what the infringement notices required him to do, i.e., remove or otherwise disable the Protected Channels on which the Works aired.

        c.     Despite the 182 copyright infringement notices, for nearly eight months after this case was filed the Protected Channel continued to be transmitted to Defendants' STBs through the use of Defendants' CDNs. Defendants had no real plan to stop transmitting the Protected Channels in response to the infringement notices and in fact had a plan to bypass those infringement notices. Fraifer testified that Defendants established "trial" CDN service accounts as a backup in the event their existing CDN services provider terminated their CDN services, as the Verizon CDN did to Defendants. Verizon terminated Defendants' CDN services on account of Defendants continually reactivating streams of the Protected Channels, despite the notices of infringement directing Defendants to take them down and keep them down. Defendants established a trial CDN services account with Internap on the same day that Verizon terminated their CDN services and entered into a contract with Tulix for CDN services only a few days later; needless to say, Defendants' infringement of the Works aired on the Protected Channels continued.

        d.     There is also in strong need of deterrence that will be served by an award of maximum statutory damages. Defendants' infringement continued for approximately eight months after this case was filed, establishing that initiation of legal proceedings are not an adequate deterrent in itself. Fraifer's false testimony at trial, as set out above, further shows his general disregard for the legal system and a strong need for deterrence. Metral testified there are various other television

streaming services similar to Defendants' STBs currently under investigation. An award of maximum statutory damages will have a deterrent effect there as well.

      e.    The Registered Works are extremely valuable to DISH. DISH's representative testified that the Protected Channels, including the MBC Protected Channels on which the Registered Works aired, are the top, most popular channels based on viewership data and must-haves for any provider of an Arabic-language television service, such as the services provided to users of Defendants' STBs. The popularity of the Protected Channels is a direct result of the popularity of the works that aired on the Protected Channels, including the Registered Works. Defendants cannot dispute the importance of the MBC Protected Channels as they themselves advertised these channels on their website and Defendants were quick to complain to the Verizon CDN if the MBC Protected Channels temporarily stopped working.

      f.    A hypothetical licensing model – a multiple of what Defendants would have paid to transmit the Protected Channels to their users – does not assist in quantifying statutory damages because DISH does not sublicense the Protected Channels. DISH's representative testified that sublicensing would dilute the value of the Protected Channels and, instead, DISH derives value by maintaining exclusive rights in the Protected Channels. A hypothetical license model also falsely assumes Defendants would have licensed the Protected Channels; in truth, Fraifer testified that Defendants were not licensed to provide any of the channels delivered to users of Defendants' STBs.

In sum, DISH should be awarded $150,000 for Defendants' infringement of each of the four Registered Works, for a total of $600,000.

## B. Defendants' Profits For The Unregistered Works

DISH is entitled to recover Defendants' profits that are attributable to their infringement of the Unregistered Works under section 504(b) of the Copyright Act. DISH's minimal burden is clearly identified in the statute: DISH must only show Defendants' gross revenues that are reasonably related to the infringement; Defendants must establish any elements of their profit attributable to factors other than their infringement and any deductible expenses. The evidence presented at trial establishes that Defendants' gross revenues reasonably related to the infringement of the 55 Unregistered Works totals $457,467:

a. Defendants presented a financial summary at trial showing that Defendants had revenues of approximately $437,330 from the sale of the STBs and related service plans between July 2015 and April 2017, which is slightly less than the time period during which Defendants infringed the Unregistered Works.

b. Defendants excluded from their financial summary any revenue received from the sale of STB service plans between July 2015 and December 2015, which totaled approximately $20,137. There is no basis to exclude this revenue as the service plans, though perhaps applied to a STB sold in 2014, were used to keep those STBs working in 2015 and thus are reasonably related to the infringement.

c. Defendants' argument that *all* STB service plan revenue should be excluded from the profits calculation also fails for the same reason. Even if the

service plans are not "subscriptions," as Defendants contend, the revenue from the service plans is reasonably related to the infringement because there is no dispute that the plans assisted customers in using their STBs, which included receiving the Works aired on the Protected Channels. And, contrary to Defendants' position, the service plans do have a subscription-like component, as made clear by Defendants' advertising the service plans as a "software/streams update" and cautioning users that "[s]ome channels may not be accessible" under a particular service plan.

d.      Defendants' deductible expenses should be zero, but in no event should they exceed the $67,862 that Defendants paid Lenkeng and Geniatech for STBs acquired in 2015, according to wire transfers produced by Defendants – there were no STBs purchased in 2016 or 2017. Defendants failed to show how many of these STBs they sold between July 2015 and Q1 2017, meaning the portion of the $67,862 deductible as cost was not established and should be treated as zero.

e.      Defendant provided no support or explanation for the STB costs claimed in their financial statements; in fact, those financial statements show STB costs that are grossly inflated when considering that Defendants paid no more than $50/STB based on their invoices, yet the financial statements reflect costs upwards of $100/STB. The falsified costs may have reduced Defendants' tax bill but should not be allowed to reduce the revenues that DISH is entitled to recover in this case.

f.      The additional costs identified on Defendants' P&L statements, for which there is also no support, consist of costs unrelated to their infringement or costs that Defendants would have incurred even without the infringement.

