**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | No. 8:16-cv-02549-TPB CPT |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GABY FRAIFER, TELE-CENTER, INC., | ) | |
| and PLANET TELECOM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' CLOSING ARGUMENT</u>**

Defendants, Tele-Center, Inc. ("TCI"), Planet Telecom, Inc. ("PTI"), and Gaby Fraifer ("Fraifer") (collectively, "Defendants"), by and though their undersigned counsel,  file this closing argument to the June 1-3, 2021 Bench Trial in defense of Plaintiff's sole count of direct copyright infringement as claimed by Plaintiff, Dish Network, L.L.C. ("Plaintiff" or "Dish"). (Doc. 323.)

To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [works at issue] and (2) defendants copied protected elements from the [works]. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011) citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008); *see also* Report and Recommendation ("R&R") (Doc. 246), at 10 (citing same).

Defendants are entitled to judgment in this matter because: (1) Plaintiff has not established ownership of valid copyrights; (2) Plaintiff cannot maintain a copyright infringement claim because they have failed to register their

Unregistered Works and cannot establish that the works are not United States works exempt from registration; (3) Plaintiff has failed to enter into evidence at trial *any* copies of the asserted works rendering impossible the Court's ability to determine the scope of protection to be afforded to the works, to identify the protectible elements, if any, of the works and to conduct a substantial similarity analysis as required under Eleventh Circuit law; (4) Plaintiff failed to provide prepublication notice of works fixed for the first time simultaneously with their transmission under 17 U.S.C. 411(c)(1),(2) and 412; and because (5) Defendants' did not directly infringe on any of the asserted works.

## I.      Copyright Ownership

Try as it may, Plaintiff cannot avoid its burden under the U.S. Copyright Act, Eleventh Circuit and Supreme Court precedent to establish the required elements for its prima facie claim for direct copyright infringement of the registered and unregistered foreign works it has asserted in this matter.  Indeed, throughout this litigation, Plaintiff has done all it could to stonewall Defendants' attempts to seek discovery regarding Plaintiff's alleged ownership of exclusive rights in the registered and unregistered foreign works which it depends upon in establishing standing in bringing this action against Defendants.

It is undisputed that Plaintiff failed to specifically identify even a single unregistered foreign work in its Amended Complaint or at any time during the discovery period in this litigation.  *See* R&R, at 5, FN3.  It was not until Plaintiff filed its Motion for Summary Judgment that it attached multiple declarations from

2

four previously undisclosed internationally-based witnesses, attaching hundreds of pages of exhibits, including previously unproduced critical documents and allegedly identifying fifty-five unregistered foreign works for the *very first time* from undisclosed witnesses. (Doc. 146.)  That is, it was not until well after the close of the discovery period in this case, when it was too late for Defendants to seek discovery with which to defend against such claims, that Defendants first learned of the nature of the claims made against them.

As established in the Report and Recommendation (Doc. 246), Plaintiff's Motion for Summary Judgment, and this Court, relied heavily upon four declarations attached to Dish's Motion for Summary Judgment to support its claims of alleged ownership of exclusive rights in the asserted registered and unregistered works and infringement. See Doc. 246, at 27 (relying on the Whitehead Declaration to "trigger the presumption of validity"); see also 32, 34, 35, 36, 41, 45 (relying on the Whitehead, Al Jazeera, World Span and IMD declarations to find for Plaintiff on various points of law, including ownership).

Indeed, the fifty-eight page Report and Recommendation, adopted by this Court, discussed numerous very close, complex arguments regarding copyright ownership, publication and the unique issues raised relating to the assertion of foreign copyrights and internet technology that have arisen in this case.  The evidence and testimony elicited and developed through four trial depositions of the foreign network declarants, who were not disclosed to Defendants during the discovery period in this case, along with the testimony of several party witnesses

have revealed critical new evidence establishing that this Court relied on declarations at summary judgment which fall woefully short of the requirements of Fed. R. Civ. P. 56(c)(4) because they were admittedly not made from personal knowledge, as claimed, but from inadmissible hearsay.  Taken together, in order to prevent manifest injustice to Defendants and so this case may be determined on the merits, under prevailing Eleventh Circuit law, the newly discovered evidence revealed through the aforementioned trial depositions, along with the testimony and evidence adduced at trial, justifies this Court's reconsideration of the threshold issues of ownership, publication, notice and scope of protection which were decided by this Court under the false pretense that the declarations it relied upon were truthful, reliable and based on the declarants' personal knowledge as required under Rule 56(c)(4), not inadmissible hearsay.

A.     **This Court Should Reconsider its Grant of Partial Summary Judgment on the Issue of Ownership in View of Newly Discovered Evidence, Misrepresentations by Key Witnesses that Their Declarations Were From Personal Knowledge as Required Under Fed. R. Civ. P. 56(c)(4) and to Prevent Manifest Injustice.**

Just prior to trial, at the behest of this Court, in view of the logistical challenges relating to travel caused by the COVID-19 Pandemic, Defendants made efforts to streamline this trial in compliance with Fed. R. Civ. P. 1, stipulating to trial depositions of these four foreign network witnesses by remote means in lieu of their live appearance at trial.  Plaintiff refused to grant Defendants any more than two hours per witness for their respective trial depositions.  However, the critical new evidence finally revealed through these brief depositions cannot be

overstated.  These trial depositions establish that each of the witnesses that provided declarations in this matter, which were indisputably relied upon by this Court at the summary judgment stage, resulting in partial summary judgment on the issue of ownership, were decidedly not based on personal knowledge as required by Fed. R. Civ. P. 56(c)(4), but on inadmissible hearsay.  See *Tishcon Corp. v. Soundview Communs., Inc.*, 2006 U.S. Dist. LEXIS 97309, at *18-21 (N.D. Ga. 2006) (discussing the requirement for personal knowledge under prior Fed. R. Civ. P. 56(e), now 56(c)(4), with regard to the very same type of third-party materials relied upon by the declarants in this matter and striking the same); *Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793, 795 (11th Cir. 2017) ("Thus, statements in an affidavit based, in part, upon information and belief -- instead of only knowledge -- cannot raise a genuine issue of fact.").

Indeed, Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion **must** be made on personal knowledge, set out facts that would be admissible in evidence, ***and*** show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 54(c)(4) (emphasis added); *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (collecting cases) ("The Rules are clear: "Supporting and opposing affidavits shall be made on personal knowledge.").  Given these revelations, there can be no question that as a matter of Eleventh Circuit law, the declarations relied upon by this Court fail to meet the requirements of Rule 56(c)(4).  "[A]ffidavits that are not based on personal knowledge 'cannot raise genuine issues of fact, and thus . . . cannot defeat a motion

for summary judgment.'" *Longleaf in Vinings Homeowners Ass'n v. QBE Ins. Corp.*, 646 F. App'x 823, 824 (11th Cir. 2016) citing *Ellis v. England*, 432 F.3d 1321, 1326-27 (11th Cir. 2005) (per curiam); *Landon v. City of N. Port*, 745 F. App'x 130, 133 (11th Cir. 2018) (finding affiant not competent to testify on the matters included in an affidavit because he lacked personal knowledge); *Calvert v. Doe*, 648 F. App'x 925, 927 (11th Cir. 2016) ("A court cannot consider inadmissible hearsay when ruling on a summary judgment motion."); *Hines v. Parker*, 725 F. App'x 801, 807 (11th Cir. 2018) ("[A]ffidavit was not 'made on personal knowledge [and failed to] set out facts that would be admissible in evidence . . . .'").

Accordingly, this Court can and should utilize its inherent powers to remedy what amounts to manifest injustice based upon misrepresentations to reconsider and deny Plaintiff's Motion for Summary Judgment, granting Defendants' Motion for Summary Judgment on the threshold issue of ownership.

First, as the comments to Fed. R. Civ. P. 56 state, "Rule 54(a) defines 'judgment' as including a decree and 'any order from which an appeal lies.' Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary 'judgment' is not a final judgment[.]" Fed. R. Civ. P. 56. The notes to Rule 56 also state that "[i]f the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." *Id.* "Summary judgment orders are considered interlocutory, and 'the court at any time before final decree (could) modify or rescind it.' Thus, vacating [an] earlier order [is] within the district court's power." *Bon Air Hotel, Inc. v. Time*,

Inc., 426 F.2d 858, 862 (5th Cir. 1970); see also *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993) ("Rule 54(b) confirms the Court's power to reconsider its interlocutory orders. The Court has discretion in deciding whether to reconsider a previous order.").

Second, Fed. R. Civ. P. 60(b) provides another avenue for a district court to reconsider a prior judgment.  See *Carrero v. Sanabi Invs., LLC*, 2019 U.S. Dist. LEXIS 117595, 2019 WL 3024462, at *3 (S.D. Fla. 2019) ("Ultimately, however, the Court retains 'substantial discretion' to grant or deny a motion for reconsideration. The Court may grant reconsideration under Rule 60(b)(6) "in order to do substantial justice[.]" citing Griffin *v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (reconsidering partial summary judgment)); see also *Obregon v. JEP Family Enters.*, 2011 U.S. Dist. LEXIS 95235, at *5 (S.D. Fla. 2011) (reconsidering partial summary judgment); Fed. R. Civ. P. 60(b) allowing for reconsideration of a prior judgment *inter alia* where, as here, there is newly discovered evidence (60(b)(2)), fraud or misrepresentation (60(b)(3)) or for "[a]ny other reason that justifies relief" (60(b)(6).).

Finally, a district court may reconsider its own order granting partial summary judgment under its inherent powers.  See *Ligotti v. United Healthcare Servs.,* 2021 U.S. Dist. LEXIS 106992, at *15-16 (S.D. Fla. June 8, 2021) ("We could always reconsider the summary judgment order under our inherent authority because 'a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court.'" citing *Oliver v. Orange Cty.*, 456 F.

App'x 815, 818 (11th Cir. 2012)). "It is within the court's discretion to grant a motion for reconsideration." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000); *Interlego A.G. v. F.A.O. Schwarz, Inc.*, No. 18835, 1976 U.S. Dist. LEXIS 15793, at \*6-7 (N.D. Ga. Mar. 31, 1976) (reconsidering prior grant of partial summary judgment in a patent matter and vacating its prior holding in the interest of judicial economy).

Here, the Court most certainly has good reason to reconsider its interlocutory order of partial summary judgment under its inherent authority. To be sure, the revelation of new evidence, establishing that this Court relied upon affidavits it likely would have stricken as a matter of law under Rule 56(c)(4), had it known they were not made from personal knowledge, on issues directly relevant to and relied upon by this Court in determining summary judgment, to prevent manifest injustice, certainly justifies reconsideration. Thus, Defendants respectfully request the Court invoke its inherent authority in the instant case.

**B.** **The Declarations of the Foreign Network Representatives Relied Upon By This Court At Summary Judgment Were Not From Personal Knowledge As Required Under Fed. R. Civ. P. 56(c)(4).**

### *John R. Whitehead (MBC FZ, LLC)*

**1. Mr. Whitehead's Declaration and Testimony Was Not Made From Personal Knowledge as Required by Fed. R. Civ. P. 56(c)(4) and Should Not Have Been Relied Upon By This Court In Determining the Issue of Ownership at Summary Judgment.**

The sworn testimony of Mr. Whitehead provided at his trial deposition on May 25, 2021 establishes the following facts:

Mr. Whitehead testified on multiple occasions during his trial deposition that, contrary to the boilerplate statement included in his sworn declaration relied upon by this Court, his declaration was, in fact, not made from personal knowledge. See Dkt. 311-1 ("*Whitehead Depo.*"), at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13- 184:9.   Instead, Mr. Whitehead testified that he relied on inadmissible hearsay from third-parties.   Mr. Whitehead's testified that: (i) he had no personal knowledge as to whether any MBC channels were transmitted on Defendants' STBs and, instead, relied solely on the statements of the third-parties that drafted the Nagra monitoring report for his conclusions; (ii) that he had never used any of Defendants' STBs; (iii) never used or accessed any of the software applications on Defendants' STBs; and (iv) that he did not select, watch or verify whether any of the programs listed in his declaration actually aired on the channels claimed.   See e.g., *Id.*, at 39:9-42:13 (Q. And the Nagra monitoring report was created by a third-party, correct?  A. Correct.  Q. And this statement is based on that third party report, right?  A. Yeah. And not your personal knowledge? A. Correct."  *Id.* 39:7-14.; "Q. And you said that you were told, so that's not from your own personal knowledge, that statement you just made, is that correct?  A.  I certainly didn't verify this information, no.  Q. Okay.  So, it's not from your personal knowledge? A. Right."  *Id.*, at 45:5-11.).

