# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | No. 8:16-cv-02549-TPB-CPT |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GABY FRAIFER, TELE-CENTER, INC., | ) | |
| and PLANET TELECOM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's Order [Doc. 323], Defendants, Tele-Center, Inc. ("TCI"), Planet Telecom, Inc. ("PTI"), and Gaby Fraifer ("Fraifer") (collectively, "Defendants"), by and though their undersigned counsel, submit their Proposed Findings of Fact and Conclusions of Law for the Bench Trial held in the above-captioned matter on June 1-3, 2021.[1]  Defendants reserve the right to request additional or amended findings.

## I.   SUMMARY OF DEFENSES

To make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [works at issue] and (2)

---

[1] The daily transcripts of the June 1-3, 2021 Bench Trial in this matter appear in the record at Docs. 329 (Vol. I), 330 (Vol. II) and 331 (Vol. III).  All references to the trial transcript volumes and specific page(s)/line number(s) are cited herein as, "(Tr. Vol.____ at __:__ .)."  With regard to deposition transcripts designated at trial by Defendants, all such deposition transcripts appear in the record as attachments to Doc. 311.  References to trial transcripts are cited herein as, "(*Surname Depo.*, at page(s): line(s).)".  References to trial exhibits are cited herein as "Defs' Exh. ___", "Pl. Exh. ___" or "Joint Exh. ___."  Defendants Exhibits are filed at Doc. 326, Plaintiff's Exhibits are filed at Doc. 325 and Joint Exhibits are filed at Doc. 327.

defendants copied protected elements from the [works]. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011) citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008); *see also* Report and Recommendation ("R&R") (Doc. 246), at 10 (citing same).

Defendants are entitled to judgment in this matter because: (1) Plaintiff has not established ownership of valid copyrights and this Court cannot rely upon deficient declarations violative of Fed. R. Civ. P. 54(c)(4) as a matter of law; (2) Plaintiff cannot maintain a copyright infringement claim because they have failed to register their Unregistered Works and cannot establish that the works are not United States works exempt from registration; (3) Plaintiff has failed to enter into evidence at trial *any* copies of the asserted works rendering impossible the Court's ability to determine the scope of protection to be afforded to the works, to identify the protectible elements, if any, of the works and to conduct a substantial similarity analysis as required under Eleventh Circuit law; (4) Plaintiff failed to provide prepublication notice of works fixed for the first time simultaneously with their transmission under 17 U.S.C. 411(c)(1),(2) and 412; because (5) Defendants' did not directly infringe upon the asserted works; (6) Defendants' use of CDNs should be considered under the safeharbor provisions of 17 U.S.C. § 512, and (7) because Defendants' resale of STBs and use of a CDN does not substantiate the type of volitional conduct necessary to establish direct copyright infringement.

## II.   FINDINGS OF FACT

**A.   Plaintiff did not establish its prima facie case of direct copyright infringement at trial.**

1.     Plaintiff failed to enter into evidence at trial copies of *any* of the asserted registered or unregistered audiovisual works.  Tr. Vols. I-III.

2.     Plaintiff failed to enter into evidence at trial copies of *any* of the allegedly infringing audiovisual works into evidence.  Tr. Vols. I-III.

3.     Without copies of the asserted registered and unregistered audiovisual works entered into evidence, this Court cannot begin to determine the nature of the works, their protectible elements, if any, and the scope of protection, if any, afforded to such works under United States law.  Tr. Vols. I-III.

4.     Without copies of the asserted registered and unregistered audiovisual works and copies of the allegedly infringing audiovisual works, this Court cannot begin to conduct a side-by-side substantial similarity analysis to determine if factual and legal or actionable copying has occurred.  Tr. Vols. I-III.

5.     Plaintiff's expert witness, Pascal Metral ("Metral"), testified that he did not conduct any of the monitoring of the STBs at issue in this litigation and thus did not use, view *any* content on or take any of the screenshots whatsoever using the third-party software preinstalled on the STBs by their manufacturer, at issue in this litigation.  Tr. Vol. I at 60:12-25.

6.     Each of the four foreign network witnesses testified and established at their trial depositions that they did not conduct any of the monitoring of the STBs

at issue in this litigation and did otherwise not use, view *any* content on or take any of the screenshots whatsoever using the third-party software preinstalled on the STBs by their manufacturer, at issue in this litigation.  Dkt. 311; see also Def's Exh. 115; Dkt. 333.

7.     Each of the four foreign network witnesses testified and established at their trial depositions that they did not use, view, or have any personal knowledge of the alleged airing of any of the asserted registered or unregistered works in the United States through URL links available one the third-party application preinstalled on the STBs, on the dates and times alleged in their declarations.  Dkt. 311; see also Defs' Exh. 115; Dkt. 333.

8.     Each of the four foreign network witnesses testified and established at their trial depositions that they did not use, view, or have any personal knowledge of the alleged airing of any of the asserted registered or unregistered works on the foreign networks on the dates and times listed in their declarations. Dkt. 311; see also Defs' Exh. 115; Dkt. 333.

9.     Plaintiff failed to present any evidence establishing publication, first publication and geographic extent of publication of *any* of the asserted registered or unregistered works.  Tr. Vols. I-III; Dkt. 311, Defs' Exh. 115, Dkt. 333.

10.     Plaintiff failed to present any evidence at trial establishing that any of the asserted registered or unregistered works were publicly performed by Defendants.  Tr. Vols. I-III; Dkt. 311, Defs' Exh. 115, Dkt. 333.

11.     Plaintiff failed to present any evidence at trial establishing that any of the registered or unregistered works were distributed to or accessed by users of the STBs in the United States by Defendants.  Tr. Vols. I-III; Dkt. 311, Defs' Exh. 115, Dkt. 333.

12.     Metral relied solely on alleged screenshots he "reviewed" taken by unidentified and admittedly unreliable automated processes or by others, all of which he confirmed at trial, he had no personal knowledge of, did not supervise the taking of, were manipulated to include inaccurate dates, times and geographical locales differing in material part from the actual dates, times and geographical location from which they were allegedly taken.  Tr. Vol. I at 59:21-23; 60:12-62:25;  78:14-79:3;  80:21-25;  81:11-82:16;  82:20-25;  83:4-10;  103:5-15; 104:8-18; 106:6-9; 107:21-108:16; 109:3-111:15; 117:2-20; 118:22-25.

13.     Metral's testimony at trial established that the screenshots were taken using an automated process subject to error, cropped to remove the actual system date and time of the computer(s) which allegedly captured the screenshots and used a system configured by third-parties, not Metral, which he did not physically supervise or inspect.  Tr. Vol. I at 59:21-23; 60:12-62:25; 78:14-79:3; 80:21-25; 81:11-82:16;  82:20-25;  83:4-10;  103:5-15;  104:8-18;  106:6-9;  107:21-108:16; 109:3-111:15; 117:2-20; 118:22-25.

14.     Metral's testimony at trial established that the screenshots attached to his report represent only $1/600^{th}$ or $1/1,000^{th}$ of a second of the audiovisual works from which they were allegedly taken.  Tr. Vol. I at 79:6-80:13.

15.    Metral's testimony at trial established that screenshots depicting either 1/600th or 1/1,000th of a second of an audiovisual work do not establish the moving images and sounds of an audiovisual work.  Tr. Vol. I at 79:6-80:13.

16.    Metral's testimony at trial established that a screenshot would, at best, represent 1/600th or 1/1000th of a second, or single frame, of an audiovisual work which would be de minimis.  Tr. Vol. I at 79:6-80:13.

17.    Metral's testimony at trial established that, taken together, all of the screenshots attached to his report, combined, would represent less than one second in real time.  Tr. Vol. I at 80:11-13.

18.    Metral established at trial that the screenshots and monitoring reports he reviewed were acquired through automated processes, not described in his report, or by third parties, not Metral, outside of his supervision and control using processes and methodologies he did not witness, verify or test.  Tr. Vol. I at 60:12-25; see also Tr. Vol. I at 59:21-23; 61:1-62:19; 80:21-25; 81:11-82:16; 82:20-25; 83:4-10; 108:3-16; 109:3-111:15.

19.    Metral established at trial that the methodology Nagra allegedly used to acquire the screenshots could not and did not identify the true source of origin of any of the content available on the Internet through the URL links of the third-party software application preinstalled on the STBs by Lenkeng because the true source of origin of the content was located outside of the CDNs, beyond the view of the alleged methodology used to monitor the STBs.  Tr. Vol. I at 70:13-16; 116:1-8.

6

20.    Metral established at trial that the methodology Nagra allegedly used to acquire the screenshots could not and did not identify the true source of origin of any of the screenshots he reviewed because the true source of origin of the screenshots was outside of the CDNs, beyond the view of the alleged methodology used to monitor the STBs.  Tr. Vol. I at 70:13-16; 116:1-8.

21.    Plaintiff did not enter into evidence at trial any evidence establishing network traffic to or from the STBs from any URLs links available on the third-party application preinstalled on the STBs.  Tr. Vols. I-III.

22.    None of the screenshots attached to Metral's report contain any URLs identifying their source of origin.  Pl. Exh. 5.

23.    Without specifically identifying which of the asserted unregistered works they relate to, Plaintiff admits in its closing argument that there are absolutely no screenshots depicting 23 of the 55 asserted unregistered works.  Dkt. 328, at 6.

24.    Plaintiff did not enter into evidence at trial any evidence establishing any of the screenshots originated from any of the URL links allegedly available on the third-party application preinstalled on the STBs.  Tr. Vols. I-III

25.    Metral established that there is no evidence that Defendants were the source of origin of any of the content available through URL links of the Lenkeng software application preinstalled on the STBs by their manufacturer, including the content of the screenshots attached to his report.  Tr. Vol. I at 70:13-16; 116:1-8.

26.     Metral established at trial that he could not and did not identify the true source of origin or author of the software application containing the URL links to external content nor the origin of the manufacturer of the STBs because he was not "tasked" with doing so.  Tr. Vol. I at 70:13-16; 116:1-8.

27.     Metral's testimony at trial established that there was frequent downtime and interruption associated with the STBs, thus, it was entirely possible that screenshots may have been captured at one moment and there could have been interruption or downtime immediately thereafter.  Tr. Vol. I at 117:11-20.

28.     Metral's testimony at trial established that regardless of Nagra's admitted manipulation of the dates, times and geographic locales noted on the screenshots, the vast majority of the screenshots, including the UlaiTV screenshots, were taken extraterritorially, outside of the reach of the U.S. Copyright Act, in Switzerland, not the United States.  Tr. Vol. I at 82:9-16; 83:4-10; 108:3-16.

29.     Metral's testimony at trial established that his usage of the term "Nagra" conflates Nagravision and NagraStar making it impossible to determine which screenshots, if any, were taken in the United States or Switzerland.  Tr. Vol. I at 109:18-111:15.

30.     Metral's testimony at trial established that none of the specific works asserted in this litigation, including any of their specific titles, seasons or episode numbers, were identified: (i) in his expert report, (ii) the Nagra monitoring report,

(iii) the notices sent to Defendants or the CDNs, (iv) or in any of the screenshots. Tr. Vol. I at 109:3-111:15.

31.     Plaintiff's corporate representative established at trial that Dish has no knowledge whatsoever of the screenshots provided in this case.  Tr. Vol. III at 523:7-13.

32.     Plaintiff's corporate representative established at trial that none of the foreign network agreements entered into by Dish Network, LLC identify any specific works.  Tr. Vol. III at 523:14-18.

33.     Plaintiff's corporate representative established at trial that the foreign network agreements entered into by Dish Network, LLC are for channels and not works.  Tr. Vol. III at 523:23-524:8.

34.     Plaintiff's corporate representative established at trial that she relied entirely on the conclusory statements of Plaintiff's Exhibit 86 in asserting that Dish held exclusive rights to channels, not works.  Ms. Remeirsma also testified that she relied on the representations and warranties in the foreign network agreements entered into by Dish Network, LLC for their exclusive rights and confirmed that Dish does not verify the foreign networks' underlying agreements or rights in or to any copyrighted works or channels claimed therein or the chain-of-title in any such rights.   Tr. Vol. III at 523:23-524:8; Defs' Exhs. 115, 92-112; Dkt 311 & 333 (referencing foreign network testimony of Dkt. 311).

**B.     The Declarations of the Foreign Network Representatives Relied Upon By This Court At Summary Judgment Were Not From Personal Knowledge As Required Under Fed. R. Civ. P. 56(c)(4).**

### *John R. Whitehead (MBC FZ, LLC)*

**1.     Mr. Whitehead's declaration and testimony was not from personal knowledge but, instead, relied on hearsay.**

1.     Mr. Whitehead testified on multiple occasions during his trial deposition that, contrary to the boilerplate statement included in his sworn declaration relied upon by this Court, his declaration was, in fact, not made from personal knowledge. See Dkt. 311-1 ("*Whitehead Depo.*"), at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13- 184:9.

2.     Instead, Mr. Whitehead testified that he relied on inadmissible hearsay from third-parties.  *Id.*

3.     Mr. Whitehead's testified that: (i) he had no personal knowledge as to whether any MBC channels were transmitted on Defendants' STBs and, instead, relied solely on the statements of the third-parties that drafted the Nagra monitoring report for his conclusions; (ii) that he had never used any of Defendants' STBs; (iii) never used or accessed any of the software applications on Defendants' STBs; and (iv) that he did not select, watch or verify whether any of the programs listed in his declaration actually aired on the channels claimed.  See *Whitehead Depo.*, at 39:9-42:13; 39:7-14; 45:5-11.

4.     Moreover, Mr. Whitehead confirmed that the alleged screenshot dates he relied on were supplied by third-parties that he did not personally watch, select

or verify any the Registered or Unregistered Works listed in his declaration, and that his statements regarding the same were not the product of any personal knowledge. *Id*., at 41:11-24; 42:7-13.

5.     Mr. Whitehead testified that he neither produced nor attached any programming grids or electronic programming guides to his declaration but, instead, allegedly received them from "third parties." *Id.*, at 168:8-20.

6.     Dish failed to produce in this litigation or enter any such documents into evidence at trial.  Tr. Vol. I-III; Fed. R. Civ. P. 37(c)(1).

7.     For the same reasons, Plaintiff cannot rely upon evidence or testimony at trial relating to undisclosed documents.  Instead, it is clear that Mr. Whitehead, again, relied on inadmissible hearsay in making such statements in his trial deposition.  Tr. Vol. I-III; Fed. R. Civ. P. 37(c)(1).

8.     Significantly, Mr. Whitehead's testimony also confirmed that none of the screenshots from third-parties NagraStar and NagraVision were capable of identifying any episode numbers or the seasons of any of the asserted works, including the Registered Works. *Whitehead Depo.*, at 169:3-12.

9.     In fact, Mr. Whitehead's testimony confirmed that while he was "told" by others that the screenshots allegedly depicted works listed in his declaration, he confirmed that he did not personally have knowledge of the same, nor did he verify any of the information concerning the works listed in his declaration, including the registered works. *Id.*, at 45:5-11.

10. Moreover, upon review of some of the screenshots he attached to his declaration, Mr. Whitehead, seemingly surprised, confirmed that they actually depicted commercials, not the works he listed in his declaration. *Id.*, at 44:1-45:11; 44:9-10.

11. In short, even a cursory reading of Mr. Whitehead's trial deposition establishes that virtually all of the statements he made in his declaration were based entirely on inadmissible hearsay received from third-parties and that his declaration was decidedly not made from his personal knowledge. *Whitehead Depo.,* at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13- 184:9; Dkt. 311-1.

12. Mr. Whitehead's statement that his declaration was made from personal knowledge was admittedly false. *Whitehead Depo.,* at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13- 184:9.

**2. Mr. Whitehead's Testimony Establishes That Plaintiff Can Not Meet its Burden in Proving its Prima Facie Case of Ownership or Infringement of U.S. Copyright Registration No. PA-1-992-319.**

13. One of the asserted Registered Works, identified as U.S. Copyright Registration No. PA-1-992-319 (the "'319 Copyright"), includes a claim of copyright by MBC FZ, LLC and O3 Productions for a work entitled, "Saherat Al Janoub." See Pl. Exh. 3.

14. There is no season listed in the description of the '319 Copyright. Pl. Exh. 3; see also *Whitehead Depo.*, at 27:6-31:9; 27:15-20.

15.     Instead, the certificate for the '319 Copyright merely states, "Ep. #15." *Id*.; Pl. Exh. 3.

16.     The certificate also states the year of completion as 2015, with an alleged date of first publication of April 14, 2016. *Id*., at 27:21-28:3.

17.     The '319 Certificate identifies two joint authors, who each claim authorship of the work-for-hire: MBC FZ, LLC and O3 Productions, LLC. *Id*., at 29:4-14.

18.     Dish has not produced nor entered into evidence at trial any writing or other evidence even purporting to grant an exclusive right in this work from O3 Productions, LLC the listed joint author of this joint work. *Id*.; see also Pl. Exh. 3;

19.     O3 Productions a separate company from both MBC FZ, LLC and MBC Luxembourg. *Whitehead Depo*., at 179:1-6

20.     Each of the copyright registration certificates for the Registered Works asserted in this litigation claim ownership as works for hire. Pl. Exhs. 1-4.

21.     Dish failed to provide any evidence at trial or otherwise of any written work-for-hire agreements from any of the underlying authors relating to any of the Unregistered or Registered MBC Works it has asserted in this litigation. Tr. Vols. I-III.

22.     Mr. Whitehead's testimony confirmed that none of the screenshots attached to Metral's Report, of which he admits no personal knowledge, were dated April 14, 2016, the date listed on the copyright registration certificate as the date of first publication. *Id*., at 51:1-52:18; 51:1-6.

23.    Mr. Whitehead could not explain why screenshots allegedly identifying other episodes of this program aired at divergent times of the day or why the episodes appeared to be listed out of order. *Id.*, at 49:1-9.

24.    Mr. Whitehead's testimony establishes he had no personal knowledge of the screenshots, the alleged works or alleged dates of airing he listed in his declaration. *Id.*, at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13-184:9.

25.    Instead, Mr. Whitehead admitted that he relied upon what he was told by third-parties and unproduced documents. *Id.*, at 39:9-41:24; 42:7-16; 45:4-11; 59:24-60:4; 168:10-20; 183:13- 184:9.

26.    Mr. Whitehead testified that he could not determine whether any of the third-party screenshots depicted the specific work listed in the '319 Copyright with any degree of certainty. *Id.*, at 167:7-11.

27.    When asked directly whether any of the screenshots identified the work listed in the '319 Copyright registration, Mr. Whitehead testified that he did not know one way or the other. *Id.*

28.    Mr. Whitehead's testimony confirmed that there are, in fact, multiple seasons of "Saherat Al Janoub" and that none of the works listed in his declaration corresponded with the '319 Copyright. *Id.*, at 47:15-52:8.

29.     Instead, all instances of works titled as "Saherat Al Janoub" the television program listed as the title of the '319 Copyright were listed in Mr.

Whitehead's declaration as Season 2 episodes, not the claimed work. *Id.*, at 49:11-21; Dkt. 146-8.

30.     Mr. Whitehead testified that none of these screenshots in exhibit 8 to his declaration were capable of identifying a season or episode number. *Id.*, at 169:3-12; 170:2-12.

31.     Mr. Whitehead was incapable of identifying the '319 Copyright and could not confirm whether or not it aired on the dates and times listed in his declaration. *Id.;* see also 167:10-11.

32.     Plaintiff failed to present evidence at trial sufficient to meet its burden in proving its prima facie case as to the alleged infringement of the work listed in Copyright Registration No. PA-1-992-319.

**3.     Mr. Whitehead's Testimony Confirmed MBC FZ, LLC Assigned All Of It's Copyrights To Another Entity Prior to Submitting the Applications Leading To The Registration of Two of the Registered Works At Issue In This Litigation And Could Not Have Granted Plaintiff an Exclusive Rights In Such Registered Works.**

33.     Mr. Whitehead's testimony establishes that MBC FZ, LLC did not own copyrights in two of the Registered Works asserted in this litigation at the time the copyright applications were filed: Copyright Registration No. PA-1-992-319 and PA-1-992-320 (the "'320 Copyright"). *Id.*, at 27:6-31:9.

34.     MBC FZ assigned all of its copyrights to MBC Luxembourg relating to MBC 1 on April 18, 2016. *Id.*, at 30:20-25; 16:12-19:24; 27:6-31:9.

35.     The applications for the '319 Copyright and '320 Copyright were filed by MBC FZ, LLC well after the claimed dates of first publication of the works and

after these works had already been assigned to a different entity, MBC Group Holding Hungary, LLC, Luxembourg Branch. *Id.*

36. Whitehead's testimony establishes that MBC FZ, LLC did not have the right to claim ownership of any of the Registered Works because they had assigned all of their copyrights to an entirely different company, prior to the date the applications for copyright relating to the works were submitted to the U.S. Copyright Office. *Id.*; see also 19:12-16.

37. On April 18, 2016, MBC Luxembourg became the assignee of the copyrights from MBC FZ, LLC. *Id.*, at 19:12-16.

38. Mr. Whitehead agreed that it was very likely that all four applications for the registered works asserted in this case were filed by MBC FZ, LLC after it had already assigned its rights in all copyrights to a different entity. *Id.*, at 33:11-24.

39. Mr. Whitehead's testimony established that MBC FZ, LLC assigned its rights to all copyrights in MBC1 to another entity prior to applying for registration of two asserted registered works and prior to purportedly granting Plaintiff exclusive rights in the same. *Whitehead Depo.*, at 16:12-17:1, 17:20-19:24; 33:11-35:17.

40. Whitehead's testimony established that MBC FZ, LLC was not the rightful copyright claimant of the Registered Works when it purportedly granted Dish exclusive rights in the '319 Copyright and '320 Copyright. *Id.*

41.     Mr. Whitehead's testimony confirms Plaintiff did not hold a valid exclusive right to these works upon the filing of this lawsuit.  *Id.*

42.     Mr. Whitehead also testified that MBC does not own rights to all the works that air on its network. *Id.,* at 172:8-174:23.

43.     Mr. Whitehead testified that MBC "license[s] channels not programs." *Id*., at 60:9-10.

44.     Mr. Whitehead, the only witness potentially capable of testifying as to the Registered Works in this matter, confirmed at his trial deposition that he had no involvement with, nor knowledge of any of the applications submitted to the U.S. Copyright Office for the Registered Works.  *Id*., 30:6-19; 33:11-34:7.

45.     Mr. Whitehead confirmed that only the first page of each of the four copyright registrations were attached to his declaration and that he failed to produce complete original, certified or complete copies of the copyright registration certificates during discovery in this matter.  *Id*., at 170:2- 171:1; Fed. R. Civ. P. 37(c)(1).

