**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DISH NETWORK LLC,**

Plaintiff,

v.

CASE NO.: 8:16-cv-2549

**GABY FRAIFER, TELE-CENTER, INC. AND PLANET TELECOM, INC., INDIVIDUALLY AND TOGETHER D/B/A ULAITV, PLANETITV, AND AHLAITV,**

Defendants.

**DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT**

Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc. (collectively "Defendants") pursuant to Rule 52(b) and 59(e), respectfully request the Court correct errors of fact and law and amend its findings of fact and conclusions of law to find that Plaintiff failed to prove that it owned the exclusive rights to publicly perform the four Registered Works in the United States, and that in any event, failed to prove that Defendants violated the right of public performance in any of the Works, or that Defendant's actions even if infringement, constituted willful copyright infringement.

**LEGAL STANDARD**

Upon timely motion, "the court may amend its findings--or make additional findings--and may amend the judgment accordingly" based on a party's timely motion. Fed. R. Civ. P. 52(b). "The purpose of [Rule 52(b)] is to allow the court to correct plain errors of law or fact." *Hannover Ins. Co. v. Dolly Trans Freight,*

*Inc.*, 6:05-CV-576-ORL-19DA, 2007 WL 170788, at *2 (M.D. Fla. Jan. 18, 2007). Similarly, after a nonjury trial, the court may, on motion for new trial, "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment" or "alter or amend a judgment" upon timely motion. Fed. R. Civ. P. 59(a)(2) and (e). Here, the trial court's finding of copyright infringement is built on inadmissible evidence, and even considering the improperly admitted documents, the evidence does not establish Plaintiff's claim of direct copyright infringement. Defendants respectfully request that this Court correct its erroneous rulings on various evidentiary issues, and issue revised findings of fact and conclusions of law stating that Plaintiff failed to prove copyright infringement by admissible evidence.

## I. The Court Should Reconsider Admitting the Testimony and Accompanying Hearsay Exhibits (Plaintiff's Exhibits 5-7) by "Expert" Attorney Metral, Which in Any Event Was Insufficient to Prove Infringement of the Right of Public Performance.

The Court rightly expressed skepticism as to Metral's "expertise," noting that Plaintiff's case "would have been much stronger had it chosen to retain a true independent technical expert" as "Metral was "a lawyer in Switzerland with no technical training who has done legal work for the party in the case that hired him." Dkt. 337 at 26. Despite recognizing the unreliable nature of Metral's qualifications, and that the information presented by Metral was not "reliable as to each and every specific detail," the Court still concluded that Metral's "analysis is sound and his

conclusions reliable." Dkt. 337 at 27. This Court expressly noted that Metral's analysis, at best, "demonstrates that Plaintiff's copyrighted programming was received by STBs regularly over a period of years." Dkt. 337 at 27. This conclusion, however, does not support a finding that such programming of the *specific* Registered Works or Unregistered Works was received by STBs *located in the United States*, however. Metral's testimony should have been excluded, because he was not qualified as an expert and his testimony was merely a vehicle for admission of unreliable hearsay documents and records prepared in anticipation of and for the purpose of litigation. Dkt. 329 at 55.

### A. All of Metral's Testimony Should Have Been Excluded Because Metral Did Not Qualify as an Expert.

In their pretrial motion in limine to exclude Metral's testimony, Dkt. 298, Defendants set out in great detail all of the reasons Metral, an attorney and vice president of legal affairs an entity whose primary purpose is create legal evidence – with no training or experience in computer forensic science or network, programming, or application engineering –should not be allowed to testify as an expert. Dkt. 298 at 6. Metral's trial testimony confirmed his complete lack of expertise, which the trial court expressly recognized in its decision. Dkt. 337 at 27. With the benefit of the trial testimony, the Court should reconsider all of the arguments made in the Motion in Limine and incorporated herein by reference, and exclude Metral's testimony and the exhibits admitted through his testimony in their entirety. In particular, Metral's trial testimony confirmed he had no

technical training or qualifications, Dkt. 329 at 58, that he reviewed documents prepared in anticipation of litigation, Dkt. 329 at 55, and that the purported evidence of transmission was captured in Switzerland, not the United States, and therefore was unreliable to show that Defendants made infringing transmissions into the United States. Dkt. 329 at 82

### B. All of Metral's Testimony Should Have Been Excluded Because it Was Not an Opinion at All, But Rather a Vehicle to Proffer Hearsay Created in Anticipation of Litigation.

