UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DISH NETWORK L.L.C.,

     Plaintiff,

v.                                  Case No. 8:16-cv-2549-TPB-CPT

GABY FRAIFER, TELE-CENTER,
INC., and PLANET TELECOM, INC.,
individually and together d/b/a
UlaiTV, PlanetiTV, and AhlaiTV,

     Defendants.

_____/


**<u>REPORT AND RECOMMENDATION</u>**

     Before me on referral is Defendants Gaby Fraifer, Tele-Center, Inc. (TCI), and

Planet Telecom, Inc.'s (PTI) motion pursuant to Federal Rules of Civil Procedure 52

and 59 to alter or amend the judgment entered against them on Plaintiff DISH

Network L.L.C.'s (DISH) copyright claim.  (Doc. 377).  For the reasons discussed

below, I respectfully recommend that the Defendants' motion be denied.

I.

     The background of this case is set forth in detail in prior decisions of the Court

(Docs. 246, 257, 337) but bears repeating here with some supplementation.  At all

times relevant to this action, DISH was a pay-television provider that offered

programming via satellite delivery and "over-the-top" services using a public internet infrastructure.  (Doc. 377 at 9–10).  As pertinent here, DISH aired its programming in the United States on a number of Arabic-language channels that were exclusively licensed to DISH (hereinafter, the Protected Channels).  *Id.* at 9, 14.  The Protected Channels consisted of the MBC FZ LLC Channels, the AJAN Al Jazeera Channels, the World Span Channels, the Dream 2 Channel, and the IMD Channels.  *Id.* at 13.

The programming on the Protected Channels included four audiovisual works that were registered with the United States Copyright Office (Registered Works) and fifty-five that were not (Unregistered Works).  *Id.* at 13–14.  Although the Registered Works and Unregistered Works were originally owned by third parties not affiliated with this litigation, DISH received the exclusive right to distribute and publicly perform these works in the United States through signed agreements recognized as valid under the Copyright Act, 17 U.S.C. § 101, *et seq.* (Copyright Act or the Act).  *Id.* at 14.

The Defendants[1] owned and operated the UlaiTV and AhlaiTV services, as well as TCI-Direct.com and Planet-itv.com.  (Doc. 246 at 5; Doc. 337 at 15).  UlaiTV and AhlaiTV offered customers access to hundreds of Arabic-language channels, while TCI-Direct.com and Planet-itv.com permitted customers to order UlaiTV and

---

[1] I collectively refer to all the Defendants when describing the conduct at issue because 1) Fraifer founded TCI and PTI, was the sole shareholder of these entities, and served continuously as their sole officer from at least June 2015 to May 2017; and 2) TCI and PTI were effectively the same company during that time frame.  (Docs. 246, 257, 337).  The latter conclusion is derived from the fact that PTI had no source of revenue, no employees, and was a department within TCI during this period, and because TCI shared office space with PTI, paid PTI's expenses, and performed the work of PTI.  *Id.*

AhlaiTV products.  (Doc. 246 at 5).  These products included UlaiTV and AhlaiTV set-top boxes (STBs), which the Defendants sold and distributed from approximately 2009 through 2017.  (Doc. 337 at 15).  A customer who purchased one of the Defendants' STBs would connect his or her television to the internet via the STB, and the television signal or programming would then be received through the internet, as opposed to coming through a cable, satellite, or other receiver of traditional broadcasts over the public airwaves.  *Id.*  The Defendants generally sold their STBs for a onetime charge of $90.  *Id.*  The Defendants' STBs allowed their customers to avail themselves of certain popular Arabic-language television programming without paying additional charges.  *Id.*  By contrast, a customer electing to obtain this same content from DISH would have to pay at least $80 per month.  *Id.*

The vast majority, but not all, of the Defendants' STBs at issue were manufactured in China by an entity known as Lenkeng, which was not a party to this action.  *Id.*  The STBs were pre-programmed with an Android operating system and came preloaded with software applications (such as YouTube, Netflix, and Google Pay) for use when the customer connected the STB to the internet.  *Id.* at 15–16.  The STBs were also equipped with software that linked them to channels already available on the internet, as well as with hardware that converted the links to internet content watchable on the STB.  *Id.* at 16.  The Defendants did not make any technological or software modifications to the STBs they received from Lenkeng before distributing them to their customers.  *Id.*

At some point in time, however, the Defendants discovered that the quality of the customer viewing experience watching television over the internet using only an STB was inconsistent, and that customers frequently experienced problems. *Id.* To address these concerns, the Defendants utilized a technology known as internet content delivery networks (CDNs). *Id.* A CDN was comprised of a group of geographically distributed internet servers that expedited the delivery of data over the internet by bringing it closer to where the end users were physically located. *Id.* at 17. The CDNs provided more stable, secure internet connectivity across geographically distant points, and were able to balance loads, thereby avoiding high traffic bottlenecking on the internet. *Id.* The CDNs also afforded added security from attacks by hackers trying to overwhelm the system with automated requests that would cause the system to crash. *Id.* CDNs were legal, and various companies, such as Verizon, sold them to the public. *Id.*

Along with CDNs, the Defendants additionally employed a type of computer known as an encoder, which transformed programming into formats suitable for streaming over the internet. *Id.* at 19. The Defendants utilized encoders to "push" or add programming onto their CDNs that was not otherwise available to their system, so that this programming could then be transmitted to the Defendants' STBs for viewing by end users. *Id.* The locations of the encoders used by the Defendants included Tampa, Florida and Germany. *Id.*

According to the evidence presented in this case, DISH's copyrighted programming was received by the Defendants' STBs regularly over a period of years.

