**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**DISH NETWORK LLC,**

Plaintiff,

v.

CASE NO.: 8:16-cv-2549

**GABY FRAIFER, TELE-CENTER, INC. AND PLANET TELECOM, INC., INDIVIDUALLY AND TOGETHER D/B/A ULAITV, PLANETITV, AND AHLAITV,**

Defendants.

**OBJECTIONS TO REPORT AND RECOMMENDATION [DKT. 394]**

Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc. (collectively "Defendants"), pursuant to pursuant to Rule 72 (b)(2), respectfully request that the district judge review the magistrate's Report and Recommendation [Dkt. 394] de novo and grant Defendants' Motion for Reconsideration [Dkt. 377].

## I. Objection: It was manifest error to admit Metral's testimony because his testimony was not harmless and had a substantial influence on the outcome of the case.

While Defendants recognize the deference accorded to the court's decision to admit Metral's testimony, the decision to admit such evidence should be set aside if it is "manifestly erroneous" – that is, if it rises to the level of an abuse of discretion. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (equating manifestly erroneous to an abuse of discretion).

**A. It was Manifest Error to Treat Attorney Metral as an Expert in Technical Analysis.**

Metral himself testified that he had no technical training or qualifications, Dkt. 329 at 58. He is a lawyer whose job was to serve as "Vice President, Legal Affairs" for Nagravision. Dkt. 298 at 3; 298-1 at 3; 298-2 at 2. Indeed, by his own admission he was one of the lawyers working on Dish's enforcement team. Dkt. 329 at 57. Metral's so-called "technical analysis" was merely thinly veiled legal argument, made by a lawyer, and did not demonstrate any unique technical understanding. A witness's qualifications must correspond to the subject matter of his or her proffered testimony. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir.1999) (citing *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990)) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Because Metral did not possess sufficient qualifications or experience, the Court should reject the R&R and instead grant the motion and exclude Metral's testimony.

**B. All of Metral's Testimony Should Have Been Excluded Because it Was Not an Opinion at All, But Rather a Vehicle to Proffer Hearsay Created in Anticipation of Litigation.**

Defendants reiterate their objection to the admission of Metral's testimony because he did not perform any real analysis in order to form "opinions" of the hearsay monitoring reports performed by third parties. The report he complied and his accompanying testimony merely summarizes the work of "security experts

working in our company and in our affiliated company that have performed the monitoring." without any proper expert disclosure of the identity or qualifications of those "experts." Dkt. 329 at 14. Metral testified: "I was retained to look back at the monitoring records, the daily reports and the monitoring materials that has been collected and performed throughout the analysis of the UlaiTV and Ahlai TV streaming devices." *Id.* All Metral did was summarize other people's fact gathering work conducted for the purposes of litigation. Not once during his testimony was Metral asked to provide his *opinion* about the hearsay documents. Rather, he testified that he oversaw a "project manager" and "Security experts or technicians" to gather factual data in an attempt to prove copyright infringement. Dkt. 329 at 17. This is a factual investigation to identify and create evidence, and therefore more akin to the fact gathering work of a private investigator, rather than expert analysis and opinion. *See, e.g.*, *Clark v. S. Broward Hosp. Dist.*, 12-61164-CIV, 2013 WL 11318865, at *1 (S.D. Fla. Sept. 18, 2013) (investigator who gathered facts is a fact witness); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1133 (M.D. Fla. 2007) (witness who conducted factual investigation of computer systems is a fact witness, not an expert witness, because witness was merely reporting facts discovered rather an opining on information provided to him by counsel).

Moreover, Metral's testimony was not truly in the nature of expert opinion, but rather an attempt to bring in inadmissible hearsay. "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent

judgment that only incidentally discloses the statement to assist the [factfinder] in evaluating the expert's opinion, then ... the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." *In re 3M Combat Arms Earplug Products Liab. Litig*., 3:19MD2885, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021) (excluding factual evidence introduced through "expert"), citing *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). In copyright cases, as in any case, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion of "expert" testimony).