Fraifer was the only person to testify about the P&L statements and when asked whether specific costs in the P&Ls, for example colocation costs, pertained to the STBs, Fraifer responded that Defendants had too many components to their business and he did not know. The costs identified in the P&Ls are not deductible under section 504(b) of the Copyright Act.

g.       Defendants also have no basis to apportion their revenues from the sale of the STBs and service plans. Defendants' apportionment argument, based on the total number of available channels, is complete speculation. Fraifer testified that Defendants have no record of the channels transmitted to users and the total number of channels fluctuated over time. Thus, Defendants cannot establish how many channels were being transmitted at the time the Unregistered Works aired on the Protected Channels to users of Defendants' STBs. Defendants' demonstrative exhibit claiming 560 channels, based on images of the programming guide attached to Metral's report, is incorrect because, as Metral explained at trial, there are substantial gaps in the channel numbers in the guide, duplicate channels, and no confirmation that each channel actually worked.

h.       Defendants' apportionment argument also relies upon the false assumption that all channels and works are equal. DISH's representative testified the Protected Channels are the most popular Arabic-language television channels due to the quality of the programs aired on the Protected Channels, which include the Unregistered Works. Defendants did not solicit any contradictory testimony. Defendants also cannot attempt to downplay the significance of the Unregistered

Works by pointing to additional works that aired on the same Protected Channels as Defendants also transmitted those other works in violation of DISH's exclusive rights – Defendants cannot point to their other infringements to reduce damages.

In sum, DISH should be awarded $457,467 for Defendants' infringement of the 55 Unregistered Works.

## C.   DISH's Attorney's Fees And Costs

DISH should be awarded attorney's fees and costs under section 505 of the Copyright Act based upon Defendants' willful infringement, as established above. Attorney's fees and costs are routinely awarded to the copyright owner, especially in cases of willful infringement. DISH will file a motion pursuant to Fed. R. Civ. P. 54(d)(2) and L.R. 7.01 establishing the amount of its attorney's fees and costs.

## D.   Permanent Injunctive Relief

A permanent injunction should be entered against Defendants under section 502 of the Copyright Act. DISH's corporate representative testified that DISH loses subscription revenues and market share as a result of Defendants' unauthorized transmission of the Protected Channels – being offered in direct competition with DISH's authorized use of the Protected Channels – and that DISH incurs harm to its business reputation. Such loses are inherently difficult, if not impossible, to calculate and constitute irreparable harm for purposes of a permanent injunction.

The balance of hardships favors a permanent injunction because, in contrast to the irreparable harm Defendants' infringement causes DISH, the burden placed on Defendants by an injunction consists only of the cost of foregoing illegal actions.

Enjoining Defendants will advance the public interest by protecting copyrighted works aired on the Protected Channels and by extension maintaining the incentive for authors to create the works and for DISH to offer the works to its subscribers.

## VI.   CONCLUSION

Defendants willfully infringed DISH's exclusive right to publicly perform the Registered Works and Unregistered Works that aired on the Protected Channels, and judgment should be entered against them jointly and severally. DISH should be awarded statutory damages of $600,000, disgorgement of Defendants' profits in the amount of $457,467, attorney's fees and costs, and a permanent injunction to prevent further infringement of DISH's copyrights.

Dated:  June 17, 2021

/s/ Timothy M. Frank
Joseph H. Boyle (*pro hac vice*)
Timothy M. Frank (*pro hac vice*)
HAGAN NOLL & BOYLE, LLC
Two Memorial City Plaza
820 Gessner, Suite 940
Houston, Texas 77024
Telephone:  (713) 343-0478
Facsimile:  (713) 758-0146
Email:  joe.boyle@hnbllc.com
Email:  timothy.frank@hnbllc.com

James A. Boatman, Jr.
Florida Bar No. 0130184
THE BOATMAN LAW FIRM PA
3021 Airport-Pulling Road North, Suite 202
Naples, Florida 34105
Telephone:  (239) 330-1494
Facsimile:  (239) 236-0376
Email:  jab@boatman-law.com

*Attorneys for Plaintiff DISH Network L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 17, 2021, I electronically filed the foregoing with the Clerk of the Court by using the NextGen CM/ECF system, which will provide notice to Defendants.

/s/ Timothy M. Frank
Timothy M. Frank (*pro hac vice*)