Moreover, Mr. Whitehead confirmed that the alleged screenshot dates he relied on were supplied by third-parties that he did not personally watch, select or verify any the Registered or Unregistered Works listed in his declaration, and that

his statements regarding the same were not the product of any personal knowledge. *Id*. ("Q. And you didn't take those screenshots yourself, correct?  A. Correct.  Q. A third party took those screenshots allegedly, right?  THE WITNESS: Yeah.  Q.  Okay.  Now, let's look at the table in Exhibit 9.  The first column on the left-hand side of the table, sir?  A. Yes.  Q. And what is that titled?  A. Screenshot dates.  Q.  And this also confirms that the dates that you relied on were taken from the Nagra monitoring report, is that correct?  A. Correct.  Q.  And they weren't the product of any personal knowledge of yours, correct?  A. Correct." Id., at 41:11-24.); ("Q. You didn't personally watch each of the programs that [are] listed in table – the table in paragraph 9, correct?  A.  That is correct.  Q.  Did you select the programs that were there in paragraph 9?  A. No."  Id., at 42:7-13.).

Mr. Whitehead testified that he neither produced nor attached any programming grids or electronic programming guides to his declaration but, instead, allegedly received them from "third parties." *Whitehead Depo*., at 168:8-20 (Q. [W]hen you submitted your declaration you didn't attach, to your declaration, any programming grids, correct?  A. Correct. Q. And you didn't – didn't attach any electronic programming guides, EPGs, correct? A. Correct.  And all of those programming grids and EPGs that you've discussed today, you received from third parties, correct? A. Yeah.").  Notwithstanding document requests propounded by Defendants during discovery in this matter and Plaintiff's burden of marshalling evidence in support of its claims, it is undisputed that Dish also failed to produce any such documents in this litigation and, thus, failed to enter

any such documents into evidence at trial. Thus, under Fed. R. Civ. P. 37(c)(1), Plaintiff cannot rely upon such evidence or testimony at trial. Instead, it is clear that Mr. Whitehead, again, relied on inadmissible hearsay in making such statements in his declaration and deposition.

Significantly, Mr. Whitehead's testimony also confirmed that none of the screenshots from third-parties NagraStar and NagraVision were capable of identifying any episode numbers or the seasons of any of the asserted works, including the Registered Works. *Whitehead Depo.*, at 169:3-12. In fact, Mr. Whitehead's testimony confirmed that while he was "told" by others that the screenshots allegedly depicted works listed in his declaration, he did not personally verify any of the information concerning the works listed in his declaration and had no personal knowledge of the same. *Id.*, at 45:5-11. ("Q: And you said that you were told, so that's not from your own personal knowledge, that statement you just made, is that correct? A: ***I certainly didn't verify this information, no.*** Q: Okay. So, it's not from your personal knowledge? A: Right."). Moreover, upon review of some of the screenshots he attached to his declaration, Mr. Whitehead, seemingly surprised, confirmed that they actually depicted commercials, not the works he listed in his declaration. *Id.*, at 44:1-45:11 ("I am told that 223 corresponds to "Sports News" but it seems to me to be a picture of a commercial." *Id.*, at 44:9-10).

In short, Mr. Whitehead's trial deposition established that virtually all of the statements he made in his declaration were based entirely on inadmissible hearsay

received from third-parties and that his declaration was decidedly not made from his personal knowledge as required under Fed. R. Civ. P. 56(c)(4). Accordingly, Mr. Whitehead's declaration and testimony should not be considered by this Court. Given this newly discovered evidence and the revelation that Mr. Whitehead's false statement that his declaration was made from personal knowledge, Defendants' urge this Court to reconsider its Order granting Plaintiff partial summary judgment on the issue of ownership. Mr. Whitehead's declaration and testimony were based on inadmissible hearsay, not personal knowledge, and thus incapable of meeting the standards required under Rule 56(c)(4) in supporting Plaintiff's claims of copyright ownership or infringement of the MBC Works. Thus, this Court should not give Mr. Whitehead's testimony any weight whatsoever. Because Mr. Whitehead was the sole witness proffered by Plaintiff in support of its claims of ownership and infringement of the Unregistered and Registered MBC Works, this Court should deny Plaintiff's claims and issue a holding in favor of Defendants.

**2.    Mr. Whitehead's Testimony Establishes That Plaintiff Can Not Meet its Burden in Proving its Prima Facie Case of Ownership or Infringement of the Work Claimed in U.S. Copyright Registration No. PA-1-992-319.**

One of the asserted Registered Works, identified as U.S. Copyright Registration No. PA-1-992-319, includes a claim of copyright by MBC FZ, LLC and O3 Productions for a work entitled, "Saherat Al Janoub." See Pl. Exhibit 3. Although Plaintiff's exhibit list [Doc. 325] misleadingly lists a season for this work, in reality, the certificate, on its face, along with Mr. Whitehead's testimony confirms there is no season listed at all. See *Whitehead Depo.*, at 27:6-31:9 ("Q.

And will you agree that there's also no season listed on this particular certificate as well? A. I do, yeah.  Q. And it's just an episode number, correct? A. Just an episode number, yeah.  Q. Episode 15.  *Id.*, at 27:15-20.).  Instead, the certificate merely states, "Ep. #15."  *Id.*; Pl. Exh. 3.

The certificate also states the year of completion as 2015, with an alleged date of first publication of April 14, 2016.  *Id.*, at 27:21-28:3.  Finally, the certificate identifies two joint authors, who each claim authorship as a work-for-hire, MBC FZ, LLC and O3 Productions, LLC.  *Id.*, at 29:4-14.  Dish has not produced nor entered into evidence at trial any writing or other evidence even purporting to grant an exclusive right in this work from the listed joint author of this joint work, O3 Productions.  *Id.*; see also Pl. Exh. 3; *Whitehead Depo.*, at 179:1-6 ("Q. Is O3 Productions a separate company from MBC Luxembourg?  A. Yes.  Q. Is O3 productions a separate company from MBC FZ, LLC?  A. Yes.").  Notwithstanding the fact that each of the copyright registration certificates for the Registered Works asserted in this litigation clearly claim ownership as works for hire, Dish failed to provide any evidence at trial or otherwise of any written work-for-hire agreements from any of the underlying authors relating to any of the Unregistered or Registered MBC Works it has asserted in this litigation bringing into question, the chain-of-title in each of the asserted works.

Dish has failed to meet its burden in proving infringement of the work claimed in U.S. Copyright Registration No. PA-1-992-319.  First, Mr. Whitehead's testimony confirmed that none of the inadmissible, third-party screenshots, of

which he admits no personal knowledge, were dated April 14, 2016, the date listed on the copyright registration certificate as the date of first publication. *Id.*, at 51:1-52:18 ("Q. Do you see April 14, 2016 anywhere on this list? A. No. Q. Or the chart in paragraph 9 of your declaration? A. No." *Id.*, at 51:1-6). He could not explain why screenshots allegedly identifying other episodes of this program aired at divergent times of the day or why the episodes appeared to be listed out of order. *Id.*, at 49:1-9 ("To be honest, I don't know the answer to that."). As Mr. Whitehead's testimony establishes, he simply had no personal knowledge of the screenshots, the alleged works or alleged dates of airing he listed in his declaration. Instead, the information he relied upon was inadmissible hearsay, provided by third-parties.

Second, and most significantly, Mr. Whitehead testified that he could not determine whether any of the third-party screenshots depicted the specific work listed in Copyright Registration No. PA-1-992-319 with any degree of certainty. *Id.*, at 167:7-11. In fact, when asked directly whether any of the screenshots identified the work listed in Copyright Registration No. PA-1-992-319, Mr. Whitehead testified, "I – I don't know one way or the other." *Id.* What Mr. Whitehead's testimony does confirm, however, is that there are, in fact, multiple seasons of "Saherat Al Janoub" and that none of the works listed in his declaration corresponded with Copyright Registration No. PA-1-992-319. *Id.*, at 47:15-52:8 ("Q. You just don't know, okay. You'd agree with me, though, sir, that now that you've seen this list that was in your sworn declaration there's certainly more than

14

one season of "Saherat Al Janoub," right? ... THE WITNESS: Yeah. In fact, these indicate that they are [all from] season 2, is that correct? A. That's what it says." *Id.*, at 49:11-21 (confirming each of the episodes listed in Mr. Whitehead's declaration [Doc. 146-8] titled as "Saherat Al Janoub" were listed as Season 2 episodes); "Q. And you already testified earlier today that none of these screenshots in exhibit 8 to your declaration were capable of identifying an episode number, correct? THE WITNESS: The screenshots don't identify an episode number. Q. Or a season, correct? A. Correct." *Id.*, at 169:3-12.; "Q. I just want to confirm, once again, where it says, title of work, here – and I am looking at the registration number that has the number of PA 1-992-319. A. Yeah. Q. I just want to confirm, once again, here, on the record, that there is no season identified in this work, correct? A. On the certificate? Q. Yes. A. That's correct." *Id.*, at 170:2-12).

The only justifiable inferences to be drawn from Mr. Whitehead's testimony and the face of the copyright registration certificate are: (i) the certificate for Copyright Registration No. PA-1-992-319 does not contain any season descriptor whatsoever, and is thus either from Season 1 or incapable of identification beyond what is described on the face of the certificate on the evidence presented at trial. In either event, Plaintiff has failed to meet its burden to prove its claim through admissible evidence. Moreover, given Mr. Whitehead's admitted lack of personal knowledge and reliance on inadmissible hearsay, Mr. Whitehead was admittedly unable to determine whether any of the third-party screenshots corresponded to the specific work identified in Copyright Registration No. PA-1-992-319. In fact,

Mr. Whitehead, testified that he simply did not "know one way or the other." *Id*., at 167:10-11. Thus, Plaintiff has failed to present evidence sufficient to meet its burden in proving its prima facie case as to the alleged infringement of the work listed in Copyright Registration No. PA-1-992-319 and its claim of infringement of this Registered Work must be denied as a matter of law.

3.   **Mr. Whitehead's Testimony Confirmed MBC FZ, LLC Assigned All Of It's Copyrights To Another Entity Prior to Submitting the Applications Leading To The Registration of the Two of the Registered Works At Issue In This Litigation, Invalidating The Registrations And Plaintiff's Claimed Exclusive Rights In Two Additional Asserted Registered Works.**

Furthermore, Mr. Whitehead's testimony also confirms that MBC FZ, LLC did not own copyrights in two of the Registered Works asserted in this litigation at the time the copyright applications were filed, Copyright Registration No. PA-1-992-319 and PA-1-992-320. *Id*., at 27:6-31:9 ("Okay, and once again, you'd agree with me based on what we discussed earlier, in your declaration at paragraph 4, that MBC FZ assigned all of its copyrights to MBC Luxembourg relating to MBC 1 on April 18, 2016, is that correct? A. In respect to the U.S." *Id*., at 30:20-25.); see also *Id*., at 16:12-19:24; 27:6-31:9 (establishing that the applications for the Registered Works were filed by MBC FZ, LLC well after the claimed dates of first publication of the works and after these works had already been assigned to a different entity, MBC Group Holding Hungary, LLC, Luxembourg Branch). Thus, Whitehead's testimony establishes that MBC FZ, LLC did not have the right to claim ownership of any of the Registered Works because they had assigned all of their copyrights to an entirely different company, prior to the date the applications

for copyright relating to the works were submitted to the U.S. Copyright Office. ("Q. So, would it be fair to say that under the agreements we've just discussed, that MBC Luxembourg, on April 18, 2016, became the assignee of the copyrights from MBC FZ, LLC? A. Yes. *Id.*, at 19:12-16.) ("Q. And what is the name and date listed on this certification? A. The name is Megha Bhuoraskar, and the date is June 20, 2016." *Id.*, at 33:11-24) (agreeing all four applications were "very likely" filed the same day, after MBC FZ, LLC assigned its rights in all copyrights to a different entity).

Mr. Whitehead's sworn testimony confirms that MBC FZ, LLC assigned its rights to all copyrights in MBC1 to another entity prior to applying for registration of two of the asserted Registered Works.  The Registered Works were therefore not properly owned by MBC FZ, LLC, the purported copyright claimant, rendering the registrations and Plaintiff's purported exclusive rights in these works invalid as a matter of law. *Whitehead Depo.*, at 16:12-17:1, 17:20-19:24; 33:11-35:17; 17 U.S.C. 512.  Indeed, given that MBC FZ, LLC granted its rights to another entity prior to the date of application for the Registered Works, MBC FZ, LLC was not the rightful copyright claimant of the Registered Works and, thus, could not have granted Dish any valid rights in the works.  *Id.*  Thus, as a matter of law, Mr. Whitehead's testimony establishes that Dish lacks standing under 17 U.S.C. 501(b) because it cannot hold a valid exclusive rights to invalid Copyright Registrations.  *Id.*  Indeed, Mr. Whitehead's testimony establishes that Defendants' have overcome the presumption of validity of Copyright Registration Nos. PA-1-992-319 and PA-1-

992-320.  Mr. Whitehead's testimony confirms MBC FZ, LLC was not the valid owner of these works on the date the applications were filed and Plaintiff was thus not the valid holder of exclusive rights in these works when this suit was filed.  *Id.*

Mr. Whitehead also testified that MBC does not own rights to all the works that air on its network. *Whitehead Depo.*, at 172:8-174:23 (some screenshots attached to his declaration clearly depicted characters MBC does not own such as Bugs Bunny and movies owned by large U.S. studious such as Despicable Me).  He also testified that MBC "license[s] channels not programs." *Id.*, at 60:9-10. Likewise, Dish's corporate representative also testified at trial that Dish licenses channels, not programs.