46.     Plaintiff supplemented their production, during trial.  Pl. Exhs. 1-4.

**4.    Mr. Whitehead's Testimony Confirms The All Thirty of the Unregistered MBC Works Asserted In This Litigation Are United States Works Subject to the Registration Requirement of 17 U.S.C. § 411(a).**

47.     Mr. Whitehead's testimony confirmed that all of the asserted Unregistered Works were published in Iraq and Iran simultaneously with the United States. *Id*., at 61:3-13; 63:11-13; 74:4-14; 175:8-21.

48.     Mr. Whitehead testified that during all relevant times MBC transmitted all of the same channels available in Iraq and Iran, to the United States "live." *Id.*, at 74:4-14; 163:5-18.

49.     Mr. Whitehead's testimony, taken together, establishes that all 30 of the Unregistered MBC Works asserted in this litigation were published simultaneously in Iraq, Iran and the United States. Id., at 61:3-13; 63:11-13; 74:4-14; 163:5-18; 175:8-21.

50.     The trial deposition testimony of each of the foreign network representatives establishes that all fifty-five (55) of the MBC, IMD, Al Jazeera, Worldspan and Dream asserted Unregistered Works asserted in this matter were published in Iraq and Iran, and the United States either simultaneously or within 30 days.  See *Whitehead Depo*. (Dkts. 311-1, 311-2, 311-3), at 63:11-13; 74:4-14; 163:5-18; 175:8-21; *Abutaha Depo*. (311-4)*,* at 7:23-9:17; 42:12-14; *Ayoub Depo*. (Doc. 311-5), at 53:22-52:5-57:15; *ElMokadem Depo*. (Doc. 311-6), at 26:6-15; 47:1-5; 88:15-18; 89:9-15; 90:3-5; 91:1-4.

**5.      Mr. Whitehead's Testimony Establishes That Plaintiff's Claims for Infringement Must Be Denied for Failure to Provide Defendants With Advance Prepublication Notice Under 17 U.S.C. § 411(c)(1), (2) and 412.**

51.     Three of the four asserted Registered Works (U.S. Copyright Reg. Nos. PA-1-992-317, PA-1-992-319 & PA-1-992-320) and all asserted Unregistered Works broadcast live were first fixed in a tangible form simultaneously with their transmission.  See *Whitehead Depo*., at 21:1-11; 26:3-17 and 26:3-17.

52.    Dish did not present any evidence of prepublication notice of the specific registered works asserted in this litigation.  Tr. Vols. I-III.

53.    Mr. Whitehead testified that three of the four asserted Registered Works were broadcast live and thus first fixed simultaneously with their first publication.  See *Whitehead Depo.*, at 21:1-11 (U.S. Copyright Reg. No. PA-1-992-320); 26:3-17 (U.S. Copyright Reg. No. PA-1-992-317); 32:1-7 (U.S. Copyright Reg. No. PA-1-992-319).

54.    Mr. Whitehead testified that multiple additional Unregistered Works were broadcast live.  *Id.*, at 47:2-4.

55.    Mr. Whitehead's testimony establishes that each of the aforementioned Registered and Unregistered Works were audiovisual works broadcast live and fixed for the first time upon their transmission on the alleged dates of first publication.  *Id.*, at 21:1-11; 26:3-17; 32:1-7 and 47:2-4.

56.    Mr. Whitehead testified that he was not aware of any prepublication notices for any of the asserted Unregistered or Registered Works being provided to Defendants on behalf of MBC or Plaintiff.  *Id.*, at 34:24-35:11.

### *Ms. Abutaha (Al Jazeera Network)*

57.    Ms. Abutaha testified that her declaration was not made from personal knowledge. Abutaha Depo., 17:22-19:12; 20:22-25; 22:17-23:8; 24:8-12; 45:15- 47:8.

58.    Ms. Abutaha testified under oath, and Dish's recently unredacted agreement confirms, that Dish did not pay any license fee whatsoever for the

distribution of Al Jazeera channels on any of Dish's platforms. Abutaha Depo., 9:20- 10:24; Defs' Exhibit Nos. 71 & 72.

59.    Ms. Abutaha testified that all unregistered works aired in Iraq and Iran simultaneously with the United States. Abutaha Depo., 7:23- 9:19; 16:16-20 (Dish received the same transmission).

60.    Al Jazeera broadcasts 24/7/365 including live broadcasts which were fixed for the first time upon their broadcast and date of first publication. Abutaha Depo., 14:17-15:8; 21:1-12.

61.    The licensor for Al Jazeera is a U.S. company. Abutaha Depo., 28:8-15.

62.    Ms. Abutaha did not draft her own declaration. Instead "one-hundred percent" of it was drafted by counsel. Abutaha Depo., 44:21-45:8.

### *Mr. Pierre Ayoub (IMD)*

63.    Mr. Ayoub testified that his declaration was not made from personal knowledge. *Ayoub Depo.*, 19:1-27:5; 39:15-40:19.

64.    Mr. Ayoub testified that IMD is a channel aggregator that licenses channels from others, including other agents, and not a network.  *Id.*, 15:8-21; 74:19- 75:9.

65.    Mr. Ayoub testified that the IMD channels each broadcast 24/7/365. *Id.*, 27:24-28:5; 32:19-21; 33:10-16; 34:13-19; 35:19-25; 37:14-20; 38:17- 39:14; 40:20-41:24.

66.     Mr. Ayoub's testimony confirms that all of the unregistered works aired free to air in Iraq and Iran, simultaneously with the United States.  *Id.*, 50:9-51:13; 52:5-15; 53:2-18; 54:15-55:24; 56:11-57:18; 62:2-7; 62:21-63:5; 64:2-8.

67.     Mr. Ayoub testified that one of the channel agreements attached to his declaration (Iqraa) was written in Arabic without any translation.  *Id.*, 77:17-78:6 (allegedly granting rights to the unregistered works having the title "El Souk").

68.     Mr. Ayoub testified that the underlying agreements attached to the declaration had their termination dates redacted, making it impossible to confirm their validity.  *Id.*, 79:2-13; 80:10-15.

69.     Mr. Ayoub's testimony confirmed some of the agreements attached to his declaration were incomplete and still others contained exclusivity limitations in the U.S.   *Id.*, 81:20-85:2;  86:21-87:10  (reserved rights);  145:25-146:19 (excluding rights for the worldwide web).

### *Mr. Haytham Elmokadem (World Span and Dream)*

70.     Mr. Elmokadem testified that his declaration was not made from personal knowledge. *Elmokadem Depo.*, 12:1-13:2; 14:4-8; 16:1-4; 56:9-22; 57:13-19; 58:20-59:5; 69:7-14; 73:11-15; 74:25-75:5; 82:12-19; 86:16-87:5.

71.     Mr. Elmokadem's testimony confirms that all of the unregistered World Span works were published in Iraq and Iran free-to-air simultaneously with the United States on the Nilesat Satellite in the Middle East. *Id.*, 26:2-15; 46:15-47:5; 55:1-22; 89:9-15; 90:3-16; 91:1-4.

72.     Mr. Elmokadem's testimony confirms that the channels licensed by World Span were subject to unpredictable interruptions in transmission and experienced significant downtime. *Id*., 38:10-24; 40:9-15; 44:12-21 (some channels shut down for months); 51:16-21; 73:1-10.

73.     Mr. Elmokadem testified that the channels licensed by World Span broadcast 24/7/365. *Id*., 38:3-9; 39:20-25; 41:14-18; 43:17-44:11; 51:16- 21.

74.     Mr. Elmokadem testified that the asserted unregistered works were non-fiction works consisting of news of the day and current events. *Id.*

**C.     The Testimony of Dish's Expert Witness, Pascal Metral, Esq.**

1.     Pascal Metral, Esq. ("Metral") is a career lawyer and has been a practicing lawyer since graduating college. Tr. Vol. I at 54:10- 55-19.

2.     Metral is an employee and the Vice President of Legal Affairs for Nagravision, SA. Tr. Vol. I at 54:10-17.

3.     Metral has never published a legal or technical article on any certain topic. Tr. Vol. I at 58:4-12.

4.     Metral does not have a science or engineering degree of any kind. Tr. Vol. I at 58:13-18.

5.     Nagravision, S.A., is a joint venture partner of Plaintiff, Dish Network, L.L.C. Tr. Vol. I at 57:4-12.

6.     Metral was engaged by Plaintiff's law firm to provide an expert report and opinion in this case. Tr. Vol. I at 13:21-14:1.

7.      Metral admits that his "report and its contents … was prepared for purposes of litigation." Tr. Vol. I at 55:20-25.

8.      Metral admitted he conducted legal work on this case and was part of plaintiff's legal team prior to providing his Report and testimony in this case.  Tr. Vol. I at 56:1-25.

9.      Metral testified that he also performed legal work for IBCAP, of which Dish is a founding member, in sending takedown notices in which he represented himself as legal counsel to CDNs and Defendants in association with this case.  Tr. Vol. I at 125:15-25.

10.      Nagravision provides video platform and STB services to Dish.  Tr. Vol. I at 51:2-52:7.

11.      Metral was not paid for his report but, instead, provided his Report and served as an expert witness as part of his duties as an employee of Nagravision, Plaintiff's joint venture partner in NagraStar.   Tr. Vol. I at 59:2-9.

12.      Metral was "retained to look back at the monitoring records" and screenshots of the UlaiTV and AhlaiTV STBs created through automated means or by others, allegedly including a third-party company called NagraStar, LLC. Tr. Vol. I at 14:14-19.

13.      Plaintiff did not present any witnesses from NagraStar, LLC at trial. Tr. Vols. I-III.

14.      Metral did not perform the monitoring of the Ulai and Ahlai STBs. Tr. Vol. I at 14:20-23; 59:12-62:5.

15.     Instead, the alleged monitoring was carried out by NagraVision, S.A. in Switzerland and NagraStar, LLC. Tr. Vol. I at 14:20-15:4.

**D.    The alleged monitoring was of "channels" not works, and occurred extraterritorially, in Switzerland, outside the ambit of the U.S. Copyright Act.**

16.     Metral confirmed that all Nagravision, S.A. monitoring of the UlaiTV STB occurred extraterritorially, in Cheseaux-sur-Lausanne, Switzerland, from June 2015 through March 2017.  Tr. Vol. I at 18:10-21; *see also* 23:4-7.

17.     Accordingly, Metral established that Nagravision accessed and viewed the UlaiTV STBs while geographically present in premises located in Cheseaux-sur-Lausanne, Switzerland, not the United States.  *Id.*; *see also* Tr. Vol. I at 24:25-25:2; 82:4-16.

18.     Metral alleges that the AhlaiTV STB was monitored on a single day, March 21, 2017, without his supervision, by Nagrastar, LLC.  Tr. Vol. I at 20:4; 78:7-13; 81:18-82:3.

19.     Metral did not have direct supervision over those who allegedly set up the system for automated monitoring.  Tr. Vol. I at 17:5-21; 78:14-18; 81:11-82:3.

20.     Metral confirmed that the automated processes used in the monitoring methodology described in his report were unreliable *inter alia* because they could neither verify that a channel link in the Lenkeng application was working properly nor identify the specific content appearing on a screen.   Tr. Vol. I at 101:20-102:12.

21.     While Nagravision was situated in Switzerland, NagraStar is located in Colorado, many thousands of miles away.  Tr. Vol. I at 59:10-17; 81:18-82:3.

22.     Metral was not in the same physical place as NagraStar to supervise or witness any of the methods used, activities relating to or creation of the alleged monitoring reports.  Tr. Vol. I at 60:18-62:5.

23.     Metral failed to identify the specific monitoring activities conducted as between Nagravision and NagraStar, referring to both entities, collectively, as "Nagra."  Tr. Vol. I. at 51:2-53:13.

24.     Metral admits he relied on hearsay materials created and provided to him by NagraStar.  Tr. Vol. I at 59:18-23; 81:11-82:3.

25.     Metral's answers at trial were, at times, evasive as recognized by the Court in striking numerous responses on cross-examination *sua sponte*.  Tr. Vol. I at 74:21-75:6; 92:5-8.

26.     Metral did not create any of the monitoring reports or take any of the screenshots attached to his Report.   Tr. Vol. I at 60:14-17.

27.     Nagravision is a for-profit joint business partner with Dish Network, the plaintiff in this case.  Tr. Vol. I at 52:1-5.

28.     NagraStar, LLC is a company co-owned by Plaintiff, Dish Network, LLC and its joint venture partner Nagravision, S.A.  Tr. Vol. I at 52:3-53:2.

29.     NagraStar, LLC is also a for-profit company financially benefiting both Dish Network, LLC and Nagravision, S.A.  Tr. Vol. I at 51:2-3.

30.     NagraStar, LLC and Nagravision, S.A. provide services to Plaintiff, including those relating to Plaintiff's streaming platform, and thus have a direct stake in the outcome of this litigation.  Tr. Vol. I at 15:7-13; 51:2-3.

31.     It is undisputed that the Metral Report uses the word "Nagra" interchangeably as between Nagravision and NagraStar, making it impossible to differentiate between the two.   Tr. Vol. I at 53:11-13.

32.     Nagravision is a technology provider that provides *inter alia* OTC platforms and software used in STBs to pay-TV customers and to pay-TV operators, including Plaintiff.  Tr. Vol. I at 45:15-18.

33.     Nagravision's provision of OTC platforms includes the use of CDNs as well.  *Id.*

34.     Metral sent cease and desist letters, prepared a Report for Plaintiff, Dish Network, L.L.C., and is involved in numerous ongoing projects for Plaintiff which financially benefit Nagravision S.A.  Tr. Vol. I at 15:9-11.

35.     Metral testified that the general goal of Nagravision S.A.'s monitoring services is to identify channels, not specific works.  Tr. Vol. I at 11:20-23; *see also Id.*, at 25:18-24 ("We are tasked by our clients to look for certain channels.").

36.     The second step in Metral's process was to attempt to identify the origin of the channels which he admitted he was not able to do with regard to Defendants' STBs. Tr. Vol. I at 116:1-8 ("Q. So, yes, I am correct that you cannot see the true source of the content using Wireshark and looking at a CDN. Correct? A. Correct. . . .").

37.     Metral's testimony established that he failed to disclose in his Expert Report that part of the automated process he used involved writing custom "scripts" to monitor the STBs plugged in at Nagravision S.A.'s computer lab.  Tr. Vol. I at 20:15-17; 27:12-16; Fed. R. Civ. P. 26 & 37(c).

38.     Metral confirmed the process used by Nagravision and Nagrastar was largely automated.  Tr. Vol. I at 78:14-18.

39.     Metral admitted that the automated monitoring used was subject to error.  Tr. Vol. I at 78:14-79:9.

40.     Metral's Report fails to disclose or identify the function, use or error rate associated with any "scripts" as part of the methodology described in Metral's Report and for this reason alone his opinion should not be considered.  Tr. Vol. I at 20:15-17; 27:12-16; Fed. R. Civ. P. 26 & 37(c).

41.     Metral admitted that many of the screenshots collected were clearly of commercials, not programs.  Tr. Vol. I at 78:25-79:5.

42.     Metral testified that he relied entirely on "doing a network traffic capture" to "identify[] where the channels are coming from" but ultimately admitted that in this case he was unable to identify the "true source" of origin of the content linked to in the URLs of the third-party Lenkeng application preinstalled on the STBs.  Tr. Vol. I at 13:3-7; 70:13-16; 116:1-8.

43.     Curiously, Plaintiff did not enter into evidence at trial *any* of the Wireshark packet capture ("PCAP") files attached to Metral's Report and, thus,

failed to provide any evidence of network traffic to and from the STBs allegedly monitored by Nagra. Tr. Vol. I-III.

<em>Monitoring Process</em>

44.     Metral admits that the monitoring process was subject to error.  Tr. Vol. I at 62:9-12.

45.     Metral admits that he lacked personal knowledge regarding the of the taking of the screenshots and creation of the monitoring reports he reviewed and relied on.  Tr. Vol. I at 59:10-61:13.

46.     Metral was not in the same physical place monitoring allegedly took place, did not physically witness the system nor confirm the system was accurately monitoring the preinstalled software on the STBs. Tr. Vol. I at 60:18-61:13; 62:15-19.

47.     Metral described the monitoring process to include plugging the set-top box into a large rack with hundreds of wires, including many other STBs.  *Id.*

48.     Metral did not personally witness, inspect or verify the alleged monitoring system or process and was, instead, many thousands of miles away from where the alleged monitoring took place.  Tr. Vol. I at 59:10-61:13.

49.     Metral did not inspect the alleged monitoring system or ensure the STBs were properly connected to the system among the hundreds of other wires connected to other, third-party STBs.  *Id.*

50.     Multiple third party STBs appear in the same monitoring reports relied upon by Metral.  *Id.*

28

51.     The monitoring system used was largely automated.  Tr. Vol. I at 63:15-21.

52.     The STBs were connected to the Internet using a VPN connection. Tr. Vol. I at 21:8-22:10.

53.     VPN is an acronym for a virtual private network, which is a device or software used to hide the true internet protocol ("IP") address of a computer accessing the Internet.  Tr. Vol. I at 23:21-24; 83:1-10.

54.     Metral confirmed that a VPN was used to mask the true internet protocol ("IP") address of the geographic location of Nagravision in Switzerland and to replace it with a fabricated IP address.  Tr. Vol. I at 24:8-11; 83:1-10.

55.     Regardless of Metral's use of a VPN, he admitted that the true geographic location from which the monitoring of the third-party software application preinstalled on the UlaiTV STB took place was indisputably extraterritorial and in Switzerland, not the United States.  Tr. Vol. I at 82:13-16; 83:1-10.

56.     Nagravision did not consistently or continuously monitor the STBs. Tr. Vol. I at 27:10-12.

57.     A laptop was used to intercept and monitor electronic communications to and from the STB from the Internet using packet sniffing software called Wireshark.  Tr. Vol. I at 21:8-22:10.

58.     An acquisition card and second laptop were connected to the STB to capture screenshots.  *Id.*

**E.     It is undisputed that the STBs Defendants resold were merely Android-based microcomputers.**

59.    It is undisputed that the STBs are simply Android-based microcomputers. Tr. Vol. I at 64:8-24; 70:17-71:18; Tr. Vol. III at 357:20-364:1 (comprehensive discussion and the Court's inquiry regarding the nature of the STBs as standard Android-based microcomputers with preinstalled third-party software).

60.    The Google Android Operating System installed on the STBs is the same operating system commonly installed on cellular phones and notepads.  Tr. Vol. I at 64:8-65:3; Tr. Vol. III at 357:20-364:1.

61.    It is undisputed that the STBs were capable of running many thousands of software applications available for download from Google Play including YouTube, Gmail, Netflix, Amazon and gaming applications. Tr. Vol. I at 70:17-71:18; Tr. Vol. III at 357:20-364:1.

62.    Like any other microcomputer, the STBs had ports to connect computer peripherals like a mouse, keyboard, printer, monitor, webcam or game controller.  Tr. Vol. III at 357:20-364:1

63.    The STBs contained various software applications preinstalled by the manufacturer including YouTube, a web browser, an e-mail client and many others.  Tr. Vol. I at 63:23-25; 67:14-24; 70:17-71:18; Tr. Vol. III at 357:20-364:1.

64.    Metral admitted that he failed to mention the many other software applications available preinstalled on the STBs.  Tr. Vol. I at 67:18-24; 70:17-25.

65.    The STBs also included a single third-party software application which was preinstalled by the manufacturer which included URL links to external websites, located on the Internet which Metral could not identify the true source of origin of.  Tr. Vol. I at 65:25-66:2; 67:11-13; *see also* Tr. Vol. III at 359:21-364:1.

66.    Metral's Report made the assumption that a user of the STBs would necessarily access the third-party application preinstalled by the STB manufacturers and channel providers, Lenkeng.   Tr. Vol. I. at 72:21-78:3 (describing the preloaded URLs selected by Lenkeng and the requirement that a user select a URL link and communicate directly with the URL through automated processes).

67.    It is undisputed that users of the STBs could freely delete any of the preinstalled software applications contained thereon, including the preinstalled Lenkeng third-party application and that the STBs had a multitude of non-infringing uses including those of a standard computer.   Tr. Vol. I at 72:2-20; see also Tr. Vol. III at 357:22-364:1.

68.    Metral failed to identify the manufacturer of the STBs who were indisputably the true source of origin of the third-party software application preinstalled on the STBs Defendants resold.  Tr. Vol. I at 67:25-68:23; 70:13-16; *see also* Tr. Vol. III at 359:21-364:1.

69.    Metral also failed to identify the author, Lenkeng, of the specific preinstalled third-party software application that selected the preloaded links to URLs located on the Internet.  *Id.*

70.     Defendants merely resold STBs manufactured by a third-party that came with a one-year warranty free of any additional charge, they did not sell a subscription plan. Tr. Vol. III at 364:2-366:8; 367:12-17; Defs. Exh. 3 at PL2176-2177 (Website FAQs confirming no subscription plan).

71.     Instead, Defendants offered a warranty and technical service extension plan which included a replacement warranty for defective STBs. *Id.*

**F.     Users of the Third-Party Software Application Preinstalled by the manufacture of the STBs selected content from preloaded URL links selected by Lenkeng, not Defendants.**

72.     Metral confirmed that consumers of the STBs who chose to use a particular preinstalled third-party software application selected and preloaded to the STBs by its manufacturer, Lenkeng, could select and click on specific URL link(s) preloaded to the application in order to link to the content they wished to access on the Internet. Tr. Vol. I at 72:21-72:19; 73:15-19.

73.     A user of the Lenkeng application had complete control over the selection of the content they wished to access, all of which originated external to the CDNs on the Internet, and Lenkeng had complete control over the selection of URL links present in the third-party application preinstalled on the STBs, not Defendants. Tr. Vol. I at 100:11-101:14.

74.     Indeed, users of the third-party application made their own conscious decision, a choice, to use the application. Tr. Vol. I at 100:11-101:14.

75.     Users chose to select and initiated a connection to a URL containing material of a user's choosing located somewhere on the Internet by clicking on a URL link.  Tr. Vol. I at 100:11-101:14.

76.     A user accessing a link on the third-party application initiated a communication to a URL of their choice from their point of origin to the source of origin of the URL link located somewhere on the Internet.  Tr. Vol. I at 75:11-17; 100:11-101:14.

77.     A user's request then traveled over the Internet, through multiple ISPs to the source URL, outside of the CDNs, all through automated technical means provided by ISPs, not Defendants.  Tr. Vol. I at 75:16-76:1; 100:11-101:14.

78.     It is undisputed, and Metral ultimately admitted at trial, that a CDN provides internet services and is thus an internet service provider or ISP that provides automated internet services not controlled by Defendants.  Tr. Vol. I at 76:9-21; 100:11-101:14.