Metral did not perform any real analysis in order to form "opinions" of the hearsay monitoring reports performed by third parties. The report he complied and his accompanying testimony merely summarizes the work of "security experts working in our company and in our affiliated company that have performed the monitoring." without any proper expert disclosure of the identity or qualifications of those "experts." Dkt. 329 at 14. Metral testified: "I was retained to look back at the monitoring records, the daily reports and the monitoring materials that has been collected and performed throughout the analysis of the UlaiTV and Ahlai TV streaming devices." *Id.* Specifically, Metral testified that an individual by the name of Damien Giroud served as the security technician, overseen by a program manager named Michael Sharpe, who both reported to Metral. Dkt. 329 at 19. In other words, all Metral did was summarize other people's fact gathering work conducted for the purposes of litigation. Not once during his testimony was Metral asked to provide his *opinion* about the hearsay documents. Rather, he testified that he oversaw a "project manager" and "Security experts or technicians" to gather

factual data in an attempt to prove copyright infringement. Dkt. 329 at 17. This is a factual investigation to identify and create evidence, and therefore more akin to the fact gathering work of a private investigator, rather than expert analysis and opinion. *See, e.g.*, *Clark v. S. Broward Hosp. Dist.*, 12-61164-CIV, 2013 WL 11318865, at *1 (S.D. Fla. Sept. 18, 2013) (investigator who gathered facts is a fact witness); *Furmanite Am., Inc. v. T.D. Williamson, Inc.,* 506 F. Supp. 2d 1126, 1133 (M.D. Fla. 2007) (witness who conducted factual investigation of computer systems is a fact witness, not an expert witness, because witness was merely reporting facts discovered rather an opining on information provided to him by counsel).

Moreover, Metral's testimony was not truly in the nature of expert opinion, but rather an attempt to bring in inadmissible hearsay. "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the [factfinder] in evaluating the expert's opinion, then … the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021) (excluding factual evidence introduced through "expert"), citing *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). In copyright cases, as in any case, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of

his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion of "expert" testimony).

**C. The Court Should Not Have Admitted the Unreliable Hearsay Screenshots (Plaintiff's Exhibit 7) or Daily Monitoring Reports (Plaintiff's Exhibit 6).**

Metral's testimony showed that he could neither authenticate the screenshots and monitoring reports, nor did he have personal knowledge of the information within them, making them inadmissible hearsay. Authentication is a condition precedent to admissibility. *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000). To authenticate an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Sanford v. Omni Hotels Mgmt. Corp.*, No. 3:16-CV-1578-J-34PDB, 2018 WL 1327090, at *5 (M.D. Fla. Mar. 15, 2018) (quoting Fed. R. Evid. 901(a)). As to the screenshots, Metral did not possess the personal knowledge to authenticate them as accurate captures of information transmitted within the United States by a set top box sold by Defendants, because he did not create them. Dkt. 329 at 59-61; 80-81.

Moreover, the screenshots did not have independent indica of authenticity, because Metral admitted that they each showed a location/time zone that was different from the actual location and time zone in which they purported to be captured. Dkt. 329 at 108. The screenshots included purported "date stamps" from places in the United States, such as Dallas, Texas [Dkt 325-6 at 2], Houston, Texas [Dkt 325-6 at 21], or New York, New York [Dkt. 325-8 at 298], or merely had a