*Id.* at 27.[2]   In fact, DISH's expert, Pascal Metral, identified hundreds of instances where this occurred.  *Id.*

DISH initiated this action in 2016, asserting that the Defendants directly infringed upon DISH's copyright in the Registered and Unregistered Works in violation of Section 501 of the Copyright Act.  (Doc. 1).  In its operative complaint, DISH alleged that the Defendants "captur[ed] broadcasts of television channels exclusively licensed to DISH and unlawfully retransmitted these channels over the [i]nternet to customers of the[ Defendants'] UlaiTV and AhlaiTV services throughout the United States."  (Doc. 62 at 1).  DISH further averred that the Defendants "profit[ed] from [this] scheme by selling UlaiTV and AhlaiTV [STBs] and corresponding service plans," and that they engaged in this conduct without compensating DISH.  *Id.*  For relief, DISH sought, *inter alia*, statutory and actual damages, as well as a permanent injunction precluding the Defendants from committing any further infringing acts.  *Id.* at 7–8.

In their answers to DISH's operative complaint, the Defendants generally denied DISH's averments and asserted counterclaims for conversion, trespass, and breach of contract.  (Docs. 77–79).  After two rounds of motions practice, the Court dismissed the Defendants' counterclaims for conversion and trespass.  (Doc. 115).  The Defendants' remaining counterclaim for breach of contract was founded upon the Defendants' allegation that DISH purchased an STB from the Defendants, agreed to

---

[2] The Defendants stopped selling the STBs and ceased conducting business altogether by May 2017. (Doc. 337 at 10).

certain terms in connection with that purchase, and then violated those terms by "hacking" into the STB and utilizing the Defendants' "URLs[3] . . . for its own purposes." (Doc. 104).

Following the close of discovery, the parties filed cross motions for summary judgment on DISH's copyright claim (Docs. 146, 217) and, in the case of DISH, on the Defendants' breach of contract counterclaim (Doc. 146) as well. The Court granted DISH's summary judgment motion as to the Defendants' breach of contract counterclaim (Docs. 246, 257) and judgment was subsequently entered against the Defendants on that cause of action (Doc. 259).

DISH's copyright claim proceeded to a bench trial, after which the Court issued a decision ruling in favor of DISH and setting forth its statements of fact and conclusions of law in support of that ruling. (Doc. 337). In short, the Court determined that the Defendants' system of CDNs and encoders infringed upon DISH's copyright. *Id.* The Court later entered a Judgment for DISH and against the Defendants on DISH's copyright claim. (Doc. 372).

The Defendants' instant motion pursuant to Rules 52 and 59 followed. (Doc. 377). DISH has responded in opposition to the Defendants' motion (Doc. 384), and the matter is thus ripe for the Court's consideration.

---

[3] URL is the abbreviation for "uniform resource locator," which is the "global address of documents and other materials on the World Wide Web." *Uniform Resource Locator*, BLACK'S LAW DICTIONARY (11th ed. 2019).

II.

Rule 52 states, in relevant part, that a "court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). Rule 59 provides, in pertinent part, that where, as here, a case is not tried to a jury, a "court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2).

Rule 52 and Rule 59 bear a "'close relationship,'" *Exim Brickell, LLC v. Bariven, S.A.*, 2011 WL 13131318, at *2 (S.D. Fla. Sept. 30, 2011) (quoting *Nat'l Metal Finishing Co., Inc. v. Barclays Am./Com., Inc.*, 899 F.2d 119, 123 (1st Cir. 1990)), and "essentially [involve] the same [standard]," *Access 4 All, Inc. v. Atl. Hotel Condo. Ass'n, Inc.*, 2006 WL 8431635, at *1 (S.D. Fla. Mar. 7, 2006). To succeed under either rule, a movant must put forth "newly-discovered evidence" or identify "manifest errors of law or fact." *Johnson v. New Destiny Christian Ctr. Church*, 771 F. App'x 991, 995 n.5 (11th Cir. 2019) (per curiam) (applying this standard to a Rule 52(b) motion); *see also Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (per curiam) (utilizing the same standard for a Rule 59 motion). Neither of these rules, however, may be employed as a mechanism to "'relitigate old matters, raise argument[s,] or present evidence that could have been raised prior to the entry of judgment.'" *Schmidt v. Rodrigues*, 641 F. App'x 913, 917 (11th Cir. 2016) (quoting *Arthur*, 500 F.3d at 1343); *see also Exim Brickel*, 2011 WL 13131318, at *2 (noting that the purpose of Rule 52 and Rule 59 is "to permit the correction of any manifest errors of law or fact that are discovered, upon

7

reconsideration, by the trial court,'" and not "'to allow parties to rehash old arguments already considered and rejected by the trial court") (quoting *Nat'l Metal Finishing Co.*, 899 F.2d at 123). On appeal, a district court's resolution of a motion brought pursuant to Rule 52 and/or Rule 59 is reviewed for an abuse of discretion. *United States v. Morgan*, 419 F. App'x 958, 959–60 (11th Cir. 2011) (per curiam) (citing *Lambert v. Fulton Cnty., Ga.*, 253 F.3d 588, 598 (11th Cir. 2001); *Trigo v. Fed. Deposit Ins. Corp.*, 847 F.2d 1499, 1504 (11th Cir. 1988)).

Here, the Defendants request that the Court correct various purported errors of fact and law and amend certain of findings of fact and conclusions of law. (Doc. 377). In particular, the Defendants ask that the Court (a) reexamine the propriety of permitting the testimony of DISH's expert witness, Pascal Metral, and considering items related to his testimony (Docs. 298, 308, 377); (b) reassess its admission of certain evidence over the Defendants' objections (Doc. 377); (c) reconsider DISH's ownership of the copyright at issue (which was decided at the summary judgment stage) (Docs. 257, 377); and (d) reevaluate whether the Defendants' infringement of DISH's copyrights was willful (Doc. 377).[4] Each of these issues will be addressed in turn.

A.