While experts may rely on hearsay to form opinions, Metral did not offer opinions. He testified to other people's out of court statements and fact gathering conducted for the purposes of litigation. Defendants submit that it was manifest error to allow Metral to act as a vehicle for the admission of hearsay.

## II. Objection: It Was Manifest Error to Admit the Unreliable Hearsay Screenshots (Plaintiff's Exhibit 7) or Daily Monitoring Reports (Plaintiff's Exhibit 6) as Business Records.

The Report and Recommendation finds that these documents, which formed the foundation of Metral's expert report and opinion, constituted business records. R&R at 14. The R&R rejects Defendant's interpretation that Metral testified the data was gathered expressly for the purposes of litigation. Dkt. 329 at 55. But the evidence as a whole clearly indicates that the sole purpose of Nagra's data

collection was to monitor Defendant's services *for the express purpose* of determining whether there was infringement and if so, capturing evidence of the alleged infringement. Dkt. 298-1; Dkt. 329 at 57 (Nagrastar monitored defendants' set top boxes on behalf of Dish). Metral's very role was as "Head of Anti-Piracy Litigation" Dkt. 298-2. Even when kept in the normal course of such anti-piracy operations, when records are "calculated for use essentially in the court, not in the business" documents that would otherwise be considered business records are not admissible. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014). Creating monitoring reports for the purposes of litigation is not a motive "that would tend to assure accuracy", and therefore is not the creation of documents that should be treated as mere business records.

Metral's testimony showed that he could neither authenticate the screenshots and monitoring reports, nor did he have personal knowledge of the information within them, making them inadmissible hearsay. Authentication is a condition precedent to admissibility. *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000). To authenticate an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Sanford v. Omni Hotels Mgmt. Corp.*, No. 3:16-CV-1578-J-34PDB, 2018 WL 1327090, at *5 (M.D. Fla. Mar. 15, 2018) (quoting Fed. R. Evid. 901(a)). As to the screenshots, Metral did not possess the personal knowledge to authenticate them as accurate captures of information transmitted within the

United States by a set top box sold by Defendants, because he did not create them. Dkt. 329 at 59-61; 80-81.

Moreover, the screenshots did not have independent indica of authenticity, because Metral admitted that they each showed a location/time zone that was different from the actual location and time zone in which they purported to be captured. Dkt. 329 at 108. The screenshots included purported "date stamps" from places in the United States, such as Dallas, Texas [Dkt 325-6 at 2], Houston, Texas [Dkt 325-6 at 21], or New York, New York [Dkt. 325-8 at 298], or merely had a UTC time code with no geographic location [Dkt 325-6 at 105], but Metral testified that they were captured either in Switzerland or Colorado, and he was not able to testify as to which screenshots were allegedly captured where. Dkt. 329 at 82-83. The only thing Metral could say for certain was that the Defendants products were physically in Switzerland when the screenshots of any item allegedly broadcast on UlaiTV were taken. Dkt. 329 at 82. Because the authenticity of the documents were suspect on their face, they should never have been admitted. See, e.g., *Z Indus. USA, LLC v. Circuitronix*, LLC, 0:17-CV-60727-UU, 2018 WL 3412854, at *16 (S.D. Fla. June 20, 2018) (excluding screenshots that lack authenticating testimony and do not possess clear indica of authenticity); *Rubinstein v. Ourian*, 20-21948-CIV, 2021 WL 4134753, at *3 (S.D. Fla. Sept. 10, 2021) (excluding unauthenticated screenshots). Indeed, this Court rejected screenshots of the allegedly infringed works produced by Defendants at the summary judgment stage because they "contain foreign language content and may not be properly

authenticated." Dkt. 246 at n. 19. The screenshots proffered by Plaintiff as Exhibit 7 have the same infirmity, and should have not have been admitted over Defendant's authenticity objection. Dkt. 329 at 35.