Further, Mr. Whitehead, the only witness potentially capable of testifying as to the Registered Works in this matter, confirmed at his trial deposition that he had no involvement with, nor knowledge of any of the applications submitted to the U.S. Copyright Office for the Registered Works.  *Id.*, 30:6-19; 33:11-34:7.  He also confirmed that only the first page of each of the four copyright registrations were attached to his declaration and that he failed to produce complete original, certified or complete copies of the copyright registration certificates during discovery in this matter.  *Id.*; Fed. R. Civ. P. 37(c)(1); *Whitehead Depo.*, at 170:2-171:1 (testifying to his lack of personal knowledge, confirming he was not involved in the filing and could not authenticate any of the registration certificates). Instead, it was only after Mr. Whitehead's trial deposition testimony revealed this deficiency that Plaintiff supplemented their production, during trial.

Moreover, Plaintiff and MBC failed to produce the underlying agreements establishing MBC FZ, LLC's lack of ownership of the Registered Works until well after the close of discovery, upon the filing of the Whitehead Declaration, which was attached to Plaintiff's Motion for Summary Judgment (Doc. 146) along with many other previously unproduced documents, all to Defendants' prejudice. Even then, the late produced documents attached to Plaintiff's motion were heavily redacted, obscuring substantively significant information. It was not until Defendants scheduled trial depositions of the foreign network representatives, approximately two weeks prior to trial, that Plaintiff agreed to unredact some of the underlying agreements in this litigation at Defendants' request. What was revealed by removal of those redactions was substantive information Defendants were improperly precluded from exploring during discovery in this matter, to their severe prejudice. Nevertheless, the trial deposition testimony Defendants have designated in this trial, reveal a wealth of new evidence, not previously available to Defendants and yet to be considered by this Court, including new evidence bearing on issues considered by the Court during summary judgment.

4.     **Mr. Whitehead's Testimony Confirms the All Thirty of the Unregistered MBC Works Asserted In This Litigation Are United States Works Subject to the Registration Requirement of 17 U.S.C. § 411(a).**

Mr. Whitehead's testimony also confirmed that all of the asserted Unregistered Works aired in Iraq and Iran simultaneously with the United States and are, thus, U.S. Works subject to the preregistration requirement. *Whitehead Depo.*, at 61:3-13 (delivery via the Arabsat Satellite having a footprint

encompassing Iraq and Iran); 63:11-13; 74:4-14; 175:8-21 (confirming simultaneous satellite and online streaming of the MBC Channels to Iraq and the U.S.) ("Q. I was asking if the MBC channels broadcast reaches Iraq and Iran?  A. If it's a free-to-air signal, yes." *Id.*, at 63:11-13; "Q. And it's available in Iran and Iraq? A. On a free-to-air basis, yes. Q. Okay, and the same channel was aired to Dish in the United States under the same agreement, correct?  A. Yes." *Id.*, at 74:10-14). Mr. Whitehead also testified that during all relevant times MBC transmitted all of the same channels available in Iraq and Iran, to the United States "live."  *Id.*, at 74:4-14; 163:5-18 ("Q. For the period June 2015 through May 2017, how many MBC channels were transmitted in the United States?  A. How many in total? Five. Q. Did you count that number from the Dish channels? A. Yes.  When you say, the Dish channels, you mean the channels we licensed to Dish?  Q. Yes. The channels we're talking about today.  ***A. Let me -- let me be clear. So, the only channels we distribute in the states are*** live ***Dish.  The Dish agreements encompass MBC 1, Al Arabiya, MBC Drama, MBC 3 and MBC MASR.***").  Thus, Mr. Whitehead's testimony, taken together, establishes that all 30 of the Unregistered MBC Works asserted in this litigation were published simultaneously in Iraq, Iran and the United States.

Even taking into account the unsubstantiated, vague and generalized allusions of Dish's substitute corporate representative at trial regarding any alleged time-shifting, such minor delays, even if proven, which they cannot be on the evidence entered at trial, are ultimately inconsequential given the 30 day window

20

of time substantiating simultaneous publication for purposes of determining the national origin of a foreign work under 17 U.S.C. 104(b)(last paragraph)(providing instruction in determining the national origin of foreign works for purposes of the Copyright Act under  104(b)(2)).

**(a)   *All of the Asserted Unregistered Works, Including the MBC Unregistered Works, Are United States Works Under 17 U.S.C. 104(b) (final paragraph) and Subject to the Preregistration Requirement of §411(a).***

The trial deposition testimony of each of the foreign network representatives establishes that all fifty-five (55) of the MBC, IMD, Al Jazeera, Worldspan and Dream asserted Unregistered Works asserted in this matter, including all thirty (30) of the MBC Unregistered Works, are United States works, which must be registered prior to bringing suit for copyright infringement under Section 411(a) of the Copyright Act.  See *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338 (11th Cir. 2017) *aff'd* 139 S. Ct. 881, 892 (2019) (affirming the preregistration requirement); see also *Id.* at 888 ("[O]utside of statutory exceptions not applicable here, §411(a) bars a copyright owner from suing for infringement until "registration . . . has been made.").  Indeed, Section 104(b) of the U.S. Copyright Act, entitled "Subject matter of copyright: National origin" establishes that, "[f]or purposes of paragraph [§ 104(b)](2), ***a work that is published in the United States or a treaty party within <u>30 days</u> after publication in a foreign nation that is not a treaty party <u>shall be considered to be first published in the United States</u>*** or such treaty party, as the case may be.").  See 17 U.S.C. 104(b) (final paragraph).

21

Indeed, the testimony and evidence revealed in each of the foreign network trial depositions establishes that the asserted Unregistered Works were all published in the non-treaty countries of Iraq and Iran and, within 30 days, also published in the United States.  See 17 U.S.C. 104(b) (final paragraph); see also *Whitehead Depo.* (Doc. 311-1, 311-2, 311-3), at 63:11-13; 74:4-14; 163:5-18; 175:8-21; *Abutaha Depo.* (311-4)*,* at 7:23-9:17; 42:12-14 (Ms. Abutaha testified that the Al Jazeera Media Network was made available at all relevant times free-to-air in all Middle East countries and North Africa, including Iraq and simultaneously in the United States through the same feed); *Ayoub Depo.* (Doc. 311-5)*,* at 53:22-52:5-57:15 (Mr. Ayoub testified that the same live feed was used for all of the IMD Channels provided to Dish as made available in the "Middle East" which is expressly defined in the IMD Agreements to include non-treaty countries Iraq, Iran, Oman, Somalia) ("Q. So, you would agree with me that these channels aired in Iran and Iraq, Correct? A. Correct.  Q. And also aired in the United States under the same feed, Correct?  A. Correct." *Id*., at 57:10-15); *ElMokadem Depo.* (Doc. 311-6), at 26:6-15; 47:1-5; 88:15-18; 89:9-15; 90:3-5; 91:1-4 (Mr. ElMokadem's testimony established all of the Worldspan and Dream channels were broadcast to the Nilesat satellite footprint in the Middle East (which includes Iraq and Iran) and the United States on the same live feed).  Accordingly, as a matter of law, all of the Unregistered Foreign Works are all United States works subject to the registration requirement of 17 U.S.C. 411(a).  Thus, Defendants respectfully request this Court issue a holding in favor of Defendants on all fifty-five of the Unregistered Works

because the testimony and evidence presented herein supports Defendants' contention that each of the Unregistered Works are United States works under 17 U.S.C. 104(b) (final paragraph), subject to the registration requirement of Section 411(a) prior to filing a lawsuit for copyright infringement and, thus, cannot be asserted against Defendants as a result. *Fourth Estate, 139 S. Ct. at 892 (2019).*

In the alternative, this Court should still hold for Defendants as to the Unregistered Foreign Works asserted in this matter because Plaintiff has failed to meet its burden of proof in definitively establishing exemption from the registration requirement of Section 411(a), the statutory formalities of the Act and the substantive requirements under Eleventh Circuit law to assert unregistered foreign works, through admissible evidence at trial.  See *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304-05 (11th Cir. 2012) (setting forth the required elements to assert unregistered foreign works); see also *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1350-51 (S.D. Fla. 2017) (holding "Plaintiff bears the burden of proving compliance with statutory formalities" and that "[w]ithout evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether the [work] met the statutory definition of a 'United States work,' or was instead a foreign work."

**5.    Mr. Whitehead's Testimony Establishes That Plaintiff's Claims for Infringement Must Be Denied for Failure to Provide Defendants With Advance Prepublication Notice Under 17 U.S.C. § 411(c)(1), (2) and 412.**

In the case of an audiovisual work, "the first fixation of which is made simultaneously with its transmission," Sections 411(c)(1) and (2) of the Copyright

Act *requires* that a copyright owner "serves notice upon the infringer, not less than 48 hours before such fixation, identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work, **and** (2) makes registration for the work" within 3 months as required under Section 411(a).  17 U.S.C. §§ 411(c)(1) & (2) (emphasis added).

Plaintiff has failed to meet its burden in establishing its prima facie case of copyright infringement in compliance with the statutory formalities of Sections 411(c)(1), (2) and 411(a) for three of the four asserted Registered Works and all asserted Unregistered Works broadcast live and first fixed simultaneously with their transmission.  See 17 U.S.C. §§ 411(c) and 412 (establishing, "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for— (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration" where the prepublication notice and registration requirements of Section 411(c) has not been complied with.).  Thus, Plaintiff's claims of infringement, for damages and attorneys' fees for all such works, including three of the Registered Works, must be denied as a matter of law under the Copyright Act.  *Kernel Records Oy v. Mosley,* 694 F.3d 1294, 1311 (11th Cir. 2012) ("Without proof of compliance with required statutory prerequisites, [Plaintiff's] case was not properly commenced.").

First, Mr. Whitehead testified that three of the four asserted Registered Works were broadcast live and thus first fixed simultaneously with their first publication. See *Whitehead Depo.*, at 21:1-11 (U.S. Copyright Reg. No. PA-1-992-

320) ("Q: A morning show, okay.  And you'd agree that this program broadcasts live from a studio in the morning?  A:  That's correct."); 26:3-17 (U.S. Copyright Reg. No. PA-1-992-317) ("Q: Is it something that's a live show?  A:  It is, yes."); 32:1-7 (U.S. Copyright Reg. No. PA-1-992-319) ("Q: Okay, so something that would be live from a studio?  A: Yeah.").  In fact, Mr. Whitehead testified that multiple additional Unregistered Works were broadcast live.  Id., at 47:2-4 ("This is a live talk show produced in Egypt, so again, I don't know how – how they – how they number their episodes.").  Indeed, Mr. Whitehead's testimony clearly establishes that each of the aforementioned Registered and Unregistered Works were audiovisual works broadcast live and fixed for the first time upon their transmission on the alleged dates of first publication.  *Id.*  Thus, the aforementioned works are subject to the requirements of Sections 411(c)(1) and (2) of the Copyright Act.

Second, Mr. Whitehead further testified that he was not aware of any prepublication notices for any of the asserted Unregistered or Registered Works being provided to Defendants on behalf of MBC or Plaintiff as expressly required under Section 411(c)(1) of the Copyright Act.  See *Whitehead Depo.*, at 34:24-35:11 ("Okay, and to your knowledge, was there ever a prepublication notice provided to defendants regarding any of the specific works that have been claimed in these registration certificates that we just reviewed?  A. No, I don't –- I don't know what a prepublication certificate is. . . .  Q.  Was there ever notice of these specific works, prior to the date that they aired, to the defendants?  A. Not that I'm aware of.").  It

is also undisputed that Dish likewise failed to provide any prepublication notices to Defendants compliant with Section 411(c)(1), did not enter any prepublication notices into evidence for any of the asserted works or provide testimony from any witnesses regarding any prepublication notices relating to any asserted works at trial. Indeed, none of the alleged infringement notices, whether sent to CDNs or Defendants, contained prepublication notice of any of the abovementioned Registered and Unregistered Works and none of the notices identified even a single specific work, rendering them wholly deficient to satisfy the requirements of 17 U.S.C. § 411(c)(1) prior to their alleged first dates of publication (also alleged to be the dates of alleged infringement).

Accordingly, Dish cannot assert infringement, seek statutory damages or attorney's fees of the aforementioned Registered or Unregistered Works because they failed to provide the required prepublication notices of the specific works alleged, one of the prerequisites required as a matter of law under Section 411(c)(1) of the Copyright Act. See 17 U.S.C. § 412. Thus, on these facts alone, Dish's claims of infringement of Copyright Registration Nos. PA-1-992-315, PA-1-992-317 and PA-1-992-320, along with any other Unregistered Works broadcast live and fixed for the first time upon their transmission, must be denied as a matter of law. Thus, Defendants request that this Court enter judgment in favor of Defendants, denying Plaintiff's claims as to the aforementioned three Registered Works and any of the Unregistered Works first fixed at the time of their transmission as identified by the foreign network representatives in their trial depositions.