79.     Metral confirmed that Verizon is both an ISP and a CDN.  Tr. Vol. I at 76:7.

80.     Just as any other content is accessed on the Internet, once a URL receives a user-initiated request, the URL communicates back whatever data that has been requested, through standard Internet protocols, which then appear on a user's computer screen through an automated internet services provided by third-party ISPs, including CDNs.  Tr. Vol. I at 77:4-11; 100:11-101:14.

81.     Metral testimony established that the third-party software preinstalled on Defendants' STBs was no different than accessing a URL through an index of bookmarks saved to a web browser installed on a standard computer. Tr. Vol. I at 77:12-25; 100:11-101:14.

82.     The URL links selected and preprogrammed by Lenkeng in their preinstalled STB application merely pointed to URLs which were originated by and made available by third-parties on the Internet, not Defendants. Tr. Vol. I at 77:12-78:3; 100:11-101:14; 359:21-360:10; 365:22-366:8.

**G.    The Monitoring Reports Were Created for Purposes of Litigation**

83.     Metral's testimony established his admission that his "report and its contents ... was prepared for purposes of litigation." Tr. Vol. I at 55:20-25.

84.     The monitoring report and screenshots were not business records and, in any event, certainly not business records of Nagravision S.A. *Id.*

85.     Metral confirmed that the "main purpose" of creating monitoring reports, screenshots and network traffic captures was to take legal action on behalf of his clients, including Plaintiff Dish Network, LLC. Tr. Vol. I at 32:21-33:12; 34:13-16.

86.     The monitoring reports purport to list URLs selected by and preloaded to the third-party software preinstalled on the STBs by Lenkeng, not Defendants. Tr. Vol. I at 39:16-25.

87.     The initial portions of the URLs identified in the monitoring reports merely identify an internet service provider or CDN as part of an automated

technical measure and to provide for security, not the true source of origin of the stream. Tr. Vol. I at 39:16-40:23; 116:1-8.

### H.   A CDN is simply an Internet Service Provider.

88.    A CDN, like any other internet service provider, is a network of geographically distributed data centers containing servers which are interconnected with one another for the purpose of providing access to content through the Internet, which they are a part of.  Tr. Vol. I at 46:13-17; 76:8-78:3.

89.    CDNs are used by many companies to more efficiently provide access to any sort of digital data, or content, over the Internet.  Tr. Vol. I at 47:12-13 ("I confirm any sort of data can be used – can have usage of CDNs").

90.    CDNs allow for stable electronic communications efficiently and with less latency through a process called load balancing which prevents any one server from being overwhelmed with requests.  Tr. Vol. I at 47:19-48:8.

91.    CDNs do not distribute full copies of content to servers on the CDN network.  Instead, CDNs, simply buffer the first packets of data and provide them through the geographically closest node on the CDN network to the requesting computer in order to avoid latency.  Tr. Vol. I at 48:9-12.

92.    Like any other internet service provider network, data enters a CDN from a source of origin outside of the CDN, often called a point of entry or ingest point.  *Id.*

93.    Where data exits a CDN back into the public Internet or to another ISP, is usually a geographically closer data center to the requestor, and is called the edge of the CDN or edge server. *Id; see also* Tr. Vol. I at 114:13-17.

94.    Metral admitted that a CDN is merely a network through which electronic communications pass like any other ISP.  Tr. Vol. I at 113:16-114:12.

95.    Metral confirmed that CDNs use automated processes triggered by a user's request, like any other ISP.  Tr. Vol. I at 113:16-114:12.

96.    Metral admitted that a CDN automatically controls the automated process be which electronic communications pass through it, like any other ISP. Tr. Vol. I at 113:16-114:12.

97.    Metral confirmed that a CDN balances the load of data that passes through it to avoid things like bottlenecking.  Tr. Vol. I at 113:16-114:12.

98.    Metral confirmed that a CDN merely provides a more stable Internet service which reduces latency in Internet connectivity by getting data from point A to point B in a more efficient manner.  Tr. Vol. I at 113:16-114:12.

99.    Metral confirmed that his methodology in using Wireshark was incapable of identifying the "true source" of the URLs linked to in the third-party application that allegedly contained streams of the foreign network channels Dish complains of.  Tr. Vol. I at 115:8-116:8.

100.   Metral confirmed that his methodology in using Wireshark was incapable of identifying end users or IP addresses outside of the edge of the CDN that accessed the URLs.  Tr. Vol. I at 115:8-116:8.

101.   Accordingly, there was absolutely no evidence whatsoever presented at trial showing any end users in the United States ever accessed the third-party software preinstalled on the STBs Defendants resold.   Tr. Vol. III at 381:15-19.

102.   In sum, Metral admitted that his methodology was incapable of confirming the true third-party source of the alleged streams of foreign channels present at the URLs linked to by the third-party software preinstalled on the STBs or any end users of the STBs in the United States, because Wireshark is incapable of seeing anything outside of the CDN.  Tr. Vol. I at 115:8-116:8.

## I.   The Screenshots of Metral's Report are insufficient to establish substantial similarity.

103.   As noted, Metral admitted on cross-examination that the Wireshark methodology he used was wholly incapable of identifying the "true source" of the streams present at the URLs bookmarked in the third-party software preinstalled by the STB manufacturers, Lenkeng.  Tr. Vol. I at 115:8-116:8.  Thus, it logically follows that Metral admitted that his methodology was wholly incapable of identifying the "true source" of the screenshots of such content.  *Id.*

104.   Metral testified that a screenshot or screen capture represents one six-hundredth (1/600th) of a second in standard definition and one one-thousandth (1/1,000th) of a second in high definition.  Tr. Vol. I at 79:6-80:10.

105.   Accordingly, at best, a screenshot represents a mere millisecond of an audio-visual work, without audio, which is *de minimis* considering that an hour long audio-visual work would contain 36,000,000 frames (1,000 x 60 x 60).  *Id.*

106.    Put another way, as Metral established, even a thousand screenshots would merely represent less than one second of an audio-visual work.  Tr. Vol. I at 80:8-13.

107.    Metral also confirmed the alleged channel streams contained on external websites accessed through URL links the third-party application were directly from the foreign networks, not Dish's channel streams.  Tr. Vol. I at 80:14-20.

108.    Metral admitted at trial that he did not "watch tv" as Plaintiff represents nor did he conduct any of the monitoring of the preinstalled third-party application on the STBs.  Tr. Vol. I at 80:21-22.

109.    Metral did not take any of the screenshots.  Tr. Vol. I at 81:13-15.

110.    Metral had no personal knowledge of the monitoring or screenshots he relied on.  Tr. Vol. I at 81:16-17.

111.    Metral did not supervise the monitoring process whatsoever, he admitted he was, at least, twice removed.  Tr. Vol. I at 81:18-23.

112.    Regardless of how Nagravision configured their VPN to hide their true IP address and replace it with a fabricated one, Metral admitted that the true geographic location from which Nagravision used and monitored the third-party software application preinstalled on the UlaiTV STB was indisputably extraterritorial, in Switzerland, not the United States.  Tr. Vol. I at 82:13-25; 83:1-10.

113.   Metral admitted that Nagravision and NagraStar (collectively referred to by Metral as "Nagra") redirected electronic communications from outside of their networks (i.e., their intranet) to a workstation running packet sniffing software, called Wireshark.  Tr. Vol. I at 83:11-18; 85:8-86:10; 111:16-24; 113:4-9.

114.   Metral admitted Nagra intercepted incoming and outgoing electronic communications from outside private networks in real time, without permission, containing routing information, IP addresses and other embedded information and stored the same in a database they disclosed to others.   Tr. Vol. I at 83:19-85:2; 85:8-86:10; 87:1-8; 87:14-19; 88:3-9 (admitting "interception" of electronic communications); 104:19-105:4; 111:16-24; 113:4-9.

115.   Metral testified that Nagra recorded incoming and outgoing network traffic, including electronic communications, using the Wireshark program and recorded the same in the form of a packet capture ("PCAP") file.  Tr. Vol. I at 111:16-24; 113:4-9.

116.   Plaintiff did not present any witnesses from NagraStar, LLC, a separate company, at trial; thus failing to provide any evidence authenticating the monitoring reports, screen shots and any use of the STBs in the United States whatsoever.  Tr. Vols. I-III.

117.   Plaintiff did not enter any Wireshark PCAP files into evidence at trial and, thus failed to provide any evidence of any network traffic establishing that any of the URLs link addresses of the monitoring report relied on by Metral and others

are related to the third-party application preinstalled on the STBs by Lenkeng or were ever accessed by the CDNs.  Tr. Vols. I-III.

**J.     Metral's testimony at trial established that he failed to disclose evidence contrary to Plaintiff's allegations and mischaracterizes the nature of the STBs in his Report.**

118.    Metral admitted that his report mischaracterized the third-party application as integral to the STBs when it was simply one of many software applications preinstalled on the STBs.  Tr. Vol. I at 89:25 – 93:17.

119.    Metral admitted that the methodology described in his report made the false assumption that a user of the STBs would necessarily access and use the third-party application he analyzed notwithstanding the many alternative, indisputably non-infringing uses of the STBs, including numerous other software applications (YouTube, Netflix, Amazon) and an Internet browser.  *Id.*; Tr. Vol. III at 357:20-364:1.

120.    Metral admitted that his Report and previous testimony on direct examination at trial each falsely represented that the third-party application preinstalled on the STBs contained an electronic programming guide, when it did not.  Tr. Vol. I at 93:11-17.

121.    Instead, Metral begrudgingly admitted at trial that his testimony and report were both inaccurate, the STBs had an Android-based operating system with a menu like any other operating system (e.g., Windows) allowing one to select any software application installed on the computer.  Tr. Vol. I at 93:18-94:19.

40

122.   Metral's testimony at trial further established that there were five-hundred and sixty ("560") URL links identified in the third-party software application preinstalled on the STBs and Plaintiff complains of only twenty ("20"). Tr. Vol. I at 98:15-99:1; 100:1-2; *see also* Tr. Vol. III at 381:2-6.

123.   Metral failed to disclose that the complained of URLs comprise a mere 3.57% of the total number of URLs present in the third-party application preinstalled on the STBs, which is one application of many others he also failed to disclose in his report. *Id.*; *see also* Tr. Vol. III at 381:7-11.

124.   Further, Metral failed to identify the many additional preinstalled software applications (e.g., YouTube, Netflix, Hulu, et. al.) available on the STBs. Tr. Vol. III at 357:20-364:1; 381:12-14.

125.   Metral failed to disclose that each and every request made to the CDNs to take down a URL link which was communicated to Defendants was, in fact, taken down through Defendants' requests to the STBs' manufacturer, Leng Keng, to remove such URLs from the third-party application. Tr. Vol. III at 385:12-392:9 (lengthy discussions of immediate good faith action taken by Defendants, resulting in successful removal of URLs by Leng Keng, upon Defendants' notice).

126.   Indeed, as Mr. Fraifer testified and Metral confirmed at trial, the missing numbers in the consecutively numbered list of 560 URL links in the third-party application were URLs Defendants successfully requested Leng Keng immediately remove from the third-party application. Tr. Vol. II at 118:7-8 (Metral acknowledging takedowns occurred); 257:17-260:4 (Mr. Fraifer confirming he

41

took immediate action, contacting Leng Keng, when informed by the CDNs of their receipt of a takedown request and that the CDNs, including Verizon, confirmed resolution of the same.); Tr. Vol. III at 386:12-23.

127.   Metral testified and Mr. Fraifer confirmed that Defendants took immediate and reasonable action upon notice from CDNs that Plaintiff had requested removal of the URLs in the third-party application on the STBs and that URLs were, in fact, removed from the application pursuant to Defendants' urging of Leng Keng.  Tr. Vol. I at 118:7-8; Tr. Vol. III at 385:12-388:6.

128.   Mr. Fraifer testified that Defendants successfully requested that Leng Keng remove the URLs linking to the channels Plaintiff complained of in their takedown notices to the CDNs such that the complained of URLs would only be accessible in the third-party application to consumers outside of the United States. Tr. Vol. II at 270:14-271:5; *see also* 272:24-273:13; Tr. Vol. III at 385:12-388:6.

129.   In short, the evidence at trial confirmed that after being informed of Plaintiff's takedown requests to the CDNs, Defendants, in good faith, immediately contacted and convinced Leng Keng to remove the complained of URLs from their third-party software application, which they did.  *Id.*

130.   Consumers outside of the United States, where Plaintiff does not claim to have any rights, were still able to access the URLs already present in the third-party software application and Plaintiff does not complain of the same.  *Id.*

131.   Metral failed to disclose in his report, but confirmed on cross-examination, that all user requests made to access the URLs and the provision of

those URLs were all unequivocally automated through ISPs (inclusive of the CDNs which are merely ISPs themselves), not through any direction or control of Defendants. Tr. Vol. I at 100:11-101:14.

132. Metral confirmed that the automated processes used in the monitoring methodology described in his report was unreliable because it could neither verify that a channel was working properly nor identify the specific content appearing on a screen.  Tr. Vol. I at 101:20-102:12.

133.   While acknowledging errors occurred using his methodology, Metral also admitted that his report failed to include a rate of error.  Tr. Vol. I at 103:5-103:13.

134.   Metral also admits that there were large gaps in time of the monitoring methodology used and that it was sporadic.  Tr. Vol. I at 104:1-7.

135.   Metral admits there were times when URL links to channels in the third-party application were not available or not working but that he failed to note those instances in his report.  Tr. Vol. I at 104:8-18.

136.   When pressed, Metral ultimately admitted on cross-examination that the dates, times and geographic locations appearing on the screenshots attached to his report were all falsified to match up with the false IP addresses inserted by Nagra when using a VPN to mask the true date, time and geographic location where monitoring of the STBs actually occurred.  Tr. Vol. I at 105:5-108:16.

137.   In short, Metral confirmed that the dates, times and geographic locations appearing on the screenshots did not accurately reflect the true date, time

and geographic location where the screenshots were taken, in Switzerland. Tr. Vol. I at 108:3-16.

138. Instead of simply taking a screenshot using the "print screen" key present on any standard keyboard, Nagra admittedly falsified the screenshots' date, time and geographic location using third-party software to correlate with the falsified IP addresses manually inserted using a VPN. Tr. Vol. I at 108:17-109:2.

139. In fact, Metral confirmed that the software used by Nagra cropped the screenshots such that the accurate system date and time on the computer taking the screenshot was intentionally excluded. Tr. Vol. I at 109:3-17.

140. Metral admitted on cross-examination that the missing system time of the computer that actually took the screenshots, which was universally cropped out of all screenshots, was relevant data. Tr. Vol. I at 109:12-14.

141. Metral's report and testimony conflates Nagravision's monitoring activities, including the screenshots attached to his report, with those of NagraStar, collectively using the term "Nagra" to identify all monitoring and screenshots which were then comingled in the same database. Tr. Vol. I at 109:15-110:1.

142. Metral admitted he did not take the screenshots, had no personal knowledge of the same and relied wholly on someone or something else to confirm the accuracy of the screenshots. Tr. Vol. I at 110:2-15.

143. Given the inability to distinguish between Nagravision's extraterritorial activities in Switzerland and NagraStar's activities (as both are referred to, collectively, as Nagra), coupled with Metral's admission that the dates,

times and geographic locations on the screenshots were all falsified and the true system date and time of the computer that allegedly captured the screenshots were all cropped, the screenshots and monitoring reports are manifestly unreliable as one cannot discern when, where or who took the screenshots with any degree of reliability.

144.   Metral confirmed his report does not identify any of the registered or unregistered works asserted by Plaintiff in this litigation.    Tr. Vol. I at 110:19-111:15.

145.   Metral did not identify any of the specific works in any of the screenshots attached to his report and admitted that his report does not identify any specific episodes, titles of works or seasons of any specific works, including those of the asserted works.    Tr. Vol. I at 110:19-111:15.

146.   Metral admitted that once a user clicked on a URL link in the third-party software preinstalled on the STBs, it was the third-party software that was responsible for initiating communication to a URL on the Internet through automated means, not through any act of Defendants.  Tr. Vol. I at 111:25-113:3.

147.   Metral confirmed that the third-party software preinstalled by the manufacturer of the STBs instructs the hardware to make a connection only when a user chooses to use that software and further chooses to click on a link to a specific URL contained in the Lenkeng application.  Tr. Vol. I at 112:7-11.

148.   Metral further testified that no audio or video content would be delivered to the STBs or a user's screen until such time as a user made the choice

to open and use the third-party software preinstalled on the STBs and consciously select and click on a specific URL, selected by Lenkeng, in Lenkeng's application, to access third-party content as present on the Internet.  Tr. Vol. I at 112:21-23.

149.   Metral admitted on cross-examination that the Wireshark methodology he used was wholly incapable of identifying the "true source" of the streams present at the URLs bookmarked in the third-party software preinstalled by the STB manufacturers, Leng Keng.  Tr. Vol. I at 115:8-116:8.

150.   Metral testified that there was frequent interruption and downtime associated with the UlaiTV service monitored by Nagra.  Tr. Vol. I at 117:2-6.

151.   Metra confirmed that there was frequent freezing and glitches such that the channel streams available through the URL links on the third-party software application preinstalled on the STBs did not display properly or otherwise lacked in picture quality.   Tr. Vol. I at 117:7-10.

152.   Metral failed to include anything in his report and had no personal knowledge of the frequency of interruption, downtime, freezing or glitches associated with the URL links.  Tr. Vol. I at 117:11-16; 118:9-10.

153.   Metral confirmed that it is entirely possible that the screenshots may have been captured at one millisecond and the screen could have frozen immediately thereafter rendering the screenshots entirely unreliable and speculative as evidence that any audiovisual works were performed or distributed. Tr. Vol. I at 117:17-20.

154.    Metral testified and Mr. Fraifer confirmed that none of the notices Plaintiff sent to the CDNs or Defendants identified any specific copyrighted works. Tr. Vol. I at 118:22-25; Tr. Vol. III at 387:24-388:6.

155.    Instead, without providing any proof of such rights whatsoever, the notices merely claimed rights in foreign channels, not any of the unregistered or registered works asserted in this case. *Id.*

156.    Notwithstanding these deficient notices, which failed to place Defendants on notice of any copyrighted works, Defendants took immediate and good faith efforts to have the URL links removed by Leng Keng, the manufacturer of the STBs and provider of the third-party application preinstalled on the STBs. *Id.*

157.    Metral also failed to disclose that the URLs contained in the third-party application were free-to-air channels.   Tr. Vol. II at 297:24-298:3.

158.    Metral failed to disclose that the screenshots he relied upon do not contain a URL identifying their source.  Tr. Vol. I.

159.    Following multiple efforts to resolve the issues with Leng Keng's third-party software application preinstalled on the STBs, Defendants ultimately stopped selling the STBs and ceased operations.  Tr. Vol. III at 390:16-392:9.

## K.    The Testimony of Defendants TCI, PTI and Fraifer

1.    Fraifer testified that TCI was incorporated in 1996 and was involved in the telecommunications business, selling pay phones, prepaid phone cards, and voice-over IP. Tr. Vol II at 287:24-295:10.

2.        TCI offered products for resale such as prepaid phone cards and voice-over IP, which were manufactured as white-label products for TCI. Tr. Vol. II at 292: 4-293:15; 295:4-10.

3.        TCI's prepaid phone cards and voice-over IP required communications with third-party providers in order to activate such products prior to shipment for customer use.  Tr. Vol. II at 292: 4-293:15; 295:4-10.

4.        TCI started selling STBs in approximately 2009 or 2010.  Tr. Vol. II at 295: 11-22.

5.        TCI and PTI first purchased and sold ZappTV STBs from Cressida Telecom, wherein Cressida Telecom provided the STBs with a preloaded application containing URL links to foreign channels as they were already available on the Internet free-to-air.  Tr. Vol. II at 296:12-298:11.

6.        The ZappTV STBs arrived preloaded with all applications and were considered plug-and-play STBs ready for end users.  Tr. Vol. II at 296:12-298:11.

7.        PTI decided to order ZappTV STBs with white label "PlanetiTV" and entered into a written contract with Cressida Telecom on May 5, 2011. Tr. Vol II at 296:12-302: 10; Defendants' Exhibit 1.

8.        Cressida Telecom also provided the channels for the PlanetiTV STBs which were also considered plug-and-play STBs. Tr. Vol II at 296:12-302: 10; Defs' Exh 1.

9.      Defendants sold PlanetiTV STBs until approximately 2014 or early 2015, and these STBs continued to operate without issue through the end of 2015.  Tr. Vol. II at 301:13-302:13.

10.      Defendants had ongoing communications with Cressida Telecom in 2015 but ultimately discontinued business with Cressida due to increases in the cost of their products and began looking for alternatives.  Tr. Vol. II at 302:14-308:17; Defs' Exhs. 50 and 51.

11.      Defendants established at trial that STBs like those it purchased from Lenkeng were ubiquitous, sold by retailers online and also came preloaded with applications containing URL links to free-to-air channels.  Tr. Vol. II at 308:18-316:7; Defs' Exhs 113 and 114.

12.      Defendants attended trade shows in search of alternatives and replacements for the Cressida Telecom product, including attending the Consumer Electronics Show in Las Vegas, Nevada, where Defendants met representatives of Lenkeng and Netup. Tr. Vol. II at 316:20-318:23.

13.      Defendants contacted Lenkeng to discuss product alternatives for the Cressida STBs, and Lenkeng sent Defendants 10 sample Android-based STBs containing a preloaded application with URL links to free-to-air foreign channels for testing purposes.  Tr. Vol. II at 316:20-318:23.

14.      The sample Android-based STBs Defendants received did not work well as the preloaded application experienced cutting and freezing with Internet streaming. Tr. Vol. II at 316:20-318:23.

49

15.     After reaching out to Lenkeng to discuss the problem, Defendants were invited to meet again at the next Consumer Electronics Show, in 2014, to discuss the potential solutions in greater detail.  Tr. Vol. II at 319:2-321:16.

16.     While meeting with Lenkeng and Netup in 2014 at the Consumer Electronics Show, Lenkeng introduced the Defendants to Mr. Sajid Maqsood who was an independent IT consultant already working with Lenkeng and its customers.  Tr. Vol. II at 319:2-321:16.

17.     Lenkeng advised Defendants that Maqsood would likely be able to resolve the technical issues, including the cutting out and freezing experienced in testing the sample Android-based STBs received from Lenkeng. Tr. Vol. II at 319:2-321:16.

18.     Following the introduction, Defendants began working with Maqsood who advised Defendants that a CDN would resolve the cutting and freezing for the Android based STBs.  Tr. Vol. II at 321:17-24.