UTC time code with no geographic location [Dkt 325-6 at 105], but Metral testified that they were captured either in Switzerland or Colorado, and he was not able to testify as to which screenshots were allegedly captured where. Dkt. 329 at 82-83. The only thing Metral could say for certain was that the Defendants products were physically in Switzerland when the screenshots of any item allegedly broadcast on UlaiTV were taken. Dkt. 329 at 82. Because the authenticity of the documents were suspect on their face, they should never have been admitted. See, e.g., *Z Indus. USA, LLC v. Circuitronix*, LLC, 0:17-CV-60727-UU, 2018 WL 3412854, at *16 (S.D. Fla. June 20, 2018) (excluding screenshots that lack authenticating testimony and do not possess clear indica of authenticity); *Rubinstein v. Ourian*, 20-21948-CIV, 2021 WL 4134753, at *3 (S.D. Fla. Sept. 10, 2021) (excluding unauthenticated screenshots). Indeed, this Court rejected screenshots of the allegedly infringed works produced by Defendants at the summary judgment stage because they "contain foreign language content and may not be properly authenticated." Dkt. 246 at n. 19. The screenshots proffered by Plaintiff as Exhibit 7 have the same infirmity, and should have not have been admitted over Defendant's authenticity objection. Dkt. 329 at 35.

For similar reasons, the Court should also have excluded the "Daily Monitoring Report," Dkt. 325-6, admitted over Defendant's authenticity objection. Dkt. 329 at 34. Metral did not personally prepare these documents, and merely testifying that "he had no reason to doubt" their authenticity is insufficient to actually authenticate them. Plaintiff chose not to utilize the procedure for self-

authenticating the data, see Rule 902(13), but if it had, Metral would not have been qualified to authenticate them because he admitted he did not have the personal knowledge of the processes used to generate the reports. Dkt. 329 at 61-63.

Both documents should also have been excluded as hearsay. They contain out of court statements offered to prove the matter asserted (that Defendants transmitted works in the United States at certain dates and times) without meeting any hearsay exception. Plaintiff argued that the business records exception was sufficient to allow admission, Dkt. 329 at 34; but the business records exception to the hearsay rule simply does not apply to documents created in anticipation of litigation. As the Eleventh Circuit has explained: for computer generated business records to be admissible, "(1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion." *United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir. 1985) (citations omitted); *see also United States v. Arias–Izquierdo*, 449 F.3d 1168, 1183–84 (11th Cir. 2006) ("the business records exception, embodied in Federal Rule of Evidence 803(6), 'requires that both the underlying records and the report summarizing those records be prepared and maintained for business purposes in the ordinary course of business and not for purposes of litigation.'"). Here, Mr. Metral expressly testified that data was gathered expressly for the

purposes of litigation. Dkt. 329 at 55. Because of this, the court should not have admitted the documents based on the business records exception.

### D. The Court Should Not Have Admitted the Hearsay Expert Report (Plaintiff's Exhibit 5).

The Court admitted and relied upon a portion of Metral's Expert Report as part of the evidence that allegedly demonstrated that Defendants directly publicly performed the allegedly infringed works in the United States. Plaintiff's Exhibit 5 (Dkt. 325-5) was admitted over both a hearsay and relevance objection. Dkt. 329 at 37-38. "Expert reports are hearsay; that is, a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Johnston v. Borders*, 615CV936ORL40DCI, 2018 WL 4215027, at *1 (M.D. Fla. Sept. 4, 2018). The purpose of an expert report is merely to inform the other side in advance of the facts upon which the expert relied to form expert opinions; the report itself is pure hearsay, with no indicia of trustworthiness, and thus does not fall under residual exception of the hearsay rule. *Diamond Resorts Int'l, Inc. v. Aaronson*, 378 F. Supp. 3d 1143, 1145 (M.D. Fla. 2019) (denying admission of expert report because "It can rarely be said that a report prepared by a paid, retained expert witness for a party or its counsel bears 'equivalent circumstantial guarantees of trustworthiness' to justify application of the residual hearsay exception").