I commence my analysis with the Defendants' challenge to the Court's ruling regarding Metral's expert testimony. As reflected in the Court's fundings of fact and

---

[4] I have reorganized the Defendants' arguments for purposes of my analysis.

conclusions of law, Metral was a Swiss attorney and the Vice President of Legal Affairs and Head of Anti-Piracy Litigation and Intelligence Operations for Nagravision SA, which was a joint venture partner with DISH in an entity known as NagraStar LLC. (Doc. 337 at 24–26).   On behalf of the International Broadcaster Coalition Against Piracy (IBCAP),[5] of which DISH was a member, Nagravision and its affiliate (collectively, Nagra) obtained and monitored UlaiTV and AhlaiTV STBs for infringing content.  *Id.*  Nagra did so by powering on the STBs, finding the programming guides for the UlaiTV and AhlaiTV services, identifying one of the Protected Channels by name or logo, selecting that channel for viewing, and then verifying the content being transmitted.  Pl.'s Exh. 5.  This process was automated at times and situated thousands of miles from Metral's location in Switzerland but was reviewed for accuracy by security technicians working for Nagra.  (Doc. 337 at 24).  The security technicians documented their findings on a daily basis, Pl.'s Exh. 6, and took screenshots of the Protected Channels being transmitted on the Defendants' services, Pl.'s Exh. 7.  These screenshots displayed "the current date and time in the city where the [virtual private network] output" was situated.   Pl.'s Exhs. 5, 7.

To assist IBCAP, Metral supervised the monitoring and investigation of more than one hundred television streaming services, including those offered by the Defendants at issue here.  (Doc. 337 at 25).  Based upon the information developed as a result of the investigation of the Defendants' activities, including the above-

---

[5] The IBCAP was created for, among other purposes, policing copyright violations. (Doc. 337 at 25). DISH was instrumental in forming and funding IBCAP.  *Id.*

referenced screenshots and data compiled by the security technicians, Metral concluded that DISH's Registered and Unregistered Works were transmitted on the Defendants' UlaiTV service on at least 861 separate occasions from June 2015 through May 2017. *Id.* at 24, 27, 34; Pl.'s Exh. 5. Metral also found that the Defendants' AhlaiTV service transmitted the Protected Channels in March 2017. Pl.'s Exh. 5. Metral memorialized his findings in a report, which he prepared as part of his duties as an employee of Nagra. (Doc. 337 at 25); Pl.'s Exh. 5.

Metral's assessments were confirmed by the deposition testimony of representatives from the networks that exclusively licensed the Protected Channels to DISH. (Doc. 337 at 24). Each of the networks reviewed the determinations made in Metral's report, including the dates that the Protected Channels were transmitted to the Defendants' STBs and corresponding screenshots. *Id.* In addition, the networks identified specific copyrighted audiovisual works exclusively licensed to DISH, which were depicted in the screenshots, or which otherwise aired on the Protected Channels on the dates the channels were transmitted to STBs as indicated in Metral's report. *Id.*

At trial, DISH sought to introduce Metral's expert testimony to establish that its copyrighted programming travelled over the Defendants' system. *Id.* In considering the admissibility of this evidence, the Court reviewed Metral's qualifications, the methodology he employed, the report he authored, and his potential bias stemming from his relationship with DISH. *Id.* at 24–25. Although the Court questioned DISH's decision not to retain a more qualified expert, it ultimately admitted Metral's testimony and relied on it to a limited extent because his

10

methodology was logical and straightforward, and because the Court did not perceive his connection to DISH to materially impact his credibility in a negative way.  *Id.* at 26–27.

The Defendants now ask that the Court "reconsider all [the] arguments [they] made in" a pre-trial motion in limine they filed to exclude Metral's testimony.  (Doc. 377 at 3).  These arguments include that Metral was not qualified to testify as an expert, that his testimony was based upon inadmissible hearsay and was otherwise unreliable, and that even if his testimony was properly admitted, it was insufficient to prove the Defendants' infringement.  *Id.* at 2–13.  This line of attack is meritless.

To begin, the Defendants' request that the Court revisit the entirety of the objections they raised in their motion in limine, without more, is not a valid basis for a challenge under either Rule 52 or Rule 59.  The Court rejected all of those objections in denying the Defendants' motion initially and then did so again when they were brought up at trial.  (Docs. 298, 308).  The Defendants cannot now use their post-judgment motion to alter or amend simply "to rehash old arguments already considered and rejected by the trial court."  *Exim Brickel*, 2011 WL 13131318, at *2 (internal quotation marks and citation omitted); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) ("Having read [the plaintiff's] motion, we conclude that it did nothing but ask the district court to reexamine an unfavorable ruling.  Reconsidering the merits of a judgment, absent a manifest error of law or fact, is not the purpose of Rule 59."); *Johnson*, 771 F. App'x at 996 n.5 (affirming a district court's denial of a Rule 52 motion after finding that "the district court's

characterization was correct: [the plaintiff] sought to call the court's attention to evidence already presented and considered.  Rule 52[']s limited scope forecloses [the plaintiff]'s strategy") (citing *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986) and quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1353 (11th Cir. 2005)).

The Defendants' attempt to incorporate by reference their prior motion in limine also violates the page restriction imposed by the Local Rules.  *See* M.D. Fla. R. 3.01(a) (stating that the length of a motion must be "no longer than twenty-five pages inclusive of all parts").  This is because it effectively doubles the length of the Defendants' instant motion.  *See Venerus v. Avis Budget Car Rental, LLC*, 2021 WL 9595511, at *4 n.3 (M.D. Fla. July 28, 2021) ("Defendants . . . purport to incorporate by reference all arguments made in their previously filed *Daubert* motion and [in their] Omnibus Motion in Limine, which were denied without prejudice, and [their] Motion to Strike, which was granted in part.  This attempt to add triple the page limit to what has already been filed is impermissible.") (internal citations omitted).