For similar reasons, the Court should also have excluded the "Daily Monitoring Report," Dkt. 325-6, admitted over Defendant's authenticity objection. Dkt. 329 at 34. Metral did not personally prepare these documents, and merely testifying that "he had no reason to doubt" their authenticity is insufficient to actually authenticate them. Plaintiff chose not to utilize the procedure for self-authenticating the data, see Rule 902(13), but if it had, Metral would not have been qualified to authenticate them because he admitted he did not have the personal knowledge of the processes used to generate the reports. Dkt. 329 at 61-63.

Both documents should also have been excluded as hearsay. They contain out of court statements offered to prove the matter asserted (that Defendants transmitted works in the United States at certain dates and times) without meeting any hearsay exception. Plaintiff argued that the business records exception was sufficient to allow admission, Dkt. 329 at 34; but the business records exception to the hearsay rule simply does not apply to documents created in anticipation of litigation. As the Eleventh Circuit has explained: for computer generated business records to be admissible, "(1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of

hearsay or uninformed opinion." *United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir. 1985) (citations omitted); *see also United States v. Arias–Izquierdo*, 449 F.3d 1168, 1183–84 (11th Cir. 2006) ("the business records exception, embodied in Federal Rule of Evidence 803(6), 'requires that both the underlying records and the report summarizing those records be prepared and maintained for business purposes in the ordinary course of business and not for purposes of litigation.'").

The magistrate's own recommendation notes that the purpose of creating the monitoring reports, as testified to by Metral, was to create infringement notices. Dkt. 394 at 15, citing Dkt. 329 at 30-34. Metral testified that the purpose of the reports is to "document evidence of infringements." Dkt. 329 at 32-33. Based on Metral's testimony, these documents were of the kind of business records that should otherwise be excluded because they were created solely in anticipation of litigation.

**C. The Court Should Not Have Admitted the Hearsay Expert Report (Plaintiff's Exhibit 5).**

The Court admitted and relied upon a portion of Metral's Expert Report as part of the evidence that allegedly demonstrated that Defendants directly publicly performed the allegedly infringed works in the United States. Plaintiff's Exhibit 5 (Dkt. 325-5) was admitted over both a hearsay and relevance objection. Dkt. 329 at 37-38. "Expert reports are hearsay; that is, a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Johnston v. Borders*, 615CV936ORL40DCI, 2018

WL 4215027, at *1 (M.D. Fla. Sept. 4, 2018). The purpose of an expert report is merely to inform the other side in advance of the facts upon which the expert relied to form expert opinions; the report itself is pure hearsay, with no indicia of trustworthiness, and thus does not fall under residual exception of the hearsay rule. *Diamond Resorts Int'l, Inc. v. Aaronson*, 378 F. Supp. 3d 1143, 1145 (M.D. Fla. 2019) (denying admission of expert report because "It can rarely be said that a report prepared by a paid, retained expert witness for a party or its counsel bears 'equivalent circumstantial guarantees of trustworthiness' to justify application of the residual hearsay exception").

At trial, Plaintiff argued that the Exhibit 5 should nonetheless be admitted as a "summary," Dkt. 329 at 37, but this list of dates in the expert report is not a Rule 1006 summary because it is a summary of inadmissible and unauthenticated data (See Part B, above). "Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004). Here, the Exhibit states as true dates that unidentified individuals and/or machines allegedly made observations of purported transmissions of date for the express purpose of litigation. Dkt. 329 at 55. These documents should therefore have been excluded from evidence. *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1161 (11th Cir. 2004) (summaries of records prepared for litigation is inadmissible…and inadmissible documents are not made admissible by being summarized.").

### D. Even If Considered, Metral's Testimony and Documents Are Insufficient to Meet Plaintiff's Burden of Proving Defendants Infringed Copyright by Publicly Performing in the United States the Works Identified in the Complaint.