## C.   Ms. Abutaha (Al Jazeera Network)

a.   Ms. Abutaha testified that her declaration was not made from personal knowledge. Abutaha Depo., 17:22-19:12; 20:22-25; 22:17-23:8; 24:8-12; 45:15- 47:8.

b.   Ms. Abutaha testified under oath, and Dish's recently unredacted agreement confirms, that Dish did not pay any license fee whatsoever for the distribution of Al Jazeera channels on any of Dish's platforms. Abutaha Depo., 9:20- 10:24; Defs' Exhibit Nos. 71 & 72.

c.   Ms. Abutaha testified that all unregistered works aired in Iraq and Iran simultaneously with the United States. Abutaha Depo., 7:23-9:19; 16:16-20 (Dish received the same transmission).

d.   Al Jazeera broadcasts 24/7/365 including live broadcasts which were fixed for the first time upon their broadcast and date of first publication. Abutaha Depo., 14:17-15:8; 21:1-12.

e.   The licensor for Al Jazeera is a U.S. company. Abutaha Depo., 28:8-15.

f.   Ms. Abutaha did not draft her own declaration. Instead "one-hundred percent" of it was drafted by counsel. Abutaha Depo., 44:21-45:8.

## D.   Mr. Pierre Ayoub (IMD)

a.   Mr. Ayoub testified that his declaration was not made from personal knowledge. Ayoub Depo., 19:1-27:5; 39:15-40:19.

b. Mr. Ayoub testified that IMD is a channel aggregator that licenses channels from others, including other agents, and not a network. Ayoub Depo., 15:8-21; 74:19- 75:9 (IMD channels do not own rights to any copyrighted works but, instead, represents other agents and channels).

c. Mr. Ayoub testified that the IMD channels each broadcast 24/7/365. Ayoub Depo., 27:24-28:5; 32:19-21; 33:10-16; 34:13-19; 35:19-25; 37:14-20; 38:17- 39:14; 40:20-41:24.

d. Mr. Ayoub's testimony confirms that all of the unregistered works aired free to air in Iraq and Iran, simultaneously with the United States. Ayoub Depo., 50:9- 51:13; 52:5-15; 53:2-18; 54:15-55:24; 56:11-57:18; 62:2-7; 62:21-63:5; 64:2-8.

e. Mr. Ayoub testified that one of the channel agreements attached to his declaration (Iqraa) was written in Arabic without any translation. Ayoub Depo., 77:17-78:6 (allegedly granting rights to El Souk).

f. Mr. Ayoub testified that the underlying agreements attached to the declaration had their termination dates redacted, making it impossible to confirm their validity. Ayoub Depo., 79:2-13; 80:10-15.

g. Mr. Ayoub's testimony confirmed some of the agreements attached to his declaration were incomplete and still others contained exclusivity limitations in the U.S. Ayoub Depo., 81:20-85:2; 86:21-87:10

28

(reserved rights); 145:25-146:19 (excluding rights for the worldwide web).

E.    **Mr. Haytham Elmokadem (World Span and Dream)**

   a.  Mr. Elmokadem testified that his declaration was not made from personal knowledge. Elmokadem Depo., 12:1-13:2; 14:4-8; 16:1-4; 56:9-22; 57:13-19; 58:20-59:5; 69:7-14; 73:11-15; 74:25-75:5; 82:12-19; 86:16-87:5.

   b.  Mr. Elmokadem's testimony confirms that all of the unregistered World Span works aired in Iraq and Iran free to air simultaneously with the United States on the Nilesat Satellite in the Middle East. Elmokadem Depo., 26:2-15; 46:15-47:5; 55:1-22; 89:9-15; 90:3-16; 91:1-4.

   c.  Mr. Elmokadem's testimony confirms that the channels licensed by World Span were subject to unpredictable interruptions in transmission and experienced significant downtime. Elmokadem Depo., 38:10-24; 40:9-15; 44:12-21 (some channels shut down for months); 51:16-21; 73:1-10.

   d.  Mr. Elmokadem testified that the channels licensed by World Span broadcast 24/7/365. Elmokadem Depo., 38:3-9; 39:20-25; 41:14-18; 43:17-44:11; 51:16- 21.

   e.  Mr. Elmokadem testified that the asserted unregistered works were non-fiction works consisting of news of the day and current events.

**F.      Prior to Engaging In An Infringement Analysis the Court Must First Assess the Scope of Protection to Be Afforded to the Alleged Foreign Collective Works Asserted in this Matter.**

In a seminal case directly relevant to the issues before this Court, the Second Circuit provided a salient warning of the risks in moving past the threshold questions of ownership and scope of protection of asserted foreign works before moving on to the infringement analysis, especially where, as in the instant case, the asserted works are claimed to be foreign collective works (i.e., compilations) with multiple underlying authors:

> The division of issues, for conflicts purposes, between ownership and infringement issues will not always be as easily made as the above discussion implies. If the issue is the relatively straightforward one of which of two contending parties owns a copyright, the issue is unquestionably an ownership issue, and the law of the country with the closest relationship to the work will apply to settle the ownership dispute. But in some cases, including the pending one, the issue is not simply who owns the copyright but also what is the nature of the ownership interest. ***Yet as a court considers the nature of an ownership interest, there is some risk that it will too readily shift the inquiry over to the issue of whether an alleged copy has infringed the asserted copyright.*** Whether a copy infringes depends in part on the scope of the interest of the copyright owner. Nevertheless, though the issues are related, the nature of a copyright interest is an issue distinct from the issue of whether the copyright has been infringed, *see*, *e.g.*, *Kregos v. Associated Press*, 937 F.2d 700, 709-10 (2d Cir. 1991) (pointing out that although work survives summary judgment on issue of copyrightability of compilation, scope of protection against claim of infringement might be limited). The pending case is one that requires consideration not simply of who owns an interest, but, as to the newspapers, the nature of the interest that is owned.

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 at 89-92 (2d Cir. 1998) (emphasis added) (discussing protection afforded to foreign collective works, as Plaintiff alleges here, noting "We agree

with the view of the Amicus that the [Berne] Convention's principle of national treatment simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors." also citing to *17 U.S.C. § 104* as discussed below with regard to simultaneous publication. *Id.*, at 90.).

*Itar-Tass* establishes that the scope of substantive protection afforded to a foreign copyright alleged to be infringed in the United States requires the Court to apply U.S. law. *Id.* Significantly, the Eleventh Circuit, the U.S. Copyright Office and numerous district courts, including those in the Eleventh Circuit, have applied and relied upon the Second Circuit's analysis and reasoning in *Itar-Tass*. *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011); *RCTV Int'l Corp. v. Rosenfeld*, 2016 U.S. Dist. LEXIS 136867, at *16 (S.D. Fla. 2016); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 102.6 (3d ed. 2014).

Significantly, Plaintiff failed to enter into evidence at trial *any* copies of the asserted Unregistered and Registered Works.  That is, remarkably, Plaintiff produced absolutely no videos of the audiovisual works in which it claims to hold exclusive copyrights in this litigation and which it claims were infringed upon by Defendants.  Thus, it follows that Plaintiff could not produce any copies of the asserted works at trial.  Without copies of the works in evidence, this Court is left unable to determine, as it must, whether any of the works are comprised of protectable elements and whether they have been infringed by the alleged copying of the same by Defendants.  Indeed, a requirement of the second prong of the test

for a copyright Plaintiff's prima facie case for copyright infringement requires this element and analysis.  See *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011) ("**(2) defendants copied <u>protected elements</u> from the [works].**") citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008); see also Report and Recommendation ("R&R") (Doc. 246), at 10 (citing same).

Plaintiff's failure to enter into evidence copies of the works is fatal to its prima facie case.  For this reason alone, the Court must deny its claims.  Plaintiff cannot rely on unauthenticated hearsay screenshots which its own expert testified represent a single frame or 1/600th or 1/1000th of a second of an audiovisual work to establish an audiovisual work's protectible elements for purposes of infringement.  This is especially true in this case given Plaintiff's claim that its works are all collective works which are a species of compilation works, protectable only in their selection and organization of preexisting works.  Moreover, a screenshot representing a millisecond of a work having a length of one hour or more would, at best, establish only de minimis use, not infringement.  Additionally, the foreign network representatives testified that their channels were subject to downtime and interruptions in transmissions calling into question whether any of the works asserted failed to air.  In fact, Mr. ElMokadem of World Span testified that certain channels were off the air for months.  Likewise, Mr. Whitehead testified that certain channels of MBC had their signal jammed. *Whitehead Depo.*, at 74:23- 75:18.  Without video evidence of the audiovisual works alleged to be

infringed, Plaintiff's claims are speculative and should be denied on this evidentiary basis alone.

Likewise, Plaintiff has also failed to enter into evidence at trial any videos of the audiovisual works it alleges aired on the Defendants' STBs.  Where a copyright plaintiff relies on circumstantial evidence to prove infringement as Plaintiff has in this case, courts in the Eleventh Circuit require a Plaintiff to prove access to each of the asserted works and substantial similarity.  This court cannot carry out its substantial similarity analysis without copies of both the Plaintiff's works and the copies it alleges Defendants performed and distributed in violation of its alleged exclusive rights.

A copyright plaintiff simply cannot prove an infringing performance or distribution of an audiovisual work through a screenshot without any proof of the original work that screenshot is alleged to have been copied from.  Further, as Dish's own expert witness, Pascal Metral, testified at trial, the STBs Defendants sold were subject to frequent downtime.  As Mr. Metral testified, it is entirely possible that such downtime could occur immediately after a screenshot is taken, making such evidence entirely unreliable to establish infringement.  Indeed, Mr. Metral testified that there were certainly instances where screenshots were allegedly discarded by Nagrastar because they did not capture anything, perhaps, due to the frequent freezing or downtime that the preinstalled application on the STBs were subject to.  Plaintiff's failure to enter into evidence videos of audiovisual works it alleges were copied by Defendants or Defendants' STB manufacturer

makes impossible this Court's ability to carry out a substantial similarity analysis,

thus rendering Plaintiff's prima facie case of copyright infringement fatally flawed.

**G. Plaintiff Has Failed To Meet its Burden of Proof to Establish Publication, First Publication and that Such Publication Diverges From the Definition of a United States Work Exempt From the Statutory Formalities Requiring Registration Under 17 U.S.C. 411(a).**

Furthermore, in Kernel *Records Oy v. Mosley*, the Eleventh Circuit set forth

the heavy burden of proof a copyright claimant asserting unregistered foreign

works must meet as to each specific unregistered foreign work asserted:

> [T]o proceed with a copyright infringement action, a plaintiff that claims his published work is exempt from the registration requirement ***must prove*** that the first publication occurred abroad. *See* 17 U.S.C. §§ 101, 411(a); *Latimer*, 601 F.3d at 1233; *BUC Int'l Corp*., 489 F.3d at 1141-42. ***This requires*** the plaintiff to first prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. [Publication can occur "when an authorized offer is made to dispose of the work in any such manner[,] even if a sale or other such disposition does not in fact occur." *Id*. at 1303.] Once the plaintiff has proven publication, ***he must then prove*** that the publication was, in fact, the first publication, ***and*** that the geographic extent of this first publication diverges from the statutory definition of a "United States work."
>
> *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304-05 (11th Cir. 2012) (holding for Defendants and finding "Although [the declarant] baldly attests [in his declaration] that the disk magazine was published, "publication is a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." *Id*., at 1310-1312.).

Here, Plaintiff has failed to meet its burden, as it must, in proving

"publication," as that term is defined under the Copyright Act (17 U.S.C. § 101), of

each of the fifty-five asserted Unregistered Works. Indeed, Plaintiff cannot rely on

any of the foreign network witnesses' declarations as each admitted that they relied on inadmissible hearsay evidence, not personal knowledge in their declarations. Mr. Metral also admitted at trial he merely examined monitoring reports prepared by others, including those thousands of miles away, and that he did not create the monitoring reports or any of the screenshots himself. Nagrastar, the alleged creator of the monitoring reports was noticeably absent at trial. Thus, because Mr. Metral admittedly did not create the monitoring report and Plaintiff failed to authenticate the report through Nagrastar or admit the monitoring report into evidence through one with personal knowledge, the monitoring report is inadmissible hearsay and cannot be relied upon by Plaintiff in support of its claims.

Dish's corporate representative had no knowledge of any of the specific works asserted in this litigation and was likewise unable to testify as to publication of any of the asserted works. She also testified that she was not involved in any of the negotiations of the agreements with the foreign networks entered into evidence in this litigation and had no personal knowledge of the same. Dish's corporate representative did, however, testify at trial that Dish's agreements with networks do not contain descriptions of any specific works. In short, Plaintiff failed to prove publication of any of the asserted works at trial.