19.     Maqsood set up CDN services for the Defendants Android based STBs including coordinating with CDN companies and setting up test accounts. Tr. Vol. II at 323: 13-325:11; Jt Exh 5, Bates 713; Tr. Vol. III at 338:25-339:18.

20.     Defendants did not begin using CDN services until working with Maqsood.  Tr. Vol. III at 393: 13-23.

21.     Dish fails to impeach Defendants regarding CDN usage as Fastly's CDN services were not used by the Defendants but instead were related to Cressida-Telecom and as the record shows, the Complaint filed was ultimately dismissed because the debt was not properly attributed to Defendants.  Tr. Vol. III at 396:7-398:9.

22.     Maqsood had a pre-existing relationship with Verizon and profited from referrals to Verizon CDN services.  Tr. Vol. II at 331:4-323:5; Tr. Vol. III at 350:11-351:9; Joint Exhibit 4, Bates Stamp 688.

23.     Evidence at trial confirms that Maqsood had multiple customers using CDN services other than TCI and PTI, including international customers.  Tr. Vol. III at 348:20-349:1; Jt Exh 3, Bates 570.

24.     Evidence at trial also confirms that Maqsood commingled customer accounts with those of the Defendants, without Defendants' permission or knowledge, including use of test and demo CDN accounts.  Tr. Vol. II at 324:21-328:18; 330:8-18; Jt Exh 6, Bates 000835.

25.     Maqsood had his own Unisoft encoders, including a server or encoder in Germany using an IP address from CETel Germany at issue in this case, and used them to test and stream channels for other customers of his.  Tr. Vol. II at 324:21-328:18; 330:8-18; Jt Exh 6, Bates 000835; Tr. Vol. III at 349:18-350:7; Jt Exh 3, Bates 588; 351:10-352:11; Jt Exh 6, Bates 815; 352:12-357:16; Jt Exh 5, Bates 726-29, 740.

26.     Defendants established that a CDN is an acronym for a content delivery network which is simply a species of an Internet service provider (ISP) allowing for a more stable, secure Internet connectivity across geographically distant points.  Tr. Vol. III at 339:25-340:25; 342:23.

27.     CDNs are characterized by their ability to balance loads which avoids high traffic bottlenecking on the Internet, allowing for reductions in latency.  Tr. Vol. III at 339:25-340:25; 342:23.

28.     CDNs also provide added security against what are known as DNS attacks where hackers overwhelm an ISP's systems with automated requests aimed at causing them to crash.  Tr. Vol. I at 136: 10-12.

29.     Defendants did not always use CDNs for the STBs and CDNs were not required for use of Lenkeng's preloaded application containing URL links to free-to-air content over the Internet.  Tr. Vol. I at 136: 13-14; 140: 1-11.

30.     CDN services are a common type of ISP in the marketplace.  Tr. Vol. III at 343: 9-11.

31.     PTI purchased Android-based UlaiTV and AhlaiTV STBs from Lenkeng and Geniatech in 2014 and 2015.  Tr. Vol. I at 132:5-24.

32.     Defendants established that they used CDNs to improve the quality and reliability of the Internet connection to resolve consumer complaints relating to the UlaiTV and AhlaiTV Android-based STBs.  Tr. Vol. I at 134: 5-20; 135: 8-9; Tr. Vol. III at 343:12-344:11.

33.     Dish did not establish that Defendants' use of the CDNs was the only way or necessary for connecting the preloaded software application on the Android-based UlaiTV and AhlaiTV STBs to the Internet; to the contrary, the preloaded software application functioned by connecting to URL links external to the CDNs that existed on the Internet. Tr. Vol. I at 137:25-138:9.

34.     Dish did not establish that the UlaiTV and AhaliTV STBs always connected to CDNs. Tr. Vol. I at 138:11-139:2.

35.     Defendants established that CDNs are optional and not required for the UlaiTV and AhlaiTV STBs. Tr. Vol. III at 344: 12-14.

36.     The UlaiTV and AhlaiTV STBs came pre-programed with an Android operating system which functions like any other Android-based computer or smart mobile device, both of which came preloaded with software applications such as YouTube, Netflix, and Google Pay for use in connection with the Internet. Tr. Vol. III, P. 357:17-358:23.

37.     End-users of the UlaiTV and AhlaiTV STBs could delete or add software applications at their discretion, and connect peripherals such as a mouse, keyboard or any other smart device. Tr. Vol. III at 358:18-359:20.

38.      Lenkeng was the third-party provider who originated the preloaded software application containing URL links to free-to-air channels, which was preinstalled as an application out of the box for the UlaiTV and AhlaiTV STBs. Tr. Vol. III at 359: 21-363:23.

39.     End-users had complete control of the UlaiTV and AhlaiTV STBs and were able to decide which application to use, access, delete or add using the Google Play Store.  Tr. Vol. III at 359:21-363:23.

40.     Defendants established that users of the Android-based UlaiTV and AhlaiTV STBs could view television channels simply by accessing the Internet, downloading the applications, and visiting a network's website such as MBC.  Tr. Vol. I at 140:12-141:6.

41.     If CDNs ceased providing internet service or went down, the interruption for end-users of the UlaiTV and AhlaiTV STBs would be short in duration like with any other interruption to an internet connection.  Tr. Vol. I at 141:10-22.

42.     PTI had an option to set up a back-up CDN service for the UlaiTV and AhlaiTV STBs to avoid any disruption in internet connection if CDN services ever ceased or could simply rely on a traditional internet connection as the STBs were originally configured by Lenkeng.  Tr. Vol. I at 143:5-18.

43.     Defendants did not select or originate any of the content available through the URL links available on the software application preinstalled by Lenkeng on the STBs.  Tr. Vol. I at 141:10-22.

44.     Defendants established that end-users of the UlaiTV and AhlaiTV STBs could purchase a warranty plan which provided an extended replacement warranty, maintenance or technical support services to end-users.  Tr. Vol. III at 363:2-364:24.

45.     The Plan would offer an end-user support such as customer assistance in connecting the STBs and troubleshooting.  Tr. Vol. III at 364: 13-366:8.

46.     End-users of the UlaiTV and AhlaiTV STBs could stream channels from the Internet using applications like Netflix, Hulu, YouTube or any other preloaded or downloaded applications contained on the STBs with or without the purchase of a Plan.  Tr. Vol. I at 143:20-145 at 1-5; Tr. Vol. III at 364:13-366:8.

47.     End-user's purchase of a Plan was not necessary to access any of the preloaded applications provided by Lenkeng on the STBs. Tr. Vol. I at 143:20-145 at 1-5; Tr. Vol. III at 364:13-366:8.

48.     Defendants also established that the Plan offered the same warranty and maintenance or technical support services for the UlaiTV and AhlaiTV STBs, regardless of whether the Plan was purchased with the STBs as a bundle or separately as an annual renewal.  Tr. Vol. II at 272:13-273:13.

49.     The Plan did not dictate whether one could access the preloaded Lenkeng application containing URL links to free-to-air channels as they were accessible using the UlaiTV and AhlaiTV STBs regardless.  Tr. Vol. II at 272:13-273:13.

50.     Defendants established that the Plan was not a subscription for the Android-based UlaiTV or AhlaiTV STBs.  Tr. Vol. III at 366:9-368:14.

51.     Dish fails to establish that the Plan provides anything more than warranty and maintenance or technical support services for the Android-based UlaiTV and AhlaiTV STBs.  Tr. Vol. II at 273:14-274:11.

52.     Defendants used Verizon CDN services in connection with the Android-based UlaiTV and AhlaiTV STBs.  Tr. Vol. I at 133:12-24.

53.     All e-mail communications with Verizon CDN services related to "Bandwidth Usage" are related to problems associated with the Verizon CDN network itself.  Trl. Vol. I at 153:17-155:12; 168:1-7.

54.     Dish does not establish that Defendants pushed channel streams from a Tampa server.  Tr. Vol. I at 158:17-159:17; 162:25-166:4; 167:18-168:7.

55.     Sfeir testified that he downloaded channel streaming software to his work computer to test channel streams accessible on the Internet on his own time and of his own choice, without any direction from TCI.  Tr. Vol. I at 158:17-159:17; 162:25-166:4; 167:18-168:7.

56.     Dish does not establish that Sfeir pushed any channels from any server to Verizon CDN.  Tr. Vol. I at 169:10-172:18.

57.     Sajid Maqsood's directed actions on behalf of TCI and PTI with the Verizon CDN, often without Defendants' knowledge or understanding.  Tr. Vol. I at 169:10-172:18.

58.     Dish fails to establish that Defendants had an CETel server in Germany and ignores evidence strongly suggesting that Maqsood likely used

such servers to provide services to his other customers.  Tr. Vol. I at 175:17-181:12; 185:7-186:25; 187:14-25; 201:15-25.

59.      Defendants' prior counsel prepared interrogatory responses which were unsigned by Defendants and incorrect.  Tr. Vol. I at 189:11-191:5.

60.      Dish fails to establish that the WhoIS printout marked as Plaintiff's Exhibit 83 contains accurate information, and ignores the WhoIS printouts Defendants presented with contradictory information.  Tr. Vol. I at 175:17-181:23; Defs' Exhs 117 and 118.

61.      Dish failed to produce a custodian affidavit for Plaintiff's Exhibit 83.  Tr. Vol. I at 183:7:184:3.

62.      Dish failed to establish that Faraj's payments via PayPal to CETel had any relation to the Defendants.  Tr. Vol. I at 196:10-197:1.

63.      Dish failed to establish that such payments were ever directed by the Defendants or made on their behalf.  Tr. Vol. I at 196:10-197:1.

64.      The timing of the payments occurred after TCI and PTI closed business operations and started to wind down. Tr. Vol. I at 196:10-197:1.

65.      Defendants did not directly communicate with CETel, and any e-mail correspondence involving the Defendants and, upon examination, the single email Plaintiff points to is due to an inadvertent "reply all" to e-mail correspondence.  Tr. Vol. I at 206:6-207:13.

66.      Defendants established that Maqsood worked with the channel provider, Lenkeng.  Tr. Vol. I, at 208:15-210:10.

67.     Verizon e-mails containing references to Germany or Gaby's encoders are simply generic references that do not attribute any meaning to the Defendants. Tr. Vol. I, at 208:15-210:10.

68.     Beyond mere speculation and cobbling together far-fetched theories, Dish fails to establish that Defendants had any encoders in Germany. Tr. Vol. I at 212:14-21; 215:13-216:23.

69.     Defendants established that Sajid Maqsood worked with Lenkeng to set up the Verizon CDNs.  Tr. Vol. I at 212:14-21; 215:13-216:23.

70.     Maqsood advised having multiple CDN test accounts and helped the Defendants set up demo accounts.  Tr. Vol. III at 344:18-345:21.

71.     Defendants used other CDN services such as Akamai and Internap for testing purposes.  Tr. Vol. II at 226: 2-227:14.

72.     Dish fails to establish that the domain name kakalinka.com is registered to the Defendants.  Tr. Vol. II at 235:7-241:14.

73.     Dish fails to produce a custodian affidavit for the Kakalinka.com printout.  Tr. Vol. II at 243:8-15.

74.     Defendants also explained that it was likely another party who set up the Kakalinka.com account.  Vol. II at 239:15-23.

75.     Defendants established that "Fraser" only supports their testimony that Defendants are not associated with this account as Fraifer clearly knows how to spell his own last name correctly.  Tr. Vol. II at 240:21-241:1.

76.     Defendants established that NetUp worked with was involved with Lenkeng in developing middleware for the UlaiTV.  Tr. Vol. II at 248:10-249:1.

77.     Defendants established that Axel middleware software functioned the same way in relation to the AhlaiTV STB.  Tr. Vol. II at 250:11-251:12.

78.     Defendants did not store any middleware software, nor did they pay for any server or storage. Tr. Vol. II at 250:11-251:12.

79.     Defendants established that the free-to-air foreign channels available through the URL links on the preinstalled application of the STBs were, and still are, freely accessible from the Internet free-to-air using any software application, even a cellular phone.  Tr. Vol. II at 255:16-257:6.

80.     The UlaiTV and AhlaiTV STBs connected to any HDMI monitor, including a television, and the Internet and contained a software application preloaded on the Android-based UlaiTV and AhlaiTV STBs containing URL links provided by the STBs manufacturer, Lenkeng.  Tr. Vol. II at 264:1-13.

81.     End-users of the UlaiTV and AhlaiTV STBs connected to the Internet and the CDNs services simply provided for a more dependable and stable Internet connection.  Tr. Vol. II at 267:2-268:21.

82.     In 2015, Adib Sfeir communicated with CDN services, relaying information to Unisoft and Lenkeng and reported on an as-needed basis to

Gaby Fraifer, as his supervisor and President of TCI and PTI.  Tr. Vol. I at 146:4-147:3.

83.     Sajid Maqsood set up and maintained all CDN services for TCI and PTI, including troubleshooting technical issues.  Tr. Vol. I at 148:16-149:17.

84.     Maqsood worked closely with Sfeir regarding CDN communications and troubleshooting.  Tr. Vol. I at 160: 1-3.

85.     Fraifer, as President of TCI and PTI, was only involved with CDN communications as needed to resolve major problems or issues.  Tr. Vol. I at 160: 1-3.

86.     Defendants established that Maqsood made decisions without Defendants' knowledge, more specifically, without Fraifer's permission or knowledge.  Tr. Vol. III at 350:11-351:9; Jt Exh 4, Bates 688.

87.     Dish fails to establish TCI's revenues attributable to the alleged infringements with regard to the sale of the Android-based UlaiTV and AhlaiTV STBs for 2015, 2016 and 2017, Q1.  Tr. Vol. II at 278:1-280:16; 369:2-24; Defs' Exh 116; Jt Exhs 7, 8 and 9.

88.     Dish fails to establish that all purported revenue is related or reasonably attributable to the alleged infringement of the asserted works and unreasonably seeks all revenues for the sale of STBs where its own expert admits are capable of a multitude of non-infringing uses and its corporate representative admits have inherent value as a computer.  Tr. Vol. II at 278:1-280:16; 369:2-24; Defs' Exh 116; Jt Exhs 7, 8 and 9.

89.     Defendants established their gross revenues associated with the sale of the Android-based UlaiTV and AhlaiTV STBs for 2015 (half year), 2016, and 2017 taking a conservative approach.  Tr. Vol. III at 372:12-375:17.

90.     Defendants established that the 2015 revenues should not include revenues associated with the Plans because such sales relate to UlaiTV STBs purchased in 2014 which are not Android based STBs and have no relation to the Android based UlaiTV STBs at issue in this case.  Tr. Vol III at 372:24-373:17.

91.     Defendants also established that their cost of goods sold are accurate as they were contemporaneously maintained by their bookkeeper in the ordinary course of business according to a formula which recorded appropriate costs and expenses directly related to the sale of the Android based UlaiTV and AhlaiTV STBs.  Tr. Vol. II at 280:20-285:14; 375:18-376:15; Jt Exhs, 7, 8 and 9.

92.     Defendants established an allocation of fixed costs from the TCI's profit and loss statements which was very conservative.  Tr. Vol. III at 376:17-379:7; 384:4-385:4; Defs' Exhs 9, 11, and 13.

93.     Defendants established that TCI's profit and loss statements were contemporaneously prepared and maintained in the ordinary course of business.  Tr. Vol. III at 376:17-379:7; 384:4-385:4; Defs' Exhs 9, 11, and 13.

94.     Defendants established a net profit number for the Android-based UlaiTV and AhlaiTV STBs and Plans of $70,592.48, but this number

includes sales for the Plans and does not make any deductions for international sales, or adjustments for attribution for the asserted works.  Tr. Vol. III at 379:8-381:6.

95.     Defendants established that if the so-called Protected Channels represents only 3.6% of the total number of channels available on the Android based UlaiTV and AhlaiTV STBs and when taking into account the asserted works, represents only a small fraction of that percentage.  Tr. Vol. III at 381:2-11.

96.     After multiplying $70,592.48 by 3.6% the estimated net profits yields only $2,541, which still does not account or adjust for sales to international customers or attribution for the asserted works.  Tr. Vol. III at 381:12-382:4.

97.     Defendants established an alternative reasonable allocation, applying a percentage of total airtime based on a 1 hour airing time for each asserted unregistered work, which such calculation yielded a net profit number of $2,823.69.  Tr. Vol. III at 382:23-384:3.

98.     Defendants established that the Defendants have a good faith reason to believe that their conduct did not amount to copyright infringement based on their business relationship from Cressida Telecom.  Tr. Vol. II at 308:18-316:7; Defs' Exhs 113 and 114.

99.     Cressida Telecom sold STBs which contained a preloaded application which contained URL links to foreign free-to-air channels available on the Internet. *Id.*; Tr. Vol II at 296:12-302:10; Defs Exh 1.

100.     Dish fails to establish that the Defendants received all Notices, which were deficient because they did not identify any works.  Tr. Vol. III, at 385:12-22.

101.     Defendants did not receive the Notices but did promptly respond to Verizon e-mail correspondence.  Tr. Vol. III, at 385:16-387:23.

102.     Defendants established that none of the Notices or e-mail correspondence identified any works.  Tr. Vol. III at 387:24-388:6.

103.     Defendants established that they fully cooperated with Verizon each and every time there was an issue or allegation of infringement associated with Lenkeng's preinstalled software application.  Tr. Vol. II at 252:1-254:10.

104.     Defendants responded immediately by notifying Lenkeng in response to Verizon's e-mail communications and requesting Lenkeng take down the complained of link, resulting in timely resolution in virtually every instance.  Tr. Vol. II at 257:17-259:6.

105.     Verizon acknowledged and thanked the Defendants for their prompt resolution to all matters or issues raised in email correspondence entered into evidence at trial.  Tr. Vol. II at 252:1-254:10.

106.     Defendants did everything within their power to cooperate with Verizon e-mail communications and requests made by Plaintiff to the CDNs. Tr. Vol. III at 388:7-391:17.

107.     Defendants did not understand the content of any Verizon e-mail communications containing allegations of copyright infringement.  Tr. Vol. II at 259:7-259:23.

108.     Defendants established that they cooperated with Verizon because they did not want a problem or disruption to their business, not because of they understood the notices.  Tr. Vol. II at 259:7-259:23.

109.     Defendants responded to all communications from Tulix CDN services.  Tr. Vol. II at 259:24-25.

110.     Fraifer's native country is Lebanon, English is not his native language.  Tr. Vol. II at 255:13-15.

111.     Defendants established that Fraifer often confuses singular and plural in communications.  Tr. Vol. II at 322:1-323:11.

112.     Fraifer and his family have been active in their local community, and he and his wife have two children attending college and has two other children in grades school.  Tr. Vol. II at 215:1-15.

113.     Defendant Fraifer would not take any action to harm his family or community.  Tr. Vol. II at 215:1-15.

**L.     The Testimony of Adib Sfeir**

1.     Mr. Sfeir worked as a sales agent for TCI from 2002 through 2015 selling phone cards for fourteen years and STBs for one.  Tr. Vol. III at 471:20-472:19.

2.     Mr. Sfeir is currently employed as a sales agent for Branex, a food, beverage and cigar distributor in Tampa, Florida. Tr. Vol. III at 471:20-473:16.

3.     Mr. Sfeir testified under oath at his prior deposition, and again at trial, that although he was ashamed to admit his transgressions, he regretted his gross exaggeration of his credentials as listed on his 2017 resume and that he knew doing so was wrong.  In the end, when it mattered most and when faced with the gravity of testifying under oath on two separate occasions, he told the truth each time.  Mr. Sfeir testified truthfully at trial.  Tr. Vol. III at 470:3-471:19; 478:2-5; Pl. Exh. 82.

4.     Mr. Sfeir disclaimed the contents of his LinkedIn resume as false under oath at his prior deposition.  *Id.*

5.     Mr. Sfeir explained that the grossly exaggerated credentials listed in his resume were drafted based on technical documents he independently found and reviewed.  *Id.*

6.     Mr. Sfeir testified that his experimentation with software from a company called Wowza was independent and not part of his duties as an employee of TCI.  Tr. Vol. III at 476:14-478:5.

7.      Mr. Sfeir confirmed that his activities in experimenting with Wowza software while at TCI's offices in Tampa were not authorized or directed by TCI or Mr. Fraifer.  Tr. Vol. III at 476:14-478:5.

8.      Mr. Sfeir testified under oath that although he sent e-mails in an effort to resolve technical issues with the STBs and the third-party software, all he did was relay information received from Verizon to Leng Keng and Leng Keng to Verizon.  Tr. Vol. III at 443:1-6; 453:11-454:7 (confirming the same to the Court when asked directly).

9.      Mr. Sfeir testified that he received technical information from vendors by phone, including URLs, which he simply relayed to Verizon.  Tr. Vol. III at 454:9-22; 478:2-5.

10.     Mr. Sfeir testified that he was the only one who communicated with Verizon, Unisoft and Leng Keng during his employment with TCI.  Tr. Vol. III at 462:2-3; 478:2-5.

11.     Mr. Sfeir testified that he did not log into middleware.  Tr. Vol. III at 443:20-22; 478:2-5.

12.     Instead, Mr. Sfeir testified that he merely logged into a website for purposes of activating the STBs which was merely a security protocol to protect against theft.  Tr. Vol. III at 444:2-12; 478:2-5.

13.     Mr. Sfeir testified under oath that he never worked with encoders.  Tr. Vol. III at 449:11-19; 478:2-5.

14.     Mr. Sfeir testified under oath in his deposition and at trial that the information on his resume was false.  Tr. Vol. III at 470:3-471:25; 478:2-5.

15.     Mr. Sfeir testified that his resume did not contain accurate information as to his work duties at TCI and that he fabricated the information in his resume to create a more impressive profile.  *Id.*; 478:2-5

16.     Mr. Sfeir was merely a sales agent that provided limited technical support which was largely comprised of assisting customers of PTI and TCI and relaying information between the ISPs to Leng Keng.  Tr. Vol. III at 471:20-22; 478:2-5.

17.     Mr. Sfeir's primary role for thirteen years was in the sale of phone cards.  Tr. Vol. III at 472:16-19; 478:2-5.

18.     Mr. Sfeir testified that he was involved in the sale of STBs at TCI for approximately one year before leaving for his current employment with Branex.  Tr. Vol. III at 472:11-15; 478:2-5.

19.     Since leaving TCI, Mr. Sfeir has worked in sales for a convenience store supplier involved in the distribution of food, beverage, cigars and candy products, not in a technological field.   Tr. Vol. III at 472:20-473:16; 478:2-5.

20.     Mr. Sfeir confirmed that the e-mails Plaintiff's counsel asked him about all contained information he received and relayed from the CDNs, Unisoft and Lenkeng.  Tr. Vol. III at 473:17-474:23; 478:2-5.