At trial, Plaintiff argued that the Exhibit 5 should nonetheless be admitted as a "summary," Dkt. 329 at 37, but this list of dates in the expert report is not a

Rule 1006 summary because it is a summary of inadmissible and unauthenticated data (See Part C, above). "Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004). Here, the Exhibit states as true dates that unidentified individuals and/or machines allegedly made observations of purported transmissions of date for the express purpose of litigation. Dkt. 329 at 55. These documents should therefore have been excluded from evidence. *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1161 (11th Cir. 2004) (summaries of records prepared for litigation is inadmissible…and inadmissible documents are not made admissible by being summarized.").

### E. Even If Considered, Metral's Testimony and Documents Are Insufficient to Meet Plaintiff's Burden of Proving Defendants Infringed Copyright by Publicly Performing in the United States the Works Identified in the Complaint.

To prove infringement of the public performance right to which Plaintiff claimed exclusivity, Plaintiff recognized that it needed to show that Defendant publicly performed the works to users Set Top Boxes (STBs) sold by them. Dkt. 302 ¶ 8. And more specifically, it needed to prove that the Works were transmitted to one or more users of the STBs *in the United States*, for two reasons: One, to the extent Dish possessed exclusive rights to any Works,[1] those rights were limited to public performance by transmission within the United States. Dkt. 331 at 156 (Tr.

[1] The Court has made clear it will not reconsider ownership at this time, and therefore Defendants are not re-raising arguments regarding ownership here, without waiver of the right to raise the ownership issues on appeal, except as set forth below.

489). Second, "federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States. *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004). To perform a work publicly, a party must "transmit or otherwise communicate a performance…by means of any device of process, whether the members of the public capable of receiving the performance or display ***receive it*** in the same place or in separate place and at the same time or different times." 17 U.S.C. § 101 (definition of public performance by transmission) (emphasis added). This builds upon the definition of transmit, which likewise states that to transmit is "to communicate [a performance] by any device or process whereby images or sounds ***are received*** beyond the place from which they are sent." 17 U.S.C. § 101 (emphasis added). Transmissions "are public performances even when they are received by small numbers of people at a time." *New World Music Co. (LTD) v. Tampa Bay Downs, Inc.*, 8:07CV398-T-33TBM, 2009 WL 35184, at *8 (M.D. Fla. Jan. 6, 2009). Thus, a performance is transmitted under the act only once it is actually watched on the receiving end. *Am. Broad. Companies, Inc. v. Aereo*, Inc., 573 U.S. 431, 446 (2014) ("Aereo transmits a performance whenever its subscribers watch a program."). Still, to prove defendants infringed the exclusive right of public performance, the performance must both be transmitted and received by at least one person in the United States.

For all of its volume and bluster, Plaintiff's evidence does not show by a preponderance of the evidence that the specific Registered or Unregistered Works

were publicly performed *in the United States* through any of Defendants' STBs. The STBs themselves were, at base, computers operating an android system that *could* transmit UlaiTV and AhlaiTV to viewers in the United States, but could also be used to access any internet content. Thus, the sale of the STBs alone is not evidence that anyone received the channels, much less the specific shows, for which DISH claimed exclusive public performance rights in the United States. The channelsPlaintiff did not provide testimony from *any* individual who personally viewed the Registered or Unregistered works via the STBs on U.S. soil. They relied solely on circumstantial evidence as testified to by Metral, who himself had no direct knowledge.

The court found that Metral's analysis "accurately demonstrates that Plaintiff's copyrighted programming was received by STBs regularly over a period of years." Dkt. 337 at 27. This finding is both incorrect and, even if supported by admissible evidence, insufficient to establish copyright infringement by public performance. Metral's "analysis" shows, at best, that at the time a screenshot was taken, a single STB received a single channel (that was not transmitted by DISH). It does not show where that STB was located, and whether the specific works at issue made a public performance received by a viewer in United States. There is no way to tell, either from Metral's testimony or the supporting documents, where the screenshots were created, but it is undisputed that the STBs were located in Switzerland. Dkt. 329 at 82. Because Metral testified that the purported transmissions were captured in Switzerland, there is insufficient evidence to show

that the any of the Registered or Unregistered works were actually publicly performed in the United States. And notably, the court does not make an actual finding that the *specific works at issue* were publicly performed in the United States via STBs sold by Defendants. Dkt. 337 at 26-27. The finding that STBs received programming "regularly over a period of years" is simple insufficient to establish infringement of any exclusive right to publicly perform the specific Works in the United States.