In addition to these deficiencies, which alone are fatal, the Defendants' criticisms of Metral's qualifications, the reliability of his opinion, and the sufficiency of his findings are lacking.  With respect to Metral's qualifications, Rule 702 provides that, where "scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or determine a fact in issue," a witness "qualified . . . by knowledge, skill, experience, training, or education, may testify in the form of opinion" if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony

is the product of reliable principles and methods," and (3) the witness "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  To satisfy the qualification requirement, a party must show that its expert has adequate "knowledge, skill, experience, training, or education" to formulate a reliable opinion about an issue before the Court.  *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting Fed. R. Evid. 702).  This standard is "not [a] stringent" one and is met as "long as the witness is at least minimally qualified."  *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009), *aff'd*, 609 F.3d 1183 (11th Cir. 2010) (citations omitted).  Once the proponent of the proffered expert testimony crosses this threshold, any disputes with the expert's qualifications will be deemed to go to the credibility and weight of the expert's testimony, not to its admissibility.  *Secs. & Exch. Comm'n v. Spartan Secs. Grp., Ltd.*, 2020 WL 7024884, at *3 (M.D. Fla. Nov. 30, 2020) (citation omitted).  A district court's determination of an expert's qualifications rests within its sound discretion.  *Berdeaux v. Gable Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).[6]

Applying these principles here, the Defendants' assertion that Metral was unqualified fails.  (Doc. 377 at 3–4).  Notably, the Defendants do not offer any argument or case authority demonstrating that the Court's handling of this issue constituted "manifest error."  *Johnson*, 771 F. App'x at 995 n.5; *Arthur*, 500 F.3d at

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit issued before the close of business on September 30, 1981.

1343.  Instead, all they essentially argue is that Metral "had no technical training or qualifications."  (Doc. 377 at 3–4).  As noted above, however, an expert need not have technical training or qualifications where, as here, he has sufficient experience in the area in question.  *See* Fed. R. Evid. 702 (stating that a witness may be qualified by experience, among other means); *Tolbert v. Discovery, Inc.*, 2021 WL 3793045, at *3–4 (N.D. Ala. Aug. 26, 2021) (finding an expert to be qualified where he "possess[ed] over [twenty] years of IT experience[,] . . . worked in the [relevant] field . . . for over a decade[,] and conducted "th[e] exact type of analysis" he performed in the case "on hundreds of computer systems and media") (internal quotation marks and citations omitted and alterations in original); *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D. Fla. Feb. 23, 2017) ("An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand.") (internal quotation marks and citation omitted)).

The Defendants' alternative claim that Metral's testimony was unreliable because it was predicated upon inadmissible hearsay fares no better.  (Doc. 377 at 4–6).  The gist of this claim is that Metral merely regurgitated the monitoring reports and screenshots created by the security technicians and thus essentially served as a "vehicle to proffer hearsay" which was created "in anticipation of litigation" and which was also not properly authenticated.  *Id.*

It is important to point out at the outset that the challenged monitoring reports and screenshots were admitted into evidence by the Court as business records pursuant to Federal Rule of Evidence 803(6) based upon Metral's testimony.  (Doc. 329 at 30–

34). Metral explained during his testimony the basis for his knowledge of the information contained in the monitoring reports and screenshots, how this information was acquired and maintained, and how he relied upon that information to advise his clients and send Infringement Notices[7] as part of his work. *Id.* The Defendants do not establish the Court manifestly erred in finding that this testimony and the other record evidence satisfied the requirements of Rule 803(6), *see United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984), and that the reports and screenshots were therefore admissible.[8] And contrary to the Defendants' suggestion (Doc. 377 at 4–6), once those items were in evidence, it was permissible for Metral to discuss their contents while on the witness stand. *See Parker*, 749 F.2d at 633.

Even were that not the case, it is well settled that "an expert may rely on hearsay evidence as part of the foundation for his opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 809 (11th Cir. 2017) (quoting *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987)). The Defendants do not meaningfully argue, much less show, that it was manifestly erroneous to deem the monitoring reports and screenshots as falling within this category of evidence. *See id.* (upholding police-practices expert's

---

[7] Infringement Notices are communications sent to a party alerting them that they are infringing upon a copyright. (Doc. 337 at 34).

[8] The Defendants' contention that Metral purportedly conceded at trial that these materials were prepared in anticipation of litigation is unsupported. (Doc. 377 at 3–6). A fair reading of the portion of the trial transcript to which the Defendants cite is that Metral was referring to his expert report, not to the monitoring records and screenshots. (Doc. 329 at 55).

reliance on hearsay statements made by those present at the scene in concert with the expert's review of, *inter alia*, photographs, investigative reports, and forensic reports, finding such evidence to be "precisely the kind reasonably relied on by experts in the field").

Finally, it bears highlighting that the Court did not blindly accept Metral's testimony that was predicated on the monitoring reports and screenshots. In fact, quite the opposite is true. The Court conducted a robust examination of the foundation for Metral's determinations and, only after doing so, found that his "analysis [was] sound" and that his "conclusions [were] reliable." (Doc. 337 at 24–27). As the Court summarized:

> For the most part, [Metral's] analysis [was] very straightforward—he simply identifie[d] television programming that aired over the internet on certain days and times. Periodic monitoring supervised by Metral indicated that [DISH's] copyrighted programming was received by users of [the] Defendants' STBs on at least 861 instances. The Court is not convinced that this information is reliable as to each and every specific detail, but the Court is convinced, in a general sense, that Metral's analysis accurately demonstrates that [DISH's] copyrighted programming was received by STBs regularly over a period of years.

*Id.* at 27.

As to the matter of the authenticity of the monitoring reports and screenshots themselves, all that is required is that there be enough evidence to buttress "a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *see also United States v. Mentor*, 570 F. App'x 894, 897 (11th Cir. 2014) ("[T]he proponent of the evidence must only present 'sufficient evidence to make out a prima facie case that the

proffered evidence is what it purports to be.'") (quoting *United States v. Belfast,* 611 F.3d 783, 819 (11th Cir. 2010)).  Once such a prima facie showing has been made, "the evidence may be admitted, and the ultimate question of authenticity is decided by the" fact finder.  *Id.* (citing same).