To prove infringement of the public performance right to which Plaintiff claimed exclusivity, Plaintiff recognized that it needed to show that Defendant publicly performed the works to users Set Top Boxes (STBs) sold by them. Dkt. 302 ¶ 8. And more specifically, it needed to prove that the Works were transmitted to one or more users of the STBs *in the United States*, for two reasons: One, to the extent Dish possessed exclusive rights to any Works,[1] those rights were limited to public performance by transmission within the United States. Dkt. 331 at 156 (Tr. 489). Second, "federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States. *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004). To perform a work publicly, a party must "transmit or otherwise communicate a performance…by means of any device of process, whether the members of the public capable of receiving the performance or display ***receive it*** in the same place or in separate place and at the same time or different times." 17 U.S.C. § 101 (definition of public performance by transmission) (emphasis added). This builds upon the definition of transmit, which likewise states that to transmit is "to communicate [a performance] by any device or process whereby images or sounds

[1] The Court has made clear it will not reconsider ownership at this time, and therefore Defendants are not re-raising arguments regarding ownership here, without waiver of the right to raise the ownership issues on appeal, except as set forth below.

***are received*** beyond the place from which they are sent." 17 U.S.C. § 101 (emphasis added). Transmissions "are public performances even when they are received by small numbers of people at a time." *New World Music Co. (LTD) v. Tampa Bay Downs, Inc.*, 8:07CV398-T-33TBM, 2009 WL 35184, at *8 (M.D. Fla. Jan. 6, 2009). Thus, a performance is transmitted under the act only once it is actually watched on the receiving end. *Am. Broad. Companies, Inc. v. Aereo*, Inc., 573 U.S. 431, 446 (2014) ("Aereo transmits a performance whenever its subscribers watch a program."). Still, to prove defendants infringed the exclusive right of public performance, the performance must both be transmitted and received by at least one person in the United States.

Plaintiff's evidence does not show by a preponderance of the evidence that the specific Registered or Unregistered Works were publicly performed *in the United States* through any of Defendants' STBs. The STBs themselves were, at base, computers operating an android system that *could* transmit UlaiTV and AhlaiTV to viewers in the United States, but could also be used to access any internet content. Thus, the sale of the STBs alone is not evidence that anyone received the channels, much less the specific shows, for which DISH claimed exclusive public performance rights in the United States. Plaintiff did not provide testimony from *any* individual who personally viewed the Registered or Unregistered works via the STBs on U.S. soil. They relied solely on circumstantial evidence as testified to by Metral, who himself had no direct knowledge.

The court found that Metral's analysis "accurately demonstrates that Plaintiff's copyrighted programming was received by STBs regularly over a period of years." Dkt. 337 at 27. This finding is both incorrect and, even if supported by admissible evidence, insufficient to establish copyright infringement by public performance. Metral's "analysis" shows, at best, that at the time a screenshot was taken, a single STB received a single channel (that was not transmitted by DISH). It does not show where that STB was located, and whether the specific works at issue made a public performance received by a viewer in United States. There is no way to tell, either from Metral's testimony or the supporting documents, where the screenshots were created, but it is undisputed that the STBs were located in Switzerland. Dkt. 329 at 82. Because Metral testified that the purported transmissions were captured in Switzerland, there is insufficient evidence to show that the any of the Registered or Unregistered works were actually publicly performed in the United States. And notably, the court does not make an actual finding that the *specific works at issue* were publicly performed in the United States via STBs sold by Defendants. Dkt. 337 at 26-27. The finding that STBs received programming "regularly over a period of years" is simple insufficient to establish infringement of any exclusive right to publicly perform the specific Works in the United States.

Moreover, because there is insufficient evidence that the STBs actually displayed the claimed works to end users in the United States, whether or not the

STBs were enhanced by content distribution networks or encoders is irrelevant, because there was no proof of public performance.