Second, given Plaintiff's inability to prove publication of any of the works at trial, Plaintiff also necessarily failed to provide admissible evidence of first publication of any of the fifty-five asserted Unregistered Works, as it must under Eleventh Circuit law. *Id.*

Finally, Plaintiff also failed to prove that the geographic extent of each first publication diverges from the statutory definition of a "United States work." *Id.*, see also 17 U.S.C. § 104(b) - Subject matter of copyright: National origin (*see* last paragraph, following numbered subparagraphs which clearly states: "For purposes of paragraph [104(b)](2), a work that is published in the United States or a treaty party within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States or such treaty party, as the case may be."); *see also* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 612.7(J) - Nation of First Publication: Works Published in Multiple Countries (further establishing that a work published in treaty and non-treaty country (e.g., publication within 30 days in a non-treaty nation such as Iraq and Iran and publication in the United States) is a United States work subject to the preregistration requirement of 17 U.S.C. § 411(a)); *see also* Berne Convention, Article 3(4), defining "simultaneously" as "within 30 days" (which explains why 104(b) (last paragraph) includes this language in adhering to the United States' execution of the Berne Convention).

Instead, each of the foreign network representatives established through testimony and the underlying contracts admitted into evidence at trial that the asserted Unregistered Works were published in the non-treaty countries of Iraq and Iran and the United States, within 30 days, making them United States works subject to the registration requirement of 17 U.S.C. 411(a). Thus, as the Court held in *Kernel Records v. Mosley*, "because [Plaintiff] failed to apply for registration [of

the unregistered foreign works] . . . and [Plaintiff] cannot demonstrate that [such works are] . . . foreign work[s] exempt from registration, [Plaintiff's] case is doomed. See 17 U.S.C. § 411(a)." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1312 (11th Cir. 2012) (affirming holding for Defendants based on Plaintiff's failure to meet its heavy burden in proving exemption from the registration requirement of Section 411(a); see also *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1350-51 (S.D. Fla. 2017) (holding "Plaintiff bears the burden of proving compliance with statutory formalities" and that "[w]ithout evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether the [work] met the statutory definition of a 'United States work,' or was instead a foreign work. . . . Without sufficiently probative evidence of [Plaintiff's alleged work] being a foreign work exempt from registration, and without a certificate of registration, [Plaintiff's] infringement suit was over before it began.").

## II. COPYRIGHT INFRINGEMENT

### A.   Dish Failed To Present Evidence At Trial Establishing That Any of the Asserted Works Were Transmitted to Users of Defendants' STBs.

Dish failed to establish at trial that any of the Asserted Works aired to users of Defendants' STBs. Contrary to Dish's position, the testimony of Pascal Metral is remarkably unpersuasive, biased, and his credentials fall woefully short of the requisite qualifications to serve as an expert witness. As the Fifth Circuit stated nearly six decades ago: "We consider it a tribute to the high calling of advocacy to

say that we think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater . . . we doubt that it is conducive to the orderly administration of justice for counsel to become the voice on summary judgment . . . Experience proves that the adversary system functions best when the role of Judge, of counsel, of witness is sharply separated." *Inglett & Co, Inc. v. Everglades Fertilizer Co., Inc.*, 255 F.2d 342, 349-50 (5th Cir. 1958).

Mr. Metral seemed a kindly gentleman but his evasive testimony at trial and clear admission that he was "tasked" with drafting a report to serve the purposes of his company's joint venture partner, Dish Network, were clear.  In the end, Mr. Metral testified that his methodologies were flawed in that they assumed that a user of Defendants' STBs would only utilize a single application preinstalled by the manufacturer to view the channels that Dish allegedly holds an exclusive license to.  He also testified that the automated methodology he used was inherently subject to error, that he did not view or inspect the monitoring setup, which, in part, was allegedly located thousands of miles from his location in Switzerland and did not physically supervise the collection of data used in his report, which was collected by others.

Curiously, Mr. Metral testified that he did not seek out the manufacturer of the STBs or the true source of origin of the URL links in the third-party application preinstalled on the STBs.  When asked why he didn't seek out the manufacturer in view of Defendants provision of their contact information early on in this case, he

testified that he wasn't "tasked" with doing so.  Mr. Metral's testimony makes clear that he was never interested in providing an objective expert opinion helpful to the Court.  Instead, his "task" was to advocate for Plaintiff.

Furthermore, the trial deposition testimony of the four foreign network witnesses each failed to identify any of the Asserted Works based on their own personal knowledge, but instead based their testimony on scripted conclusory statements based entirely on inadmissible hearsay evidence and on the unauthenticated Nagrastar monitoring report.  In sum, Dish failed to establish that any of the asserted works aired on Defendants' STBs because both the foreign network witnesses' testimony and Mr. Metral's testimony relied entirely on inadmissible hearsay, including documents which are not in evidence, including the Nagrastar monitoring report, not personal knowledge.  Thus, Dish has failed to meet its burden in proving infringement of the asserted Unregistered and Registered Works.

### 1. The Foreign Channels Were Not Transmitted.

Dish acknowledges that it is relying entirely on the testimony of Pascal Metral to establish that the foreign network channels were allegedly transmitted to users of the Defendants' STBs on the dates identified in the Nagrastar monitoring report. Dish's reliance is entirely misplaced for the reasons stated above. Moreover, Dish erroneously asserts that because Defendants did not proffer any evidence to the contrary, it has proven transmission.  Defendants do not have the burden of proof, Plaintiff has the burden of proof, and they should not be

allowed to disguise admitted co-counsel and party witness, Pascal Metral as an objective expert when, in reality, he was tasked with drafting a self-serving report with a predetermined conclusion. Moreover, Dish expects the Defendants to prove that something did not happen which runs directly counter to Dish's burden of proof that it must carry. Nevertheless, Defendants provided credible testimony establishing that Lenkeng provided the channel streams, all which were available free-to-air on the Internet.

Contrary to Dish's position, Metral did not have the requisite personal knowledge to identify *any* of the so-called Protected Channels or Foreign Channels, which renders the exercise of questioning Metral with respect to the alleged 861 instances as nothing more than an exercise in futility. Indeed, Metral testified that his methodology, using the Wireshark software to intercept electronic communications was incapable of identifying anything beyond the edge servers of the CDNs due to firewalls. Thus, he admitted that he lacked personal knowledge of the true source of the channel streams and there was thus no reason to question him further in that regard. Indeed, Defendants focused on Metral's lack of qualifications, his manifest bias, lack of error rate and the unreliable process and methodology he allegedly utilized as described in the Metral Report. Of particular significance is Metral's testimony that he is the General Counsel and employee of Nagravision, which is a joint-venture partner with Dish, and co-owner of NagraStar LLC. The parties stipulated that prior to 2017, Dish's sister company, EchoStar, was joint-venture partner under NagraStar LLC. Taken together,

Metral worked closely with Dish during the years leading up to and during the pendency of the instant case, and Metral is nothing more than Dish's self-interested, unqualified expert witness, and legal counsel. Indeed, Metral admitted that he provided legal services in this matter in his capacity as General Counsel in this matter at trial and that he had sent infringement notifications to Defendants' CDNs in this matter.  In sum, this Court should not give any weight to Mr. Metral's testimony given his apparent and insurmountable bias.  Metral made clear that he was not an objective expert witness being proffered to assist the Court.

a.      Metral was serving as Vice President of anti-piracy operations for his employer Nagravision SA, and he also testified that in this capacity he supervised employees of NagraStar LLC in the alleged monitoring of the Defendants' UlaiTV and AhlaiTV STBs. Metral did not personally generate any monitoring reports, logs or screenshots. While Metral testified that his alleged monitoring was on behalf of the International Broadcaster Coalition Against Piracy ("IBCAP"), this only reinforces Metral's biased motivation as Dish formed and funded IBCAP. The trial depositions of World Span and Al Jazeera confirm that Dish required participation of these networks, and also deducted fees to fund IBCAP on behalf of these networks. The Network Contracts contain provisions for these deductions, including language acknowledging that Dish formed IBCAP. Moreover, the parties stipulated to the fact that "at some point" between 2016 and 2017, Chris Kueling simultaneously served as Dish's former Senior Vice President of international programming and also as Executive Director of IBACP.

b.      Metral is an attorney without any relevant degree in the field of study appropriate to support his purported assertions contained in the Metral Report. Metral testified that he did not have a background or a degree in computer science or any technology. Indeed, he is an attorney who wrongfully attempts to offer a legal conclusion by means of his Expert Report. Furthermore, Metral's testimony at trial exemplified an attorney responding to questions instead of an expert witness opining on technical matters. Furthermore, the parties stipulated that as of the date of the Metral Report, Metral had not testified as an expert witness at deposition or trial in the past 4 years and that Metral had not authored any publications in the last ten years. Moreover, while Metral testified that he has since testified in other proceedings outside the United States, he did not testify that he has ever been accepted as an expert by any court in the United States. Metral simply does not have the requisite qualifications to be accepted as an expert witness under the *Daubert* factors and Federal Rules of Evidence.

c.      Contrary to Dish's position, Metral did not testify that he observed the so-called Protected or Foreign Channels, but instead he testified that he allegedly supervised NagraStar LLC employees and automated processes located thousands of miles away.  Metral also testified that he was not physically present on the premises of NagraStar LLC to supervise such employees during this process nor could he confirm that the alleged process described in his Report were always followed.  Metral also testified and conceded that such failure may have resulted in errors.  And yet, Dish expects this Court to rely on Metral's findings and flawed

42

analyses. Furthermore, the screenshots attached to Metral's Report simply do not identify the Uniform Resource Locators ("URLs") which would be necessary for Metral to connect any of the purported Works to the URLs allegedly identified through interceptions of electronic communications with the content delivery networks or CDNs. The parties stipulated that the screenshots attached to the Metral Report do not include a URL. Contrary to Dish's position, Defendants have not admitted to any of the URLs allegedly identified during the analysis of the Defendants' UlaiTV and AhlaiTV STBs.

In conclusion, Dish's so-called expert witness, Pascal Metral is nothing more than a party witness and attorney who is clearly biased, lacks the necessary qualifications to serve as an expert witness, and failed to adequately supervise a process which admittedly yielded errors and inaccurate results. Put simply, Dish has failed to provide any objectively reliable evidence to support its hollow claims that the Protected or Foreign Channels were allegedly transmitted by Defendants to end users of Defendants' UlaiTV and AhlaiTV STBs.

## 2. Dish Failed to Establish Through Admissible Evidence that the Asserted Unregistered and Registered Works Aired on the Foreign Network's Channels.

The four foreign networks that allegedly exclusively licensed foreign channels to Dish did not testify based on their personal knowledge but instead admittedly relied on inadmissible hearsay. Instead, the foreign network witnesses testified that they relied on Nagrastar's monitoring report and not personal knowledge in stating their conclusions. In fact, the Networks also testified that

they did not rely on personal knowledge when attempting to identify any of the Asserted Works allegedly depicted in the third-party screenshots attached to the monitoring report.  Moreover, the Networks also testified that they did not rely on personal knowledge when identifying the Unregistered Works.  Contrary to Dish's position, the foreign network witnesses simply did not establish, from personal knowledge or admissible evidence, that the Asserted Works were transmitted on the channels Dish claims an exclusive right in.

## B.   Defendants Did Not Transmit the Works to Users of the STBs.

Defendants did not infringe on Dish's purported exclusive right to publicly perform the Works. In order of the points raised, Defendants did not deliver the so-called Protected Channels or Foreign Channels allegedly airing the Works from their CDNs because the Defendants' use of the CDN services only improved the quality of what was already available free-to-air ("FTA") on the Internet as provided by Lenkeng. Defendants also did not push the so-called Protected Channels or Foreign Channels allegedly airing the Works from encoders to their CDNs, as the Defendants did not control encoders nor the CDNs.  Defendants' CDNs amounted to nothing more than an Internet Service Provider.

### 1.  Dish's Public Performance Copyright.

Contrary to Dish's position, and as this Court has already found[1], the Supreme Court's holding *ABC, Inc. v. Aereo*, Inc., 573 U.S. 431 (2014) and the cited

---

[1] In denying Dish's motion for summary judgment, this Court found "[t]he cases upon which Dish primarily relies … do not lead [] to a contrary conclusion." Dkt. 246 at 50.

legislative history of the 1976 Copyright Act does not support Dish's claim against the Defendants for direct copyright infringement. (Dkt. 246 at 50.) Indeed, *Aereo* did not change the longstanding requirement that "[a] defendant may be held directly liable only if it has engaged in volitional-conduct in violation of the Act." 573 U.S. at 453 (volitional-conduct requirement "is firmly grounded in the Act's text."). Furthermore, the United States Supreme Court in *Aereo* emphasized the importance of analyzing technological advancements on a case by case basis when determining whether a defendant has 'performed' under the Act including careful consideration under 17 U.S.C. §101. *Aereo*, 573 U.S. at 433 ("In other cases involving different kinds of service technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act."); *Id.*, at 450.

Dish fails to establish direct copyright infringement because a third party, not Defendants, selected and provided links or "delivered" or "pushed" the purported channel streams containing the allegedly infringing works, which were, in turn, allegedly selected by, requested, sent to and accessed by end users of an application preinstalled on the UlaiTV and AhlaiTV STBs by a third-party to access such content. Defendants did not capture a broadcast signal, originate, copy, select nor provide any transmissions or content. Instead, third-parties were responsible for originating any allegedly infringing content available at through the URL links available on the third-party application preinstalled on the UlaiTV and AhlaiTV

STBs.  Defendants' act of reselling STBs manufactured and programs by a third-party simply does not rise to the level of direct copyright infringement under prevailing law, including *Aereo*.