21.    Mr. Sfeir further confirmed with absolute certainty that the information contained in the emails he was questioned about did not originate from Defendants.  Tr. Vol. III at 472:24-475:1; 478:2-5.

22.    Mr. Sfeir testified that he activated the STBs prior to shipment by going to the vendor's website and entering an activation code into the STB just as he had done in the telephone card industry; and that there was nothing nefarious about doing so.  Tr. Vol. III at 475:2-476:13; 478:2-5.

## M.    The Testimony of Dish's Corporate Representative

23.    Ms. Remeirsma confirmed that she had been at her position only since July 2020, long after the relevant period of time at issue in this litigation.  Tr. Vol. III at 480:14-16; 505:8-20.

24.    Ms. Remeirsma testified that the top-end Arabic package is offered through its subsidiary, Sling TV, LLC, and contains 110 channels and is currently offered at a price point of $25.  Tr. Vol. III at 483:16-23.

25.    Ms. Remeirsma confirmed that Dish offers promotions and fees to potential subscribers.  Tr. Vol. III at 484:19-21.

26.    Ms. Remeirsma confirmed that Dish did not pay Al Jazeera any licensing fee during the relevant time period whatsoever.  Tr. Vol. III at 488:13-16.

27.    Ms. Remeirsma confirmed that Dish is no longer carries five of the twenty channels complained of in this litigation: Al Jazeera, Al Nahar Sports, Al Nahar Drama, Al Nahar and the Dream 2 (the "Defunct Channels").  Tr. Vol. III at 492:15-21.

28.     Dish has no ongoing interest in the Defunct Channels which amount to twenty-five percent (25%) of the channels complained of in this litigation.  Tr. Vol. III at 492:15-21.

29.     Ms. Remeirsma confirmed that Dish no longer has an exclusive license in all of the remaining fifteen channels it complains of in this litigation.  Tr. Vol. III at 492:24-493:2; *see also* Pl. Exh. 85, at "Exclusive Rights End Date" column (identifying multiple terminations of Dish's alleged exclusive rights in 16 channels, many of which were terminated early in this litigation without notice to Defendants).

30.     More specifically, Dish no longer holds exclusive rights in Al Arabiya, Al Jazeera, Al Nahar, Al Nahar Drama, Al Nahar Sports, Dream 2, IQRAA, MBC1, MBC Drama, MBC3, MBC Masr, Murr TV, New TV/Al Jadeed, Noursat, ONTV or OTV.  Tr. Vol. III at 492:24-493:2; see also 492:2-6; Pl. Exh. 85, at "Exclusive Rights End Date" column.

31.     Of the twenty (20) channels Dish has complained of, it admittedly has exclusive rights in only four (4) of those channels today: LBC, LDC, Future TV and Al Hayah 1.  *Id.*

32.     Ms. Remeirsma testified that it was not surprising to her that Dish Network LLC had not produced any documents in support of its damages. 508:21-24.

33.     Ms. Remeirsma testified that the STBs are shells in that they are merely a piece of equipment.  Tr. Vol. III at 510:15-20.

34.    Ms. Remeirsma further established that there are non-infringing uses for Android-based STBs and that they have inherent value as hardware.  Tr. Vol. III at 510:19-512:14.

35.    Ms. Remeirsma agreed that Defendants did not manufacture the STBs in this case.  Tr. Vol. III at 513:5-7.

36.    In reviewing Defendants' Exhibit 15, Ms. Remeirsma testified that Dish relies solely on the representations and warranties contained in their agreements with foreign networks and does not investigate or verify the rights claimed to be held by such foreign networks.  Tr. Vol. III at 517:10-21; 519:11-15; Def's Exh. 115.

37.    Ms. Remeirsma testified that she did not have any personal knowledge of, nor did she review the foreign network agreements but, instead, blindly relied upon the conclusory statements of Plaintiff's Demonstrative Exhibit 86 in testifying that Dish Network, LLC held exclusive rights to certain foreign network channels.  Tr. Vol. III at 519:6-10; Defs' Exhs. 92-112.

38.    Dish Network, LLC had no knowledge whatoever as to the existence of screenshots produced in this matter.  Tr. Vol. III at 523:7-9.

39.    Ms. Remeirsma testified that the foreign network agreements do not identify specific works but, instead, only identify channels.  Tr. Vol. III at 523:14-22.

40.    Ms. Remeirsma established that the agreements listed in Defendants' Exhibit 115 are agreements for channels, not works.  Tr. Vol. III at 523:23-524:8.

41.   Ms. Remeirsma testified that foreign network agreements are prospective, future, forward-looking rights, for potential works that haven't even come into existence yet.  Tr. Vol. III at 524:9-23.

42.   Ms. Remeirsma testified that there are currently only 50,000 subscribers on Dish's entire OTT platform, of which the Arabic stations are a portion, and that there were less, five years ago, but she could not provide an accurate number of total OTT subscribers or Arabic package subscribers during the relevant time period.  Tr. Vol. III at 525:13-526:13.

## III.  CONCLUSIONS OF LAW

### A.   Copyright Ownership

As established in the Report and Recommendation, (Docs. 246, *adopted at* Dkt. 257), this Court relied heavily upon four declarations attached to Plaintiff's Motion for Summary Judgment (Doc. 146) under Fed. R. Civ. P. 54(c)(4) to support its claims of alleged ownership of exclusive rights in the registered and unregistered foreign works asserted in this case.  See E.g., Doc. 246 at 27, 32, 34-36, 41, 45 (relying on the Declarations of Whitehead, Abutaha, ElMokadem and Ayoub ("Foreign Network Declarants") in finding for Plaintiff on various points of fact and law, including ownership).   Indeed, the Court's Report and Recommendation discussed numerous very close, complex arguments regarding the unique issues of fact and law which have arisen in this case relating to the assertion of registered and unregistered copyrights by a purported exclusive licensee.

However, evidence and testimony elicited and developed through four trial depositions of the Foreign Network Declarants, who were not disclosed to Defendants during the discovery period in this case, along with the testimony of several party witnesses have revealed critical new evidence establishing that this Court relied on declarations at summary judgment which fall woefully short of the requirements of Fed. R. Civ. P. 56(c)(4) because they were admittedly not made from personal knowledge, as claimed, but from inadmissible hearsay.  To be sure, each of the declarants falsely stated that their declarations were from personal knowledge only to expressly disclaim those statements once faced with the gravity of testifying under oath where the veracity of their assertions were tested.

Taken together, in order to prevent manifest injustice to Defendants, to promote the integrity of litigants in this Court, and to promote judicial efficiency so this case may be determined on the merits, under prevailing Eleventh Circuit law. The newly discovered evidence revealed through the aforementioned trial depositions, along with the testimony and evidence adduced at trial, justifies this Court's reconsideration of the threshold issues of ownership, publication, notice and scope of protection, each of  which were decided under the false pretense that the declarations it relied upon were truthful, reliable and based on the Foreign Network Declarants' personal knowledge as required under Rule 56(c)(4), not inadmissible hearsay.

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion **must** be made on personal knowledge, set out facts that would be admissible in evidence, ***and*** show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 54(c)(4) (emphasis added); see also *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (collecting cases) ("The Rules are clear: "Supporting and opposing affidavits shall be made on personal knowledge."); *Tishcon Corp. v. Soundview Communs., Inc.*, 2006 U.S. Dist. LEXIS 97309, at *18-21 (N.D. Ga. 2006) (discussing the requirement for personal knowledge).

"[A]ffidavits that are not based on personal knowledge 'cannot raise genuine issues of fact, and thus . . . cannot defeat a motion for summary judgment.'" *Longleaf in Vinings Homeowners Ass'n v. QBE Ins. Corp.*, 646 F. App'x 823, 824 (11th Cir. 2016) citing *Ellis v. England*, 432 F.3d 1321, 1326-27 (11th Cir. 2005) (per curiam); *Landon v. City of N. Port*, 745 F. App'x 130, 133 (11th Cir. 2018) (finding affiant not competent to testify on the matters included in an affidavit because he lacked personal knowledge); *Calvert v. Doe*, 648 F. App'x 925, 927 (11th Cir. 2016) ("A court cannot consider inadmissible hearsay when ruling on a summary judgment motion."); *Hines v. Parker*, 725 F. App'x 801, 807 (11th Cir. 2018) ("[A]ffidavit was not 'made on personal knowledge [and failed to] set out facts that would be admissible in evidence . . . .'").

This Court can and should utilize its inherent powers to remedy what amounts to manifest injustice based upon new evidence indisputably establishing misrepresentations were made to the Court regarding the very basis of each of the Foreign Network Declarants' declarations relied upon by this Court. The law is clear, under Fed. R. Civ. P. 54(c)(4), 56, 60(b)(6) and the Court's inherent powers, this Court has the discretion to reconsider its own prior order granting partial summary judgment on the threshold issue of ownership.

First, as the comments to Fed. R. Civ. P. 56 state, "Rule 54(a) defines 'judgment' as including a decree and 'any order from which an appeal lies.' Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary 'judgment' is not a final judgment[.]" Fed. R. Civ. P. 56. The notes to Rule 56 also state that "[i]f the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." *Id.* "Summary judgment orders are considered interlocutory, and 'the court at any time before final decree (could) modify or rescind it.' Thus, vacating [an] earlier order [is] within the district court's power." *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 862 (5th Cir. 1970); see also *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993) ("Rule 54(b) confirms the Court's power to reconsider its interlocutory orders. The Court has discretion in deciding whether to reconsider a previous order.").

Second, Fed. R. Civ. P. 60(b) provides another avenue for a district court to reconsider a prior judgment.  See *Carrero v. Sanabi Invs., LLC*, 2019 U.S. Dist. LEXIS 117595, 2019 WL 3024462, at *3 (S.D. Fla. 2019) ("Ultimately, however, the Court retains 'substantial discretion' to grant or deny a motion for reconsideration. The Court may grant reconsideration under Rule 60(b)(6) "in order to do substantial justice[.]" citing *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (reconsidering partial summary judgment)); see also *Obregon v. JEP Family Enters.*, 2011 U.S. Dist. LEXIS 95235, at *5 (S.D. Fla. 2011) (reconsidering partial summary judgment); Fed. R. Civ. P. 60(b) allowing for reconsideration of a prior judgment *inter alia* where, as here, there is newly discovered evidence (60(b)(2)), fraud or misrepresentation (60(b)(3)) or for "[a]ny other reason that justifies relief" (60(b)(6).).

Finally, a district court may reconsider its own order granting partial summary judgment under its inherent powers.  See *Ligotti v. United Healthcare Servs.*, 2021 U.S. Dist. LEXIS 106992, at *15-16 (S.D. Fla. June 8, 2021) ("We could always reconsider the summary judgment order under our inherent authority because 'a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court.'" citing *Oliver v. Orange Cty.*, 456 F. App'x 815, 818 (11th Cir. 2012)). "It is within the court's discretion to grant a motion for reconsideration." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000); *Interlego A.G. v. F.A.O. Schwarz, Inc.*, No. 18835, 1976 U.S. Dist. LEXIS 15793, at *6-7 (N.D. Ga. Mar. 31, 1976) (reconsidering prior grant of partial

summary judgment in a patent matter and vacating its prior holding in the interest of judicial economy).

Here, the Court most certainly has good reason to exercise its discretion in reconsidering its interlocutory order of partial summary judgment under its inherent authority.  The revelation of new evidence, through sworn testimony, establishing that this Court relied upon affidavits it likely would have stricken as a matter of law under Rule 56(c)(4), had it known they were not made from personal knowledge, on issues directly relevant to and relied upon by this Court in determining summary judgment, to prevent manifest injustice, cannot be ignored.

The testimony of each of the Foreign Network Declarants established that their declarations were not made from personal knowledge, but from inadmissible hearsay.  Their declarations should accordingly be stricken from the record.  To allow this case to proceed in view of the clear and unequivocal revelations of their false declarations under oath, made from foreign soil, offends notions of fair play and justice, setting a dangerous precedent.  Defendants should not be held to suffer the consequences of the declarants' contrived testimony.  When finally given the opportunity to take their testimony, albeit not in this Court as desired, their false statements were, in any event, ultimately exposed.  Indeed, their false statements were far more substantial and costly then Sfeir's exaggeration of his resume – a forgivable transgression of an otherwise honest individual who admitted his fault not once, but twice.  Defendants respectfully request this Court utilize its discretion

to do justice and reverse its interlocutory order of partial summary judgment on ownership, which relied on false evidence that should never have been considered.

**B.    A copyright plaintiff seeking to assert unregistered foreign works bears the heavy burden of proving compliance with the statutory formalities as to each unregistered work asserted.**

Outside of certain narrow statutory exceptions, 17 U.S.C. §411(a) bars a copyright owner from suing for infringement until "registration . . . has been made." *Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888 (2019); see also *Lee v. Black Entm't TV, LLC*, No. 19-cv-02751 (LAK), 2020 U.S. Dist. LEXIS 43086, at *2-4 (S.D.N.Y. Mar. 5, 2020) (applying *Fourth Estate* in dismissing claims of copyright infringement of unregistered audiovisual works).

As a threshold matter, in the Eleventh Circuit, a Plaintiff seeking to assert unregistered foreign works bears the heavy burden of "proving compliance with statutory formalities" including: (i) proof of publication, (ii) proof of first publication, (iii) proof that an unregistered work is not a United States work and, thus, (iv) exempt from the pre-suit registration requirement of Section 411(a). *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1303-5, 1312 (11th Cir. 2012) (finding Plaintiff failed to meet its burden in proving a foreign work was exempt from the registration requirement of §411(a).  In sum,:

> [T]o proceed with a copyright infringement action, a plaintiff that claims his published work is exempt from the registration requirement **must prove** that the first publication [of each asserted unregistered work] occurred abroad.  See 17 U.S.C. §§ 101, 411(a); *Latimer*, 601 F.3d at 1233; *BUC Int'l Corp.*, 489 F.3d at 1141–42.  This **requires the plaintiff to first prove a publication**: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication.  **Once the plaintiff has proven**

> ***publication, he must then prove that the publication was,***
> ***in fact, the first publication, and that the geographic extent***
> ***of this first publication diverges from the statutory***
> ***definition of a "United States work***."

*Id.* (emphasis added).  *see also Kernel Records Oy v. Mosley*, 2013 U.S. Dist. LEXIS 99094, at *28 (S.D. Fla. July 16, 2013) ("'[P]ublication is a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term.' Although Kernel asserted Acidjazzed Evening was published by Gallefoss, it lacked 'sufficiently probative evidence that it complied with the statutory prerequisites required to bring [the] action.' *Id.* at 1311.").

Plaintiff has failed to meet its heavy burden, as it must, in establishing, through admissible evidence, compliance with the statutory formalities and exemption from the pre-suit registration requirement of § 411(a) of the Act for each of the fifty-five unregistered works it seeks to assert. See 17 U.S.C. 104(b) (last paragraph following numbered list clarifying 104(b)(2)); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 612.7(J) - Nation of First Publication.

First, Plaintiff has failed to establish publication of each of the fifty-five unregistered audio-visual works it seeks to assert.  It is axiomatic that the Court cannot rely on the inadmissible hearsay and conclusory statements of witnesses that admittedly lack personal knowledge. Fed. R. Civ. P. 54(c)(4); *Mosley* at 1310-11 (rejecting affidavits and deposition testimony as conclusory on appeal). "[P]ublication is a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." *Mosley* at 1310.

Second, even were this Court to find Plaintiff established publication of each of the asserted works, Plaintiff has failed to establish that the publication of each of the fifty-five unregistered works was, in fact, the first publication of each of those works. See *Mosley* at 1305 ("Once the plaintiff has proven publication, he must then prove that the publication was, in fact, the first publication . . . ."). There is absolutely no evidence in the trial record even attempting to establish that the alleged publication of the asserted unregistered works was, in fact, the first publication of each asserted unregistered work.

Moreover, "[w]ithout evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether [each of] the [works] met the statutory definition of a 'United States work,' or was instead a foreign work." *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1350 (S.D. Fla. 2017) (rejecting conclusory deposition testimony and affidavits in a nearly identical case relating to unregistered foreign works) citing *Mosley* at 1304 (likewise rejecting conclusory statements at deposition and within a declaration as not probative and insufficient). Here, each of the foreign network witnesses testified and the underlying agreements established that the unregistered works were certainly published in Iraq and Iran through free-to-air distribution to the public and in the United States by offering the works to Dish for further distribution, either simultaneously or within 30 days. See 17 U.S.C. 104(b).

In short, this Court should not lose sight of the fact that the Eleventh Circuit has made clear that ***plaintiff bears the burden*** of definitively proving

compliance with statutory formalities and exemption from the pre-suit registration requirement through sufficiently probative evidence establishing that each asserted work is a United States work or a foreign work.  Where questions remain, plaintiff has necessarily failed to meet its burden to affirmatively prove exemption from the requirements of §411(a) and the Court must find for Defendants.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1312 (11th Cir. 2012); see also *Kernel Records Oy v. Mosley*, 2013 U.S. Dist. LEXIS 99094, at *28 (S.D. Fla. July 16, 2013) (on remand, discussing this holding at length).  In this case, Plaintiff has clearly not met its heavy burden to prove the unregistered works are exempt from the requirements of §411(a).  The fifty-five asserted unregistered works all share at least two infirmities with regard to compliance with the statutory formalities: (i) Plaintiff has not even attempted to prove the first publication of each of the fifty-five works, as it must, and (ii) Plaintiff has failed to meet its burden in establishing the works are not United States Works under Section 104(b)(last paragraph).

Section 104 of the Copyright Act specifically addresses the National Origin of works for purposes of the Act and provides direct guidance in determining whether "the geographic extent of this first publication diverges from the statutory definition of a "United States work." *Mosley, 694 F.3d 1294, 1312*; *see also* 17 U.S.C. 104(b) (see paragraph following numbered list).  Of particular significance here, the last paragraph of Section 104(b)[2] of the Copyright Act states:

---

[2] Easily overlooked, this paragraph—which clarifies 104(b)(2)—appears following 17 U.S.C. 104(b)(6).  Also noteworthy is Section 104(c) which addresses the "Effect of the Berne Convention" after the United States' accession to that treaty.  Section 104(c) makes clear Congress' intent that "No right or interest in a work eligible for protection

> For purposes of paragraph (2), a work that is published in the United States or a treaty party ***within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States*** or such treaty party, as the case may be.

*See* 17 U.S.C. 104(b).  Thus, if a work is published in a foreign nation that is not a treaty party (e.g., Iran or Iraq) and then the United States, within 30 days, the work "shall be considered to be first published in the United States" and subject to the pre-suit registration requirement of §411(a).

Four witnesses, representing each of the foreign networks at issue in this case, each testified that the works asserted in this case were transmitted and distributed free-to-air, to the general public, in the non-treaty countries of Iraq and/or Iran, and also offered to Dish and transmitted for further distribution in the United States within 30 days.  See Dkt. 311-1 ("*Whitehead* Depo." (MBC)), at 61:3-13; 63:11-13; 74:4-14; 163:5-18, 175:8-21; Dkt. 311-4 ("*Abutaha* Depo. (Al Jazeera)), at 7:23-9:17; 42:12-14; Dkt. 311-5 ("*Ayoub* Depo." ("IMD")), at 53:22-52:5-57:15; Dkt. 311-6 ("*ElMokadem Depo*." (Worldspan)), at 26:6-15; 47:1-5; 88:15-18; 89:9-15; 90:3-5; 91:1-4.

Thus, all of the Unregistered Works asserted in this case must be considered to be United States Works subject to the pre-suit registration requirement of 17 U.S.C. § 411(a).  The Unregistered Works were not registered prior to commencing

---

under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto. Any rights in a work eligible for protection under this title that derive from this title, other Federal or State statutes, or the common law, shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto."

this suit.  Dish has failed to meet its heavy burden, as it must, in proving, as to each of the fifty-five works asserted in this litigation: "publication, ... that the publication was, in fact, the first publication, and that the geographic extent of ... first publication diverges from the statutory definition of a "United States work" such that the works are exempt from the statutory formalities of the Act, inclusive of § 411(a).  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1312 (11th Cir. 2012).  As such, Dish lacks standing to bring suit as to these works.  *Fourth Estate,* 139 S. Ct. at 888 (2019); see also *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1350-51 (S.D. Fla. 2017) (holding "Plaintiff bears the burden of proving compliance with statutory formalities" and that "[w]ithout evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether the [work] met the statutory definition of a 'United States work,' or was instead a foreign work. . . . Without sufficiently probative evidence of [Plaintiff's alleged work] being a foreign work exempt from registration, and without a certificate of registration, [Plaintiff's] infringement suit was over before it began.").  Therefore, Plaintiff's claims as to the fifty-five Unregistered Works asserted in this litigation are due to be denied.

## C.     The Registered Works

### 1.     Plaintiff's Claims for Infringement Must Be Denied for Failure to Provide Defendants With Advance Prepublication Notice Under 17 U.S.C. § 411(c)(1), (2) and 412.

In the case of an audiovisual work, "the first fixation of which is made simultaneously with its transmission," Sections 411(c)(1) and (2) of the Copyright

Act *requires* that a copyright owner "serves notice upon the infringer, not less than 48 hours before such fixation, identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work, **and** (2) makes registration for the work" within 3 months as required under Section 411(a).  17 U.S.C. §§ 411(c)(1) & (2) (emphasis added).

Plaintiff has failed to meet its burden in establishing its prima facie case of copyright infringement in compliance with the statutory formalities of Sections 411(c)(1), (2) and 411(a) for three of the four asserted Registered Works and all asserted Unregistered Works broadcast live and first fixed simultaneously with their transmission.  See 17 U.S.C. §§ 411(c) and 412 (establishing, "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for— (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration" where the prepublication notice and registration requirements of Section 411(c) has not been complied with.).  Thus, Plaintiff's claims of infringement, for damages and attorneys' fees for all such works, including three of the Registered Works, must be denied as a matter of law under the Copyright Act.  *Kernel Records Oy v. Mosley,* 694 F.3d 1294, 1311 (11th Cir. 2012) ("Without proof of compliance with required statutory prerequisites, [Plaintiff's] case was not properly commenced.").

First, Mr. Whitehead testified that three of the four asserted Registered Works were broadcast live and thus first fixed simultaneously with their first publication.  See *Whitehead Depo.*, at 21:1-11 (U.S. Copyright Reg. No. PA-1-992-

320) ("Q: A morning show, okay.  And you'd agree that this program broadcasts live from a studio in the morning?  A:  That's correct."); 26:3-17 (U.S. Copyright Reg. No. PA-1-992-317) ("Q: Is it something that's a live show?  A:  It is, yes."); 32:1-7 (U.S. Copyright Reg. No. PA-1-992-319) ("Q: Okay, so something that would be live from a studio?  A: Yeah.").  In fact, Mr. Whitehead testified that multiple additional Unregistered Works were broadcast live.  Id., at 47:2-4 ("This is a live talk show produced in Egypt, so again, I don't know how – how they – how they number their episodes.").  Indeed, Mr. Whitehead's testimony clearly establishes that each of the aforementioned Registered and Unregistered Works were audiovisual works broadcast live and fixed for the first time upon their transmission on the alleged dates of first publication.  *Id.*  Thus, the aforementioned works are subject to the requirements of Sections 411(c)(1) and (2) of the Copyright Act.