Moreover, because there is insufficient evidence that the STBs actually displayed the claimed works to end users in the United States, whether or not the STBs were enhanced by content distribution networks or encoders is irrelevant, because there was no proof of public performance.

This case thus differs from *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 431 (2014) in a material respect. In *Aero* there does not appear to be any dispute that the Defendants end users – who actively subscribed to a service rather than merely purchased equipment – actively received the works they selected, whereas here, the receipt of the works in the United States is a fact in dispute, and not adequately proven. Moreover, in *Aereo*, the Defendant was actively recording and then retransmitting portions of the *Plaintiff's channels*. Here, by contrast, Defendants' STBs allowed access on a television to authorized streams already available, created by a party other than DISH, which means Plaintiffs had to prove an additional step in the chain of infringement. It did not.

## II. The Evidence Purporting to Show the Use of Encoders Was Unreliable and Did Not Show Them in Use at the Time of the Alleged Infringement.

### A. The Court Erred in Admitting Plaintiff's Exhibits 83 and 84, Which in Event Were Not Sufficient to Prove Defendants Used Encoders at the Time of the Alleged Infringement.

The Court relied heavily on Plaintiff's Exhibit 83 [Dkt. 325-74] as proof that Fraifer used encoders provided by a German company called Cetel. Dkt. 337 at 22. However, this document was not authenticated, and was hearsay Dkt. 329 at 175 (objection to admission on these bases and noting "there's no custodian"). The authenticity objection should have been sustained. To authenticate printouts from a website, the party proffering the evidence must produce "some statement or affidavit from someone with knowledge [of the website] ... for example [a] web master or someone else with personal knowledge would be sufficient." *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 8:06CV223TMSS, 2006 WL 1320242, at *2 (M.D. Fla. May 12, 2006) (rejecting admission of document allegedly printed from the Internet Archive despite argument that the site is regularly relied upon), citing *In re Homestore.com, Inc. Sec.Litig.*, 347 F.Supp.2d 769, 782 (C.D.Cal.2004).

Moreover, even if the document passed authenticity muster, it was offered as proof of truth of the matter asserted within it – allegedly that Mr. Fraifer controlled an encoder – but was inadmissible hearsay. Plaintiff's counsel argued that the website from which the information was printed is of the kind regularly relied upon by courts in support of its admission. Dkt. 329 at 176. However, such

records must still be certified by a custodian or other qualified witness to be admitted Pursuant to Fed. R. Evid. 803(6), and argument of counsel does not act as such certification.

Finally, even if the document were to be considered, it is of minimal probative value because it shows only a snapshot in time as of the timestamp in its footer dated November 13, 2017 – which is more than a year *after* the claimed initial airing of any of the allegedly infringed works as stated in the copyright registrations, and several months *after* Defendants stopped selling STBs and ceased conducting business in May, 2017. Dkt. 146-8 at ¶¶ 9-10; Dkt. 337 at 10. The "created" and "last modified" dates are of no probative value without competent testimony to explain what they mean, and Dish failed to proffer any such testimony. Defendants Exhibits 117 and 118[2] show that the "created" and "modified" dates cannot mean the date the particular party first associated with a particular IP address, because if that were the case than CETEL would have had control of the domain name from 2005 through 2017 – in which case, that would prove that Defendants did not control the domains. Dkt. 326-86, 326-87.

[2] Unlike Plaintiff's Exhibit 83, these documents were not proffered to show proof of the matter asserted in them, but rather only to demonstrate that Dish's proposed explanation for the dates could not possibly make sense. They were therefore admissible on that basis.