Here, as discussed above, Metral testified to, among other things, the manner in which the information in the reports and screenshots was obtained and preserved. (Doc. 329 at 30–34).  The Defendants do not establish the Court manifestly erred in concluding that this testimony met the low threshold for authentication under the circumstances presented.  Fed. R. Evid. 901; *Crawford v. ITW Food Equip. Grp., LLC*, 2018 WL 3599211, at *2 (M.D. Fla. Apr. 27, 2018) ("One way to authenticate evidence is to present testimony of a witness who has knowledge of the evidence.  'A document also may be authenticated by circumstantial evidence.'") (citing Fed. R. Evid. 901(b) and quoting *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985)) (alteration adopted), *aff'd*, 977 F.3d 1331 (11th Cir. 2020).  The fact that the information contained in the report and screenshots was confirmed by representatives of the networks that exclusively licensed the Protected Channels to DISH bolsters this conclusion.

I likewise find unpersuasive the Defendants' next argument that the Court should disregard Metral's testimony because the evidence of transmission upon which his testimony was grounded was captured in Switzerland, and was therefore purportedly "unreliable to show [the] Defendants made infringing transmissions into the United States."  (Doc. 377 at 4).  The problem with this argument is that it ignores

the fact that only a fraction of the offending transmissions—those occurring between June 25, 2015, and September 2, 2015, and between January 15, 2016, and May 3, 2017—were captured in Switzerland, while the remainder were captured in Colorado. (Doc. 329 at 18–20); Pl.'s Exh. 6 (distinguishing analysis done in Switzerland and Colorado).   In short, the Defendants do not demonstrate that the Court manifestly erred relative to this issue.

The Defendants' related assertion that Metral's testimony was unreliable as to whether the Registered and Unregistered works were viewed in the United States (Doc. 377 at 10–13) is similarly unavailing.  The Court has already found—and the Defendants apparently do not dispute—that "[l]iability for copyright infringement may arise where copyrighted programming originates from outside the United States and is *transmitted into* the United States."  (Doc. 337 at 5) (citation omitted and emphasis added); *see also Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 448 (2014) (stating that a transmission is simply one sent to the public, meaning "the same contemporaneously perceptible images and sounds [are communicated] to a large number of people who are unrelated and unknown to each other").  This means that DISH only had to prove that the Defendants transmitted the protected content into the United States, which it did.

The Defendants' final claim pertaining to Metral is that the Court incorrectly admitted his report, including the summary of the 861 instances of infringement it documented.  (Doc. 377 at 9–10).  This claim fails for two reasons.  First, it rests on the flawed assumptions—refuted above—that the underlying monitoring and

screenshot records constituted inadmissible hearsay and that Metral could not rely on those materials as an expert in any event. Second, Metral's summary was admissible under Rule 1006. That rule permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006; *see also Dubay v. King*, 844 F. App'x 257, 263 (11th Cir. 2021) (holding district court properly admitted a summary of expert's findings in copyright infringement case under Rule 1006). The Defendants do not show that the Court committed manifest error in admitting Metral's report.

## B.

The Defendants next line of attack—as noted above—is that the Court should not have admitted two categories of evidence offered by DISH to prove the Defendants utilized encoders. (Doc. 377 at 14–18). The encoder issue was relevant to DISH's prosecution of its case, and was "strongly" contested by the Defendants, including Fraifer, who "flatly denied using encoders to infringe copyrights." (Doc. 337 at 19).

The first category consisted of documents from PayPal demonstrating that the Defendants controlled encoders in Germany which were employed to push the Protected Channels to the Defendants' CDNs. (Doc. 377 at 16). These PayPal records revealed that an account held in the name of Fraifer's brother, Fraj Fraifer, a Canadian resident, was used to make payments to a company—Cetel GmbH (Cetel)—which the Defendants hired to assign IP addresses to the Germany encoders. (Doc. 337 at 21–22). Fraifer denied utilizing the PayPal account or instructing his brother to make the payments to Cetel. *Id.* at 22. The problem for Fraifer, as the Court pointed out in its

decision, was that the PayPal documents evidenced the account being accessed from the Defendants' Tampa offices at the same time the Cetel payments were being made in February and April 2017. *Id.* And despite the fact that Fraifer theorized his brother must have tendered the payments when visiting Fraifer in Tampa, the PayPal materials showed that the account was accessed at least 345 times over a five-month period from the Defendants' Tampa offices. *Id.*

The Defendants now argue that these records were irrelevant and unduly prejudicial. (Doc. 377 at 16). Although not a model of clarity, the Defendants appear to contend that because the PayPal records purportedly post-dated the infringing activity and the payments were made by a "third party," the records do not establish the Defendants' ownership of the encoders in April and May 2016, when the Registered Works aired. *Id.*

The Defendants' challenge to the Pay Pal documents is unavailing. While the Defendants' seemingly intimate otherwise, the Court did not reference these records solely to show that the Defendants used the encoders during the time frame covered by the PayPal materials. It also relied upon them to support its finding that Fraifer was not credible. (Doc. 337 at 22). Moreover, irrespective of whether the PayPal documents may not prove that the Defendants controlled the German encoders in the two months of April and May 2016, the Defendants' infringing conduct transpired over the course of a number of years through and including at least May 2017. *Id.* at 10. Because the PayPal documents substantiate that Fraifer's brother made PayPal payments in February and April 2017, Pl.'s Exh. 76 at 1; Pl.'s Exh. 77 at 1–4, which

is during the infringement period, the records were relevant—at a minimum—to the Defendants' use of German encoders and to the credibility of Fraifer's testimony.