This case thus differs from *Am. Broad. Companies, Inc. v. Aereo, Inc.,* 573 U.S. 431, 431 (2014) in a material respect. In *Aero* there does not appear to be any dispute that the Defendants end users – who actively subscribed to a service rather than merely purchased equipment – actively received the works they selected, whereas here, the receipt of the works in the United States is a fact in dispute, and not adequately proven. Moreover, in *Aereo*, the Defendant was actively recording and then retransmitting portions of the *Plaintiff's channels*. Here, by contrast, Defendants' STBs allowed access on a television to authorized streams already available, created by a party other than DISH, which means Plaintiffs had to prove an additional step in the chain of infringement. It did not.

The Report and Recommendation suffers from the same infirmity, in that it talks broadly about the "offending transmissions," but does not recognize that *as to the registered works*, the only allegations of infringement were made in 2016 pursuant to the Whitehead Declaration. Dkt. 146-8 at 3-4. And from the beginning to the middle 2016, as stated by the Magistrate in this R&R report, monitoring was conducted by Nagravision in Switzerland, and as per Metral testimony at trial, and all that during the same time when the 4 registered works, among other unregistered works, was allegedly aired. Dkt. 329 at 19. The Nagrastar team in Colorado "started after Nagravision." Dkt. 329 at 329-30. Because the Swiss monitoring was not conducted in the United States, this Court should grant the

motion and on reconsideration recognize that the evidence, even if admitted, does not support the finding of infringement of Dish's purported right to transmit into the United States.

## III. Objection: The Evidence Purporting to Show the Use of Encoders Was Unreliable and Did Not Show Them in Use at the Time of the Alleged Infringement.

### A. Defendants Preserved the Arguments that the Court Erred in Admitting Plaintiff's Exhibits 83 and 84, Which in Event Were Not Sufficient to Prove Defendants Used Encoders at the Time of the Alleged Infringement.

The Court relied heavily on Plaintiff's Exhibit 83 [Dkt. 325-74] as proof that Fraifer used encoders provided by a German company called Cetel. Dkt. 337 at 22. However, this document was not authenticated, and was hearsay Dkt. 329 at 175 (objection to admission on these bases and noting "there's no custodian"). The documents were admitted through the testimony of Defendant Fraifer, who actively *denied* their authenticity. Dkt. 329 at 180-81.

Moreover, even if the document passed authenticity muster, it was offered as proof of truth of the matter asserted within it – allegedly that Mr. Fraifer controlled an encoder – but was inadmissible hearsay. Plaintiff's counsel argued that the website from which the information was printed is of the kind regularly relied upon by courts in support of its admission. Dkt. 329 at 176. However, such records must still be certified by a custodian or other qualified witness to be admitted Pursuant to Fed. R. Evid. 803(6), and argument of counsel does not act as such certification.

Finally, Defendants object to the R&R's statement that they waived the argument that the document was not relevant because it shows only a snapshot in time as of the timestamp in its footer dated November 13, 2017 – which is more than a year *after* the claimed initial airing of any of the allegedly infringed works as stated in the copyright registrations, and several months *after* Defendants stopped selling STBs and ceased conducting business in May, 2017. Dkt. 146-8 at ¶¶ 9-10; Dkt. 337 at 10. The "created" and "last modified" dates are of no probative value without competent testimony to explain what they mean, and Dish failed to proffer any such testimony. Defendants Exhibits 117 and 118 show that the "created" and "modified" dates cannot mean the date the particular party first associated with a particular IP address, because if that were the case than CETEL would have had control of the domain name from 2005 through 2017 – in which case, that would prove that Defendants did not control the domains. Dkt. 326-86, 326-87. The argument was made by proffering (and the Court admitting) Defendants Exhibits 117 and 118 (See Dkt. 329 at 180-181) and again in the written closing argument. See Dkt. 333 at 54-56.