## 2. Defendants Did Not Transmit - CDNs to End Users.

In Dish's ongoing attempt to make something out of nothing, Defendants are not responsible for nor did they control any alleged transmission through use of the CDNs. While the Defendants did enter into agreements with various CDNs and paid for such ISP services, the CDN service providers are autonomous third-party companies and any determination with respect to "control" needs to be evaluated within this context.

<u>CDNs</u>

a.     Defendants testified that TCI and PTI used CDN services from Verizon and Tulix in connection with the UlaiTV and AhlaiTV STBs. However, Defendants made clear that they only used other CDN services from Octoshape, Akamai, and Internap for purposes of testing. Contrary to Dish's assertion, the identifications of "testing" as opposed to production are not without meaning, because the CDN services used for "testing" were associated with limited trial or demo CDN accounts for short periods of time.  Metral did not testify that he had any personal knowledge with respect to the Defendants' use of the CDNs nor was he able to opine as an expert with respect to the Defendants' trial or demo accounts setup with various CDN service providers for "testing" purposes.  Indeed, Metral's

Report does not mention the term "CDN" and his testimony regarding the same is entirely outside of the scope of the disclosures of his Report.

b.     Defendants testified that they did not have any involvement with OVH nor did they have any knowledge with respect to the domain name kaklinka.com and the address in Montreal, Canada. Dish questioned Defendants regarding the name "Gaby Fraser" and Defendants testified that they did not insert the name and further explained that they would be more than capable of spelling it correctly if they had been provided the opportunity. In fact, the incorrect spelling is evidence that the Defendants were not involved with and are without knowledge of kaklinka.com. Nevertheless, OVH is an internet service provider and should not be placed in the same category as a CDN service provider.

c.     Dish designated Metral as their expert witness and nowhere in the Metral Report does he discuss, mention, analyze or even attempt to explain what a CDN is nor its functionality. Metral did not testify as to having personal knowledge with respect to the Defendants' use of CDN services and his testimony is inherently unreliable. Dish's shoehorned explanation of the functionality of a CDN in relation to end users of the UlaiTV and AhlaiTV STBs is not in evidence.

d.     Dish continues to speculate as to the Defendants' use of the CDNs in relation to end users of the UlaiTV and AhlaiTV STBs, albeit without producing a single witness with personal knowledge in support of its assertions. Metral has no personal knowledge to testify as a fact witness with respect to the Defendants' use of the CDN services. Metral also was not designated as an expert on the subject of

CDN services, nor are CDN services mentioned or explained anywhere in the Metral Report. Metral's testimony certainly has limitations, which Dish certainly is aware of. Dish never produced an expert regarding CDN functionality. Contrary to Dish's position, Defendants have consistently testified that Defendants' use of the CDN services improved the internet connection and the quality to end users of the preloaded software application for the UlaiTV and AhlaiTV STBs.

e.    Dish continues to mischaracterize the Defendants testimony, especially with respect to the Defendants' use of the CDN services. Defendants have repeatedly explained that CDN services were not *necessary* for end users to use any of the preloaded software applications contained on the operation system of the UlaiTV and AhlaiTV STBs. Contrary to Dish's position, it is unremarkable that any disruption in CDN service resulted in removing internet access to end users for the UlaiTV and AhlaiTV software applications as the content of the original stream is still accessible FTA via the Internet. Any end user could download an application to access any of the so-called Protected Channels or Foreign Channels already available FTA on the Internet. Furthermore, if any CDN (like any Internet service provider or "ISP") were to be turned off, of course, no data would flow through it but that fact does not equate to control over preexisting content, available on the Internet from third-parties, or direct liability for any such content passing through such systems which are indisputably selected or requested from end users and originated by third parties. Accordingly, Dish's assertion that the CDN controls access is entirely misplaced a CDNs did nothing more than

improving the internet connection for the preloaded software application for the UlaiTV and AhlaiTV STBs.

Defendants' Operation of the CDNs

f.      Dish attempts to define for the Court what is "common sense" which is certainly a determination that this Court is more than capable of making on its own. Dish conveniently passes over the Defendants' response to questions containing what amounts to improper speech such as "we, us, our, or I", and even this Court acknowledges that it is not uncommon for individuals to respond in this manner. Defendants are not attempting to re-write the English language, but it should be emphasized that English is not Mr. Fraifer's native language. Defendants testified that his references to "we, us, our, or I" in any of the e-mail communications with Verizon are not referring to the Defendants but are referring to Lenkeng. Dish continues to speculate, albeit without any basis, as to what Defendants actually mean by "we", "I, or "our" in various e-mails communications and such speculation should not be tolerated. And to make matters worse, Dish wishes to opine as to what Sajid Maqsood actually means by "Gaby's encoders" but in doing so Dish completely passes over the numerous e-mail communications between Sajid Maqsood and Verizon indicating the encoders are actually Unisoft encoders, all of which were identified by Defendants' testimony.

g.      Adib Sfeir testified that he mispresented his experience on his resume, and further explained that if any of the listed experience was actually true that he would be making more money working somewhere other Branix. Contrary to

49

Dish's position, the fact that Sfeir's resume may read like a "how to guide" is actually persuasive evidence that his resume is entirely false as it is reads *too well* for any reasonable person to believe it is accurate. Even Sajid Maqsood's deposition testimony did not believe that Sfeir actually possessed the experience listed on his resume. Dish completely passes over Sfeir's testimony that he is currently working a distribution warehouse for various products, which is gainful employment requiring experience entirely unrelated to any of the purported experience listed on Sfeir's resume. Dish cites to common sense when it serves it purposes, but fails to apply it when it does not comport with its theory of the case. Additionally, Sfeir testified that he did not remember any of the granular detail related to the matters discussed in the e-mail communications presented to him because it had been a long time ago. Sfeir should not be asked to speculate and there is absolutely no evidence to support Dish's assertion that Sfeir was merely attempting to distance himself from the Defendants' use of the CDNs.

h.    Dish mischaracterizes Defendants' testimony with respect to Sajid Maqsood's involvement in relation to the Defendants' use of CDN services. Rather conveniently, Dish entirely fails to address any of the Defendants' testimony identifying numerous e-mails between Sajid Maqsood and Verizon which clearly depict references to Unisoft encoders, requests from Maqsood to Verizon to remove "Gaby" from this accounts and also requests to refer to all encoders as Unisoft encoders. None of these e-mail communications actually copied the Defendants, and Defendants' testified that Sajid Maqsood took steps and actions

that Defendants were simply not aware of. Defendants also testified that when meeting Sajid Maqsood they were entirely aware of his preexisting relationship with Lenkeng and middleware provider, Netup. Sajid Maqsood was highly recommended as a consultant, which the Defendants testified was the main reason that they started working with him. Sajid Maqsood deposition testimony is also marred by his inconsistent and incomplete responses to Dish's very basic questions. Furthermore, any attempt by Dish to get mileage out of the California lawsuit is entirely misplaced. Defendants' explained that the California lawsuit related to a dispute between Cressida Telecom and Fastly CDN services in relation to the Defendants' use of the Zaap model set-top boxes. The Defendants did not have anything to do with the underlying dispute, and the case was ultimately dismissed.

      i.     Defendants testified that they used middleware in connection with Lenkeng to connect to the software application preloaded on the operation system of the UlaiTV and AhlaiTV STBs. Contrary to Dish's position, Sfeir testified that the middleware connected to the preloaded software application on the operating system of the UlaiTV and AhlaiTV STBs but he did not testify that it was a control mechanism as stated or implied by Dish. Conversely, middleware was simple way for the middleware to provide technical maintenance and support to the preloaded software application of the UlaiTV and AhlaiTV STBs. Defendants testified that any actions taken with respect to middleware were taken in conjunction with the middleware company.

In conclusion, Defendants' testified that they are not responsible for the purported delivery of any Works allegedly airing on the so-called Protected Channels or Foreign Channels. Instead, as the Defendants have explained and testified, they are not responsible for any channel streams as Lenkeng provides all channels as already available FTA on the Internet. Dish does not have any evidence to contrary, and Dish's insistence that Defendants' invoices with Lenkeng should somehow itemize some sort of fee for channel streaming already available FTA on the Internet contradicts the evidence in the record. It should be emphasized that the idea of a third party providing FTA channel streams already available on the Internet is not a foreign concept as Defendants provided a copy of an agreement with Cressida Telecom. Lastly, Defendants' use of CDN services is nothing more than taking a magnifying glass to read fine print on a small piece of paper; the party placing the fine print is the originator is directly liable just as the originator of the channels should be in the instant case.

### 3. Defendants Did Not Transmit - Encoders to End Users.

Defendants did not directly infringe on Dish's purported exclusive rights to publicly perform the Works by pushing the so-called Protected Channels or Foreign Channels that allegedly aired the Works to Defendants' CDNs. Furthermore, it should be emphasized that Dish has not established that encoders in Tampa and Germany belong to any of the Defendants at any time.

## Wowza

a.     Defendants testified that any mention of an encoder in Tampa in identified e-mail communications with Verizon is referring to Wowza streaming software which was downloaded by Adib Sfeir on his desktop computer as TCI's office in Tampa, FL. Indeed, as Mr. Sfeir testified, he downloaded and used Wowza software on his own time out of his own interest.  Mr. Sfeir testified that he was not directed by Defendants to download or use the software nor was he conducting any work in his capacity as an employee of Defendants.  Defendants have repeatedly explained that the Wowza streaming software was accessed at TCI's office using TCI's internet service, and thus may have identified the IP address of the office's internet service provider, Frontier.  It is Defendants' understanding that the Wowza software was used only for testing internet streams already available on the Internet and not for the purposes described by Dish.  Verizon incorrectly believed the Wowza software to be some sort of an encoder when, in fact, it was not.

## Cetel

b.     Contrary to Dish's assertion, Defendants did not testify falsely with respect to Cetel, the IP addresses, communications with Cetel, and any matters involving Maqsood and Lenkeng.  Furthermore, Dish's reliance on encoders and IP addresses in e-mail communications with Verizon do not establish that any IP addresses or encoders were assigned to the Defendants.

c.     Dish relies on Maqsood's deposition testimony and in so doing carefully and misleadingly cherry picks select phrases out of context.

Unfortunately for Dish, Maqsood did not affirmatively confirm that the Defendants had *any* number of encoders or IP addresses as he simply explained that he "did not know" when pressured on such topics during his deposition. Maqsood's apparent lack of knowledge is repeatedly exhibited by his "I don't know" responses throughout his deposition testimony, which weakens his credibility. Even a cursory reading of Maqsood's deposition testimony makes clear that he was clearly being protective of his own interests and evasive. Indeed, while Dish relies on select excerpts of Maqsood's deposition testimony where useful to its contrived argument, Dish completely omits any mention of the numerous e-mails between Maqsood and Verizon clearly referencing "Unisoft encoders" (Maqsood's company) and Unisoft's accounts in *Germany* (where Cetel is situated). Maqsood's testimony simply cannot be taken out of content and shoehorned to serve Dish's interests.

d.      Dish's purported PDF printout of the WhoIs registration record for Germany IP address 91.151.145.43 (Plaintiff's Exhibit 83) is entirely unreliable, and contains contradictory information when compared to the information contained in subsequent PDF printouts which have also been admitted into evidence (Defendants' Exhibits 117 and 118). Significantly, Dish have never produced a business records custodian affidavit to authenticate and establish Plaintiff's Exhibit 83 as a reliable business record as an exception to hearsay. Dish failed to provide any justification for the clear inconsistencies apparent in comparing the documents. That is, when comparing the information contained in

the subsections of the record entitled "created:" and "last-modified:" in Plaintiff's Exhibit 83 to the information reflected in the same subsections in Defendants' Exhibits 117 and 118, it becomes readily apparent the Plaintiff's Exhibit 83 does not contain accurate information. This is especially true with regard to the sub-section entitled "created:" as logic would suggest that the creation date should never change but this is not the case when viewing all three exhibits side-by-side.