Second, Mr. Whitehead further testified that he was not aware of any prepublication notices for any of the asserted Unregistered or Registered Works being provided to Defendants on behalf of MBC or Plaintiff as expressly required under Section 411(c)(1) of the Copyright Act.  See *Whitehead Depo.*, at 34:24-35:11 ("Okay, and to your knowledge, was there ever a prepublication notice provided to defendants regarding any of the specific works that have been claimed in these registration certificates that we just reviewed?  A. No, I don't –- I don't know what a prepublication certificate is. . . .  Q.  Was there ever notice of these specific works, prior to the date that they aired, to the defendants?  A. Not that I'm aware of.").  It

is also undisputed that Dish likewise failed to provide any prepublication notices to Defendants compliant with Section 411(c)(1), did not enter any prepublication notices into evidence for any of the asserted works or provide testimony from any witnesses regarding any prepublication notices relating to any asserted works at trial. Indeed, none of the alleged infringement notices, whether sent to CDNs or Defendants, contained prepublication notice of any of the abovementioned Registered and Unregistered Works and none of the notices identified even a single specific work, rendering them wholly deficient to satisfy the requirements of 17 U.S.C. § 411(c)(1) prior to their alleged first dates of publication (also alleged to be the dates of alleged infringement).

Accordingly, Dish cannot assert infringement, seek statutory damages or attorney's fees of the aforementioned Registered or Unregistered Works because they failed to provide the required prepublication notices of the specific works alleged, one of the prerequisites required as a matter of law under Section 411(c)(1) of the Copyright Act. See 17 U.S.C. § 412. Thus, on these facts alone, Dish's claims of infringement of Copyright Registration Nos. PA-1-992-315, PA-1-992-317 and PA-1-992-320, along with any other Unregistered Works broadcast live and fixed for the first time upon their transmission, must be denied as a matter of law. Thus, Defendants request that this Court enter judgment in favor of Defendants, denying Plaintiff's claims as to the aforementioned three Registered Works and any of the Unregistered Works first fixed at the time of their transmission as identified by the foreign network representatives in their trial depositions.

85

**2.    Plaintiff does not have an exclusive right in Copyright Registration No. PA-1-992-319 because a single co-owner of a jointly owned work cannot grant an exclusive license to a work.**

One of the asserted Registered Works, identified as U.S. Copyright Registration No. PA-1-992-319, includes a claim of copyright by MBC FZ, LLC and O3 Productions as joint owners for a work entitled, "Saherat Al Janoub." See Pl. Exhibit 3.  Mr. Whitehead testified that MBC FZ, LLC is a different company than O3 Productions, LLC, the joint author and owner of this work. Dish has not produced nor entered into evidence at trial any writing or other evidence even purporting to grant an exclusive right in this work from the listed joint author, O3 Productions.  *Id.*; see also Pl. Exh. 3; Whitehead Depo., at 179:1-6

Section § 201(d)(1) of the Copyright Act allows only owners and exclusive licensees to bring suit for infringement. 17 U.S.C. § 201(d)(1).  Where a copyright is jointly owned, the most a single co-owner can grant unilaterally is a non-exclusive license. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008) ("Since TVT's assignment was admittedly non-exclusive, TVT succeeded only in transferring what it could under 17 U.S.C. § 201(d), a non-exclusive license, which gives Sybersound no standing to sue for copyright infringement.")

As a purported joint owner of the registered work MBC FZ, LLC, assuming *arguendo* it held such rights, which it does not, it could not have granted an exclusive right in this registered work to Dish.  It is well-established that the holder of a non-exclusive license lacks standing to sue for copyright infringement.  See

*Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1297 (11th Cir. 2011) citing *Davis v. Blige*, 505 F.3d 90, 101 (2nd Cir. 2007) ("[T]he holder of a nonexclusive license may not sue others for infringement."); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) ("[A] person holding a nonexclusive license has no standing to sue for copyright infringement."); *Sybersound Records Inc.*, 517 F.3d at 1146 ("We hold that because Sybersound is neither an exclusive licensee nor a co-owner in the nine copyrights, it lacks standing to bring the copyright infringement claims alleged in the FAC, and, thus, its copyright infringement claims fail.). MBC FZ, LLC, alone, could not have granted Dish Network, LLC an exclusive license in a Registered Work with joint authors. Thus, as a matter of law, Dish does not hold an exclusive right in the '319 Copyright and has no standing to assert this Registered Work in this matter.

**3.   Whitehead's testimony established that Plaintiff Can Not Meet its Burden in Proving its Prima Facie Case of Infringement of the Work Claimed in U.S. Copyright Registration No. PA-1-992-319.**

Dish has failed to meet its burden in proving infringement of the work claimed in U.S. Copyright Registration No. PA-1-992-319. First, Mr. Whitehead's testimony confirmed that none of the inadmissible, third-party screenshots, of which he admits no personal knowledge, were dated April 14, 2016, the date listed on the copyright registration certificate as the date of first publication. Second, and most significantly, Mr. Whitehead testified that he could not determine whether any of the third-party screenshots depicted the specific work listed in Copyright Registration No. PA-1-992-319 with any degree of certainty. *Whitehead*

*Depo.*, at 167:7-11.   Whitehead confirmed that there are multiple seasons of "Saherat Al Janoub" and that none of the works listed in his declaration corresponded with Copyright Registration No. PA-1-992-319.  *Id.*, at 47:15-52:8; 49:11-21; 169:3-12; 170:2-12; Pl. Exh. 3. Plaintiff has failed to meet its burden to prove its claim through admissible evidence.  Moreover, given Mr. Whitehead's admitted lack of personal knowledge and reliance on inadmissible hearsay, Mr. Whitehead was admittedly unable to determine whether any of the third-party screenshots corresponded to the specific work identified in Copyright Registration No. PA-1-992-319.  *Id.*, at 167:10-11.  Thus, Plaintiff has failed to present evidence sufficient to meet its burden in proving its prima facie case as to the alleged infringement of the work listed in Copyright Registration No. PA-1-992-319 and its claim of infringement of this Registered Work must be denied as a matter of law.

**4.    MBC FZ LLC did not hold the rights to two registered works when it submitted its application to the U.S. Copyright Office and thus could not have granted Dish an exclusive right in such works.**

Mr. Whitehead's testimony confirms that MBC FZ, LLC did not own copyrights in two of the Registered Works asserted in this litigation at the time the copyright applications were filed, Copyright Registration No. PA-1-992-319 and PA-1-992-320.  *Whitehead Depo.*, at 27:6-31:9; 30:20-25; 16:12-19:24; 27:6-31:9. Whitehead confirmed that the applications for the Registered Works were filed by MBC FZ, LLC well after the claimed dates of first publication of the works and after these works had already been assigned to a different entity, MBC Group Holding Hungary, LLC, Luxembourg Branch.  Thus, Whitehead's testimony establishes that

MBC FZ, LLC did not have the right to claim ownership of any of the Registered Works because they had assigned all of their copyrights to an entirely different company, prior to the date the applications for copyright relating to the works were submitted to the U.S. Copyright Office. *Id.*, at 19:12-16; 33:11-24. The Registered Works were therefore not properly owned by MBC FZ, LLC, the purported copyright claimant, rendering the registrations and Plaintiff's purported exclusive rights in these works invalid as a matter of law. Whitehead Depo., at 16:12-17:1, 17:20-19:24; 33:11-35:17; 17 U.S.C. § 512. Mr. Whitehead's testimony establishes that Defendants' have overcome the presumption of validity of Copyright Registration Nos. PA-1-992-319 and PA-1-992-320. *Id.* Dish lacks standing under 17 U.S.C. § 501(b).

## D.  **Plaintiff cannot establish its prima facie case because it has failed to produce copies of any of the works in this litigation.**

Even assuming *arguendo* that Plaintiff's infringement claims survive the first step of the actionable copying analysis, ownership, and this court refuses to reconsider its grant of partial summary judgment, Plaintiff's claims of infringement nevertheless fail at the second step in the Court's analysis of infringement.  This, because "despite extensive discovery, neither the Defendants nor the Court has received a copy of the copyrighted work[s], and, by extension, cannot conduct the substantial similarity analysis." *Vil v. Poteau*, Civil Action No. 11-11622-DJC, 2015 U.S. Dist. LEXIS 25591, at *20 (D. Mass. Mar. 3, 2015) (dismissing case where Plaintiff, as here, failed to enter copies of the asserted work

into evidence and the Court was unable to conduct its analysis of the scope of protection afforded to the work, if any, or substantial similarity analysis); *see also See Unistrut Corp. v. Power*, 280 F.2d 18, 23 (1st Cir. 1960) (same); *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572 (5th Cir. 2003) (same); *Airframe Sys. v. L-3 Communs. Corp.*, 658 F.3d 100, 107 (1st Cir. 2011) (same).

1.    **The Court cannot begin to determine the protected elements of the MBC Works, including the Registered Works, because Dish failed to produce copies of the works.**

Under controlling Eleventh Circuit law, "[t]o make out a prima facie case of copyright infringement, a plaintiff must show that (1) it owns a valid copyright in the [work at issue] and (2) defendants copied ***protected elements from the [work]***." *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011).  Plaintiff must carry its burden to prove these elements as to each of the registered and unregistered works it has asserted. *Feist Publ'ns, Inc.*, 499 U.S. 340, 346-47 (1991).

1.    **Plaintiff claims each of the MBC works are Collective Works.**

Plaintiff claims that each of the MBC works, including all of the registered works, it has asserted in this case are collective works, which is a species of compilation works.  See R&R (Dkt. 246) at 31. "The Act defines a 'compilation' as 'a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. ***The term 'compilation' includes collective works.***'" *Peter Letterese & Assocs.,* 533 F.3d at 1301 n.17

(11th Cir. 2008) citing 17 U.S.C. § 101 (emphasis added). "The copyright in a factual compilation is 'thin' in the sense that the protective scope of the copyright extends only to certain elements -- namely, the creative and original 'selection, arrangement, and coordination' of the compilation -- and not to the underlying facts or ideas. *See BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.,* 999 F.2d 1436, 1440 (11th Cir. 1993) (en banc) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348, 111 S. Ct. 1282, 1289, 113 L. Ed. 2d 358 (1991)); *see also Warren Publ'g v. Microdos Data Corp.,* 115 F.3d 1509, 1515 (11th Cir. 1997) (en banc) ("Only when one copies the protected selection, coordination, or arrangement in a factual compilation has one infringed the compilation copyright; copying of the factual material contained in the compilation is not infringement."). *Id.,* at 1301, n.18. "Not every selection, coordination, or arrangement will pass muster." *Feist*, 499 U.S. at 358 (rejecting the "sweat of the brow" analysis, discussing the three-factor test for the copyrightability of compilations ***which requires a detailed examination of the work***; stating, "The same is true of all facts -- scientific, historical, biographical, and news of the day. They may not be copyrighted and are part of the public domain available to every person." *Id.*, at 348.).

Without copies of the work in evidence, this Court cannot begin to carry out its detailed examination of the MBC works to determine the scope of the protectable elements of each of the MBC Works including their "selection, coordination and arrangement" of elements comprising the alleged collective

works Dish claims rights in.  Further, the Court cannot conduct the required substantial similarity analysis without copies of both the asserted works and the potentially infringing works in evidence.  One cannot conduct a side-by-side analysis of audiovisual works without copies of the works.  Thus, because Plaintiff has failed to enter copies of each of the fifty-nine works it has asserted in this litigation into evidence at trial, it's claims of direct copyright infringement are futile and must be dismissed on this basis alone.  Tr. Vols. I-III.

**2.    This Court cannot determine the proper scope of protection of *any* of the works because they have not been entered into evidence.**

In a seminal case directly relevant to the issues before this Court, the Second Circuit provided a salient warning of the risks in moving past the threshold questions of ownership and scope of protection of asserted foreign works before moving on to the infringement analysis, especially where, as in the instant case, the asserted works are claimed to be foreign collective works (i.e., compilations) with multiple underlying authors:

> The division of issues, for conflicts purposes, between ownership and infringement issues will not always be as easily made as the above discussion implies. If the issue is the relatively straightforward one of which of two contending parties owns a copyright, the issue is unquestionably an ownership issue, and the law of the country with the closest relationship to the work will apply to settle the ownership dispute. But in some cases, including the pending one, the issue is not simply who owns the copyright but also what is the nature of the ownership interest. ***Yet as a court considers the nature of an ownership interest, there is some risk that it will too readily shift the inquiry over to the issue of whether an alleged copy has infringed the asserted copyright.*** Whether a copy infringes depends in part on the scope of the interest of the copyright owner. Nevertheless, though the issues are related, the nature of a copyright

interest is an issue distinct from the issue of whether the copyright has been infringed, *see*, *e.g.*, *Kregos v. Associated Press*, 937 F.2d 700, 709-10 (2d Cir. 1991) (pointing out that although work survives summary judgment on issue of copyrightability of compilation, scope of protection against claim of infringement might be limited). The pending case is one that requires consideration not simply of who owns an interest, but, as to the newspapers, the nature of the interest that is owned.

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 at 89- 92 (2d Cir. 1998) (emphasis added) (discussing protection afforded to foreign collective works, as Plaintiff alleges here, noting "We agree with the view of the Amicus that the [Berne] Convention's principle of national treatment simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors." also citing to *17 U.S.C. § 104* as discussed below with regard to simultaneous publication. *Id.*, at 90.).

*Itar-Tass* establishes that the scope of substantive protection afforded to a foreign copyright alleged to be infringed in the United States requires the Court to apply U.S. law. *Id.*  Significantly, the Eleventh Circuit, the U.S. Copyright Office and numerous district courts, including those in the Eleventh Circuit, have applied and relied upon the Second Circuit's analysis and reasoning in *Itar-Tass*.  *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011); *RCTV Int'l Corp. v. Rosenfeld*, 2016 U.S. Dist. LEXIS 136867, at *16 (S.D. Fla. 2016); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 102.6 (3d ed. 2014).

Significantly, Plaintiff failed to enter into evidence at trial *any* copies of the asserted Unregistered and Registered Works.  That is, remarkably, Plaintiff produced absolutely no videos of the audiovisual works in which it claims to hold exclusive copyrights in this litigation and which it claims were infringed upon by

Defendants.  Thus, it follows that Plaintiff could not produce any copies of the asserted works at trial.  Without copies of the works in evidence, this Court is left unable to determine, as it must, whether any of the works are comprised of protectable elements and whether they have been infringed by the alleged copying of the same by Defendants.  Indeed, a requirement of the second prong of the test for a copyright Plaintiff's prima facie case for copyright infringement requires this element and analysis.  See *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1292 (11th Cir. 2011) ("(2) defendants copied **protected elements** from the [works].") citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008); see also Report and Recommendation ("R&R") (Doc. 246), at 10 (citing same).

Plaintiff's failure to enter into evidence copies of the works is fatal to its prima facie case.  For this reason alone, the Court must deny its claims.  Plaintiff cannot rely on unauthenticated hearsay screenshots which its own expert testified represent a single frame or 1/600th or 1/1000th of a second of an audiovisual work to establish an audiovisual work's protectible elements for purposes of infringement.  This is especially true in this case given Plaintiff's claim that its works are all collective works which are a species of compilation works, protectable only in their selection and organization of preexisting works.  Moreover, a screenshot representing a millisecond of a work having a length of one hour or more would, at best, establish only de minimis use, not infringement.  Additionally, the foreign network representatives testified that their channels were subject to

downtime and interruptions in transmissions calling into question whether any of the works asserted failed to air.  In fact, Mr. ElMokadem of World Span testified that certain channels were off the air for months.  Likewise, Mr. Whitehead testified that certain channels of MBC had their signal jammed.  *Whitehead Depo.*, at 74:23- 75:18.  Without video evidence of the audiovisual works alleged to be infringed, Plaintiff's claims are speculative and should be denied on this evidentiary basis alone.

Likewise, Plaintiff has also failed to enter into evidence at trial any videos of the audiovisual works it alleges aired on the Defendants' STBs.  Where a copyright plaintiff relies on circumstantial evidence to prove infringement as Plaintiff has in this case, courts in the Eleventh Circuit require a Plaintiff to prove: (i) access to each of the asserted works and (ii) substantial similarity.  This court cannot carry out its substantial similarity analysis without copies of both the Plaintiff's works and the copies it alleges Defendants performed and distributed in violation of its alleged exclusive rights.

A copyright plaintiff simply cannot prove an infringing performance or distribution of an audiovisual work through a screenshot without any proof of the original work that screenshot is alleged to have been copied from.  Further, as Dish's own expert witness, Pascal Metral, testified at trial, the STBs Defendants sold were subject to frequent downtime.  As Mr. Metral testified, it is entirely possible that such downtime could occur immediately after a screenshot is taken, making such evidence entirely unreliable to establish infringement.  Indeed, Mr.

Metral testified that there were certainly instances where screenshots were allegedly discarded by Nagrastar because they did not capture anything, perhaps, due to the frequent freezing or downtime that the preinstalled application on the STBs were subject to.  Plaintiff's failure to enter into evidence videos of audiovisual works it alleges were copied by Defendants or Defendants' STB manufacturer makes impossible this Court's ability to carry out a substantial similarity analysis, thus rendering Plaintiff's prima facie case of copyright infringement fatally flawed.

**3.    Plaintiff's claims fail because this Court cannot begin to carry out the required substantial similarity analysis without copies of the asserted and allegedly infringing works in evidence.**

"*Feist's* second prong, which, in turn, entails proof of both factual and legal copying, that is: (1) 'whether the defendant, as a factual matter, copied portions of the plaintiff's [work]'; and (2) 'whether, as a mixed issue of fact and law, those elements of the [copyrighted work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.'" *Peter Letterese & Assocs.*, 533 F.3d at 1300 *citing MiTek Holdings, Inc. v. Arce Eng'g, Inc.,* 89 F.3d 1548, 1554 (11th Cir. 1996); *see also BUC Int'l Corp. v. Int'l Yacht Council Ltd.,* 489 F.3d 1129, 1148 n.40 (11th Cir. 2007).  "We have previously recognized that 'in many copyright cases, the line between [idea] and expression is not easily drawn,' and is to be determined on the totality of the facts. *Palmer*, 287 F.3d at 1334; see also *SunTrust Bank*, 268 F.3d at 1266 (noting that although 'stock scenes and hackneyed character types' at one end of the spectrum are considered ideas, 'as plots become more intricately detailed and characters become more

idiosyncratic, they at some point cross the line into 'expression')." *Peter Letterese & Assocs.*, 533 F.3d at 1305 (11th Cir. 2008) (as required, carrying out a detailed analysis of both "factual copying", *i.e.,* whether Plaintiff has met its burden through direct or circumstantial evidence of proof of access to the copyrighted works and probative similarity, and, if so, whether there was "legal copying", *i.e.*, a side-by-side analysis of each work asserted with the allegedly infringing work to determine through a substantial similarity analysis, whether protected elements of each asserted work are infringed under Eleventh Circuit law, applying the Court's qualitative and quantitative factors).

<u>*The Substantial Similarity Analysis*</u>

"A prima facie infringement claim ***requires*** proof of both factual copying and substantial similarity:

> In the absence of direct proof, factual copying may be inferred from circumstantial evidence, either through establishing that the works are strikingly similar, or through proof of access to the copyrighted work and probative similarity. Because defendants admit that portions of Big League Sales were copied, this appeal centers on the subsequent inquiry of whether such copying is legally actionable; that is, whether there is substantial similarity between the allegedly offending works and the protectable, original elements of the book. *Peter Letterese*, 533 F.3d at 1300-01."

*Saregama India Ltd. v. Mosley*, 687 F. Supp. 2d 1325, 1337 (S.D. Fla. 2009) *aff'd* 635 F.3d 1284, 1297 (11th Cir. 2011). "***The Eleventh Circuit imposes a 'substantial similarity' requirement as a constituent element of all infringement claims***:

> **No matter how the copying is proved, the plaintiff also <u>must</u> establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements**."

*Id.*, at 1338-39 (rejecting argument from Plaintiff under Sixth Circuit case law which departed from the Eleventh Circuit standard), citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (holding this requirement must be met even in the rare case where direct evidence of factual copying is proven, considering ").

In *Peter Letterese & Assocs.*, the Eleventh Circuit set forth the long-standing requirement in the Eleventh Circuit that, "[t]he extent of copying ***<u>must</u>*** be assessed with respect to ***<u>both</u>*** the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole. *MiTek Holdings, Inc.,* 89 F.3d at 1560 & n.26 (noting that substantial similarity in this respect involves ***<u>a comparison of the works "as a whole, not constituent elements" thereof</u>***); *see also Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 75 (2d Cir. 1997) (noting that ***<u>a finding of "substantial similarity," to be legally actionable, requires that "the amount of the copyrighted work that is copied" must be "quantitatively and qualitatively sufficient"</u>***)."   533 F.3d at 1307 (11th Cir. 2008).  "**<u>[I]t is the relative portion of the *copyrighted work* -- not the relative portion of the infringing work -- that is the relevant comparison</u>**." *Id.* (emphasis added); *see also Benson v. Coca-Cola Co.*, 795 F.2d 973, 974 (11th Cir. 1986) ("To establish copying, appellant must show that

appellee had access to appellant's song, and that appellee's song is so substantially similar to appellant's that 'an average lay observer would recognize the alleged copy as having been appropriated from the original work.'") citing *Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 829 (11th Cir. 1982).

In *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459-60 (11th Cir. 1994), the Eleventh Circuit, considered the substantial similarity of an audiovisual work, finding that:

> Because the Copyright Act protects "original works of authorship," 17 U.S.C. § 102(a), the "*sine qua non* of copyright is originality." *Feist Publications, supra,* 499 U.S. at 345, 111 S. Ct. at 1287. Material that is not original cannot be copyrighted. In addition to broad ideas, noncopyrightable material includes "*scenes a faire* "--stock scenes that naturally flow from a common theme. *See, e.g., Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.) (no protection for common elements in police fiction, such as "drunks, prostitutes, vermin and derelict cars" and "foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop"), *cert. denied,* 476 U.S. 1159, 106 S. Ct. 2278, 90 L. Ed. 2d 721 (1986); *Evans v. Wallace Berrie & Co.,* 681 F. Supp. at 817 ("Such similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and plates made of oysters or mother of pearl are not protected similarities of expression, but are more accurately characterizations that naturally follow from the common theme of an underwater civilization.").