**B. Fraj Fraifer's Paypal Payments to CETEL, Which Post-Date the Alleged Infringement and Were Irrelevant.**

The Court admitted Plaintiff's Exhibits 76 and 77 (Dkt. 325-67 and 325-68) over a relevancy and undue prejudice objection. Dkt. 329 at 76. The Court relied heavily on these documents, noting that while it initially agreed that the dates in the purported whois document (Ex. 83) did not match, his brother's payments to CETEL in February and April of 2017 affected its view of Mr. Fraifer's credibility. Dkt. 329 at 197. But these payments were made by a third party and again a year after the alleged infringement and months after Defendant went out of business in May 2017. They do not prove, or even tend to prove, that Defendants controlled encoders in April and May of 2016, when the Registered Works aired, Dkt. 146-8 at ¶ 9. Nor do they prove or tend to prove that those encoders were used to publicly perform the Registered Works (or any works) in the U.S. on the days they first aired in the United States. or any other days. Without proving both of those things, Plaintiffs have failed to meet their burden to prove copyright infringement.

**C. The Court Similarly Should Have Excluded and Not Relied Upon Plaintiff's Exhibit 84.**

As with the other "whois" records, the Court should not have admitted Plaintiff's Exhibit 84, admitted over both hearsay and authenticity objections. To overcome the authenticity objection, the Court in real time visited the website listed on that exhibit and decided that it matched the propounded exhibit. Dkt. 330 at 23-27. While well-meaning, such actions are not permissible, because by conducting or directing its own investigation the Court calls into question the

Court's impartiality and gives the unfortunate appearance of becoming an advocate for a party. *See, e.g, DiGiovanni v. Deutsche Bank Nat'l Tr. Co.*, 226 So. 3d 984, 988 (Fla. 2d DCA 2017) ("Whether intentional or not, the trial judge gave the appearance of partiality by taking *sua sponte* actions which benefitted one party over the other") (applying state court rules of evidence and ethics modeled after Federal rules) (internal citation omitted); *see also* Code of Conduct for U.S. Judges Canon 3(C)(a) (judge should not have "personal knowledge of disputed evidentiary facts").

Moreover, even if the Court were within its discretion to actively investigate authenticity, information available on the date of the Court's viewing does not demonstrate the data was the same on the date of the alleged print out. Moreover, the underlying document was still hearsay. Counsel argued that the whois database qualifies for the Section 803(17) exception to hearsay as being "from a director or compilation that's regularly relied on by the public or persons in particular occupations, including federal courts." Dkt. 330 at 25. But as the case law above in Part II.A. recognizes, Courts regularly require such information to be authenticated to be admitted. Moreover, there is no testimony – as opposed to counsel representation – that these documents are regularly relied upon so as to fit into the Rule 803(17) exception. In making evidentiary determinations for purposes of determining whether a hearsay exception applies, the Court must still utilize evidence. *In re Intern. Mgmt. Associates, LLC*, 781 F.3d 1262, 1268 (11th

Cir. 2015) (someone who is knowledgeable about the facts supporting the hearsay exception must testify). Mere argument is not sufficient.

## III. The Court Should Reconsider its Finding that Dish Owned an Exclusive Rights to the Registered Work that Aired on MBC Massr, Because the Documentation Provided by Dish Does Not Support That Finding.

On their face, the copyright registrations all stated that MBC FC LLC was the original author of the registered works. Pl's Ex. 1-4, Dkt. 325-1 through 325-4. The agreements provided by Dish at summary judgment, however, did not successfully "connect the dots" between MBC FC LLC as the Network/Copyright Owner/Copyright Claimant and Dish as to the registered works that originally aired on the MBC Masr channel – specifically, Chef Hassan (Episode 289), the subject of the copyright registration admitted as Exhibit 4. Dkt. 146-8 ¶ 9; Dkt. 325-4. By declaration, MBC FZ LLC's counsel, John Whitehead, swore that "MBC exclusively licensed all of its copyrights in the works that aired on the MBC Drama, MBC3 also known as MBC Kids, and MBC Masr channels to its affiliate MabMedia LLC ("MabMedia") for purposes of the United States, as shown in paragraphs 1, 3.2, and 9.4 of the redacted copy of the April 26, 2012 agreement attached as Exhibit 4." Dkt. 146-8, citing Dkt. 146-10 at 1-13 (Appendix Pages 91-102). However, on its face, that agreement *does not convey any rights in the MBC Masr*