As for the Defendants' assertion that the PayPal records were unduly prejudicial, Rule 403 permits a court to "exclude relevant evidence if its probative value is *substantially outweighed* by a danger of . . . *unfair* prejudice." Fed. R. Evid. 403 (emphasis added). The Eleventh Circuit has cautioned, however, that "Rule 403 is an extraordinary remedy which should be used sparingly," and that a "trial court's discretion to exclude evidence as unduly prejudicial is narrowly circumscribed." *United States v. McGregor*, 960 F.3d 1319, 1324 (11th Cir. 2020) (internal quotation marks and citations omitted).

Here, the harm about which the Defendants complain is nothing more than the prejudice associated with any probative evidence. As one court has succinctly observed, all "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of [a] relevant matter under Rule 403." *Cauchon v. United States*, 824 F.2d 908, 914 (11th Cir. 1987) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)). Stated differently, "'[u]nfair prejudice' cannot be simplistically defined as evidence having adverse effects on a party's case; rather, it is 'an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (alteration in original) (quoting *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir. 1979)).

In sum, the Defendants fail to show that the Court's rulings relative to the PayPal records was manifestly erroneous.

The second category of records the Defendants challenge were obtained from the publicly available online database known as WHOIS. This database allows users to "access information regarding domains, including the registrant's name, address, phone number, and e-mail address." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1064 n.22 (9th Cir. 2009) (citation omitted). The WHOIS records at issue here evidenced that the IP address of the German encoders was assigned to Cetel and the domain name "kakalinka.com" as late as November 2017. Pl.'s Exhs. 83, 84. These documents were tendered in support of, *inter alia*, Metral's finding that a specific CDN in Germany was deployed by the Defendants to transmit the Protected Channels to their customers. (Doc. 384 at 13) (citation omitted).

The Defendants now contend that the WHOIS records amounted to inadmissible hearsay. (Doc. 377 at 14–17). This assertion does not survive scrutiny. Rule 803 allows for the introduction into evidence of a report containing "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." Fed. R. Evid. 803(17). The testimony and exhibits adduced at trial revealed that the WHOIS documents fell within the ambit of this rule, insofar they were of the kind regularly relied upon to establish the identity of registrants. *See Tracfone Wireless, Inc. v. Technopark Co., Ltd.*, 313 F.R.D. 680, 685 (S.D. Fla. 2016) (noting that many courts "routinely" consider WHOIS database information to identity a party in question) (collecting cases); *EarthLink, Inc. v. Ahdoot*,

2005 WL 8154298, at *8 (N.D. Ga. Feb. 1, 2005) ("WHOIS is a public database that courts have relied upon in order to ascertain the party who has registered a domain name. Under these circumstances, the court agrees that WHOIS search results come within the hearsay exception noted in Federal Rule of Evidence 803(17) for directories and other published compilations relied upon by the public.") (citations omitted). Indeed, Metral testified that as a result of his role in monitoring and investigating copyright infringement of television streaming services on behalf of IBCAP, he was aware that Nagra utilized WHOIS to identify the CDN involved in the infringing conduct. (Doc. 329 at 40).

The Defendants also argue that DISH did not properly authenticate the WHOIS records. (Doc. 377 at 14–15). A document may be authenticated under Rule 901 "through the testimony of a witness with knowledge *or* by 'appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *Mentor*, 570 F. App'x at 897 (quoting Fed. R. Evid. 901(b)(4)) (emphasis added). Further, as alluded to earlier, "[a]uthentication may be established 'solely through the use of circumstantial evidence,'" *United States v. Taylor*, 688 F. App'x 638, 641 (11th Cir. 2017) (per curiam) (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)), and such evidence need not be conclusive, *Breland v. Levada Ef Five, LLC*, 2016 WL 1717207, at *8 (S.D. Ala. Apr. 28, 2016) (citing *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993), *reh'g denied*, 5 F.3d 1493 (5th Cir. 1993)).

The contested WHOIS documents contained the domain name, as well as the date and time they were printed. Pl.'s Exhs. 83, 84. Also, as pertinent here, the Court asked DISH's counsel at trial to view the WHOIS webpage on his laptop to confirm that one of the WHOIS records which pertained to the "kakalinka.com" domain name and which was then being offered into evidence looked the same as the one on the webpage. (Doc. 330 at 27). DISH attested that the two were identical and, after being given the opportunity to view his opponent's screen, defense counsel demurred, stating "I don't need to look at plaintiff's counsel's computer. I will accept his representation." *Id.* The Court thereafter admitted this WHOIS record. *Id.*

Notwithstanding the above, the Defendants assert that DISH did not provide adequate evidence to authenticate the WHOIS documents because it did not call a witness or produce an affidavit addressing the issue. (Doc. 377 at 14–15). This assertion is unavailing. To start, the Defendants abandoned their authenticity challenge to the WHOIS document regarding the "kakalinka.com" domain name given the representations they made at trial when the record was displayed on the computer.

Moreover, as described previously, DISH was not required under Rule 901 to tender proof beyond the "distinctive characteristics" displayed on the face of the WHOIS documents. *Mentor*, 570 F. App'x at 897 (quoting Fed. R. Evid. 901(b)(4)); *see also SMS Audio, LLC v. Belson*, 2017 WL 1533971, at *3 (S.D. Fla. Mar. 20, 2017) (recognizing that circumstantial indicia of authenticity may be used "to authenticate [electronically stored information], including e-mail, text messages and the content of

websites") (internal quotation marks omitted) (collecting cases).   As such, the Defendants do not show that the Court committed manifest error in admitting the challenged WHOIS records.