### B. Fraj Fraifer's Paypal Payments to CETEL, Which Post-Date the Alleged Infringement and Were Irrelevant.

Defendants object to the R&R's statement that the "infringing conduct transpired over the course of a number of years through and including at least May 2017." Dkt. 394 at 20. The court again erroneously relies on the notion that there was infringement of channels, rather than specific works protected by copyright

law. Dish's witness Johnathan Whitehead testified only to alleged infringement that occurred in 2016. Dkt. 146-8 at 4-5. Plaintiff's Exhibits 76 and 77 (Dkt. 325-67 and 325-68) are not relevant because they post-date the alleged infringement and were made months after Defendant went out of business in May 2017. They do not prove, or even tend to prove, that Defendants controlled encoders in April and May of 2016, when the Registered Works aired, Dkt. 146-8 at ¶ 9. Nor do they prove or tend to prove that those 2017 encoders were used to publicly perform the Registered Works (or any works) in the U.S. on the days they first aired in the United States. or any other days.

The prejudice here is not "the prejudice associated with any probative evidence" [Dkt. 394 at 21] because the evidence was not probative at all. Moreover, the prejudice is unfair because it drew an emotional reaction. *See Cauchon v. United States*, 824 F.2d 908, 914 (11th Cir. 1987). The Court should therefore reject the Report and Recommendation in this issue.

## IV. Objection: Defendants Properly Raised the Issue that Dish Did not Own Exclusive Rights to the Chef Hassan Registered Work that Aired on MBC Massr.

The Report and Recommendation rejects Defendants' arguments as to ownership by relying on *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995), citing *Crunchyroll, Inc. v. Pledge*, 2014 WL 1347492, at *14 (N.D. Cal. Mar. 31, 2014)) for the proposition that Defendants should not be allowed to raise the ownership issue because "there is no dispute

between the copyright owner and the transferee about the status of the copyright." Dkt. 394 at 27, citing Dkt. 246 at 40-41.

But the facts of *Imperial Design* are different than here, because in that case both the author and the transferee were plaintiffs. Moreover, the parties in that case proffered a written memorialization of the transfer after the fact. Here, the declaration of John Whitehead states the ownership based solely on an attached written agreement that does not support his statement. The declaration states: "MBC exclusively licensed all of its copyrights in the works that aired on the MBC Drama, MBC3 also known as MBC Kids, and MBC Masr channels to its affiliate MabMedia LLC ("MabMedia") for purposes of the United States, as shown in paragraphs 1, 3.2, and 9.4 of the redacted copy of the April 26, 2012 agreement attached as Exhibit 4." Dkt. 146-8, citing Dkt. 146-10 at 1-13 (Appendix Pages 91-102). However, on its face, that agreement does not convey any exclusive rights to any channel and much less to any work, and also *does not convey any rights in the MBC Masr channel*, but only the MBC 3 (Kids) and MBC Drama US feeds. See Dkt. 146-10. Where, as here, a party's declaration is directly contradicted by the document that purports to support the declaration, the Court should credit the document as speaking for itself and not give any credibility to the statement. *See, e.g., Rensel v. Centra Tech, Inc.,* 17-24500-CIV, 2018 WL 4410110, at *14 n.17 (S.D. Fla. June 14, 2018) ("where statements in affidavit were flatly contradicted" by writings, "affidavit was wholly without credibility"). Unlike in *Imperial Design*, there is no writing to demonstrate the necessary transfer. Because there is no

writing – even after the fact – and the testimony is based solely on the inadequate contract, Dish failed to prove it owned an exclusive license to transmit the MBC Masr channel and by extension, the Chef Hassan work. The Court should therefore, at the very least, amend its findings of fact to determine that there was no proof of infringement of the Chef Hassan Work (and therefore, no basis for awarding statutory damages for the Chef Hassan Work).