Additionally, Plaintiff's Exhibit 83 was purportedly printed on November 11, 2017 (on the face of the document) which is date *after* the date "last-modified" of April 20, 2017 – shouldn't the last-modified date of April 20, 2017 being included on the Plaintiff's Exhibit 83 which such exhibit was purportedly printed months later? This inconsistency, along with the change in dates set forth in the sub-section entitled "created" for all three versions of this registration page, confirm only 1 thing - that Plaintiff's Exhibit 83 cannot be relied upon as accurate and reliable. Nevertheless, Defendants testified that it had no involvement with the creation of the purported registration depicted on Plaintiff's Exhibit 83 which identified *Planet-Telecom* as the netname.  Defendants also testified that Maqsood had a prior relationship with Lenkeng before Defendants and used his consulting services, that Defendants were not always aware of the actions taken by Maqsood, and the Defendants' identified multiple e-mails during trial evidencing communications between Maqsood and Verizon which support the fact that Unisoft had encoders and accounts from *Germany*.

e.      Defendants also testified that they did not write nor provide the unverified interrogatory response referenced by Dish at trial.  In fact, Defendants testified that the supplemental response was not signed by any of the Defendants and that it was simply written, prepared and signed by their former counsel without Defendants' knowledge.

f.      Defendants testified that there is no relation between the PayPal account for Faraj Fraifer and the Defendants.  Further, Defendants testified that they did not instruct Faraj Fraifer to make any payments to Cetel.  Faraj Fraifer conducted business internationally and his conduct is entirely unrelated to and independent of Defendants.  The timing of the payments are at or near the time the Defendants were in the process of winding down TCI operations. Faraj Fraifer, a family member, visited the Defendants' during this time period and accessed the internet from TCI's offices during this time period which is reflected by the Tampa IP address. Defendants did not have any Germany encoders nor did use the referenced PayPal account to serve Defendants' interests in any way.

g.       Defendants testified that they did not have any communications with Cetel. The e-mail communication that was presented to Defendants at trial was an e-mail sent to Defendants to which they mistakenly "replied all" when Defendants attempted to directly communicate with Verizon.  Such e-mail communication also demonstrates that Maqsood was involved with all chains of communication.

In conclusion, Defendants did not testify falsely regarding the referenced Tampa and Germany encoders.  Contrary to Dish's position, none of the evidence

at trial establishes that Defendants used encoders in Tampa or Germany to push the so-called Protected Channels or Foreign Channels to CDNs. Dish makes sweeping assertions to strategically support its position, but completely ignores the numerous e-mail communications between Sajid Maqsood and Verizon identifying that encoders are actually Unisoft encoders. Lastly, for the aforementioned reasons, Sfeir misrepresented his experience on his resume and nothing more. Defendants simply did not transmit any Works allegedly airing on the foreign channels Dish claims rights to.

### 4. Defendants Are Not Directly Liable for Infringement of Purported Dish's Rights.

Dish's reliance on *Aereo* to support its assertion that Defendants *directly* infringed on their purported exclusive right of public performance of the Works allegedly airing on foreign channels it licenses is entirely misplaced.  As this Court correctly found, the facts in *Aereo* are readily distinguishable from this case. Moreover, *Aereo* did not change the longstanding volitional-conduct requirement under the Act for direct copyright infringement. See 573 U.S. at 453.  While Dish continues to argue that the holding in *Aereo* is controlling here, Dish fails to mention that the United States Supreme Court injected limitations on its holding due to its concerns in the application of its holding, expressly noting that courts should analyze technological advancements on a case-by-case basis when determining whether a defendant has 'performed' under the Act.  *Aereo*, 573 U.S. at 433 ("In other cases involving different kinds of service technology providers, a

user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act."); *Id*., at 450.

Contrary to Dish's position, Defendants merely sold STBs which were operated by end users for multiple non-infringing uses and functions including internet access, browsing, e-mail, and other common applications available from the Google Play Store such as YouTube or Pandora. Defendants established the noninfringing uses of its STBs through the testimony of Mr. Fraifer, Mr. Metral and even Dish's Corporate Representative. Indeed, Metral and Dish testified that the STBs have non-infringing uses and functions like any other smart device. Dish's representative characterized the STBs as a "shell" and made clear that the software is what is used to connect to URLs containing streams. Mr. Metral also testified that the third-party preinstalled software was responsible for streaming. Indeed, the UlaiTV and AhlaiTV STBs are products sold by Defendants were Android-based micro-computers not unlike many other smart devices in the marketplace. Like any computer, they may be used with a keyboard, mouse, USB drive, monitor and other peripherals.

Furthermore, Defendants did not publicly perform the Works because their purchase of the STBs and use of a CDN (an internet service provider) does not constitute a volitional act rising to the level of direct infringement under the Copyright Act. See *Cartoon Network LP, LLLP*, 536 F.3d at 130-33 (requiring volitional act for direct liability for copyright infringement); *CoStar Group, Inc.*

58

373 F.3d at 550; see *Aereo, Inc.*, 573 U.S. at 453 (emphasizing that the volitional act requirement "...is firmly grounded in the Act's text."); *Bwp Media United States v. T&S Software Assocs.*, 852 F.3d 436, 444 (5th Cir. 2017) (requiring a volitional act for direct infringement liability).

Defendants' mere use of a CDN cannot be classified as a cable television provider under the Copyright Act, nor does it constitute 'equipment' being 'leased' as described in *Aereo*. *Id.* Defendants sold STBs (Android-based microcomputers) capable of and intended for non-infringing uses and the use of a CDN to improve and provide reliable internet connectivity is not the equivalent of the infringement-specific 'equipment' installed and controlled by Defendants in *Aereo* "to capture the broadcast signal, translate it into digital data, and then store and transmit the data" using user specific antennas that it supplied. *Id.*; Dkt. 246 at 50.

Moreover, the underlying issues in *Aereo* differ markedly from those in this case. *Aereo* was a case focused on a company which was indeed very much operating a cable TV company, capturing television signals, storing video and providing what amounted to video on demand services. There were no non-infringing uses of *Aereo's* products, they were intended for and used only for infringement. Here, Defendants sold Android-based STBs which Plaintiff's own expert witness admitted are micro-computers fully capable of running literally hundreds of thousands of software applications and as many non-infringing uses. A fact that is not in dispute. Defendants' also testified that TCI was also concurrently in the business of selling phone cards, voice-over IP phones and not

just set-top boxes.  Magistrate Tuite was correct in finding that the cases relied upon by Dish, including *Aereo* are readily distinguishable.

The Court's hypothetical posed at trial of person holding a magnifying glass over a copyright poem printed in small text and then allowing another to view the magnified text is similar to the Defendants' conduct in the instant case. Dish incorrectly claims that this Court's hypothetical misses the mark "because the poem implicates the display right rather than the public performance right." The Court's analogy is on point.  Defendants' use of a CDN (i.e., the magnifying glass) simply allows one to more easily see what is already present on the Internet (i.e., the poem).  Dish seeks to attach nefarious intent to what amounts to the use of broadband versus dial-up.  Improving the quality of an Internet connection through the use of a CDN is no different as a CDN is nothing more than an internet service provider.  Plaintiff's assertion that using a CDN amounts to a transmission substantiating direct copyright infringement flies in the face of existing copyright jurisprudence and would set a dangerous precedent.   By Plaintiff's logic, installing a payphone would subject a company providing voice over internet protocol telephone service to liability for an end user's illegal use of such a phone.  Of course, a VOIP phone operator has the ability to "shut down" the line or "pull the plug" but the provision of a VOIP line does not substantiate a volitional act which rises to the level of causation of the illegal use of a VOIP phone capable of noninfringing use.  What Defendants have done here is no different.

Dish's proposed hypothetical misses the mark as the Defendants did not install anything nor did they capture any streams.  Instead, the UlaiTV and AhlaiTV STBs arrived from their manufacturers, Lengkeng, with a preloaded software application on the preinstalled Android operating system.   However, what is probative for this Court's analysis under *Aereo* is who transmitted the Works, who committed a volitional act and whether such an act results in direct causation or is merely contributory or otherwise secondary.  Here, there can be no question that end users choose to use an application, select content provided by a third-party, request content from that third-party, Lenkeng, that selects and provides what is made available on its application.   Defendants do not carry out any of these volitional acts.  And, contrary to Dish's position, Defendants used middleware to provide technical maintenance support services to address complaints relating to internet connectivity issues and customer service.

Dish fails to establish direct copyright infringement because a third party, not Defendants, selected and provided links to channel streams containing the allegedly infringing works, which were, in turn, allegedly requested, sent to and accessed by end users through the automated means of a third-party application preinstalled on the UlaiTV and AhlaiTV STBs by a third-party manufacturer, Lenkeng, to access such content.  Defendants did not capture a broadcast signal, originate, copy, select nor provide any transmissions or content.   Nor did Defendants require the use of the Lengkeng application.  As the testimony at trial established, purchasers of the STBs were free to delete the application or not use

61

it. Defendants did not charge a fee for using the application. Put simply, Defendants were not responsible for originating any allegedly infringing content or transmission through a third-party application preinstalled on the UlaiTV and AhlaiTV STBs.

### 5. Fraifer Should Not Be Found Individually Liable.

While Defendant Fraifer was the President and sole shareholder of TCI and PTI, Fraifer acted in his corporate capacity at all relevant times, in a company he worked decades to build. Fraifer simply did not possess the requisite involvement nor direct financial interest with respect to TCI's and PTI's alleged infringement activity and he certainly should not be held individually liable for the acts of a third-party manufacturer. Fraifer also did not have the ability to supervise Maqsood as he was a consultant and not an employee of TCI. As evidenced at trial, Defendants testified that they were not aware of all of Maqsood's actions taken with the CDNs and various encoders identified in e-mails between Maqsood and Verizon. In fact, Defendants testified that Fraifer was not personally involved in many of the e-mails between Maqsood and Verizon. Lastly, Sfeir testified that he reported to Fraifer but he did not testify that he reported everything to Fraifer as Dish misrepresents to this Court. Sfeir sometimes took actions on behalf of TCI and PTI without reporting to Fraifer as President of TCI and PTI. Accordingly, for the reasons stated above, Fraifer is not individually liable because he (1) did not possess the requisite financial interest nor the ability to supervise the alleged

infringing activity; and (2) did not possess the requisite level of personal involvement.

### III. DAMAGES & OTHER RELIEF

### A. Statutory Damages for the Registered Works.

Dish should not be awarded statutory damages of $150,000 for any of the four Registered Works purportedly airing on the MBC channels. Contrary to Dish's position, Dish falls woefully short of establishing any justification for an award of maximum statutory damages in this case under section 504(c) of the Copyright Act for several reasons:

a.    Assuming, arguendo, that this Court finds that the Defendants directly infringed on Dish's exclusive distribution or public performance rights with respect to the Registered Works, the Defendants should not be found as willful infringers under the Copyright Act. Any willfulness determination requires an evaluation of the Defendants' understanding of the facts and circumstances surrounding their purported actions giving rise to any infringement activity. Defendants testified that they did not receive all notices of copyright infringement, and of those relatively few notices actually received, such notices did not identify any of the Registered Works. Furthermore, none of the e-mail communications with any CDNs related to any purported copyright infringement identify any of the Registered Works but instead only identify channels to which there is no protection. Metral also testified that the infringement notices that he sent did not

identify any of the Registered Works. Lastly, Defendants also testified that the MBC Channels all aired on the internet free-to-air during all relevant time periods including all periods giving rising to the instant case, which, when coupled with the Cressida Telecom agreement (Defendants' Exhibit 1), provides a reasonably basis to conclude that Defendants reasonably believed that their conduct did not violate any of the alleged exclusive rights held by Dish.

b.      While Defendants testified to receiving a few infringement notices, the Defendants also testified that they did not know exactly why any of the other infringement notices were not actually received. Indeed, Defendants were unwilling speculate regarding any of the notices not actually received. Furthermore, contrary to the Dish's position, Defendants did not testify that the Defendants understood what the infringement notices required them to do, but instead testified that they simply complied with all requests from the CDN providers. Defendants promptly responded to instructions from CDN representatives at all times.

c.      Defendants testified that they did not receive all infringement notices, regardless of timing with respect to the instant action. Defendants also testified they did not originate the streams of any of the channels, including the MBC channels, but instead the channels were provided by Lenkeng as available on the internet free-to-air. Defendants also testified that they sold the STBs to customers located outside of the United States, which Dish has no claim to any such activity is outside the scope of the instant action. Indeed, any delay caused in complying

with any of the requests from the CDN providers are simply due to the Defendants working with Lenkeng to stop any channel streaming in the United States while allowing the sale of the STBs to customers located outside of the United States. Defendants further testified that they promptly complied with the CDN requests to keep their business relationships with the CDNs and not because they believed that they were infringing on Dish's purported rights. Indeed, the Defendants were able to find various CDN providers willing to conduct business and set up trial or demo accounts accordingly, even though some CDN providers, such as Verizon CDN, felt pressure by Dish to cutoff business relationships with the Defendants. Accordingly, Dish misrepresents the significance of the decisions made by CDN providers to cease doing business with the Defendants.

d.   Defendants' testimony at trial does not show or reflect in any way "a general disregard for the legal system". To the contrary, Defendants testified that they promptly cooperated with the requests from the CDNs and also had reason to the believe that all channels, including the MBC channels, were available on the internet free-to-air, all which were provided by Lenkeng in conjunction with the middleware provider in relation to the UlaiTV and AhlaiTV STBs. While Dish emphasizes a strong need for deterrence, Dish did not testify as to why Dish failed to pursue the originator of the channel streams, nor any third parties such as Lenkeng or even the middleware provider. Furthermore, Dish also presented a demonstrative at trial showing the effective dates of the agreements (Plaintiff's Exhibit 85), which identifies the end dates of the Dish's purported exclusive rights

to distribute and publicly perform the MBC channels in the United States. Such MBC channels are somehow "necessary" to Dish's current Arabic-television offering to customers but yet according to Dish's demonstrative exhibit they failed to secure any purported exclusive rights to distribute and publicly perform such MBC channels in the United States.

e.      Dish's testimony regarding the popularity of the MBC channels is self-serving and merely speculative. Indeed, such MBC channels are apparently so important that Dish failed to secure the exclusive rights to distribute and public the MBC channels in the United States. Yet, despite such failure, Dish somehow still manages to provide an Arabic-language television service. Furthermore, contrary to Dish's position, Defendants' testimony did not express any position with respect to the popularity of the MBC channels. Dish continues to mispresent the Defendants' testimony at trial, and also conveniently fails to mention that they do not have an expert on damages or with respect to the value of any of the Foreign Channels, including the MBC channels. While Defendants responded promptly to the requests of the CDNs, but they did not testify that they singled-out the MBC channels as being more important relative to any other channels or Foreign Channels.

f.      Dish goes to great lengths to divert this Court's attention away from the fact that Dish paid mere cents on the dollar for the rights to distribute and publicly perform the MBC channels in the United States. MBC's testimony confirmed the licensing fees paid by Dish to MBC for the MBC channels as set forth

in the MBC Network Agreements. Furthermore, Dish's self-serving testimony that any sublicensing would dilute the value of the so-called Protected Channels or Foreign Channels simply glosses over the importance of the relatively inexpensive fees paid by Dish to MBC under the MBC Network Agreements.