*Id.* (affirming trial court's holding for defendants).

Here, Plaintiff has failed to produce in this litigation or enter into evidence at trial *any* copies whatsoever of *any* of the fifty-nine Unregistered or Registered audiovisual Works it asserts Defendants' directly infringed.  Plaintiff cannot rely on the defective screenshots attached to Metral's report to establish the scope of protection of the collective works it claims nor can it rely on screenshots to

establish infringement of audiovisual works. Metral confirmed that the screenshots represent a millisecond of a work (i.e., either 1/600th or 1/1,000th) which. Additionally, such a screenshot would, at best, only represent one side of the coin. Plaintiff has not produced copies of the asserted works. Thus, this Court cannot carry out the required substantial similarity analysis and Plaintiff's claims must fail.

Finally, Plaintiff cannot rely on the sole outlier case of *Range Road Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012) in an effort to save its claims. A recent Fifth Circuit case which is directly on point, addressed this very issue, rejecting Plaintiff's assertion of *Range Road Music* because unlike the Fifth and Eleventh Circuit's requirement that a Court conduct a substantial similarity analysis to determine both factual and legal copying through a substantial similarity analysis, "[i]n the Ninth Circuit, 'substantial similarity' is not an element of a claim of copyright infringement." *Virtual Chart Sols. I, Inc. v. Meredith*, Civil Action No. 4:17cv546, 2019 U.S. Dist. LEXIS 140962, at *27 (E.D. Tex. June 17, 2019) (rejecting application of *Range Road Music* where Plaintiff failed to enter into evidence copies of the asserted works). Thus, this Court should dismiss Plaintiff's claims of copyright infringement as Plaintiff's failure to produce during discovery and enter into evidence at trial, copies of its asserted audiovisual works and the alleged infringing works is fatal to its claims.

**E.      Dish cannot rely on extraterritorial use of the STBs to establish infringement under the U.S. Copyright Act.**

Federal copyright law has no extraterritorial effect, and therefore "it is only where an infringing act occurs in the United States that the infringement is actionable under the federal Copyright Act, giving the federal courts jurisdiction over the action." *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004) citing *Subafilms, Ltd. v. MGM-Pathe Communications*, 24 F.3d 1088, 1091 (9th Cir. 1994) (en banc); *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) ("It is well established that copyright laws generally do not have extraterritorial application.").

Regardless of Nagra's admitted use of a VPN to replace its IP address, admitted cropping and further manipulation of the dates, times and geographic locations it appended to the screenshots it relies upon, Metral's testimony established that the true geographic location from which the alleged use and monitoring of the third-party software application preinstalled on the UlaiTV STB took place extraterritorially, in Cheseaux-sur-Lausanne, Switzerland, not the United States.

Metral also admitted at trial that his Report's usage of the term "Nagra" conflates Nagravision and NagraStar making it impossible to determine which screenshots, if any, were taken by Nagravision or NagraStar.  To assume otherwise would require improper speculation.  Further, Plaintiff failed to present any witnesses from NagraStar at trial.  Thus, Plaintiff cannot rely on the screenshots or monitoring report as evidence of actionable infringement in the United States under the U.S. Copyright Act.  Accordingly, because Plaintiff relies solely on the

testimony and report of Metral, it cannot meet its burden in proving infringement of the asserted works.

## F.   The Safeharbors of the Digital Millennium Copyright Act.

### 1.   For purposes of Section 512 of the Digital Millennium Copyright Act, Defendants are service providers.

Section 512(k)(1)(A) defines a "service provider" for purposes of § 512(a) specifically as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received."  17 U.S.C. § 512(k)(1)(A).  For all other subsections of § 512, a "service provider" is defined simply as "a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)."  17 U.S.C. § 512(k)(1)(B).

Plaintiff's own expert witness established at trial that the CDNs used automated processes, providing connections for online communications, between or among points specified by a user, of the user's choosing, without modification of the content of the material contained at the URLs linked to in the third-party Lenkeng software application, using standard Internet protocols used by any ISP, without modification to the content of the material as sent or received.  Thus, for purposes of Section 512(k)(A) and (B) of the Copyright Act, Defendants' provision of CDN services establishes Defendants as a "service provider" under the Act.

Court have applied the safeharbor provisions of the DMCA to entities like Defendants. See *Bwp Media United States v. T & S Software Assocs.,* 852 F.3d 436, 438 (5th Cir. 2017) (collecting cases) (in a case directly on point, the Court discussed the volitional conduct requirement for direct infringement, the effect of *Aereo* and application of the safeharbor protections of Section 512 to hold for Defendant even where Defendant "failed to designate a registered agent under Section 512." Defendants' contact information was clearly and prominently included on their website and the evidence submitted at trial indicates Plaintiff was able to contact the CDNs through their designated agents.

> **2.    Plaintiff's Notices to the CDNs and Defendants are deficient under the exclusionary rule of 17 U.S.C. § 512(c)(3)(B)(i) and § 512(c)(3)(A)(ii) to establish actual knowledge because they failed to identify any of the specifically asserted works.**

In the Digital Millennium Copyright Act, Congress "enact[ed] a notice and takedown protocol encouraging copyright holders to identify specific infringing material to service providers." *UMG Recordings, Inc. v. Shelter Capital Partners Ltd. Liab. Co.*, 718 F.3d 1006, 1022 (9th Cir. 2013).

Section 17 U.S.C. § 512(c)(3)(A)(ii) requires that, in order to be effective, a notice must include "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site." 17 U.S.C.  § 512(c)(3)(A).  "Notably, the statute specifies that notice of infringement by or on behalf of a copyright holder that does not substantially comply with § 512(c) '***shall not be considered*** . . . in determining whether a service provider has actual

knowledge or [has red-flag knowledge].' 17 U.S.C. § 512(c)(3)(B)(i). [In any event,] Proper DMCA notice under 17 U.S.C. § 512(c)(3) provides only a *claim* of infringement, and is not necessarily sufficient by itself to establish actual or 'red flag' knowledge." *UMG Recording*, 718 F.3d 1006, 1020 n.12 (9th Cir. 2013).

Section 512(c)(3)(B)(i) known as "the 'exclusionary rule' ... prohibits consideration of substantially deficient [] notices for purposes of "determining whether a service provider has actual knowledge or is aware of facts and circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(3)(B)(i); *see also* H.R. Rep. No. 105-551, pt. 2, at 56 (explaining this provision); Nimmer § 12B.04(B)(4)(c) ("[T]he copyright owner bears the burden of demonstrating knowledge independently of the failed notification."). Congress' intention is further reflected in the DMCA's direct statement that "[n]othing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

Congress made a considered policy determination that the "DMCA notification procedures [would] place the burden of policing copyright infringement — identifying the potentially infringing material and adequately documenting infringement — squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); see also 17 U.S.C. § 512(m). In parsing § 512(c)(3), we have "decline[d] to shift [that] substantial burden from the copyright owner to the provider." *Id.*; see also *UMG Recordings, Inc.*, 718 F.3d

at 1022 (9th Cir. 2013) (discussing the application of Section 512 at length in affirming the trial court's holding for Defendant); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009) (same).

Plaintiff's notices were deficient in, at least, two respects. First, the vast majority of the notices in evidence were sent to CDNs, not Defendants. Second, evidence, including testimony at trial, confirmed that none of the notices satisfied the basic requirement under the DMCA of specifically identifying the work(s) alleged to be infringed. Significantly, it is undisputed, and Plaintiff's expert witness established at trial, that none of the notices sent to various CDNs nor any of the notices allegedly sent to Defendants identify even a single specific copyrighted work as expressly required under 17 U.S.C. 512(c)(3)(A)(ii).

It is undisputed that the notices Plaintiff relies upon merely identify third-party foreign channels, not the specific works asserted in this case. Channels, however, are not the subject matter of copyright protection under the Act. See 17 U.S.C. § 102(b). Instead, a channel is an "idea, procedure, process, system, method of operation [or] concept" not a work of authorship fixed in a tangible medium of expression. *Id.* If copyright were extended to protect ideas, processes or systems, then it would be possible to circumvent the rigorous prerequisites of patent law and secure monopoly-like protection for an invention merely by describing the invention in a copyrightable work. See e.g., *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003) (warning of the overextension of IP rights outside of their intended ambit).

Plaintiff has asserted fifty-five unregistered works and four registered works in this matter, not channels.  None of the fifty-nine works were identified in Plaintiff's notices.  Instead, the record establishes that Defendants first learned the identity of the four asserted registered works upon the filing of this lawsuit.  Further, it is undisputed that Defendants were not provided notice as to the identity of the fifty-five unregistered works asserted in this litigation until the filing of Plaintiff's Motion for Summary Judgment (Dkt. 146), following the close of discovery in this matter.

Even then, however, such works were only identified in declarations from four foreign network declarants that each admitted during their trial depositions that their declarations were not made from personal knowledge, but relied entirely on hearsay.  Dkt. 311.  Instead, these declarants confirmed under oath that they did not select, watch nor verify that the works listed in their declarations actually aired on the channels on the specified dates and times as claimed but, instead, relied on inadmissible hearsay.

Taken together, it cannot be said that Defendants were *ever* properly placed on actual notice of the alleged infringement of any of the specific works asserted in this matter until after the filing of this suit, and with regard to the unregistered works, after the filing of Plaintiff's Motion for Summary Judgment – long after Defendants' business ceased operations.

**3.      Defendants expeditiously requested the STB manufacturers remove the URL links complained of by Plaintiff.**

Notwithstanding the deficiency of these notices, Mr. Fraifer's testimony at trial established and Plaintiff's expert confirmed, that Defendants, in good faith, expeditiously took action to request removal of the URLs complained of upon each and every notice received from the CDNs in an effort to resolve Plaintiff's complaints.  Mr. Fraifer testified that Defendants contacted the manufacturers of the STBs, Lenkeng, and requested that they immediately remove from the third-party application the offending URL links complained of in notices received from CDNs.  Indeed, evidence of record at trial, including Metral's testimony, confirmed that gaps appeared in the numerical sequence of URL links in the Lenkeng application preinstalled on the STBs.  Mr. Fraifer's testimony further established these gaps as evidence of the successful takedown requests made by Defendants to Lenkeng in response to Plaintiff's notices.

Additionally, numerous e-mails from the CDNs, admitted into evidence at trial, further acknowledge Defendants' compliance with the CDNs' requests following notice from Plaintiff.  Mr. Fraifer also established at trial that he also requested Lengkeng geoblock access to the URLs linked to in the third-party application such that they would be inaccessible to users in the United States.  However, when it became apparent such efforts were not successful, Defendants ceased reselling the STBs altogether and closed their doors.

**4.     The DMCA Safeharbors.**

Section 512(a) limits a service providers liability for "infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections" initiated by other persons, carried out through automatic technical process, without selection of the material by the service provider except as an automatic response to the request of another, no copy is made which is accessible to anyone other than anticipated recipients for a longer period than necessary for the transmission, routing, or provision of connections, and the material is transmitted through the system or network without modification of its content. 17 U.S.C. § 512(a).

Section 512(b) limits liability for "infringement of copyright by reason of intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider where (A) the material is made available online by a person other than the service provider; (B) the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and (C) the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B),

request access to the material from the person described in subparagraph (A)." 17 U.S.C. 512(b).

The evidence along with Mr. Fraifer's, Mr. Sfeir's and Metral's testimony at trial established that the CDNs were merely automated pass-through networks. The URL links and the contents of the external websites they linked to were selected by and made available by a third-party, not Defendants, within a third-party application preinstalled in STBs manufactured by a third-party. Users, if at all, selected the content they wished to access in the third-party application by selecting a URL link. The CDNs operated through automatic technical processes for the purpose of providing stable internet connectivity like any other ISP. Any caching of data was transient, initiated at the direction of others and accessible only to the requestor. Thus, Defendants' acts fall well within the safeharbor of both 17 U.S.C. 512(a) & (b) which, in any event, further illustrates the lack of Defendants' volitional conduct required to rise to the level of direct copyright infringement.

Subsection (c) limits liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). For the same reasons stated in relation to subsection (b) above, subsection (c) also provides the CDNs and Defendants safeharbor and illustrates Defendants' lack of volitional conduct in merely providing stable internet connectivity. Plaintiff's notices were deficient and thus incapable of imputing actual knowledge upon

Defendants.  Plaintiff acted expeditiously to request the removal of the URLs from a third-party software application present on the STBs which it did not control.

Section 17 U.S.C. § 512(d) of the DMCA establishes that a "service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link" where it lacks actual knowledge, does not receive financial benefit directly attributable for activity it also has the right and ability to control, and takes action after being placed on actual notice.  Neither the CDNs nor Defendants were placed on actual notice because the notices sent by Plaintiff and Metral were deficient under the provisions of § 512(c)(3)(B)(i).

Even assuming *arguendo* the notices to be sufficient, which they are clearly not, the CDNs and Defendants acts are protected by the provisions of § 512(d) because they properly took timely action to request the takedown of the URLs linked to within a third-party application over which they had no control, did not have the right and ability to control third-party activity, did not charge a subscription fee and, ultimately, ceased operations altogether once it became apparent full resolution of the complained of third-party acts were not possible.

Finally, § 512(l) of the DMCA provides that "[t]he failure of a service provider's conduct to qualify for limitation of liability under this section shall not

bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense." 17 U.S.C. § 512(l).  Thus, this Court, as others have can rely on a lack of volitional conduct to reach the same result.

Indeed, Courts have found a lack of volitional conduct required to establish a prima facie case of *direct* copyright infringement is enough to deny such claims. *Bwp Media United States*, 852 F.3d 436, 443-4 (5th Cir. 2017) ("We adopt the volitional-conduct requirement in direct-copyright-infringement cases."); *Parker v. Google, Inc.,* 422 F. Supp. 2d 492, 497 (E.D. Pa. 2006) ("When an ISP automatically and temporarily stores data without human intervention so that the system can operate and transmit data to its users, the necessary element of volition is missing."); *CoStar Grp., Inc. v. LoopNet, Inc.,* 373 F.3d 544, 556 (4th Cir. 2004) ("Whenever CoStar has complained to LoopNet about a particular photograph, LoopNet has removed the photograph.");  *Religious Tech. Ctr. v., 907 F. Supp.* 1361, 1370 (N.D. Cal. 1995) ("Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party.")

## G.   Defendants did not transmit or publicly perform any of the asserted works.

### 1.   The Foreign Channels Were Not Transmitted.

Dish failed to establish at trial that any of the Asserted Works aired to users of Defendants' STBs.  Contrary to Dish's position, the testimony of Pascal Metral

is remarkably unpersuasive, biased, and his credentials fall woefully short of the requisite qualifications to serve as an expert witness. As the Fifth Circuit stated nearly six decades ago: "We consider it a tribute to the high calling of advocacy to say that we think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater . . . we doubt that it is conducive to the orderly administration of justice for counsel to become the voice on summary judgment . . . Experience proves that the adversary system functions best when the role of Judge, of counsel, of witness is sharply separated." *Inglett & Co, Inc. v. Everglades Fertilizer Co., Inc.*, 255 F.2d 342, 349-50 (5th Cir. 1958).

Mr. Metral seemed a kindly gentleman but his evasive testimony at trial and clear admission that he was "tasked" with drafting a report to serve the purposes of his company's joint venture partner, Dish Network, were clear. In the end, Mr. Metral testified that his methodologies were flawed in that they assumed that a user of Defendants' STBs would only utilize a single application preinstalled by the manufacturer to view the channels that Dish allegedly holds an exclusive license to. He also testified that the automated methodology he used was inherently subject to error, that he did not view or inspect the monitoring setup, which, in part, was allegedly located thousands of miles from his location in Switzerland and did not physically supervise the collection of data used in his report, which was collected by others.

Curiously, Mr. Metral testified that he did not seek out the manufacturer of the STBs or the true source of origin of the URL links in the third-party application preinstalled on the STBs.  When asked why he didn't seek out the manufacturer in view of Defendants provision of their contact information early on in this case, he testified that he wasn't "tasked" with doing so.  Mr. Metral's testimony makes clear that he was never interested in providing an objective expert opinion helpful to the Court.  Instead, his "task" was to advocate for Plaintiff.

Furthermore, the trial deposition testimony of the four foreign network witnesses each failed to identify any of the Asserted Works based on their own personal knowledge, but instead based their testimony on scripted conclusory statements based entirely on inadmissible hearsay evidence and on the unauthenticated Nagrastar monitoring report.  In sum, Dish failed to establish that any of the asserted works aired on Defendants' STBs because both the foreign network witnesses' testimony and Mr. Metral's testimony relied entirely on inadmissible hearsay, including documents which are not in evidence, including the Nagrastar monitoring report, not personal knowledge.  Thus, Dish has failed to meet its burden in proving infringement of the asserted Unregistered and Registered Works.

## 1. The Foreign Channels Were Not Transmitted.

Dish acknowledges that it is relying entirely on the testimony of Pascal Metral to establish that the foreign network channels were allegedly transmitted to users of the Defendants' STBs on the dates identified in the Nagrastar

monitoring report. Dish's reliance is entirely misplaced for the reasons stated above. Moreover, Dish erroneously asserts that because Defendants did not proffer any evidence to the contrary, it has proven transmission.  Defendants do not have the burden of proof, Plaintiff has the burden of proof, and they should not be allowed to disguise admitted co-counsel and party witness, Pascal Metral as an objective expert when, in reality, he was tasked with drafting a self-serving report with a predetermined conclusion.  Moreover, Dish expects the Defendants to prove that something did not happen which runs directly counter to Dish's burden of proof that it must carry.  Nevertheless, Defendants provided credible testimony establishing that Lenkeng provided the channel streams, all which were available free-to-air on the Internet.  Metral also confirmed that his methodology was incapable of determining the true source of the content linked to in the URLs of the preinstalled third-party application of the STBs.  Likewise, Metral confirmed he could not see beyond the edge of the CDN and thus could not identify any end users accessing the CDN.  Accordingly, Dish's claim that Defendants' transmitted fails.

## 2.    Defendants did not publicly perform.

Plaintiff's truncated definition of a "performance" and the "transmit clause" under the Act misleadingly omits the critical "public place" clause of 17 U.S.C. § 101 which is dispositive of its claims.  In sum, Plaintiff failed to produce *any* admissible evidence at trial of a public performance of *any* works by *any* users of the STBs.

In *Columbia Pictures*, the Ninth Circuit discussed the requirement of a public performance versus a private one in a:

> A performance may be characterized as public under the Act through application of two clauses which define the term "perform or display a work 'publicly.'" Under clause (1), ***a performance is public if it occurs "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered.***" 17 U.S.C. § 101 (1977) (the "public place" clause). Under clause (2), a performance is public if someone "transmit[s] or otherwise communicate[s] a performance or display of the work ***to a place specified by clause (1) or to the public***, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.* (the "transmit" clause).

*Columbia Pictures Indus. v. Prof'l Real Estate Inv'rs, Inc.*, 866 F.2d 278, 280 (9th Cir. 1989) (finding provision of laserdisc players to hotel guests and rental of movies was not a public performance under the Act as required to find infringement of the performance right); *see also Capitol Records, Inc. v. MP3tunes, LLC,* 48 F. Supp. 3d 703, 719 (S.D.N.Y. 2014).

The House Commentary on the 1976 version of the Act further clarifies the meaning of "perform the copyrighted work publicly" as stated in the Act:

> Under Clause (1) of the definition of "publicly" in § 101, a performance . . . is "public" if it takes place "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." One of the principal purposes of the definition was to make clear that, contrary to the decision in *Metro-Goldwyn-Mayer Dist. Corp. v. Wyatt*, 21 C.O. Bull. 203 (D. Md. 1932), performances in "semi-public" places such as clubs, lodges, factories, summer camps and schools are "public performances" subject to copyright control. The term "a family" in this context would include an individual living alone, so that

> a gathering confined to the individual's social acquaintances would normally be regarded as private. Routine meetings of businesses and governmental personnel would be excluded because they do not represent the gathering of a "substantial number of persons."

*Columbia Pictures*, 866 F.2d at 281 (9th Cir. 1989) quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 5659, 5677-78.

Violation of the performance right requires a public performance. First, Plaintiff failed to establish through any evidence whatsoever at trial that any users accessed the asserted works using the STBs in the United States. Moreover, even assuming NagraStar used the STBs in the United States, such use was automated and even if it wasn't, would not establish a public performance under the Act's definition. Thus, Dish has failed to establish a violation of its alleged public performance right.

## H. The facts in *Aereo* are readily distinguishable from this case.

Contrary to Dish's position, and as this Court has already found[3], the Supreme Court's holding *ABC, Inc. v. Aereo*, Inc., 573 U.S. 431 (2014) and the cited legislative history of the 1976 Copyright Act does not support Dish's claim against the Defendants for direct copyright infringement. (Dkt. 246 at 50.) Indeed, *Aereo* did not change the longstanding requirement that "[a] defendant may be held directly liable only if it has engaged in volitional-conduct in violation of the Act." 573 U.S. at 453 (volitional-conduct requirement "is firmly grounded in the Act's

---

[3] In denying Dish's motion for summary judgment, this Court found "[t]he cases upon which Dish primarily relies … do not lead [] to a contrary conclusion." Dkt. 246 at 50.

text."). Furthermore, the United States Supreme Court in *Aereo* emphasized the importance of analyzing technological advancements on a case-by-case basis when determining whether a defendant has 'performed' under the Act including careful consideration under 17 U.S.C. §101. *Aereo*, 573 U.S. at 433 ("In other cases involving different kinds of service technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act."); *Id.*, at 450.

Moreover, for the reasons stated below, Defendants resale of the STBs containing preinstalled third-party software and use of CDNs to improve the dependability of internet connectivity for its customers does not substantiate the volitional-conduct required for a finding of direct copyright infringement under the Act.

"In direct-infringement cases, courts have trended toward requiring volitional conduct. This requirement first came to the fore in 1995 when a California district court held that an ISP serving as a passive conduit for copyrighted material was not liable for direct infringement." *Bwp Media United States v. T & S Software Assocs.*, 852 F.3d 436, 439 (5th Cir. 2017) citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995).

*Aereo* did not alter and, as Circuit Courts across the country have held, is consistent with, the long-standing volitional-conduct requirement for a finding of direct copyright infringement.  "In a developing line of authority, every circuit to

address this issue has adopted some version of *Netcom*'s reasoning and the volitional-conduct requirement." *See, e.g.*, *Bwp Media*, 852 F.3d at 440 (5th Cir. 2017) citing *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666-67 (9th Cir. 2017); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 387 (3d Cir. 2016); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).