*channel*. Rather, that agreement applies only to the MBC 3 (Kids) and MBC Drama US feeds:

mbc

Annexure 1 – Channels description

1- MBC 3 (Kids) – US feed – 24/7 kids general entertainment television channel in SD format

2- MBC Drama US feed - 24/7 Arabic Drama series television channel in SD format

See Dkt. 146-10. Where, as here, a party's declaration is directly contradicted by the document that purports to support the declaration, the Court should credit the document as speaking for itself and not give any credibility to the statement. *See, e.g., Rensel v. Centra Tech, Inc.*, 17-24500-CIV, 2018 WL 4410110, at *14 n.17 (S.D. Fla. June 14, 2018) ("where statements in affidavit were flatly contradicted" by writings, "affidavit was wholly without credibility").

Without the initial transfer from MBC FZ LLC to Mab Media, any further transfer by Mab Media to Dish cannot include the MBC Masr channel, and therefore Dish failed to prove it owned an exclusive license to transmit the MBC Masr channel and by extension, the Chef Hassan work. The Court should therefore, at the very least, amend its findings of fact to determine that there was no proof of infringement of the Chef Hassan Work (and therefore, no basis for awarding statutory damages for the Chef Hassan Work).

## IV. Court Should Reconsider its Finding Willful of Infringement.

Even if the Court does not alter its finding of infringement, the Court should reconsider its finding that the infringement was willful. Dkt. 337 at 33-36. The

Eleventh Circuit has explained that willfulness occurs when a defendant either has actual knowledge that the action is infringing, or is acting in reckless disregard of the possibility that it is infringing a copyright. *Olem Shoe Corp. v. Washington Shoe Corp.*, 591 Fed. Appx. 873, 877 (11th Cir. 2015). In *Olem Shoe*, the Court held that sending cease and desist letters, without more, does not give rise to an inference that a party is willfully infringing. *Id.* at 879. The Court noted that when cease and desist letters do not include copyright registration letters or deposit copies, or otherwise do not provide sufficient information to determine whether the claims were legitimate, they do not create an inference of willfulness. *Id.*

Here, the takedown notices in evidence similarly do not adequately identify the works claimed to be infringed in a manner sufficient to have allowed Defendants to determine whether the claims were legitimate. P's Ex. 18-51; Metral, Dkt. 329 at 118. For similar reasons of having fair notice of the alleged infringement, to be adequate under the Digital Millennium Copyright Act, requires "[i]dentification of the copyrighted ***work*** claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site." 17 U.S.C. 512(c)(3)(A)(ii). But the notices sent to Defendants via Verizon do not identify any single works or even a "representative list of works at that site," but rather identify channels, which are not protected works under the Copyright Act, and without any indication that the party requesting takedown owned exclusive rights in specific works on the channels. *See, e.g*. Pl's Ex 18-51, Dkt. 325-14 through 325-47.

Moreover, those notices were directed at the CDNs facilitated by Verizon, and at the time they were sent, it was not at all clear that providing a CDN constituted infringement, as opposed to merely acting as a protected internet service provider – this Court has acknowledged that whether providing CDNs to purchasers of the STBs constituted direct copyright infringement was a "close case" and "a question of first impression." Dkt. 337 at 28-31. This Court also found that generally, the use of CDN technology is "perfectly legal, and various companies, such as Verizon, sell CDN services to the public." Dkt. 337 at 17. The Court found to be accurate Defendants' assertion that "a substantial portion, and perhaps all, of the copyrighted programming at issue here was publicly available on the internet for free," and the STBs simply provided their customers "with URL links that allowed customers to access and view what they could access and view on their own, for free, without a STB or CDN." Dkt. 337 at 31. If the Court found it a close call, then it was certainly reasonable for Defendants to have a reasonable belief that their actions in, as they saw it, providing a device to stream items the Court does not dispute were already available for free on the internet was not infringement. *See, e.g.*, *Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) (where determination of infringement required application of an unsettled area of the law, potential for reasonable disagreement makes belief actions are not infringement reasonable) (reversing finding of willfulness). The Court should therefore reverse its finding of willfulness and reduce the statutory damages to no more than $30,000 per work.