The Defendants additionally contend that a WHOIS document relating to Cetel was of "minimal probative value" because, *inter alia*, the Defendants' business ceased operating roughly six months prior to the date on that record.  (Doc. 377 at 15).  The Defendants did not raise this issue at trial, however, and have thus waived it.  *See* (Doc. 329 at 173–85); *see also Carroll v. ATA Retail Servs., Inc.*, 2017 WL 11113320, at *7 (N.D. Ga. July 25, 2017), *aff'd*, 747 F. App'x 762 (11th Cir. 2018); *Banks v. MarketSource, Inc.*, 2023 WL 3215649, at *23 n.10 (N.D. Ga. Mar. 30, 2023).  Even were that not the case, the Defendants' objection to this record would still fail because the document linked the Defendants to one of the CDNs employed to transmit the Protected Channels.  Again, the Defendants do not demonstrate that the Court's handling of this issue was manifestly erroneous.

The Defendants' final claim relative to the WHOIS documents is that the Court exhibited a bias against them when, "in real time[, it] visited the website listed on [the WHOIS record regarding the "kakalinka.com" domain name] and decided that it matched the propounded exhibit."  (Doc. 377 at 16).  According to the Defendants, this act was improper because it caused the Court to acquire personal knowledge about disputed evidentiary facts.

The Code of Conduct for United States Judges necessitates that a judge disqualify himself where, as relevant here, "the judge's impartiality might reasonably

25

be questioned, including[,] but not limited to[,] instances in which . . . the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Code of Conduct for United States Judges Canon 3(C)(1)(a) (2014). Courts have found disqualification to be warranted under this standard only when the personal knowledge in question "stem[med] from an *extrajudicial* source." *LaMarca v. Turner*, 662 F. Supp. 647, 654 (S.D. Fla. June 4, 1987) (citation omitted); *see also Abrams-Jackson v. Avossa*, 743 F. App'x 421, 424 (11th Cir. 2018) ("'The general rule is that bias sufficient to disqualify a judge must stem from extrajudicial sources, and must be focused against a party to the proceeding.'") (per curiam) (quoting *Hamm v. Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983)).

Here, the Defendants do not cite any authority establishing that information on a website displayed at trial, which was not contested by the parties, constitutes an extrajudicial fact which a court may not consider. *See generally* (Doc. 377 at 16–17). In fact, there is case law in this Circuit to the contrary. *See S. Grouts & Mortars, Inc. v. 3M Co.*, 2008 WL 4346798, at *16 (S.D. Fla. Sept. 17, 2008) (taking judicial notice of the results of, *inter alia*, a whois.net search of domain name registrations that revealed "several of the domain names listed by [the plaintiff were] either not registered to [the defendant], or ha[d] an obviously legitimate connection to [the defendant]"), *aff'd*, 575 F.3d 1235 (11th Cir. 2009). The Defendants do not show that the Court committed manifest error in addressing this matter.

C.

In addition to the above challenges, the Defendants urge the Court to reevaluate its determination at the summary judgement stage that DISH owned the copyright for one of the Registered Works.  (Doc. 377 at 18–19).  In support of this contention, the Defendants assert for the first time that there was a gap in the copyright chain-of-title for that work based upon a licensing agreement relating to the Protected Channel on which the work aired.  *Id.*  The problem with this argument is that the evidence upon which it rests was known to the Defendants long ago, and the Defendants offer no explanation as to why they did not pursue this matter at a prior juncture in the lawsuit.  As the Eleventh Circuit has repeatedly held, "[d]enial of a motion to amend is 'especially soundly exercised when the party has failed to articulate any reason for the failure to raise an issue at an earlier stage in the litigation.'"  *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992) (quoting *Lussier v. Dugger*, 904 F.2d 661, 667 (11th Cir. 1990)); *see also Johnson*, 771 F. App'x at 996 n.5; *Ferrier*, 728 F. App'x at 962–63.

The Defendants' challenge is infirm for another reason as well.  As the Court pointed out at the summary judgment stage, allowing a third party infringer—like the Defendants—to contest ownership as part of an attempt to escape liability would be anomalous and unwarranted where, as here, "'there is no dispute between the copyright owner and the transferee about the status of the copyright.'"  (Doc. 246 at 40–41) (quoting *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995) and citing *Crunchyroll, Inc. v. Pledge*, 2014 WL 1347492, at *14 (N.D. Cal. Mar. 31, 2014)).  And as the Court also highlighted, "DISH has provided

declarations, in which the [n]etwork representatives attest that they have transferred the exclusive rights at issue to DISH." *Id.* (citations omitted).

Even were the Court to entertain the Defendants' challenge, it would still fail. The crux of the Defendants' argument is that the agreement between the original author of the work, MBC, and its affiliate, MabMedia (which ultimately transferred the copyright to DISH), did not list MBC Masr as a channel being transferred. (Doc. 377 at 18–19). Regardless of whether the Defendants are correct, there is other evidence in the record—namely, a declaration from MBC, along with MBC's trial testimony—which establishes that this copyright was passed from MBC to DISH through MabMedia. (Docs. 146-8, 310-2). MBC's testimony is, in turn, buttressed by MabMedia's agreement with DISH, which explicitly states that MabMedia was granted the exclusive rights in MBC Masr from MBC. *See* (Doc. 146-11); *see also BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 647–48 (E.D. Va. 2015) (finding that even though the list of copyrighted works in annex 1 to licensing agreement was blank, plaintiff's declaration properly established copyright chain-of-title), *aff'd in part and rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018). In short, the Defendants do not demonstrate that the Court's ruling on this matter was manifestly erroneous.

## D.

The Defendants' last challenge—as referenced previously—is that the Court erred in finding the Defendants' infringement of DISH's copyrights to be willful. (Doc. 377 at 19–23). This claim meets the same fate as the Defendants' other arguments.

The Court described the legal principles governing infringement in its statement of facts and conclusions of law (Doc. 337 at 7–8) but some of those principles bear repeating here.  Pursuant to section 504(c)(1) of the Copyright Act, an owner may elect to recover statutory damages in lieu of any other form of monetary relief.  *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1271 (11th Cir. 2015) (citing *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952)).  The Act's "statutory damages provision is designed to discourage wrongful conduct," and authorizes a range of damages between $750 and $30,000 for each infringed work.  *Id.* (citing same).  The Act, however, additionally allows a court, in its broad discretion, to increase "award[s] of statutory damages' in cases involving willful infringement to $150,000 per work."  *Id.* (internal quotation marks and citation omitted).