Moreover, Defendants challenged this ownership issue at several stages of the litigation, including, *inter alia*, in their Amended Motion for Summary Judgment [Dkt. 217 at 7-16] and in their Opposition to Plaintiff's Motion for Sanctions. See Dkt. 233 at 6, 11-19. The Court denied the summary judgment and ruled in Dish's favor on the ownership issue. See Dkt 246 (report and recommendation); DKt. 253 (Defendants' objections to Report and Recommendation); Dkt. 257 (order adopting report and recommendation. Thus Defendants did not waive this argument.

## V. Objection: Court Should Reconsider its Finding Willful of Infringement.

Even if the Court does not alter its finding of infringement, the Court should reconsider its finding that the infringement was willful. Dkt. 337 at 33-36. The Eleventh Circuit has explained that willfulness occurs when a defendant either has actual knowledge that the action is infringing, or is acting in reckless disregard of the possibility that it is infringing a copyright. *Olem Shoe Corp. v. Washington Shoe Corp.*, 591 Fed. Appx. 873, 877 (11th Cir. 2015). In *Olem Shoe*, the Court held

that sending cease and desist letters, without more, does not give rise to an inference that a party is willfully infringing. *Id.* at 879. The Court noted that when cease and desist letters do not include copyright registration letters or deposit copies, or otherwise do not provide sufficient information to determine whether the claims were legitimate, they do not create an inference of willfulness. *Id.*

The Report and Recommendation does not address the holding in *Olem Shoe Corp.*, or the quality of the notices that were accepted into evidence, relying instead on the quantity of purported notices regarding "Protected Channels." But the the takedown notices in evidence similarly do not adequately identify the works claimed to be infringed in a manner sufficient to have allowed Defendants to determine whether the claims were legitimate. P's Ex. 18-51; Metral, Dkt. 329 at 118. For similar reasons of having fair notice of the alleged infringement, to be adequate under the Digital Millennium Copyright Act, requires "[i]dentification of the copyrighted ***work*** claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site." 17 U.S.C. 512(c)(3)(A)(ii). But the notices sent to Defendants via Verizon do not identify any single works or even a "representative list of works at that site," but rather identify channels, which are not protected works under the Copyright Act, and without any indication that the party requesting takedown owned exclusive rights in specific works on the channels. *See, e.g*. Pl's Ex 18-51, Dkt. 325-14 through 325-47. Moreover, many of the Dish notices did not mention the channels upon which the four registered works aired

– MBC Masr, MBC3/Kids, or MBC1 See Dkt. 146-8. Whether it was one notice or 182 notices, notices that fail to apprise the Defendants of the works at issue cannot provide adequate notice to support knowledge or willfulness. *See*, e.g. *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 642 (S.D.N.Y. 2011), on reconsideration in part, 07 CIV. 9931 WHP, 2013 WL 1987225 (S.D.N.Y. May 14, 2013) ("a notice merely stating "all songs" by a particular artist, or some other vague descriptor, and nothing more, is inadequate"); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1022 (9th Cir. 2013) (substantially deficient DMCA notices cannot be used to establish knowledge of infringement). The court was seduced by the sheer number of the purported notices, but the proper focus should be first on the adequacy of the notices. *Id.* Because the notices were inadequate to identify the allegedly infringed works, it is an abuse of discretion to rely on them to find knowledge and willfulness.

Rather than address the inadequacy of the notices, the R&R states that because the Defendants temporarily took down the streams upon receipt of the notices, then put the channels back up, the Defendants had to have been aware that their behavior was "illicit." R&R at 394. But it is just as likely that the Defendants paused to investigate, determined that the notices did not give sufficient information to identify the allegedly infringing material, and so put the items back after the investigation. Dkt. 330 at 253-57 (Fraifer testimony regarding investigating allegations and discussing his services with the channel providers and a retired judge who advised him the service was not infringing).