In conclusion, assuming arguendo that this Court finds that the Defendants infringed on Dish's purported rights to distribute and publicly perform the MBC channels, the Defendants are not willful infringers, and Dish should not be awarded maximum statutory damages of $150,000 for each of the four Registered Works (nor the collective amount of $600,000 for all four). Conversely, any appropriate statutory award under section 504(c) of the Copyright Act should not exceed the minimum amount of $750 for reach of the four Registered Works, for a total of $3,000.

## B.   Defendants' Profits for the Unregistered Works.

Should this Court find the Defendants liable for direct copyright infringement, Dish is entitled to recover only Defendants' profits that are *attributable* to their infringement of the Unregistered Works under section 504(b) of the Copyright Act. While Dish correctly states the burden-shifting standard for the appropriate disgorgement of profits analysis, Dish conveniently passes over and entirely omits the important factors of attribution. Contrary to Dish's position, the evidence presented at trial establishes that the Defendants' profits attributable to the alleged infringement of the Unregistered Works to which Dish may be entitled totals, at most, $2,541:

a.      The Defendants presented a financial summary at trial (Defendants' Exhibit 116 at 1) showing that the Defendants' revenues of $437,330.70 from the sale of the UlaiTV and AhlaiTV STBs as set forth on Joint Exhibits 7, 8 and 9, which certainly includes the relevant period as claimed by Dish in the instant case.

b.      Indeed, the Defendants correctly excluded from their financial summary any revenue received from the sale of the UlaiTV Plans between July 2015 and December 2015 in the approximate amount of $20,137. The Defendants testified that such sales were purchases of Plan renewals associated with set-top boxes sold in 2014 which were unrelated to sales of the UlaiTV and AhlaiTV STBs in the instant case. Such Plan renewals were associated with prior models of set-top boxes and not the Android based UlaiTV and AhlaiTV STBs relevant in the instant case and therefore are correctly excluded from the revenue analysis.

c.      Defendants testified that the UlaiTV and AhlaiTV Plans are not subscriptions (see also Defendants' Exhibits 3 and 6). The Defendants affirmatively disagree that any such Plans should be included in the revenue attribution analysis but decided to include it in its financial summary for purposes of presenting a *reasonable* calculation to facilitate this Court's analysis. The Defendants not only testified that the Plans provided technical and warranty support for the UlaiTV and AhlaiTV STBs, but they also testified that the Plans were not necessary to use the UlaiTV and AhlaiTV STBs. Defendants' further testified that users of the UlaiTV and AhlaiTV STBs could access the internet, download applications and also access channels streaming on the internet without

68

purchasing a Plan. Indeed, the Plans were not necessary for the use of the UlaiTV and AhlaiTV STBs and therefore any associated revenues should not be included in the revenue analysis. Swq21`

      d.     Dish simply misrepresents the Defendants' deductible expenses and does not offer any reasonable basis to conclude that such expenses should equal $0. Contrary to Dish's position, Defendants' sales by item summaries, which have been stipulated to by the parties as Joint Exhibits 7, 8, and 9, set forth the gross revenues of the UlaiTV and AhlaiTV STBs, associated COGS, and associated quantity sold between July 2015 to 2017, quarter 1. Not only did the Dish stipulate to Joint Exhibits 7, 8, and 9, but the Defendants also testified at trial that TCI's profit and loss statements and financial statements were contemporaneously maintained in the ordinary course of business and were not altered from their contemporaneous form. The Defendants also explained that the COGS in the approximate amount of $206,760 set forth on Defendants financial summary (Defendant Exhibit 116, at 2), which such numbers were taken directly from the Stipulated Joint Exhibits, 7, 8, and 9, were calculated by TCI's bookkeeper according to a formula related to all appropriate expense allocations for the COGS as in the ordinary course of business. Such expenses items allocated for the COGs would certainly include more than simply purchases but also other variable expense allocations associated with sale of the UlaiTV and AhlaiTV STBs. Accordingly, the Defendants are not limited to amounts paid to Lenkeng and

Geniatech prior to 2016 for the UlaiTV and AhlaiTV STBs but should also be entitled to deduct the COGS set forth on the stipulated Joint Exhibits 7, 8, and 9.

e.     Dish assumes the very thing that Dish must establish in that the Defendants have somehow allegedly "falsified costs". Dish points to invoices to establish a cost per STB as if they have proven something. Contrary to the Dish's position, the Defendants offered an explanation and testified at trial that the Defendants' bookkeeper calculated the COGS associated with the sale of the UlaiTV and AhlaiTV STBs according to a formula which accounted not only the costs of STBs but also accounted for *variable* expense allocations attributable to the sale of the UlaiTV and AhlaiTV STBs. It should be emphasized that the COGS on the stipulated sales by item summaries (Joint Exhibits 7, 8, and 9) directly support the COGS reflected on Defendants TCI's profit and loss statements as contemporaneously maintained in the ordinary course of business (Defendants' Exhibits, 9, 11, and 13). Furthermore, contrary to Dish's position, Dish is not entitled to recover the Defendants' revenues in this case in any way whatsoever.

f.     Defendants presented a financial summary at trial (Defendants' Exhibit 116 at 3) showing the Defendants' allocation of fixed expenses totaling $159,978.64 during the relevant time period in the instance case, which such fixed expenses were taken from TCI's profit and loss statements as set forth on Defendants' Exhibits 9, 11, and 13. Defendants testified that their profit and loss statements were contemporaneously maintained in the ordinary course of business, and, consequently, are inherently reliable. Rather than acknowledge the

Defendants' testimony, Dish sweepingly assert that there is no support for the fixed expenses on the Defendants profit and loss statements without providing any justification or evidentiary support. Further, Defendants simply argue that the fixed expenses are not deductible under §504(c) when in fact the expenses apply to Defendant TCI's entire business operations and the Defendants are reasonably applying a percentage allocation of the fixed expenses based on the UlaiTV and AhlaiTV revenue as a percentage of total revenue as set forth on Defendant TCI's profit and loss statements. Further, Defendants testified that such allocation of fixed expenses was reasonable and appropriate because all fixed expenses were necessary for Defendant TCI's business operations and that Defendant TCI would not exist as business without such expenses. Dish should not be permitted to cherry pick which fixed expenses that they believe are unrelated to any alleged infringement.

g.    Defendants also presented a demonstrative exhibit (Defendant Exhibit 116, at 4) to support attribution of revenues based on the asserted so-called Protected Channels or Foreign Channels (20) and the total number of channels (560) taken directly from the channel list attached as exhibit 5 to the Metral Report. The consequent percentage based on the number Foreign Channels (20) and the total channels (560) is 3.6%, which when applied to the net profit calculation on Defendants' financial summary of $70,592.48 (Defendants' Exhibit 116 at 3) yields a mere $2,541 to which Dish may be entitled to, at most (Defendants' Exhibit 116 at 4). Metral did testify that not all channels were listed

in sequence on the channel listing as set forth on exhibit 5 of the Metral Report, he did not offer any testimony which would contradict the Defendants' testimony explaining that the small gaps in the identified channel sequence was likely due to Defendants responding to the CDN requests in having the channel providers remove certain channels. It should be emphasized that Metral did testify that exhibit 5 attached to his Report did not actually list any programs but only channels, which certainly renders the label "programming guide" incorrect and misleading. Moreover, Metral did not confirm that any of the channels were duplicate nor was he able to confirm that any channels did not work.

h.    Dish failed to provide any evidence at trial establishing the value or priority of all Foreign Channels and Works. While Dish certainly testified that the Protected Channels were the most popular Arabic-language television channels, such testimony did not even attempt, nor did it mention all other Arabic channels to which the so-called Protected Channels are being compared to. Other than mere speculation, Dish has entirely failed to demonstrate that the so-called Protected Channels or Foreign Channels are any more valuable when compared to any other Arabic-language television channels. Indeed, Dish's position that the so-called Protected Channels were "necessary" to offer an Arabic-language package to customers is unfounded and runs counter to Dish's effective date of agreements demonstrative (Plaintiff's Exhibit 85) presented at trial. Dish's demonstrative exhibit identifies all of the end dates of Dish's purported exclusive rights to distribute and publicly perform the vast of majority of the foreign channels it

72

complains of in this litigation.  If such channels were as important or popular to Dish's current Arabic-television offering as its corporate representative claimed at trial, one is left to wonder why Dish has failed to renew its exclusive rights to distribute and publicly perform the vast majority of those foreign channels.

In conclusion, Dish should only be entitled to disgorgement of profits in the total amount of $2,541, at most.

## C.  Dish Should Not Be Entitled to its Attorney's Fees And Costs.

Contrary to Dish's position, Dish should not be awarded attorney's fees and costs under section 505 of the Copyright Act, especially because there is no basis to find the Defendants are willful infringers.  Additionally, Dish cannot seek attorney's fees and costs for the Unregistered Works in this case, which comprise fifty-five of the fifty-nine works asserted in this case.  Indeed, the lion's share of legal work and costs in this case has related to unregistered foreign works with little to no value.  As to the four Registered Works asserted in this case, for the reasons discussed herein, Dish cannot seek statutory damages or attorney's fees for three of the works because it failed to provide prepublication notice as to such works under 17 U.S.C. §§ 411(c)(1) and 412.

Furthermore, should the Court find appropriate to award Dish's attorney's fees in the instant case, the reasonableness determination of any fee award must be analyzed using the prevailing *Johnson* factors under Eleventh Circuit precedent which takes into account numerous facts including the amount of damages at issue in the case.  Finally, Dish has admitted to this Court that it has other, ostensibly,

73

non-monetary reasons for pursuing cases such as this.  Defendants should not be held financially responsible for Dish's internal or business reasons in pursuing its strategic litigation goals.

## IV. CONCLUSION

Defendants are entitled to judgment in this matter because: (1) Plaintiff has not established ownership of valid copyrights; (2) Plaintiff cannot maintain a copyright infringement claim because they have failed to register the Unregistered Works, have not and cannot establish that the works are not United States works exempt from registration under Section 411(a); (3) Plaintiff's failure to enter into evidence at trial copies of the asserted works render impossible the Court's ability to determine the scope of protection afforded to what are admittedly collective works, to identify their protectable elements, if any, and to conduct a substantial similarity analysis as required under Eleventh Circuit law; (4) Plaintiff failed to provide the required prepublication notice for the asserted works fixed for the first time simultaneously with their transmission under 17 U.S.C. 411(c)(1),(2) and 412; and because (5) Plaintiff has failed to meet its burden in establishing that Defendants directly infringed on any of Plaintiff's asserted copyrights.  Defendants acts in utilizing CDNs simply do not rise to the level of volitional conduct required to substantiate a claim of direct copyright infringement, Plaintiff has not asserted contributory or secondary infringement in this action.

Defendants respectfully request that this Court enter judgment in its favor on Plaintiff's sole count of direct copyright infringement, granting Defendants attorney's fees and costs.

Dated: June 25, 2021    Respectfully submitted,

         By: */s/ Joseph R. Sozzani*
           Joseph R. Sozzani, Esq., B.C.S.
           Florida Bar Number: 120297
           E-Mail: JSozzani@InfinityIPLaw.com
           INFINITY IP, PLLC
           222 West Bay Drive
           Largo, FL 33770
           Tel: 727.687.8814

           Derrick L. Clarke, Esq.
           Florida Bar Number: 95550
           E-Mail: dclarke@dclarkelegal.com
           Law Office of Derrick L. Clarke, PA
           146 2nd Street North. Suite 310
           St. Petersburg, FL 33701
           Tel: 727.379.4434

           *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 25, 2021, I electronically filed the foregoing with the Clerk of the Court using the NextGen CM/ECF system which will provide notice to Defendants.

           */s/ Joseph R. Sozzani*
           Joseph R. Sozzani