In *Aereo* the Supreme Court found that defendant's system and service, which it supplied, operated and provided to paying subscribers, bore an "overwhelming likeness" to the "community-antenna-television ("CATV") systems that Congress had meant to bring within the Act's scope via a set of 1976 amendments." *Id.* at 2503.

Dish fails to establish direct copyright infringement because a third party, not Defendants, selected and provided links or "delivered" or "pushed" the purported channel streams containing the allegedly infringing works, which were, in turn, allegedly selected by, requested, sent to and accessed by end users of an application preinstalled on the UlaiTV and AhlaiTV STBs by a third-party to access such content. Defendants did not capture a broadcast signal, originate, copy, select nor provide any transmissions or content. Instead, third-parties were responsible for originating any allegedly infringing content available at through the URL links available on the third-party application preinstalled on the UlaiTV and AhlaiTV STBs. Plaintiff's own expert admitted that the methodology he utilized was incapable of identifying the true source of the content available on the URL links

118

in the application preinstalled by Lenkeng.  Defendants' act of reselling STBs manufactured and programs by a third-party simply does not rise to the level of direct copyright infringement under prevailing law, including *Aereo*.  Bwp Media United States v. T & S Software Assocs., 852 F.3d 436, 440-41 (5th Cir. 2017)

Plaintiff's argument that the Supreme Court's opinion in *Aereo* suggests a different result is without merit.  The Supreme Court expressly excluded "novel issues not before the Court, as to which 'Congress has not plainly marked [the] course.'" *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2511 (2014).  It is undisputed that the third-party STBs resold by Defendants were merely Android-based microcomputers, capable of a multitude of non-infringing uses, just as any other computer.  Indeed, Plaintiff's own expert, Dish's corporate representative, Fraifer and TCI's former employee universally testified as to the many non-infringing uses and third-party software applications preinstalled on the STBs by their manufacturer including YouTube, Netflix, Gmail, Google Play and others.  That a single software application, provided by the STBs manufacturer, contained links to external URLs as they exist on the Internet, simply does not equate to the antenna-based system "overwhelmingly similar" to community antenna television system ("CATV") at issue in *Aereo*.

### *The Court's Magnifying Glass Analogy*

Defendants' use of a CDN to improve the stability and reliability of Internet connectivity to consumers of their STBs simply does not rise to the level of volitional conduct necessary to substantiate direct copyright infringement.  Like

119

Scalia's copy shop analogy in *Aereo*, this Court's magnifying glass analogy in ascertaining the role of a CDN under the facts of this case is apropos. In providing a magnifying glass (by way of analogy, a CDN) with which to read a copyrighted poem in small print (i.e., a copyrighted work), one is merely improving the quality of a viewer's vision (i.e., Internet connection), not selecting or providing the poem (i.e., third-party content). Likewise, the provider of the magnifying glass (or CDN) has no control over the provision or selection of the poem, nor the content thereof (third-party content), it is the user that selects and chooses to read the poem with its magnifying glass (CDN), be it plagiarized or not. Indeed, neither the poem a user of the magnifying glass chooses to read nor the poem a third-party provides to the user could fairly be said to have resulted from a volitional act subjecting the provider of the magnifying glass to direct liability for the acts of such third-parties (i.e., users or content providers). To find otherwise, would result in the absurd consequence of subjecting a reseller of magnifying glasses to liability for a purchaser's viewing of infringing works, the precise outcome that the volitional conduct requirement for direct copyright infringement seeks to avoid.

Plaintiff's gross mischaracterization of the role of a CDN should not persuade this Court. Plaintiff's own expert witness confirmed that CDNs are nothing more than Internet service providers which are operated and controlled by third-party companies such as Verizon through automated processes, not Defendants control. The CDNs were indisputably used by Defendants to improve the reliability and stability of Internet services in response to consumer

complaints, not to improve the quality of the content of URLs already present on the Internet.

The fact that Defendants sold an Android-based microcomputer which contained many third-party software applications preinstalled by its manufacturer, including a software application preinstalled on website or URL links present on, does not transform Defendants into a direct infringer.

Finally, Plaintiff has not asserted any claims of secondary copyright infringement in this matter.  Instead, Plaintiff has asserted a sole count of direct copyright infringement.  Accordingly, the Court may not consider theories of secondary copyright infringement in this matter.  See *GlobalOptions Servs. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299-1300 (M.D. Fla. 2015) (discussing the difference between contributory and vicarious secondary infringement and direct infringement).

## IV.   DAMAGES & OTHER RELIEF

## A.   Statutory Damages for Registered Works.

Dish should not be awarded statutory damages of $150,000 for any of the four Registered Works purportedly airing on the MBC channels. Contrary to Dish's position, Dish falls woefully short of establishing any justification for an award of maximum statutory damages in this case under section 504(c) of the Copyright Act for several reasons:

a.   Assuming, arguendo, that this Court finds that the Defendants directly infringed on Dish's exclusive distribution or public performance rights

with respect to the Registered Works, the Defendants should not be found as willful infringers under the Copyright Act. Any willfulness determination requires an evaluation of the Defendants' understanding of the facts and circumstances surrounding their purported actions giving rise to any infringement activity. Defendants testified that they did not receive all notices of copyright infringement, and of those relatively few notices actually received, such notices did not identify any of the Registered Works. Furthermore, none of the e-mail communications with any CDNs related to any purported copyright infringement identify any of the Registered Works but instead only identify channels to which there is no protection. Metral also testified that the infringement notices that he sent did not identify any of the Registered Works. Lastly, Defendants also testified that the MBC Channels all aired on the internet free-to-air during all relevant time periods including all periods giving rising to the instant case, which, when coupled with the Cressida Telecom agreement (Defendants' Exhibit 1), provides a reasonably basis to conclude that Defendants reasonably believed that their conduct did not violate any of the alleged exclusive rights held by Dish.

b.     While Defendants testified to receiving a few infringement notices, the Defendants also testified that they did not know exactly why any of the other infringement notices were not actually received. Indeed, Defendants were unwilling speculate regarding any of the notices not actually received. Furthermore, contrary to the Dish's position, Defendants did not testify that the Defendants understood what the infringement notices required them to do, but

instead testified that they simply complied with all requests from the CDN providers. Defendants promptly responded to instructions from CDN representatives at all times.

      c.     Defendants testified that they did not receive all infringement notices, regardless of timing with respect to the instant action. Defendants also testified they did not originate the streams of any of the channels, including the MBC channels, but instead the channels were provided by Lenkeng as available on the internet free-to-air. Defendants also testified that they sold the STBs to customers located outside of the United States, which Dish has no claim to any such activity is outside the scope of the instant action. Indeed, any delay caused in complying with any of the requests from the CDN providers are simply due to the Defendants working with Lenkeng to stop any channel streaming in the United States while allowing the sale of the STBs to customers located outside of the United States. Defendants further testified that they promptly complied with the CDN requests to keep their business relationships with the CDNs and not because they believed that they were infringing on Dish's purported rights. Indeed, the Defendants were able to find various CDN providers willing to conduct business and set up trial or demo accounts accordingly, even though some CDN providers, such as Verizon CDN, felt pressure by Dish to cutoff business relationships with the Defendants. Accordingly, Dish misrepresents the significance of the decisions made by CDN providers to cease doing business with the Defendants.

d.      Defendants' testimony at trial does not show or reflect in any way "a general disregard for the legal system". To the contrary, Defendants testified that they promptly cooperated with the requests from the CDNs and also had reason to the believe that all channels, including the MBC channels, were available on the internet free-to-air, all which were provided by Lenkeng in conjunction with the middleware provider in relation to the UlaiTV and AhlaiTV STBs. While Dish emphasizes a strong need for deterrence, Dish did not testify as to why Dish failed to pursue the originator of the channel streams, nor any third parties such as Lenkeng or even the middleware provider. Furthermore, Dish also presented a demonstrative at trial showing the effective dates of the agreements (Plaintiff's Exhibit 85), which identifies the end dates of the Dish's purported exclusive rights to distribute and publicly perform the MBC channels in the United States. Such MBC channels are somehow "necessary" to Dish's current Arabic-television offering to customers but yet according to Dish's demonstrative exhibit they failed to secure any purported exclusive rights to distribute and publicly perform such MBC channels in the United States.

e.      Dish's testimony regarding the popularity of the MBC channels is self-serving and merely speculative. Indeed, such MBC channels are apparently so important that Dish failed to secure the exclusive rights to distribute and public the MBC channels in the United States. Yet, despite such failure, Dish somehow still manages to provide an Arabic-language television service. Furthermore, contrary to Dish's position, Defendants' testimony did not express any position

with respect to the popularity of the MBC channels. Dish continues to mispresent the Defendants' testimony at trial, and also conveniently fails to mention that they do not have an expert on damages or with respect to the value of any of the Foreign Channels, including the MBC channels. While Defendants responded promptly to the requests of the CDNs, but they did not testify that they singled-out the MBC channels as being more important relative to any other channels or Foreign Channels.

      f.    Dish goes to great lengths to divert this Court's attention away from the fact that Dish paid mere cents on the dollar for the rights to distribute and publicly perform the MBC channels in the United States. MBC's testimony confirmed the licensing fees paid by Dish to MBC for the MBC channels as set forth in the MBC Network Agreements. Furthermore, Dish's self-serving testimony that any sublicensing would dilute the value of the so-called Protected Channels or Foreign Channels simply glosses over the importance of the relatively inexpensive fees paid by Dish to MBC under the MBC Network Agreements.

      In conclusion, assuming arguendo that this Court finds that the Defendants infringed on Dish's purported rights to distribute and publicly perform the MBC channels, the Defendants are not willful infringers, and Dish should not be awarded maximum statutory damages of $150,000 for each of the four Registered Works (nor the collective amount of $600,000 for all four). Conversely, any appropriate statutory award under section 504(c) of the Copyright Act should not

exceed the minimum amount of $750 for each of the four Registered Works, for a total of $3,000.

## A.   Defendants' Profits for the Unregistered Works.

Should this Court find the Defendants liable for direct copyright infringement, Dish is entitled to recover only Defendants' profits that are *attributable* to their infringement of the Unregistered Works under section 504(b) of the Copyright Act. While Dish correctly states the burden-shifting standard for the appropriate disgorgement of profits analysis, Dish conveniently passes over and entirely omits the important factors of attribution.  Contrary to Dish's position, the evidence presented at trial establishes that the Defendants' profits attributable to the alleged infringement of the Unregistered Works to which Dish may be entitled totals, at most, $2,541:

a.    The Defendants presented a financial summary at trial (Defendants' Exhibit 116 at 1) showing that the Defendants' revenues of $437,330.70 from the sale of the UlaiTV and AhlaiTV STBs as set forth on Joint Exhibits 7, 8 and 9, which certainly includes the relevant period as claimed by Dish in the instant case.

b.    Indeed, the Defendants correctly excluded from their financial summary any revenue received from the sale of the UlaiTV Plans between July 2015 and December 2015 in the approximate amount of $20,137. The Defendants testified that such sales were purchases of Plan renewals associated with set-top boxes sold in 2014 which were unrelated to sales of the UlaiTV and AhlaiTV STBs in the instant case. Such Plan renewals were associated with prior models of set-

top boxes and not the Android based UlaiTV and AhlaiTV STBs relevant in the instant case and therefore are correctly excluded from the revenue analysis.

c.      Defendants testified that the UlaiTV and AhlaiTV Plans are not subscriptions (see also Defendants' Exhibits 3 and 6). The Defendants affirmatively disagree that any such Plans should be included in the revenue attribution analysis but decided to include it in its financial summary for purposes of presenting a *reasonable* calculation to facilitate this Court's analysis. The Defendants not only testified that the Plans provided technical and warranty support for the UlaiTV and AhlaiTV STBs, but they also testified that the Plans were not necessary to use the UlaiTV and AhlaiTV STBs. Defendants' further testified that users of the UlaiTV and AhlaiTV STBs could access the internet, download applications and also access channels streaming on the internet without purchasing a Plan. Indeed, the Plans were not necessary for the use of the UlaiTV and AhlaiTV STBs and therefore any associated revenues should not be included in the revenue analysis. Swq21`

d.      Dish simply misrepresents the Defendants' deductible expenses and does not offer any reasonable basis to conclude that such expenses should equal $0. Contrary to Dish's position, Defendants' sales by item summaries, which have been stipulated to by the parties as Joint Exhibits 7, 8, and 9, set forth the gross revenues of the UlaiTV and AhlaiTV STBs, associated COGS, and associated quantity sold between July 2015 to 2017, quarter 1. Not only did the Dish stipulate to Joint Exhibits 7, 8, and 9, but the Defendants also testified at trial that TCI's

profit and loss statements and financial statements were contemporaneously maintained in the ordinary course of business and were not altered from their contemporaneous form. The Defendants also explained that the COGS in the approximate amount of $206,760 set forth on Defendants financial summary (Defendant Exhibit 116, at 2), which such numbers were taken directly from the Stipulated Joint Exhibits, 7, 8, and 9, were calculated by TCI's bookkeeper according to a formula related to all appropriate expense allocations for the COGS as in the ordinary course of business. Such expenses items allocated for the COGs would certainly include more than simply purchases but also other variable expense allocations associated with sale of the UlaiTV and AhlaiTV STBs. Accordingly, the Defendants are not limited to amounts paid to Lenkeng and Geniatech prior to 2016 for the UlaiTV and AhlaiTV STBs but should also be entitled to deduct the COGS set forth on the stipulated Joint Exhibits 7, 8, and 9.

e.    Dish assumes the very thing that Dish must establish in that the Defendants have somehow allegedly "falsified costs". Dish points to invoices to establish a cost per STB as if they have proven something. Contrary to the Dish's position, the Defendants offered an explanation and testified at trial that the Defendants' bookkeeper calculated the COGS associated with the sale of the UlaiTV and AhlaiTV STBs according to a formula which accounted not only the costs of STBs but also accounted for *variable* expense allocations attributable to the sale of the UlaiTV and AhlaiTV STBs. It should be emphasized that the COGS on the stipulated sales by item summaries (Joint Exhibits 7, 8, and 9) directly

support the COGS reflected on Defendants TCI's profit and loss statements as contemporaneously maintained in the ordinary course of business (Defendants' Exhibits, 9, 11, and 13). Furthermore, contrary to Dish's position, Dish is not entitled to recover the Defendants' revenues in this case in any way whatsoever.

f.      Defendants presented a financial summary at trial (Defendants' Exhibit 116 at 3) showing the Defendants' allocation of fixed expenses totaling $159,978.64 during the relevant time period in the instance case, which such fixed expenses were taken from TCI's profit and loss statements as set forth on Defendants' Exhibits 9, 11, and 13. Defendants testified that their profit and loss statements were contemporaneously maintained in the ordinary course of business, and, consequently, are inherently reliable. Rather than acknowledge the Defendants' testimony, Dish sweepingly assert that there is no support for the fixed expenses on the Defendants profit and loss statements without providing any justification or evidentiary support. Further, Defendants simply argue that the fixed expenses are not deductible under §504(c) when in fact the expenses apply to Defendant TCI's entire business operations and the Defendants are reasonably applying a percentage allocation of the fixed expenses based on the UlaiTV and AhlaiTV revenue as a percentage of total revenue as set forth on Defendant TCI's profit and loss statements. Further, Defendants testified that such allocation of fixed expenses was reasonable and appropriate because all fixed expenses were necessary for Defendant TCI's business operations and that Defendant TCI would not exist as business without such expenses. Dish should not be permitted to cherry

pick which fixed expenses that they believe are unrelated to any alleged infringement.

g. Defendants also presented a demonstrative exhibit (Defendant Exhibit 116, at 4) to support attribution of revenues based on the asserted so-called Protected Channels or Foreign Channels (20) and the total number of channels (560) taken directly from the channel list attached as exhibit 5 to the Metral Report. The consequent percentage based on the number Foreign Channels (20) and the total channels (560) is 3.6%, which when applied to the net profit calculation on Defendants' financial summary of $70,592.48 (Defendants' Exhibit 116 at 3) yields a mere $2,541 to which Dish may be entitled to, at most (Defendants' Exhibit 116 at 4). Metral did testify that not all channels were listed in sequence on the channel listing as set forth on exhibit 5 of the Metral Report, he did not offer any testimony which would contradict the Defendants' testimony explaining that the small gaps in the identified channel sequence was likely due to Defendants responding to the CDN requests in having the channel providers remove certain channels. It should be emphasized that Metral did testify that exhibit 5 attached to his Report did not actually list any programs but only channels, which certainly renders the label "programming guide" incorrect and misleading. Moreover, Metral did not confirm that any of the channels were duplicate nor was he able to confirm that any channels did not work.

h. Dish failed to provide any evidence at trial establishing the value or priority of all Foreign Channels and Works. While Dish certainly testified that the

Protected Channels were the most popular Arabic-language television channels, such testimony did not even attempt, nor did it mention all other Arabic channels to which the so-called Protected Channels are being compared to. Other than mere speculation, Dish has entirely failed to demonstrate that the so-called Protected Channels or Foreign Channels are any more valuable when compared to any other Arabic-language television channels. Indeed, Dish's position that the so-called Protected Channels were "necessary" to offer an Arabic-language package to customers is unfounded and runs counter to Dish's effective date of agreements demonstrative (Plaintiff's Exhibit 85) presented at trial. Dish's demonstrative exhibit identifies all of the end dates of Dish's purported exclusive rights to distribute and publicly perform the vast of majority of the foreign channels it complains of in this litigation.  If such channels were as important or popular to Dish's current Arabic-television offering as its corporate representative claimed at trial, one is left to wonder why Dish has failed to renew its exclusive rights to distribute and publicly perform the vast majority of those foreign channels.

In conclusion, Dish should only be entitled to disgorgement of profits in the total amount of $2,541, at most. *See* Pl. Exh. 116.

## B.   Mr. Fraifer Should Not Be Held Individually Liable.

Mr. Fraifer cannot properly be held individually liable for the acts of the corporation as any such acts must be imputed to the corporate defendants.  Courts in the Eleventh Circuit have found that any actions undertaken by a corporation's managers, intended to benefit the corporation, must be directly imputed to the

corporation, not the individual.  A corporation only acts through its officers, employees, or agents.  See *In re Spear & Jackson Securities Litigation*, 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005) ("Courts have uniformly held that acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation."); see also *United Feature Syndicate, Inc. v. Sunrise Mold Co., Inc.*, 569 F. Supp. 1475, 1480-81 (S.D. Fla. 1983) ("Knowledge of officers, directors, employees and agents of the corporation is imputed to the corporation itself."); *43 N. Broadway LLC v. Essential Media Grp. LLC*, No. 17-24518-CV-WILLIAMS/TORRES, 2018 U.S. Dist. LEXIS 242075, at *8, n.2 (S.D. Fla. Apr. 17, 2018) (denying amendment of copyright complaint to name manager as a secondary infringer on a theory of contributory or vicarious secondary infringement where direct infringement was alleged against the corporation) citing *Stop & Shop Companies, Inc. v. Federal Ins. Co.*, 136 F.3d 71, 74 (1st Cir. 1998) ("We repeat at the threshold the fundamental premise that, while a corporation does have a noncorporeal and independent existence, it can conduct its affairs only though its officers and employees.") and *Coach, Inc. v. Sapatis*, 27 F. Supp. 3d 239, 245 (D.N.H. 2014) ("A corporation can only act through its agents.").  Accordingly, even if this Court disagrees with Defendants, Mr. Fraifer should not be found individually liable for acts benefiting the corporation.

## C.   Dish Should Not Be Entitled to its Attorney's Fees And Costs.

Contrary to Dish's position, Dish should not be awarded attorney's fees and costs under section 505 of the Copyright Act, especially because there is no basis

to find the Defendants are willful infringers.  Additionally, Dish cannot seek attorney's fees and costs for the Unregistered Works in this case, which comprise fifty-five of the fifty-nine works asserted in this case.  Indeed, the lion's share of legal work and costs in this case has related to unregistered foreign works with little to no value.  As to the four Registered Works asserted in this case, for the reasons discussed herein, Dish cannot seek statutory damages or attorney's fees for three of the works because it failed to provide prepublication notice as to such works under 17 U.S.C. §§ 411(c)(1) and 412.

Furthermore, should the Court find appropriate to award Dish's attorney's fees in the instant case, the reasonableness determination of any fee award must be analyzed using the prevailing *Johnson* factors under Eleventh Circuit precedent which takes into account numerous facts including the amount of damages at issue in the case.  Finally, Dish has admitted to this Court that it has other, ostensibly, non-monetary reasons for pursuing cases such as this.  Defendants should not be held financially responsible for Dish's internal or business reasons in pursuing its strategic litigation goals.

## V. CONCLUSION

Defendants are entitled to judgment in this matter because: (1) Plaintiff has not established ownership of valid copyrights and cannot rely on declarations which were not made from personal knowledge; (2) Plaintiff cannot maintain a copyright infringement claim because they have failed to register the Unregistered Works, have not and cannot establish that the works are not United States works

133

exempt from registration under Section 411(a); (3) Plaintiff's failure to enter into evidence at trial copies of the asserted works render impossible the Court's ability to determine the scope of protection afforded to what are admittedly collective works, to identify their protectable elements, if any, and to conduct a substantial similarity analysis as required under Eleventh Circuit law; (4) Plaintiff failed to provide the required prepublication notice for the asserted works fixed for the first time simultaneously with their transmission under 17 U.S.C. 411(c)(1),(2) and 412; and because (5) Plaintiff has failed to meet its burden in establishing that Defendants directly infringed on any of Plaintiff's asserted copyrights.  Defendants acts in utilizing CDNs simply do not rise to the level of volitional conduct required to substantiate a claim of direct copyright infringement, Plaintiff has not asserted contributory or secondary infringement in this action.

Defendants respectfully request that this Court enter judgment in its favor on Plaintiff's sole count of direct copyright infringement, granting Defendants attorney's fees and costs.

Dated: July 31, 2021                    Respectfully submitted,

By:  */s/ Joseph R. Sozzani*
Joseph R. Sozzani, Esq., B.C.S.
Florida Bar Number: 120297
E-Mail: JSozzani@InfinityIPLaw.com
INFINITY IP, PLLC
222 West Bay Drive
Largo, FL 33770
Tel: 727.687.8814

Derrick L. Clarke, Esq.

134

Florida Bar Number: 95550
E-Mail: dclarke@dclarkelegal.com
Law Office of Derrick L. Clarke, PA
146 2nd Street North. Suite 310
St. Petersburg, FL 33701
Tel: 727.379.4434

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on July 31, 2021, I electronically filed the foregoing with the Clerk of the Court using the NextGen CM/ECF system which will provide notice to Defendants.

*/s/ Joseph R. Sozzani*
Joseph R. Sozzani