The cease and desist letters from the International Broadcaster Coalition Against Piracy (IBCAP) and/or DISH, while voluminous, similarly did not provide Defendants with sufficient notice to dispel the Defendants' reasonable belief that their actions in selling STBs and providing CDNs to deliver content that individuals could legally access via the Internet were not infringing. *See, e.g.*, Dkt. 327-1 through 327-8. Whether those notices were sent to Defendants directly, or to Verizon, they merely repeated the same kinds of allegations over and over again – never providing sufficient information about works (as opposed to "channels") over which Plaintiff alleged to have exclusive rights. *Id.* "[O]ne who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful'" for statutory damages purposes. *Kohus v. Graco Children's Products Inc.*, 13 F. Supp. 3d 829, 838 (S.D. Ohio 2014), citing 4 Nimmer on Copyright, § 14.04[B][3][a], at 14–78–14–79.

The Court seemed to give weight to the mere volume of the notices, noting that 62 of them concerned the three channels upon which the four registered works were initially streamed, stating "The Infringement Notices plainly stated, and Defendants understood, that Protected Channels should not be delivered to Defendants' STB because works that aired on the Protected Channels were protected by copyright." Dkt. 35. This finding overlooks the Court's important earlier finding that the issues surrounding copyright ownership were "Complex, detailed, and involved intricate, unfamiliar technical information, as well as challenging legal concepts." Dkt. 337 at 10. By the time the magistrate issued the

report and recommendation resolving these complex ownership issues in January, 2020 [Dkt. 246],[3] Defendants had long since ceased conducting business. They stopped the allegedly infringing activity even before they had a reasonable believe that Dish actually owned the rights it alleged.

Moreover, the Court should reduce the statutory damages award because the need for deterrence of third parties is met by clarifying the legality of the technology used, and it is not necessary to further deter Defendants, who are out of business. Dkt. 337 at 10; Dkt. 330 at 10. The Court awarded maximum statutory damages here, in part, because Defendants continued to use CDNs after the lawsuit was initiated. Dkt. 337 at 36.But where, as here, a belief that the actions are not infringing is reasonable, the continued use of CDN services after the case was initiated does not show that Defendants acted willfully. Plaintiff's never sought or received a preliminary injunction. The settling of the legal uncertainty is sufficient deterrent, both for these Defendants (who have long ceased to provide CDNs) and future defendants. Finally, as set forth above, there is not sufficient evidence to show that Defendants (as opposed third parties) used encoders, so the purported "misleading testimony" is neither misleading nor relevant to the statutory damages calculus.

[3] Defendants intend to challenge the ownership issues on appeal, recognizing that the Court definitively ruled on the ownership issue at summary judgment and has declined to reconsider at trial.

## CONCLUSION

For all of the foregoing reasons, the Court should amend its findings of fact to hold that Plaintiff failed to meet is burden of proving copyright infringement by a preponderance of admissible evidence, and enter judgment of non-infringement in Defendants' favor. In the alternative, the Court should amend its factual finding that Defendants infringed the Chef Hassan Work (Dkt. 325-4) and remove any award of statutory damages related to that work. Further, whether or not the findings of infringement stand, the Court should amend its factual finding that Defendants committed willful copyright infringement and reduce the award of statutory damages to $30,000 or less pursuant to 17 U.S.C. § 504(c)(1).

Date: May 17, 2022

By: *Dineen Pashoukos Wasylik*

Dineen Pashoukos Wasylik,
FBN 0191620
**DPW LEGAL**
PO Box 48323
Tampa, FL 33646
(813) 778-5161; (813) 907-3712 (fax)
service@ip-appeals.com
dineen@ip-appeals.com
*Attorney for*
*Defendants Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc.*