Willfulness in this context "means that the defendant 'kn[ew its] actions constitute[d] an infringement."  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990). Willfulness, however, does not require a showing of maliciousness, *id.* (citations omitted), and includes a defendant's reckless disregard of "the possibility that it was infringing a copyright," *Yellow Pages Photos*, 795 F.3d at 1272 (collecting cases).

Although a district court has wide latitude in granting statutory damages, it should take into account both the willfulness of the defendant's conduct and the deterrent value of any sanction it issues.  *Cable/Home Commc'n Corp.*, 902 F.2d at 852. Further, a district court may, if it deems it just, impose liability upon a defendant within the statutory limits in order to penalize a defendant and to vindicate the

statutory policy even if the defendant's infringing activity did not cause an injury or was unprofitable. *F.W. Woolworth Co.*, 344 U.S. at 233.

In this case, the Court took pains to articulate the basis for its finding that the Defendants acted willfully. Given the Defendants' challenge to the Court's rationale, I find it appropriate to set out the Court's explanation largely in full:

> [The] Defendants' infringement of the Registered Works was willful because [the] Defendants, among other things, repeatedly ignored Infringement Notices; took strategic measures to avoid the legal implications [of] those Infringement Notices; attempted to disguise their use of encoders to infringe [DISH's] copyrights; and when exposed, "doubled down" by providing, at best, misleading testimony about their use of encoders during the trial in this matter.
>
> Periodic monitoring conducted by [DISH's] expert indicated that [the] Protected Channels were received by users of [the] Defendants' STBs on at least 861 instances. The Court is not convinced that this information is accurate in every detail, but it is convinced that, in a general sense, [DISH's] copyrighted programming was received by STBs via CDNs regularly over a period of years. Fraifer's own emails and [other] testimony establish that [the] Defendants were regularly using encoders to "push" [DISH's] copyrighted programming onto their system for consumption by end users.
>
> [The] Defendants were sent 182 notices of copyright infringement concerning works aired on the Protected Channels immediately prior to or during the time period the Works were aired ("Infringement Notices"). [The] Defendants received [seven] Infringement Notices emailed to their counsel. [The] Defendants also received [fifty-eight] Infringement Notices emailed directly to them. [The] Defendants received but refused to accept [seventeen] Infringement Notices mailed to [the] Defendants' Tampa offices or Fraifer's home, most having been returned with handwritten notations stating, "Wrong Address," "Refused," or similar words of rejection. [The] Defendants received at least [thirty-nine] of the [one hundred] Infringement Notices that were emailed to [the]

30

Defendants' CDN companies.  [Sixty-two] of the 182 Infringement Notices concerned the . . . channels on which the four Registered Works aired and were sent to [the] Defendants or their CDN companies prior to the time that the Registered Works aired on those Protected Channels. The Infringement Notices plainly stated, and [the] Defendants understood, that [the] Protected Channels should not be delivered to [the] Defendants' STB[s] because works that aired on the Protected Channels were protected by copyright.

Furthermore, the evidence demonstrated that [the] Defendants attempted to avoid the legal implication of the Infringement Notices, and give the false impression of compliance, by temporarily removing or deactivating the Protected Channels identified in the Infringement Notices, but then knowingly and intentionally reinstating or reactivate[ing] the Protected Channels at a later point in time.  In addition, [the] Defendants acquired backup CDN services that could be used to deliver [the] Protected Channels to end users in the event that [the] Defendants' existing CDN company terminated [the] Defendants' services in response to [the] Infringement Notices.  This strategy was apparently developed in response to the fact that Verizon terminated [the] Defendants' CDN services due to their pattern of taking down Protected Channels and immediately putting them back up.

Statutory damages are also necessary to deter future violations of the law. [The] Defendants' infringement continued for eight months after this action was filed, demonstrating that initiation of a legal proceeding is not an adequate deterrent.

And finally, [the] Defendants have demonstrated a general disregard for the legal system by attempting to disguise their use of encoders to infringe [DISH's] copyrights, and after getting caught, attempting to "explain away" their actions with, at best, misleading testimony in the trial of this matter.

For all of the foregoing reasons, [DISH] is awarded $150,000 in statutory damages for each of the four Registered Works, for a total of $600,000, as authorized under [the Copyright Act].

(Doc. 337 at 33–36) (citations omitted).

The Defendants now maintain that the above cited evidence does not support a finding of willfulness because the multiple Infringement Notices sent to the Defendants did not adequately alert them that the claimed copyrights were legitimate or that the Defendants were infringing anyone's rights by broadcasting publicly available material.  (Doc. 377 at 20).  This argument is unpersuasive.

Regardless of the content of the Infringement Notices, there is undisputed evidence that the Defendants took down the Protected Channels following their receipt of an Infringement Notice and then immediately put the channels back up for its users. As the Court emphasized in the above excerpt, the Defendants even acquired backup CDNs when Verizon began terminating their CDN services as result of this practice. All of this begs the question as to why the Defendants would take steps to avoid the legal consequences of infringing another entity's copyright if they were not aware of the illicit nature of their behavior.  *See Cable/Home Comm. Corp.*, 902 F.2d at 846–51 (finding that the infringing conduct was willful where the party "openly publicized and encouraged the purchase of the[ ] pirate chips" after the party had been "frequently warned that th[o]se chips were unlawful").  In short, the Defendants fail to identify any manifest error in the Court's determination that they willfully violated DISH's copyright.

## III.

Based upon the foregoing, I respectfully recommend that the Court deny the Defendants' motion to alter or amend the judgment (Doc. 377).

Respectfully submitted this 31st day of August 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).


Copies to:
Honorable Thomas P. Barber, United States District Judge
Counsel of record