The Report and Recommendation also does not address the uncertainty in the law at the time the notices were sent regarding whether providing a CDN constituted infringement, as opposed to merely acting as a protected internet service provider – this Court has acknowledged that whether providing CDNs to purchasers of the STBs constituted direct copyright infringement was a "close case" and "a question of first impression." Dkt. 337 at 28-31. As argued in the Motion, this Court also found that generally, the use of CDN technology is "perfectly legal, and various companies, such as Verizon, sell CDN services to the public." Dkt. 337 at 17. The Court found to be accurate Defendants' assertion that "a substantial portion, and perhaps all, of the copyrighted programming at issue here was publicly available on the internet for free," and the STBs simply provided their customers "with URL links that allowed customers to access and view what they could access and view on their own, for free, without a STB or CDN." Dkt. 337 at 31; see also Dkt. 330 at 256-57 (testimony regarding free streaming of the channels on the Internet). The R&R merely repeats verbatim the original findings, repeating the statement that "[t]he Infringement Notices plainly stated, and Defendants understood, that Protected Channels should not be delivered to Defendants' STB because works that aired on the Protected Channels were protected by copyright." Dkt. 394 at 31, citing Dkt. 377. Defendants object that the R&R overlooks the Court's important earlier finding that the issues surrounding copyright ownership were "Complex, detailed, and involved intricate, unfamiliar technical information, as well as challenging legal concepts." Dkt. 337 at 10.

The Report and Recommendation does not address this argument, or the case law cited in the Motion demonstrating that when the area of law is unsettled, the belief that the party's actions was not infringement was reasonable and thus it would be erroneous to find willfulness. *Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996). "[O]ne who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful'" for statutory damages purposes. *Kohus v. Graco Children's Products Inc.*, 13 F. Supp. 3d 829, 838 (S.D. Ohio 2014), citing 4 Nimmer on Copyright, § 14.04[B][3][a], at 14–78–14–79. The Court should therefore reject the R&R's decision on willfulness, and instead reverse the finding of willfulness and reduce the statutory damages to no more than $30,000 per work.

Finally, the R&R does not address the argument that the need for deterrence of third parties is met by clarifying the legality of the technology used, and it is not necessary to further deter Defendants, who are out of business. Dkt. 337 at 10; Dkt. 330 at 10. The Court awarded maximum statutory damages here, in part, because Defendants continued to use CDNs after the lawsuit was initiated. Dkt. 337 at 36. But where, as here, a belief that the actions are not infringing is reasonable, the continued use of CDN services after the case was initiated does not show that Defendants acted willfully. Plaintiff's never sought or received a preliminary injunction. The settling of the legal uncertainty is sufficient deterrent, both for these Defendants (who have long ceased to provide CDNs) and future

defendants. Finally, as set forth above, there is not sufficient evidence to show that Defendants (as opposed third parties) used encoders, so the purported "misleading testimony" is neither misleading nor relevant to the statutory damages calculus.

## CONCLUSION

For all of the foregoing reasons and the reasons set forth in the Motion [Dkt. 377], the Court should overrule the R&R, grant the Motion, and amend its findings of fact to hold that Plaintiff failed to meet is burden of proving copyright infringement by a preponderance of admissible evidence, and enter judgment of non-infringement in Defendants' favor. In the alternative, the Court should amend its factual finding that Defendants infringed the Chef Hassan Work (Dkt. 325-4) and remove any award of statutory damages related to that work. Further, whether or not the findings of infringement stand, the Court should amend its factual finding that Defendants committed willful copyright infringement and reduce the award of statutory damages to $30,000 or less pursuant to 17 U.S.C. § 504(c)(1).

Date: October 19, 2023

By: *Dineen Pashoukos Wasylik*

Dineen Pashoukos Wasylik,
FBN 0191620
**DPW LEGAL**
PO Box 48323
Tampa, FL 33646
(813) 778-5161; (813) 907-3712 (fax)
service@ip-appeals.com
dineen@ip-appeals.com
*Attorney for*
*Defendants Gaby Fraifer, Tele-Center, Inc., and Planet Telecom, Inc.*